24-1422

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

### NORTH CASCADES CONSERVATION COUNCIL,

Plaintiff-Appellant,

**v.**

**UNITED STATES FOREST SERVICE**, a federal agency of the United States Department of Agriculture, and **KRISTIN BAIL**, in her official capacity as Forest Supervisor, Okanogan-Wenatchee National Forest, United States Forest Service,

Defendants-Respondents.

_____

On Appeal from the United States District Court
For the Eastern District of Washington – Spokane Division
Honorable Stanley A. Bastian
Case No. 2:22-cv-00293-SAB

_____

_____

## EXCERPTS OF RECORD
## VOLUME 8 OF 9

_____

William H. Sherlock, OSB No. 903816
lsherlock@eugenelaw.com
HUTCHINSON COX
940 Willamette Street, Suite 400
PO Box 10886
Eugene, OR 97440
Telephone: (541)686-9160

Regional Forester, Objection Reviewing Officer
Pacific Northwest Region, USDA Forest Service
Attn:  1570 Appeals and Objection
P.O. Box 3623
Portland, OR  97208

June 9, 2022

RE:     **Objection to the *Twisp Restoration Project* Draft Decision and Final EA; Methow Valley Ranger District, Okanogan-Wenatchee National Forest; Authorized by Kristin Bail, Supervisor, Okanogan-Wenatchee National Forest**

Dear Objection Reviewing Officer:

This Objection to the Twisp Restoration Project ("TRP") is submitted jointly on behalf of the North Cascades Conservation Council ("NCCC," or "Lead Objector"), and Richard Bailey as an individual (together, "Objectors").  We have read and followed the Opportunity to Object Guidelines sent by the Methow Valley Ranger District to ensure that this Objection complies with 36 CFR 218(A)(B); 36 CFR 218.2; 36 CFR 218.5; and 36 CFR 218.8(b)(c) and (d).

Objectors each submitted both Scoping comments, and comments on the Draft EA for the TRP.  These have been the only opportunities to comment on the public record for this project.  Objectors have on occasion met in person, and/or via teleconference with Supervisor Bail, and Methow Valley District Ranger Chris Furr to discuss the TRP and related issues.

This Objection is timely, as the legal notice was published in the Wenatchee World on April 30, 2022.  The 45 day Objection period thus expires on June 14, 2022.  This Objection and supporting documents were mailed on June 9, 2022.  We also submitted several attachments via email prior to the deadline.

We object specifically to the following aspects of the Decision:  **(1)** An undisclosed amount of timber removal in four timber sales impacting 21,971 acres, removing trees up to 25 inches diameter; **(2)** Construction of 2.8 miles of road, reopening 6.0 miles of now-closed road, opening to motor vehicle use 8.0 miles of "unauthorized" roads that will be added to the Forest road inventory, and construction of 4.8 miles of temporary roads; **(3)** a total of 102.6 miles of new hand and/or machine-created fire line; **(4)** Removal of "danger trees" along 110.8 miles of existing roads; **(5)** Prescribed burning of 23,167 acres; and **(6)** Implementation of "Conditions Based Management."

We also object to Service's NEPA process for the TRP, and we raise additional concerns with the Endangered Species Act ("ESA"), and Federal Advisory Committee Act ("FACA").

**Preface/Summary**

1) <u>Rejection of Offered Alternatives</u>:  We object to the denial of the opportunity to submit reasonable alternatives to be included in the EA.

2) <u>Inadequate Range of Alternatives and Inaccurate "No Action" Alternative</u>:  We object to the inclusion of only a single action alternative and the "No Action" alternative in the EA, and the misrepresentation of the conditions that would result from implementation of the No Action Alternative.

AR 12162

3) <u>Project Funding is Not Guaranteed</u>:  The Decision does not articulate how the project Needs would be met for the 20-year project duration given the admission in the economic assessment that funding sources to complete the project are not identified nor confirmed, and may be difficult to obtain.

4) <u>No EIS, Faulty FONSI</u>:  Objectors believe an EIS is required, and object to the "Finding of No Significant Impact" as stated in the Draft Decision.

5) <u>No Disclosure of Anticipated Future Actions</u>:  Objectors contend that after completion of the TRP, further action would be necessary to maintain desired conditions, and that such actions must be disclosed.

6) <u>No Public Comment Period After Changes to the Project</u>:  Objectors contend that the Forest Service should have re-opened the public comment period after major changes were made to the TRP.

7) <u>Segmentation of Connected Actions and Failure to Adequately Analyze Cumulative Effects</u>:  We object to the segmentation of the TRP from the adjacent Midnight Restoration Project (which was originally a part of the TRP) which would be authorized under a separate NEPA analysis after the TRP is implemented, resulting in no cumulative impacts analysis.

8) <u>Inequitable Public Process</u>:  Objectors contend that organizations and interests composing the North Central Washington Forest Health Collaborative have been given exclusive access to information and influence, while all other publics have been denied information, and limited to receiving information and providing comments when the NEPA public record was open.

9) <u>The Effectiveness of Logging in Reducing the Risk of Large Wildfires Has Not Been Validated</u>: Objectors contend that the unique attributes of the Twisp River Watershed have not been identified in the finding that the forest does not meet the HRV or desired conditions, and that the science generally articulating unnaturally dense forests is conflicting.

10) <u>Conditions Based Management is Not Warranted</u>:  We object to the implementation of Conditions Based Management, and contend that the inclusion of this provision denies public access to actual logging prescriptions that will, or could be implemented.

**1) Rejection of Offered Alternatives**

NCCC's comments on the Draft EA included an offer to prepare a second action alternative: "If the USFS is not prepared to develop this type of Alt. 3, NCCC in consultation with others is willing to draft an independent alternative…"  (Copy enclosed as Exhibit 1)

In his response to the TRP Scoping Notice, Bailey submitted written comments dated December 6, 2019 (copy enclosed as Exhibit 2).  These outlined an alternative for management of the Twisp Corridor, including recreation improvements, silvicultural recommendations, and road decommissioning.  Bailey again referenced this alternative and his intention to submit it for inclusion in the EA in his Draft EA comments (copy enclosed as Exhibit 3).

Subsequently, the March 17, 2021 edition of the *Methow Valley News* published an op-ed by Bailey (copy enclosed as Exhibit 4) describing his alternative.  In its March 24, 2021 Edition (copy enclosed as Exhibit 5), the newspaper published a front-page headline story about Bailey's alternative.

However, in an e-mail dated June 3, 2021 (copy enclosed as Exhibit 6), Methow Valley District Ranger Chris Furr denied Bailey's request to include the alternative in the Final EA, informing him that: "...comments, including any suggested alternatives, must be submitted during the comment period for

AR 12163

consideration."  Bailey had in fact submitted his alternative during both comment periods.  Later that month, Bailey requested a meeting with Okanogan-Wenatchee National Forest Supervisor Kristin Bail, which request was turned down via a phone call from Supervisor Bail's staff.

During an in-person meeting on July 6, 2021 with Ranger Furr and TRP project leader Eireann Pedersen, Bailey again disclosed his desire to submit his alternative.  Furr acknowledged that he had seen Bailey's op-ed and read the story in the *Methow Valley News*, but reiterated it was too late in the process for an independent alternative to be considered.  Furr again told Bailey his alternative would not be considered during a December 8, 2021 telephone conference that included Phil Fenner, NCCC's President.

Further, Bailey's disclosure of intent to submit an alternative for inclusion in the EA was not mentioned in the EA section on "Alternatives Considered but Eliminated from Detailed Study."  The EA states: "Some public comments received in response to the proposed action provided suggestions for alternative methods for achieving project needs.  The following alternatives were considered but dismissed from detailed consideration for the reasons summarized below."

However, the EA does not note which alternatives were dismissed, it only dismisses suggestions for changes in project actions while ignoring Bailey's offered alternative, the only actual alternative offered to Objector's knowledge.

In her Draft Decision, Supervisor Bail dismisses consideration of additional alternatives:  "There are no unresolved conflicts that necessitate the development of another action alternative."  The Scoping and Draft EA comments from Objectors bring to light a number of conflicts, including the absence of more than one action alternative.  These unresolved conflicts have not been addressed and appear to have been ignored.

Specifically, Bailey's alternative included a proposal to decommission and rehabilitate Road 4420 on the west side of the Twisp River.  This proposal was designed to eliminate erosion impacts from one of the two roads that parallel the Twisp River and would directly contribute to the satisfaction of the first stated "Need" for the proposal:  "Protect and maintain aquatic, riparian, and hydrologic resources and restore areas impacted by past management.  Increase watershed resiliency to existing and anticipated disturbances, including those tied to predicted changes in climate."

Bailey's proposal included mitigation for reduced access to recreation trails on the west side of the Twisp River by constructing a pack bridge on the east side of the river.  This alternative directly addresses the Needs, and is a reasonable proposal.  Yet it is not mentioned in the Decision, nor was it mentioned in the EA.

NEPA requires the Forest Service to "…rigorously explore and objectively evaluate all reasonable alternatives and to briefly discuss the reasons for eliminating any alternatives that were not developed in detail." (40 CFR 1502.14).  The Decision does not consider Bailey's alternative, nor does it discuss the reasons for refusing it out-of-hand other than the incorrect assertion that it was not timely.

In *Native Ecosystems Council v. U.S. Forest Service* (428 F.3d 1233 (9th 2005)), the Ninth Circuit Court of Appeals found:  "So long as 'all reasonable alternatives' have been considered and an appropriate explanation is provided as to why an alternative was eliminated, the regulatory requirement is satisfied…"

Service foreclosed opportunities to include alternatives in the EA offered during scoping and in comments to the Draft EA.  It did so prior to the Final EA and publication of the Draft Decision. It rejected the offered alternatives with no explanation. See *Environmental Defense Center v. Bureau of Ocean Energy*

AR 12164

*Management*, 2022 WL 1816515 at *14 (9th Cir. 2022) ("The existence of a viable but unexamined alternative renders an [EA] inadequate.") (alteration in original) (quoting *Western Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013))).

### 2) Inadequate Range of Alternatives and Inaccurate "No Action" Alternative

The Service's obligation to consider a reasonable range of alternatives is at the "heart" of NEPA. *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 757 (2004). NEPA requires the Service to do so in an Environmental Assessment ("EA"), not just in an Environmental Impact Statement ("EIS"). *Environmental Protection Information Center v. U.S. Forest Service* ("*EPIC*"), 234 Fed.Appx. 440, 443 (9th Cir. 2007). Under NEPA, the Service must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). Project alternatives derive from the "Purpose and Need" statement, which briefly defines "the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." *City of Carmel-By-The-Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142 (9th Cir.1997); 40 C.F.R. § 1502.13. The stated goal of a project necessarily dictates the range of "reasonable" alternatives, and an agency cannot define its objectives in unreasonably narrow terms. *Id.* at 1155. The Ninth Circuit consistently holds that failure to consider a reasonable alternative is fatal to an agency's NEPA analysis, even in the context of an EA. *E.g.*, *EPIC*, 234 Fed.Appx. at 443.

In short, providing only one action alternative defeats the purpose of NEPA, which is to provide a number of options to address a specific "Purpose and Need" with selections that would achieve objectives while minimizing or eliminating specific environmental impacts.

In its Draft EA comments, NCCC contended that at least one additional action alternative is necessary due to the then-30-year (now reduced to 20 years) duration of the project; unproven long-term funding; more "surgical" silvicultural prescriptions; and attention to expanding forest ecology information. Further, NCCC stated that the EA fails to provide an objective comparison of the effects of the two alternatives presented, the no action) and preferred alternatives, and that an EIS is required for a project of this magnitude and level of controversy. See, e.g., *Bark v. U.S. Forest Service*, 958 F.3d 865, 870 (9th Cir. 2020) ("Substantial expert opinion presented by the Appellants during the administrative process disputes USFS's conclusion that thinning is helpful for fire suppression and safety.").

NCCC also raised several issues the present action alternative fails to address. These include unanticipated, but likely natural occurrences such as wildfire that would necessitate changes in the project; the absence of a viable monitoring plan; and no consideration of the increased impacts from climate change. The failure of the single action alternative to address these concerns, and the absence of a range of alternatives, has left these concerns unanswered.

NCCC also noted that the comparison of the two alternatives is inaccurate, as it fails to consider the benefits that would result from no action: "The extensive interventions under Alt. 2 (preferred) purport to substitute management actions for nature's own self-healing restoration as a result of natural succession, but there is no analysis that compares the outcomes of the two alternatives in the detail that is needed to make an informed choice."

Conflicting science as to the effectiveness of fuels reduction treatments in reducing wildfire risk (see infra, "The Effectiveness of Logging in Reducing the Risk of Large Wildfires Has Not Been Validated") is another reason the Forest Service must provide a range of alternatives. Additional Alternatives must address whether logging is a viable solution to alleged unnatural fuel loading and what other options or alternate means of treatment exist, and also the question as to whether fuel loading in the Twisp River

Watershed is in fact outside the Historic Range of Variability (HRV). For example, an alternative should have been developed that identifies naturally-occurring dense stands of timber and protects them for habitat, while concentrating thinning only in previously logged areas where dense timber stands evolved as a result of past logging.

Further, the Draft Decision states: "Some northern spotted owl habitat will be temporarily removed, downgraded or degraded by thinning treatments, but no permanent loss of habitat will occur." This statement could be applied to virtually any stand of old growth owl habitat. Eventually, even a clear-cut would likely return to "owl habitat" (presuming there are any owls remaining), but it would take at least a century of undisturbed growth following replanting. An alternative should have been developed that would preclude thinning in matrix stands that provide owl habitat. Such an option would eliminate admitted impacts to an ESA listed species that continues to decline despite habitat protection measures implemented via the Northwest Forest Plan. The Endangered Species Act does not permit temporary degradation of habitat for listed species.

With only a single plan of action, the deciding officer and the public receive no presentation of options that exist to fulfill the project Needs while reducing or eliminating environmental impacts. A range of alternatives should provide for: diverse silvicultural prescriptions; different options for areas of logging and prescribed burning entries; alternate options for road construction and decommissioning; standards for governing removal of trees; an option that precludes implementing "Conditions-Based Management;" and a means of addressing long-term funding issues.

Finally, the consequences of the no-action alternative are presented as an exaggerated scenario. The Decision arbitrarily limits responses to ongoing issues involving roads, culverts, Road's End Campground, and forest structure to doing nothing, thus allowing alleged damage to continue.

To present a valid scenario of taking no action with regard to forest health, the EA should, for example, describe the various fire scenarios that could occur, and how each would impact the forest and the downriver property owners—*if* a fire were to occur—with and without fuels reduction treatments.

It should also disclose the reasons three fires that impacted the Twisp River Drainage over the past eight years have been effectively controlled, and what the ecological impacts and benefits of the fires were. The reality of recent fires being effectively controlled suggests at least part of the rationale for fuels reduction actions proposed in the TRP is unjustified.

These concerns were referenced in both NCCC's comments on the Draft EA and in Bailey's Draft EA comments.

**3) Project Funding is Not Guaranteed**

The economic study that was prepared for the TRP was for the 77,000-acre project, not the revised 24,000-acre project. Therefore, the revenue generated would be far less, due to the decreased area where commercial logging would occur. This leaves many unanswered questions, most important, how will the aspects of the project that don't involve logging be guaranteed?

The economic report by Matthew Avery, dated October 5, 2020, over a year before the TRP was changed, makes clear that funding to complete the non-timber cutting aspects of the TRP is not guaranteed. He even notes that funding is lacking for existing, necessary management actions apart from the TRP: "The proposed action would require a level of investment that may not be possible with the current or expected levels of appropriations…"

AR 12166

8-ER-1385

Further, there is no board-foot estimate of how much commercial timber would be removed, so there is no way to determine how much revenue logging will generate. If funding runs short, the project could be left half-finished, with only the logging aspect (the revenue generating aspect) completed. This would not satisfy the Needs as articulated in the EA and Decision.

Under "Project Issues and Concerns," the Economic Report lists only one concern, the revenue generated from logging. However, many commenters, including Bailey, raised the issue of impacts to recreation use due to log truck traffic, and the noise, dust and other impacts of commercial logging operations.

The report does not ascribe revenue lost to the local community associated with the degradation of recreation quality in the Twisp Corridor due to logging activities and the alteration of the natural setting. Recreation use in the Twisp Corridor has particular value to the town of Twisp, as the recreation use that occurs from people outside the community must travel through the middle of town to access the six campgrounds and nine trailheads in the Corridor.

## 4) No EIS, Faulty FONSI

The Finding of No Significant Impact ("FONSI") for the TRP, given the scope and nature of the project, was arbitrary and capricious. An EIS should have been prepared as a matter of law. As recently confirmed by the Biden Administration, an EIS is required if "the effects of the Project are highly controversial and uncertain" from a scientific point of view. *Bark*, 948 F.3d at 870; *see also* NEPA Regulations Revisions, 87 F.R. 23453 (confirming that NEPA analysis requires "decisions informed by science"). The TRP takes place over tens of thousands of acres containing no fewer than seven ESA-listed species. 40 C.F.R. § 1501.3(b)(1). The FONSI and EA contain no "convincing statement of reasons to explain why [the TRP's] impacts are insignificant," *Bark*, 948 F.3d at 869, in light of the TRP's size and impact.

The Draft Decision describes:

*An undisclosed amount of timber removal in four timber sales.* We could find no description of the volume of timber that will be removed in board feet, nor number of trees to be removed. The impacts of removing trees up to 25 inches diameter, including fire-resistant ponderosa pine and Douglas fir over 21,971 acres, cannot be evaluated unless the amounts to be removed, and their locations are disclosed. No trees that were present prior to fire suppression and commercial logging in the project area should be removed, but we found no provisions protecting trees of the age class that indicate they are naturally-occurring and not due to fire suppression and logging. Moreover, the application of Based Management precludes accurate depictions of trees to be removed (see *infra*, "Conditions Based Management is Not Warranted.")

*Construction of 2.8 miles of road, reopening 6.0 miles of now-closed road, opening to motor vehicle use 8.0 miles of "unauthorized" roads that will be added to the Forest road inventory, and construction of 4.8 miles of temporary roads.* The opening/construction of new roads totaling 21.6 miles can produce a variety of adverse environmental consequences, including erosion impacting listed trout and salmonid populations, weed spread, wildlife harassment, human-caused fires, and increased unauthorized ATV use. The impacts of construction and opening of these roads are potentially highly significant and were not given adequate review in the EA, nor are said impacts mitigated by the proposed closure of other roads. The Decision states: "The project area includes many unauthorized roads that are causing resource concerns." How then, can incorporating eight miles of unauthorized roads into the Forest system, opening six miles of now-closed roads, and construction of 7.6 miles of new road be justified?

*A total of 102.6 miles of new hand and/or machine-created fire line.* The impacts of these proposed fire lines, an undisclosed amount being bulldozed, to contain prescribed burns or create permanent fuel breaks

AR 12167

are not adequately evaluated, and their locations are not revealed. Long-term impacts, including compaction and creation of conditions favorable to weeds, and use of fire line "trails" by off-road vehicles post-project, are not objectively considered.

*Prescribed burning of 23,167 acres.* The burning itself, and the potential for loss of control of these burns constitutes a significant threat to the project area that is inadequately analyzed and evaluated.

*The proposed removal of "danger trees" along 110.8 miles of existing roads.* Standards for determining danger trees are not sufficiently outlined, and there appears to be no documentation of actual danger posed by standing trees via presentation of information describing harm to people or property damage from falling trees on the Okanogan-Wenatchee National Forest.

As previously noted, the Decision states: "Some Northern Spotted Owl habitat will be temporarily removed, downgraded or degraded by thinning treatments…" A purported "temporary" reduction in habitat within areas designated as Matrix under the Northwest Forest Plan, with the claim that habitat may be improved at some point in the future, does not constitute an acceptable risk given immediate owl habitat needs. The TRP would have a *significant impact* on owl habitat.

The Decision notes that seven ESA listed species exist in or near the project area. It also states with regard to listed fish species: "Two actions included in Alternative 2 (preferred) may cause short-term, adverse effects to these species that could result in a "Take…" Such risk constitutes a significant impact. Habitat for all seven species will be extensively modified, and the activities proposed, even if they proceed as planned with no issues such as prescribed burns escaping containment, there will be unavoidable impacts.

All of these proposed actions cannot be brushed aside as having "no significant impact," particularly when the EA fails to adequately consider their environmental consequences. Also, Conditions-Based Management will allow departure from the projected impacts of proposed logging activities. These oversights and omissions cast a pall over the FONSI decision. The impacts of the project cannot be quantified as Conditions Based Management negates any realistic projection.

Objectors have a major concern over the EA's overall lack of depth in evaluating ecological impacts that would be ameliorated by a properly prepared EIS. The Preferred Alternative would essentially reconstruct the forest of the Twisp Watershed to conform to a condition that is not adequately validated as "unnatural," nor outside the Historic Range of Variability (HRV). Depictions of present conditions do not appear to be based on complete scientific investigation of what the conditions were prior to the advent of modern firefighting and the logging practices of the past within the Twisp Watershed. An EIS would incorporate a broader variety of information regarding historic forest conditions that could present scenarios of an HRV that is specific to the Twisp River Watershed. If no such information exists, the depiction of present forest conditions as undesirable is purely speculative.

Objectors cannot agree that the actions proposed in the TRP will have no significant impact on ESA-listed species, existing habitat for a number of other forest-dependent wildlife species, water quality, or impacts to recreation use in a popular recreation corridor. Log truck traffic, displacement of recreational use due to logging activities, and alteration of forest conditions from semi-primitive to logged, including skid trails, slash, stumps and other accouterments of commercial-scale logging, will have impacts in a highly popular recreation corridor that cannot be dismissed as insignificant.

The EA states: "Treatments…would have a beneficial long-term impact on economic sustainability and sustainable recreation by promoting resilience to expected disturbances from wildfires, insects and disease, and climate change …" However, the document fails to articulate why a forest that *might* be

AR 12168

impacted by a fire, or insects and disease, is less desirable for recreation than a forest that *will* be logged, and thus show accompanying unnatural characteristics. When so many of the over 1,000 comments on the Draft EA expressed concerns over the project's impacts to recreation use, what basis is there for this conclusion? Local residents walk, bike and access their property on Twisp River Road, but the impacts of extensive traffic from log trucks and heavy equipment movement have not been quantified. An objective analysis would provide figures for present use of the road, and the projected increase in traffic due to logging and other related operations.

In its Draft EA comments, NCCC expressed concerns related to the failure to prepare an EIS in the context of the project time frame. It cites the EA's economic report that indicates unstable funding sources that could preclude or hamper the proposed project duration. An EIS would provide presently missing "escape plans" to alter management scenarios based on the lack, or absence of funding in the future. NCCC's Draft EA comments state: "The commitment to an undefined sequence of actions through the Draft EA for a period of 30 [since reduced to 20] years is not a responsive nor responsible planning process under NEPA."

Finally, given the magnitude of the TRP in area, scope and time, a watershed-level EIS is needed, so that multiple alternatives can be developed, reasonable independent alternatives can be included, listed species will be protected through adaptive monitoring, and a more thorough analysis can be conducted.

The need for an EIS is noted both in NCCC's Draft EA comments and in Bailey's Draft EA comments.

**5) No Disclosure of Anticipated Future Actions**

Realistically speaking, we question the viability of the assertion that the Forest Service can reverse the alleged impacts of over 100 years of fire suppression and high-grade logging in one fell swoop. That aside, the EA fails to disclose future actions that will be necessary to keep the forest in its remanufactured post-project condition. There is no articulation of how the TRP will meet the stated project "Needs" over the long term. If there are no future actions, the Needs will ultimately not be met, because the EA fails to explain how conditions contrived by the project will sustain, or emulate the centuries-long processes of natural forest succession. It should be assumed the forest will return to its present condition.

The EA does not articulate whether naturally-ignited wildfires will be allowed to burn post-project. If they will not, how will the conditions produced by the TRP to correct problems created by past fire suppression be maintained? Or, if naturally-ignited fires will be allowed to burn, thus resuming fire's role in forest succession, what measures will be taken to reduce the risk of unnaturally large wildfires? If the Forest Service claims the forest is going to remain static, it must validate this assumption by disclosing what future actions, including further silvicultural treatments, will be needed.

The EA discloses no "end game," where the forest will be impacted only by natural forces, or conversely, if perpetual forest management/manipulation via logging, prescribed burning, or other human actions will be necessary. The failure to disclose future actions violates NEPA. 40 C.F.R. § 1501.3(b); 40 C.F.R. 1508.1(g)(3) (defining "[c]umulative effects"); *see also Tinian Women Association v. U.S. Navy*, 976 F.3d 832, 838 (9th Cir. 2020) ("The rationale for evaluating cumulative impacts together is to prevent an agency from 'dividing a project into multiple actions 'to avoid a more thorough consideration of the impacts of the entire project.") (quoting *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 894 (9th Cir. 2002)).

**6) No Public Comment Period After Changes to the Project**

AR 12169

During the Forest Service's January 26, 2022 public presentation, the public was first informed of major changes to the TRP. However, the public record was never re-opened to provide for comments on the changes prior to publication of the Final EA. The decision not to reopen the TRP for public comment violates NEPA, as the current TRP is significantly different from the original proposal and contains significantly different elements and impacts. 40 C.F.R. § 1500.3(b)(1). This is the antithesis of federal decision-making informed by the public, as the public was afforded no opportunity to comment on the TRP as currently planned.

NEPA requires Service to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures." *Id.* § 1506.6(a); *see also id.* § 1506.6(b) (setting out additional NEPA requirements for public involvement and notice). Objectors fail to see how Service could have complied with NEPA's public notice and comment procedures by failing to reopen the comment period following the drastic changes shown in the EA for the current TRP.

The original Scoping Notice and Draft EA proposed and analyzed a 77,000-acre TRP. It was reduced to 24,000 acres, and several significant changes were made purportedly due to the Cedar Creek Fire. The Forest Service should have allowed public comment after the Cedar Creek Fire burned 10,600 acres of the project area and "other considerations" necessitated a major change in the project.

The changes to the TRP were outlined in a description that included a change in the size of the project from 77,000 acres to 24,000 acres, reduction of the project timeline from 30 years to 20 years, and the elimination of designated Late Successional Reserves and roadless areas from the project. Yet how those changes were integrated into the other aspects of the project are not disclosed in the Draft Decision.

The announced TRP changes are not just a matter of scaling down the project with exactly the same elements. It is a changed TRP with different elements and substantially different environmental impacts and purported benefits than were contained in the original proposal. For example, review of the 2020 and 2022 maps of treatment units show significant changes in the logging prescription boundaries within the same area. The public should have had the opportunity to comment to allow input that informed the decision-making process, as required by NEPA.

The document describing the project changes indicate it was altered primarily due to the 2021 Cedar Creek Fire. Yet the EA does not fully explain why the project was subsequently reduced by 53,000 acres when the fire had only burned 10,600 acres. If it was due to the elimination of the roadless areas and LSR's, the reason for their elimination, and also for their initial inclusion in the project area, must be explained.

The Decision does not describe how the project objective of reducing the risk of wildfire by altering the forest structure will be achieved when the scope of fuels reduction was shrunk by 53,000 acres. The Draft EA claimed that the "landscape-level" expanse of the original project was integral to the achievement of its objectives.

This issue arose only after the Draft EA comment period was closed. Therefore, it is by rule exempt from the requirement that issues raised in this Objection must have been raised in previous comments: "…unless the objection concerns an issue that arose after the designated opportunity(y) for comment…". 36 C.F.R. § 219.53(a).

## 7) Segmentation of Connected Actions and Failure to Adequately Analyze Cumulative Effects

The current EA and FONSI for the TRP fails to analyze the effects of, or even mention, the known projects that will occur in the area eliminated from the original TRP. By doing so, Service failed to

AR 12170

adequately account for an analyze the cumulative effects of the TRP. 40 C.F.R. § 1508.1(g)(3). Cumulative impacts analysis requires an agency to "give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment." *Lands Council* 395 F.3d at 1027. "A proper consideration of the cumulative impacts of a project requires some quantified or detailed information; general statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Management*, 387 F.3d 989, 993 (9th Cir.2004) (internal quotations omitted).

The standard of analysis is not reduced because the NEPA document produced is an Environmental Assessment, rather than an EIS. *Kern v. U.S. Bureau of Land Management*, 284 F.3d 1062 (9th Cir.2002) ("Given that so many more EAs are prepared than EISs, *adequate consideration of cumulative effects requires that EAs address them fully.*") (quoting Council on Environmental Quality, *Considering Cumulative Effects Under the National Environmental Policy Act* at 4, Jan. 1997) (emphasis in the original). Therefore, case law applicable to cumulative impacts analysis in an EIS is equally applicable to the current TRP EA.

In *Lands Council*, the court described an EIS that failed to meet the standard of an adequate catalogue of past, present and future actions. The court said the EIS:

> . . . generally describes the past timber harvests, gives the total acres cut, with types of cutting, per decade, and asserts that timber harvests have contributed to the environmental problems in the Project area. But there is no catalog of past projects and no discussion of how those projects (and differences between the projects) have harmed the environment. Apart from a map in the Project file that shows past harvests, with general notes about total acres cut per watershed, there is no listing of individual past timber harvests. Moreover, there is no discussion of the connection between individual harvests and the prior environmental harms from those harvests that the Forest Service now acknowledges. Instead, the Final Environmental Impact Statement contains only vague discussion of the general impact of prior timber harvesting, and no discussion of the environmental impact from past projects on an individual basis, which might have informed analysis about alternatives presented for the current project.

*Id.* at 1027. The court found that this level of disclosure failed to meet NEPA's purpose of providing "a sufficiently detailed statement of environmental impacts . . . to permit informed decision making." *Id.*

Similarly, in *Klamath-Siskiyou Wildlands*, the court found that, although the two EAs under consideration contained sections of over a dozen pages labeled cumulative effects, "a close read reveal[ed] that those sections [did] not adequately discuss the subject" because they only discussed the direct effects of the project" in their own "minor watershed." 387 F.3d at 994. The court found that a table, described as presenting in graphic form the cumulative effects of the project on an extensive list of criteria, did "not actually provide a useful analysis of the project" because it only provided an analysis of direct effects of four timber sales on their own watersheds, and provided no larger analysis of the significance of these effects as a whole. *Id.*

In this case, Service has indicated its intention to proceed with NEPA analysis of the Midnight Restoration Project. In her April 4, 2022 letter to Phil Fenner, OWNF Supervisor Kristin Bail states: "Midnight Restoration will be a new project that is developed as a result of the reduction of the Twisp Restoration Project footprint." (Copy enclosed as Exhibit 7.)

AR 12171

The Midnight project will encompass the area that was eliminated from the original TRP. The Wilderness Society, a member of the North Central Washington Forest Health Collaborative (NCWFHC), commissioned a study in March 2022 that makes specific recommendations for silvicultural treatments within the area eliminated from the TRP (study sent via email). These were based on discussions with the Forest Service at the November 3, 2021 meeting of the Collaborative.

Segmenting the TRP from the planned Midnight Project will result in two separate NEPA analyses for conjoined actions. The Forest Service has already established that the two projects are connected, as what is now the Midnight Project was originally part of the TRP as a single action. *See* 40 C.F.R. § 1501.3(b) ("Agencies should consider connected actions consistent with § 1501.9(e)(1)."; *id.* § 1501.9(e)(1) ("[Agencies shall consider a]ctions (other than unconnected single actions) that may be connected actions, which means they are closely related *and therefore should be discussed in the same impact statement*.")

The revised TRP EA does not consider its impacts on habitat and watershed values conjoined with the impacts that will result from the Midnight project. Proceeding with the TRP decision and following with the planned Midnight project under a separate decision would preclude analysis of both project's cumulative impacts. Thus, the TRP decision violates NEPA, since it does not reference the Midnight project. Its impacts will be irreversible, and given its 20-year duration, impacts from the TRP will continue after the Midnight project decision is completed, assuming it will be completed within the next 20 years.

The TRP decision excludes 10,600 acres originally planned for treatment due to the Cedar Creek Fire. However, the impacts of the actions proposed in the TRP have not been analyzed with consideration for the impacts of the fire, and the commercial logging that occurred as part of the firefighting effort. The logging operation during the fire removed what appeared to be around two million board feet of timber, with no NEPA process. The cumulative impacts of the fire, the logging, and actions planned in the TRP must be considered. For example, if the fire and the logging created increased soil erosion, this must be considered when assessing the potentials for increased erosion with the TRP.

Originally, what is now called the Twisp Aquatic Restoration Project (TARP) was part of the TRP. It was suddenly separated, and a 20-day comment period was allowed. However, no Objection period was observed. NCCC commented on TARP, and the response from project manager Lance George indicated there would be a commercial logging component that was not mentioned in the decision. Originally, the only tree removal was for instream structures. However, Mr. George corrected that statement and said there would not be a commercial logging component. Still, the cumulative impacts of the timber removal for instream structures for the now-ongoing TARP with the TRP were not considered.

The issues in this section of our Objection were brought to light only after discovery of the existence of the Midnight project, the segmenting of the TARP, and after the Cedar Creek Wildfire and the logging that accompanied it had occurred. These were discovered only after the close of the Draft EA comment period. As previously noted, the EA comment period was never re-opened to allow concerns to be raised over the joint analysis of the Cedar Creek Fire, the logging, and the TRP. However, on page 9 of his Draft EA comments, Bailey notes that disclosure of future actions needed to maintain contrived forest conditions is necessary.

## 8) Inequitable Public Process

Our primary concern with public process is over a November 3, 2021, presentation by Methow Valley District Ranger Chris Furr to the North Central Washington Forest Health Collaborative. At this meeting, Ranger Furr announced major changes in the TRP and sought the Collaborative's input. After NCCC discovered this, we convened a teleconference with Furr that occurred on December 8, 2021. We

AR 12172

requested that he provide the information he had disclosed to the Collaborative to the rest of the public. Ranger Furr refused to do so.

We then convened a January 18, 2022 telephone conference with OWNF Supervisor Kristin Bail. NCCC and Bailey objected to Ranger Furr's refusal. She declined to pursue corrective action to resolve the issue. (We are forwarding a transcript of this conversation via email.)

On or about March 20, 2022, NCCC discovered that during the November 3, 2021 meeting, Ranger Furr also disclosed the existence of the aforementioned Midnight Restoration project to the Collaborative.

In an April 18, 2022 letter to Supervisor Bail (copy attached as Exhibit 8), NCCC objected a second time to the special access given to the NCWFHC with regard to the Midnight Restoration project. Her response is cited above. She found Ranger Furr's actions were appropriate.

However, as far as we can tell, the Midnight Restoration project still has not been revealed to the public, despite a question from a participant at the January 26, 2022 presentation as to what plans might exist for the areas eliminated from the original TRP. Service responded that no plans were presently in the works for that area.

The changes to the TRP were finally revealed to the public at the January 26 presentation, but as explained above, Service declined to re-open the public record. Thus, the Collaborative was given special opportunities to influence both the TRP and the Midnight project, but no other publics were allowed to be involved in, or comment on either one.

At the April 13, 2022 meeting of the NCWFHC Steering Committee, Mike Anderson of the Wilderness Society (co-chair of the NCWFHC) made the following statement. Ranger Furr was in attendance, and spoke after Anderson's presentation in support of his propositions:

"On Midnight (restoration project)…we did want to…revisit the discussion we had within the Steering Committee back in December…(actually November 3) when the Forest Service came to us and asked if we wanted to take on a collaborative Midnight Restoration Project, and we didn't reach consensus at that point, but some within the Collaborative did move forward with the development of a pre-NEPA landscape analysis and prescription, which was prepared by Sean Jeronimo with Resilient Forestry under contract with The Wilderness Society…and I think as a general consensus from those concerned about Midnight project is that next steps are to develop a proposed action…a purpose and need statement…based upon the landscape prescription that Sean Jeronimo has put together…I've gotten a cost estimate for them to kind of lead us through the development of the purpose and need and the proposed action, and so I think if we do have consensus from the steering committee for working together on those next steps leading up to the actual beginning of a NEPA process with the scoping…"

This transcript was made from a recording of the meeting by virtual attendee Phil Fenner. (We have forwarded the recording via email.) Methow District Ranger Chris Furr was in attendance and spoke in support of Anderson's propositions following the presentation. At present, the Collaborative has not posted minutes of the meeting, and has not responded to our requests for minutes, so we do not have that documentation as yet.

A February 2, 2022 story in the Methow Valley News states: "The [Methow Valley] Ranger District and North Central Washington Forest Health Collaborative met in November to discuss their options. They considered two approaches: keeping the boundaries [of the TRP] the same and evaluating the fire impacts as part of the overall environmental analysis; and eliminating watersheds burned in the fire and relying on the original analysis for the unaffected areas…they chose option 2." (Copy enclosed as Exhibit 9.)

We strenuously object to what appears to be a conscious attempt to cut the public outside the Collaborative out of the public process. The Forest Service has provided the Collaborative with information that was later denied to the rest of the public. It has provided NCWFHC with opportunities to influence the TRP and Midnight projects that other publics have not had. The Collaborative is assuming the Forest Service's role in coordinating the NEPA process for Midnight. The rest of the public can only react to an already-developed project after the Collaborative has had exclusive, preemptive opportunities to be directly involved.

The public outside the Collaborative can only react at some unforeseen time to a proposed action that has already been created between the Forest Service and a select group of publics as represented by the Collaborative. The Collaborative thus has an inside track on project development, and has "buy-in" that will make it more difficult for other publics to inspire meaningful changes.

This one-sided process has allowed the Collaborative to create specific silvicultural prescriptions via the Resilient Forestry recommendations, and will allow it to facilitate the NEPA process for Midnight, when other publics were told no further plans were in the works for areas eliminated from the original TRP, and have not even been informed that a project is being considered. Objectors have only been allowed to obtain information and provide input on the record during the TRP comment periods, but the Collaborative has been able to assist in the development of the project pre-NEPA, and outside the public record.

As soon as Service made the decision to proceed with the Midnight Project, it should have allowed all publics to be involved. The decision should have triggered a public scoping notice in November 2021.

If the record would have been re-opened after the announcement of changes to the TRP, and the Midnight project would have been scoped, Objectors would have provided comments that could have influenced revisions. NCCC would have sent an information alert to its membership and informed Service that the impacts of the Cedar Creek Fire and the commercial logging operation that occurred during the firefighting effort required a supplementary NEPA analysis. Objectors would have again asked for our alternatives to be included in the EA.

It would appear based on the above facts that the Collaborative is acting more like a FACA Committee than a Resource Advisory Committee under the 2009 Collaborative Forest Landscape Restoration Act [Title IV PL 111-11 Omnibus Public Lands Management Act, and PL 106:393 (Section 205) Resource Advisory Committees (Title IV)].
Whether or not this relationship violates black letter law, we contend it is unacceptable and must be addressed by Service. Unquestionably, the public process for the development and advancement of the TRP has been undemocratic and may raise issues with the First Amendment of the U.S. Constitution's right to petition the government, and the Constitution's guarantees of equal protection. At the very least, Service's relationship with the NCWFHC undermines NEPA's mandate to foster and encourage meaningful public participation in determining how to proceed with environmentally sensitive proposals such as the TRP and Midnight projects.

Objectors have been denied equal access to information and opportunities to influence decision-making despite our good faith involvement in the process since we first learned of Forest Service plans that would impact the Twisp River Watershed. Nor has the rest of the public been given equal opportunity to be involved in the development of a project that could have grave impacts to a highly treasured place of tremendous public importance and concern—the Twisp River Corridor.

AR 12174

Our discovery of the relationship between Service and the NCWFHC occurred only after the close of the comment period for the TRP Draft EA and all other comment periods.

**9)  The Effectiveness of Logging in Reducing the Risk of Large Wildfires Has Not Been Validated**

The TRP EA provides neither adequate nor objective, site-specific information to illustrate how the forests of the Twisp Watershed are unnaturally overcrowded, nor has Service shown how the forests have otherwise departed from the HRV.  If the claim is that past fire suppression has altered the natural forest composition, then Service must disclose the history of fire suppression in the Twisp Watershed.  We found no such information in the EA

We also found no site-specific information indicating what the natural frequency of dense stands composed of different tree species was in the Twisp Watershed prior to fire suppression and logging activities.

The HRV as presented in the EA is not based on complete historic information, it is an estimate based on limited historical records and projections.  Even if accurate depictions of pre-logging and fire suppression forest conditions were available for the Twisp River Watershed, past forest conditions cannot be accurately quantified via snapshots from a frozen point in time.  There must be consideration of natural forest succession.  Parts of the Twisp forest went through divergent stages of evolution over a vast time frame.

Moreover, the EA has not delineated naturally occurring dense timber stands from those occurring due to past logging.  As for dense stands that resulted due to fire suppression, it would not be possible to objectively quantify those that might not have otherwise existed, because modern fire suppression may not have been occurring for a longer period of time than estimated fire frequency for the Twisp forest.

To address fire risk reduction, the EA fails to validate its claim that the Twisp Watershed does not meet "desired conditions," or that the existing conditions, and not climate change, are creating an unnaturally extreme fire hazard.  The EA fails to establish that the forest is more susceptible to wildfire, due to past logging and fire suppression, or that it could experience a larger wildfire than would naturally occur.

The EA states:  "The ID Team used the Okanogan-Wenatchee National Forest Restoration Strategy (USDA 2012) by applying the Ecosystem Management Decision Support framework (EMDS) to compare existing landscape characteristics to likely historical conditions and projected conditions under future climatic settings.  These management directions and guidance helped identify several needs in the project area, described below with specific instances of current conditions that have departed from desired conditions."

The Decision states:  "…no research has been published that provides a strong basis for countering the research used in this analysis."  We disagree.

Since the publication of the 2012 Restoration Strategy, new information has emerged that contradicts the portrayal of "desired conditions," and that delineate "desired" conditions from actual historic conditions.  These can be referenced in a paper called *Everything you wanted to know about wildland fires in forests but were afraid to ask…"* (Ingalsbee, DellaSala, Hanson, 2018; sent via email.) This paper states:  "Over historical timelines, recent amounts of forest acres burned and high-severity burned acres each year are still within the natural range of variation for the past century, and far below the normal tens of millions of acres burned before the 20th century…"

AR 12175

In its Draft EA comments, NCCC contends that the portrayal of unnaturally dense stands of timber and excessive fuel loading differs across the Twisp Watershed, and that these differences are not identified, nor have the impacts of climate change ben adequately evaluated for its role in recent large wildfires. There are locations that don't meet the criteria of not meeting the HRV, or satisfying desired conditions. There are few or no goals for different sites and conditions to be achieved.

There is also no articulation in the EA of the unique character of the Twisp forest due to its geographic location: a "wet" ponderosa pine/Douglas fir ecosystem that experiences relatively heavy amounts of precipitation compared to other semi-arid forests, and which has adapted to fire in ways distinct from other ponderosa pine/Douglas fir forests. The EA makes no notation that the Twisp forest is naturally more dense than other east-side ponderosa pine-Douglas fir forests, thus increasing the natural frequency of dense timber stands.

The EA also disregards studies that show the project could actually facilitate forest conditions that would be more conducive to an unnaturally large wildfire. In particular, a study by Curtis Bradley, et al, *"Does Increased Forest Protection Correspond to Higher Fire Severity in Frequent-Fire Forests of the Western United States?"* (copy sent via email), surveyed 1,500 wildfires over a 30-year period. It found forests that had been selectively logged, including specific fuels reduction treatments, experienced more severe fires than areas that had never before been logged.

In a paper titled *"Adapt to More Wildfire in Western North American Forests as Climate Changes,"* Tania Schoennagel at the University of Colorado, and eleven other forest ecologists found that "…fuels reduction cannot alter regional wildfire trends." (Copy sent via email.)

We cite the above documents to illustrate that the EA is inadequate, that the alternatives offered do not address conflicting scientific information, that the Needs as described will not likely be met, and that the project may exacerbate fire danger. *See also Bark*, 958 F.3d at 871 ("Appellants thus have shown a substantial dispute about the effect of variable density thinning on fire suppression.")

It is clear that the TRP's validation for its claims that the project will reduce wildfire risk is inadequate, or at the very least in scientific dispute. Logging as proposed in the TRP would have a significant impact on the forest ecosystem and on downriver homeowners because it will remove live trees, reducing carbon storage, thereby exacerbating climate change. It will remove the more fire-resistant trees, up to 25 inches diameter. Logging will open the forest canopy resulting in quicker and more thorough drying of ground fuels due to increased exposure to hot winds and sunlight.

The existence of contradictory studies cries for a suite of alternatives in an EIS that considers all the various scientific information, and proposes diverse solutions to meet the stated Needs. The impact of thinning a critical mass of dense stands on species that require dense stands for habitat has not been considered in the EA. The TRP Decision claims: "Outside of mature stands, the landscape will become more open, emulating pre-suppression era habitat conditions, which will improve retention of large trees." However, the Decision fails to disclose that reduction of an uneven forest canopy, including the removal of medium-sized trees characterized as "ladder fuels," will result in more direct impact to large trees from wind, and thus will increase the potential for blowdown. Prescriptions in the Decision call for tree densities of 15 trees per acre, leaving the remaining trees susceptible to wind damage.

Removal of "medium-sized" trees will also reduce old growth recruitment. This will in turn result in decreased habitat for old growth-dependent species over the long term, and increased dry ground fuel loading.

AR 12176

Finally, the EA claims the TRP will reduce the risk of destructive wildfire to the ecosystem and downriver properties, yet it fails to identify the type and intensity of wildfire the project is supposed to protect against, or what might result from alternate treatments. For example, if a firestorm of the magnitude that has become common in the age of climate change were to occur, the project would not likely have any positive effect. Conversely, if a fire of lesser magnitude were to occur without the alleged benefits of the project, it might be beneficial to the ecosystem by naturally clearing ground fuels and dense timber stands resulting in decreased fire danger, and reduced risk to downriver properties.

Bailey notes the inadequate documentation of departure from natural forest conditions in his Draft EA comments.

**10) Conditions Based Management is Not Warranted**

Our comments regarding Conditions Based Management (CBM) during TRP comment periods were limited because we found neither a strict definition nor any published standards for this practice.

During the January 26, 2022 Methow Ranger District presentation on the TRP, project leader Eireann Pedersen explained CBM is a provision that allows flexibility in the removal of trees meeting certain conditions that might not have otherwise been designated for removal in the project prescription.

Our inquiries have revealed common descriptions indicating that CBM defers logging prescription applications and ground-based examination until after NEPA analysis is complete, and allows departure from logging prescriptions laid out in in NEPA analyses. If this is accurate, due to CBM, the public has no idea how and where logging will actually occur until after the NEPA process for public comment is closed.

The public can only comment on what it can see based on the EA and Decision depictions. If projected forest management scenarios are subject to alteration as the project is being implemented on the ground, there is no surety that the desired conditions will be met, or that what the public was shown during the comment periods was even accurate.

CBM appears to exclude the public from site-specific decisions, and reduces transparency. In *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729–30 (1998) the court ruled that Service must provide the public with "notice and an opportunity to be heard" in the analysis of "specific areas in which logging will take place, and which logging methods will be used."

During the January 26, 2022 presentation on the TRP, the project manager said she and other staff have repeatedly been over "every acre" of the project area. This should indicate that Service personnel have seen all they need to see and that the CBM provision is not warranted.

Since the contractors would be paid with trees, the CBM provision allows removal of larger "money trees," which are also the most fire-resistant, and provide present and future habitat. Incentive to remove more, larger trees exists to meet contractor needs for value-added timber to increase profits from the project. CBM provides an open checkbook to depart from the conditions the project was designed to facilitate. The alleged need for CBM is not validated, nor is its implementation adequately explained or analyzed.

Bailey expressed concerns over Conditions-Based Management in the form of a question to the Forest Service at the January 26, 2022 virtual meeting. If a comment period would have been provided after the changes in the TRP were announced on January 26, 2022, Objectors would have expressed further concerns about CBM.

AR 12177

**Suggested Remedies**

Objectors contend that from the outset, the Twisp Restoration Project has been tainted with inequitable public involvement opportunities, marginalization of the NEPA process, inadequate scientific validation for proposed actions, and inadequate evaluation of environmental impacts. Since our concerns are procedural as well as substantive, we see no relief that can be provided merely by adjusting the activities proposed in the TRP.

We request that the Forest Service begin the NEPA process anew if it wishes to proceed with silvicultural and other related actions in the Twisp River Watershed. Secondarily, we contend that if the Forest Service wishes to proceed with forest management actions in the Watershed, including but not limited to the TRP and the Midnight project, it must prepare an EIS for a project of this magnitude.

We also have a suggestion with respect to the TRP EA's Forest Plan amendments. What faith is the public supposed to have in the Forest Planning process when the agency will arbitrarily dilute or eliminate the protection provisions in the Plan to allow logging, as is proposed in the TRP?

With respect to the inequitable public process, even if Service does not believe its exclusive disclosures to, and input from the NCWFHC are technically illegal, Service concede that this relationship has been unfair to other publics. It cannot be allowed to continue or to be an enabling aspect of the TRP decision. We request that decisive action be taken, and documented, ensuring that all publics will have equal access to information from Service, as well as the ability to influence proposed actions at the same level of the project development phase as all other publics, including the NCWFHC.

This concludes our Objections. We look forward to your response.

Respectfully Submitted,


Phil Fenner
North Cascades Conservation Council (Lead Objector)
P.O. Box 95980; University Station, Seattle, WA. 98145
██████████  —  philf@northcascades.org


Richard Bailey
P.O. Box 1086; Winthrop, WA  98862
██████████  —  ██████████


Enclosures
Exhibits sent electronically to:  objections-pnw-regional-office@usda.gov

AR 12178

# Midnight Restoration Project
## Landscape Evaluation and Prescription



*Photos by Derek Churchill*



**RESILIENT FORESTRY**

Prepared by:
Sean Jeronimo, PhD
sean@resilientforestry.com
March 14, 2022

AR 12179

# Contents

Acknowledgements...................................................................................................2

The purpose of this document ...............................................................................2

Executive summary.................................................................................................3

    Summary map....................................................................................................4

How it works............................................................................................................5

Landscape evaluation overview.............................................................................7

Resilience assessment ...........................................................................................8

    Forest type .........................................................................................................8

    Forest structure .................................................................................................9

Severe disturbance assessment ..........................................................................11

    Fire ...................................................................................................................11

    Drought.............................................................................................................12

Key resources .......................................................................................................13

    Wildlife habitat .................................................................................................13

    Large tree complex forest ...............................................................................14

Work of wildfires ...................................................................................................15

    Low- and moderate-severity areas: finish what wildfire started....................16

    High-severity burned areas: replant to ensure continued forest cover ........17

Landscape prescription.........................................................................................18

    Treatment types and amounts.........................................................................18

    Treatment priorities .........................................................................................21

Social, policy, and operational filters ...................................................................22

Abbreviations cheat sheet....................................................................................23

AR 12180

## Acknowledgements

Preparation of this document was funded by The Wilderness Society. Earlier work providing a foundation for this document was funded by Conservation Northwest, Washington Department of Natural Resources, and other North Central Washington Forest Health Collaborative partners. The information presented in this document builds on earlier analyses completed by Timothy Downing, Derek Churchill, and Bill Gaines. The author thanks Derek Churchill, Bill Gaines, and Kerry Kemp for helpful feedback in preparing this work.

## The purpose of this document

This is a landscape evaluation and prescription for the Midnight Restoration Project area. In this context, a landscape is a collection of sub-watersheds composed of forest and non-forest patches. The Midnight planning landscape is approximately 67,000 acres in size, with individual patches ranging from about 10-200 acres.

A landscape evaluation describes how the current ecosystem conditions differ from the desired conditions.

A landscape prescription describes the management actions that are needed to move the ecosystem from its current conditions to the desired conditions.

Since these analyses are closely related, this document treats them as one unified task. The results of this analysis are answers to the following questions:

- How many acres of this landscape should be treated to restore the ecosystem?
- What kinds of treatment are needed?
- Where are the most important places to treat?
- Where might social, policy, and operational filters affect what work can actually be done?

These answers allow forest managers to clearly express the landscape restoration purpose and need. This is also a starting point for creating a proposal for management actions that will address the treatment need.



2

AR 12181

# Executive summary

The Midnight Restoration Project landscape has a need for treatments to reduce forest density and change the spatial patterns of trees across about 8,850-12,500 acres, or 13-19% of the landscape. Among the three sub-watersheds that compose the Midnight planning area, about 20% of the treatment need is in Upper Twisp, about 50% is in Middle Twisp, and about 30% is in Little Bridge Creek. All of these acres are currently inhabited by young, dense forest with multilayered canopies. The goal of treatments would be to transition these forests to a more open canopy condition, restore surface fuel loads, and reintroduce the frequent fire that historically maintained this landscape.

There are opportunities to enhance habitat for wildlife indicator species while performing this work. There is a need across the landscape to consolidate white-headed woodpecker habitat through restoration of open-canopy dry pine forests, especially in Little Bridge Creek. There are variable needs for northern spotted owl habitat, but an emphasis is retaining dense, complex forest where it will be sustainable into the future given threats from fire and drought. Parts of Upper Twisp and north-facing slopes of Middle Twisp offer the best options.

The majority of areas in need of treatment are outside of inventoried roadless areas, but some higher priority areas (500-1000 acres) fall within these zones. There is a significant need for treatment within late-successional reserves (LSR): potential treatment locations are roughly evenly split between LSR and Matrix. There is no way to address the landscape treatment need without treating in LSR.

Given recent fires in the area (2018 Crescent and 2021 Cedar fires), there is a need for some specific post-fire management actions. About 8,000-15,000 acres are in need of post-fire recovery, including assessing natural regeneration and potentially planting additional trees. Within the Cedar fire footprint, about 150-300 acres would benefit from post-fire thinning of green and/or dead trees to leverage the work of wildfire in accomplishing restoration objectives.

3

AR 12182

8-ER-1401

## Summary map

This map shows a summary of the landscape prescription. Priority 1 represents the minimum number of treatment acres that would address the landscape need. Priorities 1 and 2 together address the maximum number of acres needed. Priority 3 represents lower priority acres that can be substituted when Priority 1 and 2 acres are ruled out for practical reasons. Habitat overlays for indicator species are shown below for context.



■ Priority 1
■ Priority 2
■ Priority 3

■ High sev. fire response
■ Low/mod. sev. fire response
▨ Wilderness

■ WWP habitat
▨ NSO habitat

4

AR 12183

## How it works



AR 12184

8-ER-1403

## Incorporating Forest Restoration Principles

The analysis presented in this document is based on the Okanogan-Wenatchee Forest Restoration Strategy evaluation process. In support of this type of analysis, Hessburg and others published a 2015 article describing seven core principles for forest restoration in dry, fire-dependent ecosystems of the inland Northwest. This landscape evaluation and prescription follows the seven principles. Here, we explain how the management guidance from these principles is used in this analysis.

| Guidance | How it is used here |
| --- | --- |
| Management must have coherent links across spatial scales from trees to landscapes to regions | This analysis is just one piece (i.e., the mid-scale) of landscape restoration planning. Planning areas like this one are identified in the context of the greater watershed/region. The next step is stand-level planning guided by this landscape prescription. |
| Use topography as a template to guide restoration | The Resilience Assessment (pgs 7-9), Drought and Fire Prioritization (pgs 10-11), and Large Tree Sustainability (pg 13) all aim to better match vegetation to the topographic template. |
| Restore disturbance regimes and vegetation patterns; the rest will follow | The Resilience Assessment (pgs 7-9) and Drought and Fire Prioritization (pg 10) are designed to put the right vegetation types in the right places and allow natural disturbances to re-establish. |
| Restore the natural configuration of forest patch sizes and patterns | The Resilience Assessment (pgs 7-9) is designed around comparing current forest patches to the sizes and patterns that would be found under resilient conditions. |
| Within stands, focus on restoring variable tree clump and gap patterns | This occurs at a finer scale than the Landscape Evaluation is concerned with, but the recommended treatments in the Landscape Prescription (pgs 17-19) are intended to accomplish this goal. |
| Retain and promote large trees, snags, and logs | The Large Tree resource (pg 13) makes this a priority. |
| Work across ownership and management allocations | This analysis applies social, political, and operational filters only as an interpretive lens after assessing the ecological needs of the landscape (pg 22). |

6

AR 12185

## Landscape evaluation overview

Each element of the landscape evaluation is presented in sequence. The elements are then brought together to form the final landscape prescription. The descriptions in this section are intentionally brief. For those interested in more detail, see the Midnight Restoration Project Data Detail Supplement.

The Midnight Restoration Project planning area is composed of roughly three sub-watersheds, shown below. The sub-watershed referred to as Little Bridge Creek throughout this document also includes sections of the Wolf Creek and Thompson Creek sub-watersheds.



7

AR 12186

# Resilience assessment

## Forest type

Different environments support different forest types. In a resilient landscape, species composition, forest structure, and disturbance regimes are tightly coupled with the environmental setting. This means that a restored forest looks different in a dry valley than it does high in the mountains. For this reason, the three major forest types are split apart when evaluating treatment needs. Below, each forest type is described in terms of its characteristic resilient conditions.



■ **Dry forest**
Dominated by an open canopy of fire- and drought-tolerant species like ponderosa pine

Lower-severity fire regime

■ **Moist forest**
Dominated by a mix of densities with more Douglas-fir and larch than dry forest

Mixed-severity fire regime

■ **Cold forest**
Dominated by a mix of densities with more fire- and drought-intolerant species like true fir and spruce

Mixed- to high-severity fire regime

■ **Shrubland/herbland**
Areas without forest cover are dominated by shrubs and grasses

■ **Non-vegetated**
Water, rocks, and the like

8

AR 12187

## Forest structure

The sizes, density, and pattern of trees is referred to as forest structure. The size and arrangement of patches of similar structure determines a lot about how an ecosystem functions: whether trees have enough water, how fire moves across the landscape, what habitat is available for wildlife, and more. Patches are the basic unit of analysis for this evaluation; we analyze the abundance, size, and pattern of different types of forest patches to understand how much of the landscape needs restoration and what kinds of work need to be done.

To simplify talking about forest structure, each patch is assigned a structure class. The seven structure classes used in this evaluation are:



Stand Initiation

Earliest stages of a regenerating forest after severe disturbance



Stem Exclusion, Open Canopy
Young trees in a patchy open canopy, often interspersed with shrubs



Stem Exclusion, Closed Canopy
Young trees in a dense closed canopy, often shading each other out



Young Forest, Multi-Story
Dense young forest with foliage from treetops all the way to the ground



Understory Reinitiation
Young/mature trees with a relatively dense canopy over a separate layer of small trees



Old Forest, Multi-Story
Old trees with dense canopy and continuous foliage from the treetops to the ground



Old Forest, Single-Story
Old trees with open canopy and a large gap between the ground and the lowest branches

Past research has identified ranges of forest structure associated with landscape resilience for historical forests and for future conditions, incorporating ongoing and expected climatic changes. The following charts compare current conditions for each sub-watershed within the planning area to these ranges of variation. The horizontal bars represent the range of resilient conditions under historical and future climates. The small vertical bars represent the current acreage of each structure class in the sub-watershed. Where the current acreage is too high, a * indicates a departure that will be recommended for treatment in the landscape prescription and a ◊ indicates a departure that requires letting the forest grow over time. Where the current acreage is too low, the goal is to create more of that class as a result of treatments or to let patches grow over time to develop into the given structure class.

9

AR 12188



AR 12189

# Severe disturbance assessment

## Fire

Fire is a key factor shaping western forest landscapes. In this evaluation, it is a priority to reduce the risk of high-severity fire, especially where it endangers key resources such as old trees or critical habitat.

The Midnight Restoration Project planning area has burned relatively recently (see "Post-fire management" section). Based on current vegetation conditions, Upper and Middle Twisp are primed to burn at higher severities than would have occurred historically, while Little Bridge Creek is set to burn at lower severities on average.



11

AR 12190

## Drought

As climate changes, suitable zones for a given forest type have begun and will continue to shift around. If natural vegetation changes do not keep up with climate shifts, local forest conditions can become stressed as they are no longer supported on a site. In this evaluation, it is a priority to anticipate forest type shifts and treat to re-align vegetation with its environment.

Across the planning area, over one-third of Dry Forest is expected to become Woodland (or grass/herb land) by ca. 2055. Even more strikingly, three-quarters of the moist and transitional forest ("Dry-moist" below) is expected to become Dry Forest.

Forest Type Transitions



AR 12191

# Key resources

## Wildlife habitat

Some wildlife species use habitats that take a long time to develop and are hard to replace. It is a priority in the landscape evaluation to protect and restore habitat for certain species. However, protection and restoration may look different for different species.

For this planning area, we focused on two indicator species: the white-headed woodpecker (WWP) and the northern spotted owl (NSO). The WWP uses open pine forests with solitary large trees, while the NSO uses dense forests of tall trees. Protecting WWP habitat is likely to involve thinning and prescribed fire treatments, while protecting NSO habitat is more often accomplished by treating around the most important locations to provide a buffer from fire.

White-headed woodpecker habitat



Northern spotted owl habitat



13

AR 12192

8-ER-1411

## Large tree complex forest

Large trees perform a disproportionate amount of work toward many ecosystem services compared to small trees. They are more resistant to disturbances, they sequester more carbon, and they can regulate thousands of gallons of water per day. Large trees growing in dense, complex forests are an important element of the forest landscape, providing a unique and varied habitat for a range of organisms. However, dense, complex forest on too dry of a site can lead to very high risks for mortality from drought and fire, so it is important for these patches to be sited in sustainable locations given current and future climate.

In this evaluation, an emphasis is placed on protecting sites with large trees in complex forest where this structure will be sustainable into the future.



14

AR 12193

## Work of wildfires

Wildfires do ecological work. Some of what happens during a wildfire is helpful for landscape restoration, like consuming surface fuels, thinning the forest canopy, and selecting for fire-resistant trees. Other fire effects result in additional need for restoration, particularly large high-severity patches where future regeneration is uncertain.

The Little Bridge Creek sub-watershed burned in the 2021 Cedar Fire:



**Burn severity**
- High >75%
- Moderate 25-75%
- Low <25%

As part of this landscape evaluation, we are analyzing the immediate fire effects to incorporate short-term fire response into the landscape prescription. In low- and moderate-severity burned areas, the focus is to finish the job that wildfire started. Priorities are areas where the pre-fire forest had high density or species ill-suited to the site, and the prescribed work will be to further reduce fuel loads and shift species composition.

In high-severity burned areas, the focus is on ensuring forest regeneration into the future. We distinguish between areas where we expect that climate will or won't continue to support forest. In places where regenerating forest cover is unlikely, the goal is to transition to native grasslands or shrublands. Where forest cover is sustainable, to goal is to determine the most important locations to plant trees to ensure forest recovery.

15

AR 12194

## Low- and moderate-severity areas: finish what wildfire started

High priority locations shown here should be considered for post-fire management to leverage the work that wildfire has begun. Just like pre-fire forest restoration treatments, this work would include thinning green and/or dead trees with a focus on re-establishing resilient density, spatial patterns, and species composition. The difference here is that the fire has already accomplished some of the work, presenting an opportunity to create larger patches of restored landscape with lower costs than usual.



16

AR 12195

### High-severity burned areas: replant to ensure continued forest cover

The following two maps show areas where fire killed all or almost all of the trees across large areas. Without tree planting, these locations may take a very long time to become forest again. In some places, it might not happen at all.

Priorities on the first map emphasize dry places, showing where planting trees could help resist some climate change effects by establishing seedlings in strategic borderline locations.



Priorities on the second map emphasize places expected to have adequate water into the future. This is where planted trees are most likely to be successful.



17

AR 12196

# Landscape prescription

## Treatment types and amounts

The treatment needs described here come from analyzing forest structure within different forest types. The lines that begin "Treat X acres..." indicate the kind of work that is usually accomplished with mechanical thinning treatments. The other lines indicate needs that require some other kind of management, such as planting and protecting seedlings.

A cheat sheet for the abbreviations used in this table is included at the end of the document.

Upper Twisp

| Forest type | Treatment need | Notes |
|---|---|---|
| Dry forest | Treat 500-700 acres of YFMS, break up large patches | Shift some to medium-sized SEOC patches, favor PP<br>• Consolidate WWP habitat, grow into OFSS<br>Shift some to medium-sized UR patches, favor DF<br>Consolidate NSO habitat and grow into OFMS |
| Moist forest | Treat 100-500 acres of YFMS, break up largest patch | Shift to medium-sized SEOC patches, grow into OFSS Favor PP, WL |
| | Maintain NSO habitat | Grow/connect larger patches |
| | Facilitate growth of SECC from SI | Protect from HS reburn |
| Cold forest | Treat 500-1300 acres of YFMS, but retain and build larger patches | Shift to UR, grow into OFMS Marten habitat |
| Cold and Moist forest high-severity burn areas | Goal of 4000-6000 acres of forest recovery | Avoid very large patches growing into SECC |
| | Assess amount and species of regeneration, plant fire/drought-adapted species if needed | |
| | Protect desirable patches of regen from high-severity reburns | |
| | Promote small-medium sizes patches of shrub/herbland; allow creation with reburns | |

18

AR 12197

Middle Twisp

| Forest type | Treatment need | Notes |
|---|---|---|
| Dry forest | Treat 2500-3000 acres of YFMS, break up large patches | Shift some to medium-sized SEOC patches, favor PP<br>• Consolidate WWP habitat, grow into OFSS<br>Shift some to medium-sized UR patches, favor DF<br><br>Consolidate NSO habitat and grow into OFMS |
| Moist forest | Treat 2500-3400 acres of YFMS, reduce number of patches | Shift some to medium-sized UR patches, grow into OFMS<br>Shift some to medium-sized SEOC patches, favor PP, grow into OFSS |
| | Reduce NSO habitat | Fewer, more compact patches in most sustainable locations |
| | Facilitate growth of SECC from SI | Protect from HS reburn |
| Cold and Moist forest high-severity burn areas | Goal of 2000-5500 acres of forest recovery | Avoid very large patches growing into SECC |
| | Assess amount and species of regeneration, plant fire/drought-adapted species if needed | |
| | Protect desirable patches of regen from high-severity reburns | |
| | Promote small-medium sizes patches of shrub/herbland; allow creation with reburns | |

19

AR 12198

Little Bridge Creek

| Forest type | Treatment need | Notes |
|---|---|---|
| Dry forest | Treat 2500-3100 acres of YFMS, break up large patch | Shift to medium-sized SEOC patches, favor PP<br>• Consolidate WWP habitat, grow into OFSS |
| Moist forest | Maintain NSO habitat | Grow and connect more compact patches |
| | Facilitate growth of SECC from SI | Protect from HS reburn |
| Cold forest | Treat 250-500 acres of YFMS, break up largest patches | Reduce SAF, favor AL, LP, PP<br>Shift to UR, grow into OFMS |
| | Break up largest patch of marten habitat into smaller patches | |
| Cold and Moist forest high-severity burn areas | Goal of 2000-3500 acres of forest recovery | Avoid very large patches growing into SECC |
| | Assess amount and species of regeneration, plant fire/drought-adapted species if needed | |
| | Protect desirable patches of regen from high-severity reburns | |
| | Promote small-medium sizes patches of shrub/herbland; allow creation with reburns | |

20

AR 12199

8-ER-1418

## Treatment priorities

This map shows locations where treatment could help meet the needs identified in the table above, with colors to signify lower or higher priority. Higher priority areas are those where treatment could do the most to reduce risks to the forest from fire and drought.

This priority map, which combines forest resilience with risk of severe disturbance, can also be overlaid with the Wildlife habitat and Large tree and complex forest maps to see how these key resources interact with other facets of forest restoration. For example, spotted owl habitat in the Middle Twisp valley and the southern part of Little Bridge Creek has a higher treatment priority and less sustainability for large tree complex forest compared to habitat in the Upper Twisp sub-watershed.



21

AR 12200

## Social, policy, and operational filters

The landscape evaluation and prescription is focused on the ecological needs of the landscape. But ecological needs aren't the only thing determining management actions. The needs of society, law and administrative regulation, and practical constraints on operations in the forest all place filters on what work is realistically achievable and where.

This map shows some of the most important filters present on this landscape. Other than Wilderness, all of the filters shown do allow varying degrees of active management, including selling logs as byproducts of restoration treatments. When designing a forest landscape restoration project, it is up to the project team to balance the ecological needs of the landscape with social sentiment and the regulatory environment.



**Filters**
- Roadless
- NSO Critical Habitat
- Wilderness
- Late Successional Reserve
- Riparian Reserve

22

AR 12201

# Abbreviations cheat sheet

| Abbreviation | Meaning | |
|---|---|---|
| **Stand development stages** | | |
| SI | Stand initiation |  |
| SEOC | Stem Exclusion, Open Canopy |  |
| SECC | Stem Exclusion, Closed Canopy |  |
| YFMS | Young Forest, Multi-Story |  |
| UR | Understory Reinitiation |  |
| OFMS | Old Forest, Multi-Story |  |
| OFSS | Old Forest, Single-Story |  |

AR 12202

| | |
|---|---|
| Other abbreviations | |
| WWP | White-headed woodpecker (*Leuconotopicus albolarvatus*) |
| NSO | Northern spotted owl (*Strix occidentalis caurina*) |
| PP | Ponderosa pine (*Pinus ponderosa*) |
| LP | Lodgepole pine (*Pinus contorta*) |
| AL | Alpine larch (*Larix lyallii*) |
| WL | Western larch (*Larix occidentalis*) |
| DF | Douglas-fir (*Pseudotsuga menziesii*) |
| SAF | Subalpine fir (*Abies lasiocarpa*) |
| HS | High severity, in reference to fire effects |

AR 12203

00:00:00.000 --> 00:00:02.170
Bail, Kristin - FS
For that where we've got a backup.

00:00:03.270 --> 00:00:03.960
Philip Fenner
OK great.

00:00:04.820 --> 00:00:07.300
Philip Fenner
Listen did you get teams to work on your computer?

00:00:07.410 --> 00:00:14.860
Lisa Bergman (Guest)
Yeah, amazingly. I just clicked on the thing and boom. So I'm going to go and see how Dave is doing. He
thought he could too. But I don't see him yet.

00:00:15.250 --> 00:00:17.710
Philip Fenner
No well it says guest by waiting to join.

00:00:15.990 --> 00:00:16.580
Lisa Bergman (Guest)
So.

00:00:18.130 --> 00:00:18.640
Lisa Bergman (Guest)
Oh.

00:00:19.950 --> 00:00:22.460
Philip Fenner
So maybe Kristen just needs to let him in or.

00:00:21.940 --> 00:00:22.410
Lisa Bergman (Guest)
OK.

00:00:23.630 --> 00:00:25.440
Philip Fenner
And then Rick was gonna call him by phone.

00:00:25.900 --> 00:00:26.380
Lisa Bergman (Guest)
Alright.

00:00:27.910 --> 00:00:30.130
Bail, Kristin - FS
Yeah, and I'm I'm waiting for.

AR 12204

00:00:30.990 --> 00:00:32.810
Bail, Kristin - FS
The pop up to let me in.

00:00:35.530 --> 00:00:38.880
Philip Fenner
Like it's it's letting me look at the lobby and we've got.

00:00:39.100 --> 00:00:40.410
Bail, Kristin - FS
Oh, there, we go I got it now.

00:00:40.770 --> 00:00:43.450
Philip Fenner
You got the phone call in there that must be Rick.

00:00:45.010 --> 00:00:46.310
Lisa Bergman (Guest)
Oh yeah, the little red thing.

00:00:48.600 --> 00:00:51.640
Philip Fenner
I don't know if I can let him in oh now everybody is sideways.

00:00:58.150 --> 00:01:00.830
Philip Fenner
It's alright I could turn my phone around if that's the way it has to be.

00:01:02.240 --> 00:01:07.940
Philip Fenner
Yeah, I couldn't get it working on my computer. But as soon as I went on my iPhone. It just started so that's good.

00:01:08.330 --> 00:01:09.950
Lisa Bergman (Guest)
I'm gonna go up and see how Dave is doing.

00:01:10.520 --> 00:01:10.920
Philip Fenner
Sure.

00:01:11.180 --> 00:01:13.950
+12*******79
I'm I'm I'm on the phone.

00:01:14.420 --> 00:01:15.020
Philip Fenner
Oh, Hi Dave,

00:01:14.710 --> 00:01:15.180
Lisa Bergman (Guest)
Oh.

00:01:17.390 --> 00:01:19.260
Lisa Bergman (Guest)
OK, Dave you couldn't make it work.

00:01:20.370 --> 00:01:21.850
+12*******79
I'm still working on it.

00:01:22.240 --> 00:01:22.690
Lisa Bergman (Guest)
Alright.

00:01:28.780 --> 00:01:31.260
Philip Fenner
got this nifty little tripod for my phone.

00:01:33.850 --> 00:01:37.080
Philip Fenner
Which should do the trick today hopefully?

00:01:40.090 --> 00:01:45.220
Philip Fenner
Uhm that so that's there's still says there's somebody waiting in the lobby on a phone number.

00:01:49.430 --> 00:01:56.540
Bail, Kristin - FS
Erin it's supposedly it's admitting it's I've got the little spinning circle going so.

00:01:56.760 --> 00:01:58.230
Philip Fenner
Ah, OK good cool.

00:01:59.440 --> 00:02:01.520
Philip Fenner
I hadn't admit button, too, so I hit it.

00:02:05.070 --> 00:02:05.800
Philip Fenner
Never works.

00:02:07.490 --> 00:02:08.380
Philip Fenner
Sideways.

AR 12206

00:02:10.360 --> 00:02:10.640
Philip Fenner
Yeah.

00:02:15.910 --> 00:02:20.150
Philip Fenner
We have 2 people by phone. I know one of them is Dave Fluharty, who's the other one.

00:02:22.380 --> 00:02:24.010
+15*******82
Rick Bailey in Winthrop.

00:02:24.550 --> 00:02:25.560
Philip Fenner
I was hoping it was you.

00:02:26.630 --> 00:02:27.130
Philip Fenner
Alright.

00:02:29.600 --> 00:02:33.040
Philip Fenner
How soon is Dave comes back I think we're pretty close to being hauling?

00:02:34.580 --> 00:02:34.900
Philip Fenner
Right.

00:02:35.810 --> 00:02:37.580
+12*******79
I'm still here, I'm still here.

00:02:38.390 --> 00:02:39.320
Philip Fenner
Oh, OK well.

00:02:40.080 --> 00:02:43.600
Philip Fenner
You wanna just stay on by phone that probably work just as well.

00:02:44.510 --> 00:02:50.620
+12*******79
Yeah, I'll stay on my phone if I get in otherwise I'll be. I'll switch to that.

00:02:52.640 --> 00:02:56.230
Philip Fenner
OK, well before we do anymore. I'm going to get everybody 's.

AR 12207

8-ER-1426

00:02:56.980 --> 00:03:01.560
Philip Fenner
Explicit vocal consent to this being recorded in stats.

00:03:02.470 --> 00:03:02.850
Philip Fenner
Which is?

00:03:05.000 --> 00:03:07.540
Lisa Bergman (Guest)
OK, yes, it's fine with me, I'm Lisa Bergman.

00:03:07.860 --> 00:03:08.230
+12*******79
Yep.

00:03:08.650 --> 00:03:09.060
+12*******79
Beyond.

00:03:16.340 --> 00:03:17.470
Philip Fenner
And most importantly.

00:03:16.940 --> 00:03:19.180
David L. Fluharty
And most importantly, Christmas.

00:03:18.110 --> 00:03:18.780
Philip Fenner
Kristen.

00:03:25.090 --> 00:03:46.920
Bail, Kristin - FS
Yeah, so you will get feedback if you have both your computer audio and audio and phone audio on so you might have to turn turn one of those off and yes, I I do consent. In fact, I do have the record button for the teams meeting and I can send that out to you afterwards as sort of a backup in case.

00:03:46.980 --> 00:03:50.500
Bail, Kristin - FS
Uhm failure your phone recording doesn't work.

00:03:49.290 --> 00:03:49.510
Philip Fenner
Yep.

00:03:51.510 --> 00:03:51.960
Philip Fenner
OK.

AR 12208

00:04:00.600 --> 00:04:02.290
David L. Fluharty
So I'm I'm now on.

00:04:01.230 --> 00:04:01.720
Philip Fenner
And I.

00:04:02.580 --> 00:04:10.650
David L. Fluharty
Uh like not yet visible but I'm on and have you I can hear you everyone?

00:04:12.280 --> 00:04:12.730
Lisa Bergman (Guest)
Good.

00:04:13.640 --> 00:04:16.890
Philip Fenner
Oh yeah, the sound your voice sound quality is much better now, Yep.

00:04:19.570 --> 00:04:20.520
Philip Fenner
And we still have Rick?

00:04:22.400 --> 00:04:27.420
+15*******82
Yeah, and I consent to recording inspect encourage it.

00:04:29.150 --> 00:04:29.630
Philip Fenner
Very good.

00:04:31.550 --> 00:04:37.450
Philip Fenner
Well, uh, Kristen I don't know how familiar you are with the North Cascades Conservation Council.

00:04:38.060 --> 00:04:46.310
Philip Fenner
Uh I looked and it looks like your office at least on the mailing list for our quarterly Journal wild does that ring a Bell.

00:04:48.500 --> 00:04:52.050
Bail, Kristin - FS
I don't recall seeing it for awhile, but our office.

00:04:52.680 --> 00:04:58.980
Bail, Kristin - FS
For almost a year has been under construction and our Mail is not.

AR 12209

8-ER-1428

00:05:00.710 --> 00:05:04.430
Bail, Kristin - FS
You know working and we've been working virtually for.

00:05:04.970 --> 00:05:15.250
Bail, Kristin - FS
Uh yeah for for all cash almost 2 years now, so if it's hard copy. I I may have missed it if it's not hard copy. I have not seen it in my email.

00:05:09.290 --> 00:05:09.760
Philip Fenner
Right.

00:05:16.780 --> 00:05:21.150
Philip Fenner
Well, I'll simplify it for you, then and just give you a quick rundown of what the N 3 sees all.

00:05:20.610 --> 00:05:22.230
Bail, Kristin - FS
Yeah, but please please do.

00:05:22.860 --> 00:05:27.680
Philip Fenner
Yeah, so the The Standard boilerplate that we put at the top of all of our letters.

00:05:28.690 --> 00:05:32.610
Philip Fenner
Is it the North Cascades Conservation Council was founded in 1957?

00:05:33.450 --> 00:05:41.900
Philip Fenner
Our mission is to protect and preserve the scenic cyantific recreational educational and wilderness values of the North Cascades.

00:05:43.670 --> 00:05:48.610
Philip Fenner
NCCC you might also heard it hear it referred to as N 3 C.

00:05:49.680 --> 00:05:56.520
Philip Fenner
Works to protect and preserve the North Cascades lands waters plants wildlife through public participation in legal channels.

00:05:57.750 --> 00:06:01.910
Philip Fenner
We are a single area all volunteer nonprofit organization.

AR 12210

00:06:03.490 --> 00:06:07.760
Philip Fenner
So the unit really unique thing there is the all volunteer part of it, these days.

00:06:09.590 --> 00:06:19.230
Philip Fenner
We believe the North Cascades are a national treasure. We like to refer to them as the American Alps and we believe they're worthy of being safe for future generations to enjoy intact.

00:06:20.380 --> 00:06:29.020
Philip Fenner
So we take action actions to stop damaging timber sales while supporting Responsible Forest Management and protecting forestlands from conversion to Nonforest uses.

00:06:29.690 --> 00:06:33.620
Philip Fenner
We also support their rewilding of previously damaged forest landscapes.

00:06:35.370 --> 00:06:40.540
Philip Fenner
We are independent all volunteer and our work is carried out by our board in approximately 300 members.

00:06:41.260 --> 00:06:45.290
Philip Fenner
They accept donations but no sponsorships in order to maintain our independence.

00:06:46.530 --> 00:06:51.470
Philip Fenner
And we've got a long list of accomplishments guy should be wilderness area North Cascades National Park.

00:06:52.160 --> 00:06:55.480
Philip Fenner
Stopping the proposed open pit copper mine very glacier peak.

00:06:56.610 --> 00:07:08.970
Philip Fenner
Doesn't really 94% of the National Park wilderness stopping high rostam negotiating environmental Learning Center. Wild Sky Wilderness. Alpine lakes wilderness. Additions most recently, and the list goes on, but I think you get the idea.

00:07:10.310 --> 00:07:10.720
Philip Fenner
Hopefully.

00:07:13.640 --> 00:07:18.890
Philip Fenner
So yeah, we have been keeping an eye on the twist restoration project for some time.

AR 12211

00:07:19.580 --> 00:07:24.030
Philip Fenner
We had a meeting over there last fall like late last summer.

00:07:25.100 --> 00:07:35.590
Philip Fenner
And it coincided coincidentally was right after the fuel break cutting took place along the road. So we went up and took a look at that. That's what was written up in our channel and I'll make sure you get a electronic copy of that.

00:07:36.700 --> 00:07:38.900
Philip Fenner
Like a person until you find interesting.

00:07:40.020 --> 00:07:40.440
Philip Fenner
Uhm.

00:07:41.890 --> 00:07:53.440
Philip Fenner
So I guess the place I would like to start is just to run down the Chronology. So so far. Since then, so they can. We know right where we're where we're at, and we agree on the basic facts here.

00:07:54.300 --> 00:07:54.660
Bail, Kristin - FS
Yeah.

00:07:55.380 --> 00:07:56.040
Philip Fenner
So November.

00:07:55.770 --> 00:08:02.760
Bail, Kristin - FS
Can you just do clarify for me one thing though uh? How how far? How far South does your area of interest go.

00:07:58.790 --> 00:07:59.240
Philip Fenner
Yep.

00:08:03.790 --> 00:08:05.940
Philip Fenner
Oh, you know that's something of.

00:08:05.390 --> 00:08:06.360
David L. Fluharty
Columbia River.

AR 12212

00:08:06.730 --> 00:08:19.550
Philip Fenner
We definitely go all the way to the Columbia River because we talk about Mount Rainier and the wilderness around it with some regularity and so on, although our our primary focus. The majority of our efforts are northwest Snoqualmie Pass. But the

00:08:14.920 --> 00:08:15.230
Bail, Kristin - FS
OK.

00:08:20.680 --> 00:08:22.880
Philip Fenner
Columbia River is official Southern Belle.

00:08:24.080 --> 00:08:28.090
Bail, Kristin - FS
OK, no thanks for that 'cause uh, yeah, I wasn't I wasn't clear on that.

00:08:28.670 --> 00:08:30.590
Philip Fenner
And we don't really stop Italian border either.

00:08:31.560 --> 00:08:32.070
Philip Fenner
Because the

00:08:32.720 --> 00:08:42.780
Philip Fenner
or an ecosystem certainly doesn't stop there. So we yeah, so we sessions and initiatives to do with cross border issues. But Luckily that whispers all.

00:08:35.230 --> 00:08:35.760
Bail, Kristin - FS
No.

00:08:43.520 --> 00:08:56.980
Philip Fenner
Local so yeah, November 16. We obtain an excerpt of a NVCC Metal Valley Citizens Council news email stating that the twist respiration project will be reduced.

00:08:57.630 --> 00:08:59.710
Philip Fenner
From 77 to 24,000 acres.

00:09:01.470 --> 00:09:03.920
Philip Fenner
Uh we find no public form of this same notice.

AR 12213

00:09:05.980 --> 00:09:17.770
Philip Fenner
November second we give you text. The lack of transparency asking you know what can we do. To to get higher up your community right or somehow to find these things.

00:09:18.950 --> 00:09:22.940
Philip Fenner
Do you recommend that we speak to them at our district Ranger Christopher about that?

00:09:24.260 --> 00:09:28.680
Philip Fenner
No on 12 8. We have the conference call. Rick Bailey and I have a conference call with Christopher.

00:09:29.470 --> 00:09:32.300
Philip Fenner
Uh dense without any satisfactory answers to us.

00:09:33.380 --> 00:09:41.050
Philip Fenner
And the next day you email us to ask us how the call went and we reply as a little later, saying that you know, we're dissatisfied.

00:09:41.730 --> 00:09:45.850
Philip Fenner
How you replied that he would rather talk live with us then exchange letters?

00:09:46.570 --> 00:09:52.240
Philip Fenner
Uh we agree and only requirement being that'd be recorded and.

00:09:53.670 --> 00:09:54.180
Philip Fenner
Here we are.

00:09:56.000 --> 00:09:56.480
Philip Fenner
No.

00:09:58.230 --> 00:09:59.610
Philip Fenner
Gonna keep moving here, the.

00:10:00.720 --> 00:10:04.280
Philip Fenner
Q&A that we engaged in my letter and email.

00:10:05.560 --> 00:10:06.170
Philip Fenner
Prior to this.

AR 12214

00:10:07.320 --> 00:10:10.130
Philip Fenner
You know there were back and forth, but we ended up with.

00:10:11.880 --> 00:10:20.380
Philip Fenner
Some questions remaining you agreed with us that the collaborative is not responsible for disseminating
information about our projects.

00:10:22.010 --> 00:10:22.960
Philip Fenner
About your projects.

00:10:23.880 --> 00:10:30.280
Philip Fenner
As a you know real fundamental issue, there that it, it's the Forest Service responsibility to do so not the
collaborative 's responsibility.

00:10:31.190 --> 00:10:31.610
Philip Fenner
No.

00:10:33.790 --> 00:10:37.300
Philip Fenner
If we were to write you again today, but since we're talking to you will just ask you straight up.

00:10:37.890 --> 00:10:41.790
Philip Fenner
It's been over 2 months now since we heard that the project had been scaled back.

00:10:42.690 --> 00:10:44.510
Philip Fenner
To 1/3 of its original acreage.

00:10:45.310 --> 00:10:49.670
Philip Fenner
Uh that 2 months seems too long a delay in making a public announcement of such a major change.

00:10:51.700 --> 00:10:54.950
Philip Fenner
How are we going? How will you reduce or eliminate that delay in the future?

00:10:57.490 --> 00:11:18.300
Bail, Kristin - FS
Well, IA couple things come, yeah, I I did respond with some information about the collaborative.
They're operating procedures and you know just some background about how they're formed and and
who who is on that. You know which was embedded in in your in your list of questions. So did you get
the press release about the public meeting that's coming up next week?

AR 12215

00:11:21.380 --> 00:11:22.460
Philip Fenner
I didn't did anybody else.

00:11:21.890 --> 00:11:22.620
+15*******82
Yeah, well.

00:11:23.220 --> 00:11:25.340
Philip Fenner
Mean crisper referred to it, but

00:11:26.390 --> 00:11:29.320
+15*******82
Yeah, I I have heard that there is a public meeting on on.

00:11:29.380 --> 00:11:31.080
+15*******82
Yeah, Saturday.

00:11:33.330 --> 00:11:46.190
+15*******82
But you know, I haven't gotten anything official. I I'm going to look in the newspaper. But that's that's what I heard a man and you know just to elaborate. A little bit more on on what bill just said.

00:11:40.540 --> 00:11:40.910
Bail, Kristin - FS
Uh-huh.

00:11:46.700 --> 00:11:52.530
+15*******82
Uh we, we you know, we, we asked Chris during that call.

00:11:53.640 --> 00:11:59.860
+15*******82
If we could get the information that was provided to the collaborative and he told us we'd have to wait for this meeting.

00:12:00.610 --> 00:12:02.920
+15*******82
And that was really.

00:12:04.450 --> 00:12:12.170
+15*******82
Uh objectionable to us and that's one of the reasons that we, we, we're we're taking this very seriously.

00:12:13.850 --> 00:12:20.470
+15*******82
So you know, we what we're really after here if I can paraphrase and go to the bottom line.

AR 12216

8-ER-1435

00:12:21.050 --> 00:12:28.260
+15*******82
It's just some assurances some acknowledgement of responsibility for this and some.

00:12:29.380 --> 00:12:34.050
+15*******82
Promises or assurances that this will not happen again.

00:12:36.490 --> 00:13:06.340
Bail, Kristin - FS
Yeah, so uh Phil I don't know if you shared out the email response that I provided because I I think a key part of that which does you know speak specifically to this concern is that you know, I did offer that you know, Chris for you know would would make sure that you all were you know updated regularly monthly either. You know as part of a broader group or if you know, nothing had else had been shared that you know, he was able to.

00:13:06.620 --> 00:13:25.930
Bail, Kristin - FS
You know give you an update you know every month 'cause there. There are sometimes months, but you know a month or 2 that passes in between. You know meetings with the collaborative or otherwise sharing information and you know, I I definitely took to heart what you all shared with me and I have spoken to my public affairs staff officer.

00:13:16.190 --> 00:13:16.990
Philip Fenner
it's free.

00:13:26.020 --> 00:13:57.670
Bail, Kristin - FS
Uhm Victoria Wilkins, saying that I did very much you know want to make sure that we were more proactive and frequent with our communications on Twisp River and you know? Our our activities, particularly upon the Metal Valley Ranger District and you know the timing of the of the public meeting. You know this is Chris is doing without his environment environmental coordinator. Meg trivantis out on another assignment, so this was really the first time that we've been able to put together the broad public meeting too.

00:13:58.010 --> 00:14:13.860
Bail, Kristin - FS
You know share you know the information about the smaller project footprint and next steps moving forward for that landscape and so in the mean time, we've had a lot of internal Forest Service conversation about.

00:14:14.580 --> 00:14:35.660
Bail, Kristin - FS
Uh you know postfire recovery and you know, there's some funding that is being provided to that. So we're articulating what some of our needs are and that's has to go through internal Forest Service

AR 12217

Review and that hasn't hasn't been shared and 'cause. We're still in the process of of developing that proposal so we're very much.

00:14:35.810 --> 00:15:06.160
Bail, Kristin - FS
I'm also doing work on the postfire recovery piece and what that looks like for for that district so you know a lot going on and and some things get delayed in order to accommodate having to provide information on on different initiatives. So yes, so next Wednesday, is a public meeting and and and if if you aren't able to find that I can certainly send the the press release out, but that is our follow through too.

00:15:06.500 --> 00:15:10.810
Bail, Kristin - FS
And have that public meeting, scheduled and share information broadly.

00:15:11.470 --> 00:15:35.690
David L. Fluharty
So just just to let you know, I'm registered I received scoping notices. I've received everything but you the letter that or the email that you sent I think, to fill or Rick was the first time I'd seen mention of the the January 22nd meeting and I'm very pleased to see that that's happening, but I don't understand why.

00:15:35.740 --> 00:15:43.410
David L. Fluharty
Came up with all the involvement so far. I haven't been notified as an active member of the public so.

00:15:44.720 --> 00:15:52.060
David L. Fluharty
And I've I've I wrote as a representative of M 3 C so I'm there's there's something happening here that.

00:15:53.120 --> 00:15:54.320
David L. Fluharty
Is is?

00:15:55.240 --> 00:15:56.100
David L. Fluharty
Less than perfect.

00:15:57.430 --> 00:15:57.820
David L. Fluharty
Uh.

00:15:58.670 --> 00:16:04.900
Bail, Kristin - FS
Yeah, so there's there's different ways that we share information. There's you know the static project website.

00:16:05.940 --> 00:16:35.670
Bail, Kristin - FS

AR 12218

And then you know, there's you know, people, you know like we get invited to meetings. So so one thing and you all know this. I'm just going to put it into the room is you know the collaborative invites us. We don't invite the collaborative so you know they have their regular meetings. They they run their own agendas and they invite us to meetings and so we you know as we would to any other meeting that people have with us. We will share what we have as far as real time so.

00:16:35.730 --> 00:17:05.130
Bail, Kristin - FS
The The Press earliest kind of comes out in a different way. This is this is through our public affairs office and so, if I can make sure that you all are on that mailing list for any press releases that the forest issues but that's like a broad list. It's not we don't like customize. Our press releases to only one Ranger District. That's like this is on like a a forest wide. You know public affairs lists so there's different ways. You know that you'll you'll get information.

00:17:05.840 --> 00:17:26.970
Bail, Kristin - FS
So you know in terms of if you provided a comment on the EA that doesn't necessarily automatically sign you up for every press release that the forest issues. 'cause you'll hear you'll get a press release about Cle Ellum. You know recreation fees or you know you'll get you'll get everything. Once you sign up for the the public affairs. One, which is fine. Just want to just want to make sure you know what you're getting into.

00:17:23.100 --> 00:17:26.660
David L. Fluharty
Yeah, I I'm saying I'm signed up for that.

00:17:27.020 --> 00:17:27.280
Bail, Kristin - FS
2.

00:17:28.180 --> 00:17:33.680
David L. Fluharty
I am signed up for that, so This is why, why I'm a bit puzzled.

00:17:30.240 --> 00:17:30.720
Bail, Kristin - FS
OK.

00:17:34.350 --> 00:17:34.770
Bail, Kristin - FS
Yeah.

00:17:35.030 --> 00:17:35.630
David L. Fluharty
So.

AR 12219

00:17:35.160 --> 00:17:38.050
Philip Fenner
It's an amazing incidents, but I just got an email right now.

00:17:38.990 --> 00:17:42.570
Philip Fenner
Forest Service news release from Victoria Wilkins just now.

00:17:44.050 --> 00:17:46.230
Bail, Kristin - FS
Well, I'm glad she's not making a liar out of me.

00:17:44.110 --> 00:17:44.500
Philip Fenner
Little.

00:17:48.230 --> 00:17:50.560
David L. Fluharty
Thank you. Thank you, maybe I've got it too.

00:17:48.490 --> 00:17:48.830
Philip Fenner
That's it.

00:17:52.740 --> 00:17:53.870
Philip Fenner
Could that be a coincidence?

00:17:54.380 --> 00:18:04.310
Bail, Kristin - FS
Yeah, no, I just I just got it this morning. So so I I get it. Just break right before the rest of the world does.
But Yes, it's the 26th Wednesday the 26th.

00:18:04.790 --> 00:18:18.200
Philip Fenner
OK, but I mean be all of that as it may the fact remains that the change. That was made to the project
was substantial. We're talking about 2/3 reduction in acreage that just changes everything.

00:18:13.480 --> 00:18:13.850
Bail, Kristin - FS
Uh-huh.

00:18:18.780 --> 00:18:19.210
Bail, Kristin - FS
Uh-huh.

00:18:19.380 --> 00:18:24.600
Philip Fenner
It changes a lot and and and I heard the changes or can it continue and the question is.

AR 12220

00:18:19.930 --> 00:18:20.270
Bail, Kristin - FS
Yeah.

00:18:21.320 --> 00:18:21.790
Bail, Kristin - FS
Yeah.

00:18:25.870 --> 00:18:32.870
Philip Fenner
How is it that the the collaborative is informed of this stuff months 2 months before anybody else is?

00:18:36.210 --> 00:18:36.820
Bail, Kristin - FS
Well, as

00:18:38.060 --> 00:18:38.900
Philip Fenner
Let me just seems.

00:18:38.790 --> 00:19:08.780
Bail, Kristin - FS
we, we share we share information and you know, Chris you know, basically says this is what we're going to do this is our intent is you know the fact that the part of the project area burned up. You know, we need to take a another look at this and so that's what we're that's what we're going to do. We don't know what's going to happen. Yet with the the portion that is now outside of the twist restoration or in some you know dialogue with our state partner and we're allowed to have one.

00:19:08.890 --> 00:19:22.250
Bail, Kristin - FS
On one conversations with our state partners you know as far as what might what what they might be interested in in. In doing out there and then you know that our public meeting next week is where we'll talk about next steps in relation to.

00:19:16.080 --> 00:19:16.690
+15*******82
Camping.

00:19:22.300 --> 00:19:42.270
Bail, Kristin - FS
Do you know what we do with this smaller area but you know with the fire you know that? Did you know change the existing condition of the project and and you know there was a lot of need to take that step back and recognize that the district is going to have.

00:19:43.110 --> 00:19:49.350
Bail, Kristin - FS
A huge workload both nipa and implementation with postfire recovery and so being able to.

AR 12221

8-ER-1440

00:19:49.400 --> 00:19:59.160
Bail, Kristin - FS
To focus its work moving forward to allow part of the project area to move forward while longer term.

00:19:59.200 --> 00:20:07.050
Bail, Kristin - FS
Uh you know, kind of reconsideration of what happens in the remainder of the project area. You know that gives us time to have those conversations.

00:20:09.250 --> 00:20:12.330
+15*******82
Well, I I'm Chris bye could I've scuse me.

00:20:13.680 --> 00:20:39.640
+15*******82
Christian if I could just be bold. I mean, I know nobody likes to have their feet held to the fire and I don't enjoy doing this at all but the fact of the matter is that you know, we there was an exclusive release of information important information was exclusively released to one public entity and withheld from other public entities even after there was an admission.

00:20:41.050 --> 00:20:44.640
+15*******82
That that it had been disclosed exclusively to the collaborative.

00:20:45.380 --> 00:20:45.890
+15*******82
So.

00:20:46.570 --> 00:20:47.720
+15*******82
Specifically.

00:20:48.530 --> 00:20:54.200
+15*******82
How how is that going to change? What are you going to do to make sure that doesn't happen again?

00:20:57.580 --> 00:21:27.350
Bail, Kristin - FS
Again, I'll I'll point to what I committed to in my email. Earlier, which was I committed the district Ranger to providing you proactive communication, either through email, or a meeting on a monthly basis, so that and that is that is special treatment. We don't do that. For every group and it. I really wanted you to know how committed I am to providing good proactive communication with folks so you know that that is kind of my.

00:21:27.550 --> 00:21:57.660
Bail, Kristin - FS
My bottom line, you know in terms of you know, my commitment to you know, making sure that you all are are getting the information that you want in a in a timely manner and you know, we'll continue to

AR 12222

work with the collaborative our state partners or tribal partners and our County commissioners are all committed to that, so we will continue to be working with them. But we also want to make sure that you know other other groups that choose not to be a part of that collaborative are also kept kept in the loop.

00:21:57.720 --> 00:22:12.020
Bail, Kristin - FS
And, of course, we have our broader public conversations and the static website where we provide information as to when we have documents and information available, so I know I know you all don't.

00:22:12.350 --> 00:22:21.130
Bail, Kristin - FS
Uh we choose to sit in on on a collaborative meetings. You know, but they are available to folks so that is, is something that.

00:22:21.550 --> 00:22:43.710
Bail, Kristin - FS
Uh you know other people may choose to. You know make that option even though that you that you don't so but as I said. My my commitment was that you would have you know, either either. An email or or a meeting with Chris on a monthly basis to make sure that you know, not only this project. But other projects. You know you're as up to date as everyone else.

00:22:32.460 --> 00:22:32.900
+15*******82
Yeah.

00:22:46.160 --> 00:22:47.750
+15*******82
Would you consider a letter?

00:22:48.500 --> 00:22:56.750
+15*******82
To us and maybe a press release, saying that you acknowledge responsibility for this and that it's not going to happen again.

00:22:57.160 --> 00:22:57.730
Bail, Kristin - FS
No.

00:22:58.780 --> 00:23:03.760
Bail, Kristin - FS
I I I feel that we are always we've been always been acting in good faith.

00:23:03.810 --> 00:23:20.170
Bail, Kristin - FS
If this was never an intent to withhold information and and I&I. Guess I'll I argue with you, a little bit that there was any intention to withhold that district has been through Heckenbach, you know with the fires this year and.

AR 12223

00:23:20.390 --> 00:23:52.450
Bail, Kristin - FS
Uh you know, we attended a meeting at the collaboratives request and shared with them information and have been up to our eyeballs and Postfire Recovery and Kovid and everything else and you know, I certainly will take responsibility for a delay in. In what we wanted to do, which was to sooner have a have a public meeting than what we've been able to schedule. But you know just knowing how hard those people are working and what they've been through.

00:23:53.110 --> 00:24:03.320
Bail, Kristin - FS
I wasn't going to push them into putting on something like that before they were ready and it had a chance to recover after quite a quite a harrowing summer.

00:24:04.900 --> 00:24:22.830
+15*******82
Well, I'm sympathetic to that question, but you know the thing of it is, is you mentioned that there was no intention to withhold but actually there was we asked Chris during that phone call. If you would give us that information that he disclosed to the collaborative and he declined.

00:24:05.450 --> 00:24:05.690
Bail, Kristin - FS
Or.

00:24:23.560 --> 00:24:29.030
+15*******82
We said we'd have to wait for the public meeting so that seems to me to be an intention to withhold.

00:24:30.310 --> 00:25:00.210
Bail, Kristin - FS
Well, I will not sign a letter that throws my Ranger under the bus and a meeting that I wasn't there at, I I. I think that I want to look forward. I want to frame our relationship moving forward and you know, I certainly have no intention of of withholding information and I'm not going to write a letter saying, You know, my Ranger intentionally withheld anything because I don't know that that's the case and and truly you know if our I think our shared concern.

00:25:00.270 --> 00:25:18.880
Bail, Kristin - FS
Is about the health of these lands you know your your interest in in shaping? How they're managed into the future and you know, I think our our our time together is very well spent on what that looks like and how we can help help you know further. The vision of what you see out there.

00:25:19.440 --> 00:25:29.480
Bail, Kristin - FS
Uh so, so yeah, no, I I I'm I would not agree to a letter like that because I don't feel like it is something that is for the greatest good for all of us.

AR 12224

8-ER-1443

00:25:32.330 --> 00:25:32.770
+15*******82
OK.

00:25:34.770 --> 00:25:43.080
+13*******92
I'm just for a second to step down into the issue with the collaborative again, you sent us a operating protocol document.

00:25:44.090 --> 00:25:45.100
+13*******92
And UM.

00:25:45.790 --> 00:25:56.220
+13*******92
In there, there's a paragraph that says that with communication to the Forest Service on that topic that we should refer to a memorandum of understanding and demo you.

00:25:56.930 --> 00:26:02.720
+13*******92
It exists, but the MOU wasn't in there, so can, we see that please.

00:26:03.700 --> 00:26:15.770
Bail, Kristin - FS
No 'cause it doesn't exist to my knowledge. There was not an MOU that was affected to my knowledge. Again, I've been here 2 and a half years, so if somebody drags out something from 2014.

00:26:16.760 --> 00:26:46.030
Bail, Kristin - FS
You know, I will stand corrected but there was a letter of intent, which I did share with you, which is you know, my articulation of how I want to work with the collaborative but my understanding based on an email and recollection was at the Mo. You was never finalized and the previous 4 supervisor settled on a letter and I shared with you. The letter that I did a refresh on under my signature, which reflects you know the relationship.

00:26:46.080 --> 00:26:47.460
Bail, Kristin - FS
That I have with the collaborative.

00:26:58.210 --> 00:27:02.620
+13*******92
So how do we? How would we join this meeting that's coming up next Wednesday just as a?

00:26:58.460 --> 00:27:00.330
+15*******82
I've got a couple of things here.

AR 12225

8-ER-1444

00:27:03.810 --> 00:27:08.120
+13*******92
An aside here with the meeting is coming up on the 26th he said, Is It.

00:27:07.780 --> 00:27:08.250
Bail, Kristin - FS
Correct.

00:27:09.170 --> 00:27:10.260
+13*******92
Available virtually

00:27:11.230 --> 00:27:13.660
+13*******92
that is that in the press release. I just haven't gotten that far yet.

00:27:15.230 --> 00:27:23.580
Bail, Kristin - FS
I I will double check, but I'm almost 100% positive we would not be having an in person public meeting during Omicron so yeah.

00:27:25.780 --> 00:27:32.090
+15*******82
Well, it will it be a uh account 'cause I I would attend if it's you know if it's an in person type meeting.

00:27:32.550 --> 00:27:39.200
Bail, Kristin - FS
No, I I wouldn't I wouldn't authorize an in person meeting at this time, knowing the Kovin environment that we're in with.

00:27:37.980 --> 00:27:38.360
+15*******82
Yeah.

00:27:39.250 --> 00:27:42.760
Bail, Kristin - FS
Uh I I over here in Chelan County and.

00:27:40.300 --> 00:27:48.610
+13*******92
Oh, there, I'm sorry, there is a link down at the bottom of the press release that isn't the first with project website and says all materials information will be there OK.

00:27:46.500 --> 00:27:46.900
Bail, Kristin - FS
Yeah.

00:27:49.200 --> 00:27:57.280
Bail, Kristin - FS

AR 12226

Yeah, Yeah, but no we, we won't be having person in person meetings for a number of weeks now, while we're in the spike of Omicron.

00:27:50.740 --> 00:27:51.390
+15*******82
OK, so.

00:27:58.220 --> 00:28:08.290
+15*******82
No, that's a That's a wise decision and I totally agree with you. But how do we know how to get connected to that meeting is that going to be released?

00:28:09.090 --> 00:28:11.640
+15*******82
In the newspaper or where do we find that?

00:28:13.560 --> 00:28:35.200
Bail, Kristin - FS
Well, there are couple links in the news release. I'm unfortunately, not on my on my email right now, so I can't look at it, but there are some links in there that will have the logistics posted when they're available, so if you if you keep that press release you should be able to access that link when those materials are posted.

00:28:37.100 --> 00:28:40.570
+13*******92
Yeah, the only thing on the press release is just a link to the project website.

00:28:38.060 --> 00:28:38.450
+15*******82
OK.

00:28:41.140 --> 00:28:41.610
Bail, Kristin - FS
OK.

00:28:42.830 --> 00:28:48.260
Bail, Kristin - FS
Yeah, they may not have set it up yet 'cause. It'll it'll have to be its own you know special.

00:28:48.990 --> 00:28:56.950
Bail, Kristin - FS
You know forum and and site and you know? Our public affairs spokesman just not have done that yet since it's a little over a week week out.

00:29:04.080 --> 00:29:10.610
+15*******82
OK, I've got a couple of other requests come if endless Dave and Phil you have anything.

AR 12227

8-ER-1446

00:29:11.350 --> 00:29:11.940
+15*******82
You wanna

00:29:12.650 --> 00:29:13.420
+15*******82
caution?

00:29:14.610 --> 00:29:18.330
+13*******92
Well, I I would just still like to hear some.

00:29:14.710 --> 00:29:15.070
David L. Fluharty
Good.

00:29:19.160 --> 00:29:26.720
+13*******92
A commitment to reducing information release delays in the future as much as possible, you know just in the spirit of.

00:29:27.640 --> 00:29:28.510
+13*******92
Public engagement.

00:29:30.350 --> 00:29:49.370
Bail, Kristin - FS
Well, I can say with some you know, Scouts honor that I have directed my public affairs officer to ensure that there is proactive in future of proactive and consistent and frequent communication on our projects and as we move forward, particularly with infrastructure bill.

00:29:49.430 --> 00:30:05.510
Bail, Kristin - FS
Uh you know that communication is going to be even more important for the work that it potentially could be included in that. So so I've made a specific ask an expectation to both my Ranger and my public affairs staff officer to make that happen.

00:30:06.350 --> 00:30:33.360
Bail, Kristin - FS
More more than giving a direct you know instruction to my people. I don't know what else I can you know promise other than you know we can have a follow up meeting 6 weeks or 6 months from now and and have a check in to see how it's working from your end in terms of you know reasonable frequency of of communication and again, you know it may be that there's no change. You know from month to month, but you know that's that's OK.

00:30:37.530 --> 00:30:41.560
+13*******92
Yeah, oh definitely suits your meetings are are are going to be real desirable.

00:30:41.610 --> 00:30:49.020
+13*******92
Uh and during that last meeting in November that the collaborative invited you to attend.

00:30:50.030 --> 00:30:52.600
+13*******92
Do you guys have any minutes or?

00:30:53.460 --> 00:30:59.110
+13*******92
Description of what took place in that meeting anything more than just what we've heard Thirdhand from the.

00:30:59.920 --> 00:31:00.770
+13*******92
Community Council.

00:31:02.610 --> 00:31:04.300
Bail, Kristin - FS
I'm what I UM.

00:31:05.080 --> 00:31:06.630
Bail, Kristin - FS
I was not at that one.

00:31:07.620 --> 00:31:16.610
Bail, Kristin - FS
The collaborative has its own meeting minutes so I could ask them to share the November 16th meeting minutes with you.

00:31:17.230 --> 00:31:17.810
Bail, Kristin - FS
Uhm.

00:31:17.600 --> 00:31:18.930
+13*******92
Yes, great.

00:31:19.430 --> 00:31:33.680
Bail, Kristin - FS
Yeah, but that's their their their it's it's their collaborative and they're in charge of of you know the meeting. The meeting notes if if there are any for for that particular meeting and so that's how I that's how it end up sharing them with you.

00:31:29.670 --> 00:31:30.080
+13*******92
OK.

AR 12229

8-ER-1448

00:31:35.590 --> 00:31:38.020
+13*******92
Yes, if you could do that that would be very helpful. Thank you.

00:31:37.410 --> 00:31:37.740
Bail, Kristin - FS
Uh-huh.

00:31:38.590 --> 00:31:38.910
Bail, Kristin - FS
Yeah.

00:31:44.260 --> 00:31:45.010
+13*******92
Yeah, go ahead Rick.

00:31:46.350 --> 00:31:48.330
+15*******82
OK, thanks, yeah, I just uh.

00:31:49.100 --> 00:32:19.490
+15*******82
Wanted to just try to lighten up here a little bit. You know, I I don't like this at all. I don't like being in an adverse aerial relationship with the Forest Service and I've been involved with the Forest Service since 1977. When I was getting involved in Mount Hood and then of course for many, many, many years on the rollout. Whitman and unfortunately that relationships turned to adversarial and the reason for that was things like this and I don't like it.

00:32:19.580 --> 00:32:30.020
+15*******82
I don't wanna get it all up. It's a trust thing. And when you can't trust the federal agency. Then, who can you trust? I mean, it's it's it's it's difficult?

00:32:31.150 --> 00:33:01.620
+15*******82
But I'm hoping that that you know, there will be some way if you're not interested in assuring us in writing that this isn't going to happen again. What what other assurances can we have that that you know that this kind of thing isn't going to happen. I mean, this is not going to be continuing policy. I mean, you say it's not and I? I understand that and I believe you but I you know, I mean this? Is this is something that just.

00:33:01.680 --> 00:33:06.570
+15*******82
And here we are still without the information that was given to the collaborative more than 2 months later.

AR 12230

00:33:07.260 --> 00:33:07.840
+15*******82
And.

00:33:09.280 --> 00:33:12.940
+15*******82
You know that's just something that needs to be rectified.

00:33:13.540 --> 00:33:27.370
+15*******82
And there needs to be some sort of an understanding that that that things will be done differently. In the future. And if you're not going to United Center letter OK? What what do you think?

00:33:28.630 --> 00:33:31.060
+15*******82
Would be appropriate if you were us?

00:33:31.670 --> 00:33:33.940
+15*******82
What would you be suggesting?

00:33:39.960 --> 00:34:00.540
Bail, Kristin - FS
Well, uh you know, and I I feel bold, Yeah 'cause I don't like ever to speak. You know it. You know, but truly articulating you know the the preferred method of engagement and how you want to be in engaged you know, I I've offered up. You know the the uh weekly or excuse me a monthly connection with with Chris fur to provide input.

00:34:01.490 --> 00:34:09.980
Bail, Kristin - FS
You know what I what I'm trying to get my mind around is you know, my understanding from the, The November meeting was a verbal.

00:34:10.730 --> 00:34:15.420
Bail, Kristin - FS
Update as to what the Forest Service was thinking by Chris to the group.

00:34:16.260 --> 00:34:16.860
Bail, Kristin - FS
So.

00:34:18.030 --> 00:34:34.840
Bail, Kristin - FS
You know, do so essentially it is uh something similar to you, saying this is what we're thinking and that's where everyone is right now is you know, we've just shared that this is what we're thinking and our formal you know, kind of launching of the next steps is happening with the public meeting next week.

00:34:35.540 --> 00:34:59.740
Bail, Kristin - FS

AR 12231

8-ER-1450

So so, so I struggle a little bit is you know, we got and I've created a you know that that monthly connection work risk and tell you the same thing. He told them You know where where were you know going to be changing. Our our strategy. Here to to recognize that you know the landscape has been impacted. We have to you know redo analysis and baselines and all that and and you know, we'll we'll focus on a smaller smaller area.

00:35:00.510 --> 00:35:01.170
Bail, Kristin - FS
So.

00:35:00.880 --> 00:35:06.880
+13*******92
I'm just not sure I'm not sure why you think you could do that on a monthly basis when he didn't do it. The first time we talked to him.

00:35:02.410 --> 00:35:02.870
Bail, Kristin - FS
Yeah.

00:35:08.220 --> 00:35:13.770
+13*******92
It just doesn't seem to be his Mo basically told us to join the collaboratively who wanted to know anything otherwise.

00:35:08.620 --> 00:35:09.110
Bail, Kristin - FS
'cause I.

00:35:14.360 --> 00:35:20.480
+13*******92
You know just wait for us to tell you something like anybody else would read the newspaper you'll find out go away.

00:35:21.620 --> 00:35:22.700
+13*******92
It was we were really.

00:35:21.910 --> 00:35:22.330
Bail, Kristin - FS
Well.

00:35:24.240 --> 00:35:25.890
+13*******92
And I don't I don't like his attitude.

00:35:24.700 --> 00:35:25.750
Bail, Kristin - FS
Well, I I I.

AR 12232

00:35:26.750 --> 00:35:27.580
+13*******92
Conducive to

00:35:26.980 --> 00:35:32.380
Bail, Kristin - FS
I have confidence that if I tell my Ranger and staff office and staff officer to do something that they will do it.

00:35:37.450 --> 00:35:45.990
+13*******92
it's worth a try right you know, I'm not gonna say no. I'm gonna say sure let's give it a try. But I'm just saying I was skeptical at based on the first encounter.

00:35:42.560 --> 00:35:42.900
Bail, Kristin - FS
Yeah.

00:35:47.760 --> 00:35:48.630
+13*******92
Very skeptical.

00:35:48.910 --> 00:35:49.280
Bail, Kristin - FS
Yeah.

00:35:49.350 --> 00:35:49.760
+13*******92
But.

00:35:50.420 --> 00:35:51.960
+13*******92
But OK let's do it.

00:36:02.190 --> 00:36:09.800
Bail, Kristin - FS
So can, we can, we count the 26th visit for as as a as an engagement or would you like something separate scheduled for later this month?

00:36:03.300 --> 00:36:03.740
+15*******82
Yes.

00:36:12.950 --> 00:36:19.130
+15*******82
Well, I I think you know you've answered her questions as best you could and uh.

AR 12233

00:36:19.860 --> 00:36:23.030
+15*******82
You know, I'm I only have one more question for you.

00:36:23.580 --> 00:36:23.960
Bail, Kristin - FS
Uh-huh.

00:36:23.930 --> 00:36:28.720
+13*******92
I'm sorry to 2626 it will be an engagement so we can go a month from there.

00:36:23.980 --> 00:36:24.650
+15*******82
Uh.

00:36:29.370 --> 00:36:29.760
Bail, Kristin - FS
OK.

00:36:29.720 --> 00:36:30.990
+13*******92
In my opinion, yeah.

00:36:31.620 --> 00:36:39.600
Bail, Kristin - FS
Yeah, and I will I will write a I will write a note in my calendar invite to double check and make sure that connection has happened.

00:36:32.150 --> 00:36:32.890
+15*******82
OK. Yeah.

00:36:42.040 --> 00:36:42.510
+15*******82
Good.

00:36:43.300 --> 00:36:47.560
+15*******82
So my last question is a Christian when you were on the Ochako.

00:36:48.340 --> 00:36:50.130
+15*******82
Did you know a guy named Tim little Bo?

00:36:52.980 --> 00:36:53.630
Bail, Kristin - FS
Yes.

AR 12234

00:36:55.070 --> 00:36:55.440
+15*******82
Yeah.

00:36:56.210 --> 00:36:57.590
+15*******82
Yeah, he was my closest friend.

00:36:56.530 --> 00:36:56.890
Bail, Kristin - FS
Yeah.

00:36:59.480 --> 00:37:05.690
Bail, Kristin - FS
Yeah, but you're you're going back a little bit 'cause, I I left the Ochako in 2006.

00:37:07.180 --> 00:37:07.590
+15*******82
Yeah.

00:37:07.640 --> 00:37:13.190
+15*******82
Yeah, well. Tim has been there and done that disputes and Mal here and everywhere else for.

00:37:13.770 --> 00:37:23.240
+15*******82
Since way before that, but yeah, Tim Tim was a very close friend of mine and and uh. Yeah, good guy to work with. He was a lot easier to work with than I am.

00:37:26.000 --> 00:37:27.610
Bail, Kristin - FS
I know and and UM.

00:37:28.480 --> 00:37:58.590
Bail, Kristin - FS
I always you know, my greatest fear is not that people are interested in their national forests and public lands. My greatest fear is that they aren't they become uninterested in our national forests and public lands and you know, and and people start actively thinking about other other uses other than public uses for those lands so I always welcome. You know engagement and people being committed. You know to to working with us together, even if we don't agree as to.

00:37:58.650 --> 00:38:23.040
Bail, Kristin - FS
Exactly you know what needs to be done, but that you know, we are committed to both caring caring about our landscape and and trying to find that common ground where it exists. So you know, I I well welcome your engagement and interest. I'm I'm really glad that you did reach out to me with your concerns and and you know, I do want to find a a good workable way to to ensure that you, you all are connected in the way that you want to be connected.

AR 12235

00:38:23.580 --> 00:38:29.760
Bail, Kristin - FS
And and you know just figure out how best to do that, and and understand you know that.

00:38:30.970 --> 00:38:46.200
Bail, Kristin - FS
You know with with with short staff, you know, I'm I'm going to be leaning on Chris to help me with that
as well as you know, Victoria Public Affairs Officer. She she helps with you know, ensuring you know
communication materials and and meetings and things are are planned and executed.

00:38:49.790 --> 00:38:50.200
+15*******82
Good.

00:38:49.980 --> 00:38:55.090
David L. Fluharty
So do do you have a few more minutes to answer a couple more questions I?

00:38:54.560 --> 00:38:56.210
Bail, Kristin - FS
Yes, uh I have till 3:00 o'clock.

00:38:56.130 --> 00:39:01.220
David L. Fluharty
Yeah, I I really, really appreciate you spending time with us today and and.

00:39:01.620 --> 00:39:25.660
David L. Fluharty
Uh I'm kind of the policy wonk for for our organization and I. I tend to. I tend to try to go back and read
the the legislation that you're operating under and they're and I'm not a lawyer. So this is not. This is not
a legal analysis. That's just kind of a question in which you probably have have dealt with.

00:39:22.000 --> 00:39:22.450
Bail, Kristin - FS
Uh-huh.

00:39:25.710 --> 00:39:33.430
David L. Fluharty
Uh at least I hope that you have with respect to this, this change that we've we've been told about.

00:39:33.500 --> 00:39:45.130
David L. Fluharty
Uh and the first one, is the eligibility of an area for a collaborative process requires that the the area be
at least 50,000.

00:39:45.600 --> 00:39:47.090
David L. Fluharty
Uhm acres.

AR 12236

8-ER-1455

00:39:47.800 --> 00:39:55.400
David L. Fluharty
And as you know, we're now down to half of that come with with what what we've been told will be done.

00:39:56.870 --> 00:39:58.780
David L. Fluharty
So I'm I'm curious.

00:39:59.560 --> 00:40:00.900
David L. Fluharty
You know this does he act.

00:40:01.560 --> 00:40:09.870
David L. Fluharty
Somehow pull the rug out from underneath you on these things or is there some wiggle room that you have to continue to.

00:40:09.920 --> 00:40:32.710
David L. Fluharty
We work with a collaborative or work work with this process on on twist. Rest Restoration 'cause. It's it's really quite a quite a change in doesn't seem to fit into what I'm reading here and in the in public law of level 111 11. You know, I'm sure you've memorized it's.

00:40:35.930 --> 00:40:37.340
Bail, Kristin - FS
Well, there is a?

00:40:38.320 --> 00:40:48.810
Bail, Kristin - FS
It you know you could have a collaborative of of all sorts and kinds. I mean, we work with friends groups. We work with you know trail associations you know, we work with.

00:40:49.540 --> 00:40:50.990
Bail, Kristin - FS
Uh you know.

00:40:50.650 --> 00:40:51.540
David L. Fluharty
MPC.

00:40:52.090 --> 00:40:59.920
Bail, Kristin - FS
Yeah, and yeah, and and so uh you know in terms of you know, we don't have like a formal factor relationship with this collaborative.

00:41:01.050 --> 00:41:08.590
Bail, Kristin - FS
You know the the collaborative is a a self formed you know group that you know that.

AR 12237

8-ER-1456

00:41:10.000 --> 00:41:17.850
Bail, Kristin - FS
Runs itself you know this and and makes its rules, and you know chooses what it it works on the Forest
Service does not.

00:41:18.460 --> 00:41:23.060
Bail, Kristin - FS
Uh you know set the agenda you know it doesn't you know.

00:41:23.800 --> 00:41:36.500
Bail, Kristin - FS
Uhm say who who how they organize or how they do that. Their work, so let's say. I'm trying to
remember 11111 is that the omnibus public lands frustration or public lands act.

00:41:29.170 --> 00:41:29.510
+15*******82
Right.

00:41:37.270 --> 00:41:41.900
David L. Fluharty
Yeah, that's that's the omnibus public Lands Management Act in 2009.

00:41:42.200 --> 00:41:54.900
Bail, Kristin - FS
Yeah, so it's not this isn't a specifically chartered collaborative. It's it's one that was just formed of its
own own desire and it's not been formally chartered by the Forest Service.

00:41:54.960 --> 00:42:08.360
Bail, Kristin - FS
So for any specific purpose and that's why there's no charter document. I mean, there's only the
documents that the collaborative has created for itself, so maybe I need to see the specific language.

00:42:06.770 --> 00:42:08.140
David L. Fluharty
And then did your letter.

00:42:09.160 --> 00:42:09.850
David L. Fluharty
And your love.

00:42:09.370 --> 00:42:09.770
Bail, Kristin - FS
Pardon.

00:42:11.280 --> 00:42:26.350
David L. Fluharty
Your your letter confirming that you have selected them at and using them as the collaborative or all
projects in the Okanogan Wenatchee National Forest, not specific to any any.

AR 12238

00:42:26.500 --> 00:42:43.080
David L. Fluharty
Uh specific collaborative whether it's mission or whether it's the twist or or any of the others. So I mean, it's very, very broad mandate that you're working under but the the question is still.

00:42:43.660 --> 00:42:55.750
David L. Fluharty
Uh we're we're talking now, I mean to be eligible for the funding and to be eligible to be part of this. This collaborative process. The land area, according to what I'm reading.

00:42:56.200 --> 00:42:58.690
David L. Fluharty
Uh she should should be.

00:42:56.270 --> 00:42:59.330
Bail, Kristin - FS
Oh are you talking oh are you talking about CFL RP.

00:42:59.490 --> 00:43:02.330
David L. Fluharty
It should be 50,000 acres, or greater.

00:43:02.990 --> 00:43:03.890
David L. Fluharty
And and

00:43:03.130 --> 00:43:07.130
Bail, Kristin - FS
So are you talking about collaborative forest landscape restoration projects.

00:43:07.620 --> 00:43:09.320
David L. Fluharty
yes, which is.

00:43:08.700 --> 00:43:25.270
Bail, Kristin - FS
OK so yeah, this isn't that collaborative is not is not equivalent to that. They're not formed for CFRP program. The CLRP program is completely different and our our existing CFL ERP proposal is well above 50,000 acres.

00:43:27.350 --> 00:43:36.370
David L. Fluharty
But do you reach the original proposal is but what you're now telling us it's been scaled back right and that is what I'm trying to understand.

00:43:35.860 --> 00:43:49.190
Bail, Kristin - FS
Oh yeah, no there. There's a lot. There's stuff all the way down to Wenatchee River Ranger District.

AR 12239

That's in the CFRP proposal. So it goes all the way you know it. It's a much larger area in our CFL RP proposal. Not it's not just twist.

00:43:50.110 --> 00:44:05.480
David L. Fluharty
So so that's why I can't find a a document that you sent to the advisory panel or approval instituting the twist restoration project.

00:44:05.800 --> 00:44:11.540
Bail, Kristin - FS
Yes, no it's it's brought it's much broader than that I can I can come?

00:44:12.160 --> 00:44:18.870
Bail, Kristin - FS
Yeah, they they should it should be on the IT should be on the CFL RP website. You should be able to find our proposal on there.

00:44:12.240 --> 00:44:13.590
David L. Fluharty
But I think.

00:44:19.570 --> 00:44:43.520
David L. Fluharty
I I can find one from LA 2012 or 2014 that is that broad broad thing I couldn't find the one that I was looking for the one thinking that these were separate projects and that that and so, so that is what you're telling me now is that the the larger scheme of things.

00:44:26.710 --> 00:44:27.090
Bail, Kristin - FS
Yeah.

00:44:43.970 --> 00:44:50.860
David L. Fluharty
Uh is makes you eligible and the fact that this one scaled back is is not but.

00:44:52.480 --> 00:45:08.230
David L. Fluharty
So so I I can understand that, but then then the question to me is if if this has been designated that this area is 77,000 square acre 77,000 acres is now a a?

00:45:09.100 --> 00:45:09.770
David L. Fluharty
Uhm.

00:45:10.810 --> 00:45:12.910
David L. Fluharty
Now split into 2 parts.

AR 12240

8-ER-1459

00:45:13.500 --> 00:45:43.830
David L. Fluharty
Uhm whereas before it was seen as an ecosystem based project. It seems to me like the the need for keeping that ecosystem focus is even greater and that that what it sounds like is your calling that forest restoration plan for the burned burned area and part of the reason we went over there was to see just how the fire had skipped around in there so.

00:45:13.670 --> 00:45:14.070
Bail, Kristin - FS
Uh-huh.

00:45:44.150 --> 00:45:45.130
David L. Fluharty
It seems to me like.

00:45:45.540 --> 00:46:15.930
David L. Fluharty
Uh when you compare that with the other other burnt recently burned areas in the same place where we're losing, it an opportunity to look at this whole thing from a landscape of perspective by by by separating this into 2 prod projects and it. You know is one project now to be funded out of one thing and one out of infrastructure money or are they both going to be eligible for it.

00:46:15.990 --> 00:46:25.100
David L. Fluharty
Infrastructure study, it, you probably don't know the answers. But these these are things that that are really important to to some of us anyway.

00:46:19.200 --> 00:46:19.710
Bail, Kristin - FS
Uh-huh.

00:46:25.740 --> 00:46:33.820
Bail, Kristin - FS
Yeah, Well, you're you're really hitting on you know, there is not a lot of clarity as to what is and isn't funded by infrastructure?

00:46:35.180 --> 00:46:57.820
Bail, Kristin - FS
You know, but one thing is, you know the we still have all the analysis done for the entire T of the twist restoration project 'cause. We were moving towards you know, we had the draft and then you know, we were looking for that way to to you know take what we had heard in response to the draft. All the comments and input and what that was going to look like for the final.

00:46:58.610 --> 00:47:28.900
Bail, Kristin - FS
So we have you know they affected environment. We have all of that. You know basic analysis. You know that doesn't form that landscape. You know level approach and so all that is still applicable to what it is that we think we you know that we think was needed, particularly for that area closest to the

AR 12241

communities. You know that it is in matrix lands and it's giving us and doing this approach, the way we're proposing it. That gives us a little more space to update our analysis. You know for that upper part of the landscape.

00:47:29.190 --> 00:47:59.680
Bail, Kristin - FS
Yeah, where they had a whole lot more LSV. You know, and and you know areas where there was a lot more. You know dialogue that people wanted to have to update the analysis there and to have that additional dialogue. So we wanted to be able to continue to move forward and and do what we feel is is going to help protect those communities that were you know, so terribly impacted by fire this summer and still have that a good thoughtful looking analysis for that portion.

00:47:59.740 --> 00:48:16.050
Bail, Kristin - FS
Up there and then of course, we have the whole upper metal landscape analysis that is coming into the into the future that will be working on that could also potentially be funded by infrastructure in the future since infrastructure is a you know a multi year.

00:48:16.110 --> 00:48:27.890
Bail, Kristin - FS
Uhm multi year effort as well as the chief and this is other news that I am just getting the chief has released you know his tenure wildfire strategy.

00:48:28.900 --> 00:48:36.200
Bail, Kristin - FS
And you know as as sharing is sharing that out, now and I can send that information to you.

00:48:36.510 --> 00:48:45.810
Bail, Kristin - FS
Uh you know to you know that just came out today and I did not have a a. A pre uh. A preview copy of it, I got it when everyone else did.

00:48:48.240 --> 00:48:48.770
David L. Fluharty
Right.

00:48:49.180 --> 00:48:49.770
+15*******82
Alex.

00:48:49.620 --> 00:48:49.990
David L. Fluharty
You know.

00:48:51.000 --> 00:48:51.990
David L. Fluharty
So so much.

AR 12242

8-ER-1461

00:48:51.160 --> 00:49:06.380
Bail, Kristin - FS
Yeah, but it it very different you know, and you know the the bottom part it. Towards the towards the you know the communities is more matrix and the upper part is more LSV and I you know, I&I welcome you know that that conversation about what we might do.

00:49:06.430 --> 00:49:08.340
Bail, Kristin - FS
You too.

00:49:09.850 --> 00:49:19.520
Bail, Kristin - FS
I understand the need the the needs for for self treatment, but understanding also that it's LSV in northern spotted owl habitat and you know, there's been a portion of it impacted by fire.

00:49:20.900 --> 00:49:41.940
David L. Fluharty
Right I mean, this, I mean, one one of the worries that I've had is is that this is the end and we've seen this happen is that this is a formula for going in with salvage logging and you know that's frequently not done with the ecosystem in mind, and So what you're saying is something that.

00:49:41.990 --> 00:50:01.080
David L. Fluharty
Dumb is it I think is is positive. We're going to be out. Obviously watching it, and could commenting is as best we can so just just to let you know that we're we, we would really prefer to see this still together as a as a.

00:49:52.400 --> 00:49:52.790
Bail, Kristin - FS
Uh-huh.

00:50:01.410 --> 00:50:11.020
David L. Fluharty
In a twist restoration project of 77,000 square acre 77, 8000 acres, but

00:50:11.620 --> 00:50:13.090
David L. Fluharty
Well, you know.

00:50:14.230 --> 00:50:17.520
David L. Fluharty
We also understand that fire has changed.

00:50:17.800 --> 00:50:22.060
David L. Fluharty
The the the environment, too, so.

AR 12243

00:50:22.770 --> 00:50:23.190
Bail, Kristin - FS
Yeah.

00:50:22.810 --> 00:50:23.220
David L. Fluharty
Ah.

00:50:23.890 --> 00:50:26.290
David L. Fluharty
But those those are those are.

00:50:27.750 --> 00:50:29.920
David L. Fluharty
You you help me understand.

00:50:31.480 --> 00:50:36.300
David L. Fluharty
Why this reading is is incomplete so I appreciate that?

00:50:36.700 --> 00:50:51.890
Bail, Kristin - FS
Yeah, well. I appreciate folks that actually look at the legislative language. You know, and and you know ask those good questions. So so yes, I'll I'll look for the link. But yeah, it won't, it doesn't show up as a twist, you know, see if LRP project. It's

00:50:52.180 --> 00:51:06.470
Bail, Kristin - FS
uh you know a much broader landscape than that and and so that the 50,000 acres is, is well exceeded with what we're moving forward with and has been selected by the secretary for implementation. We're just awaiting funding from Congress.

00:51:07.090 --> 00:51:12.330
Bail, Kristin - FS
Uh you know to to be able to you know start implementing the the the the project.

00:51:12.970 --> 00:51:15.240
David L. Fluharty
Yeah, I mean that that's that dumb.

00:51:15.830 --> 00:51:20.750
David L. Fluharty
You know reading reading this, the the funding and how it's to be used and the sequence.

00:51:21.040 --> 00:51:21.690
David L. Fluharty
Uhm.

00:51:22.910 --> 00:51:40.570
David L. Fluharty
Gives you a really remarkably difficult. UM job because a lot of the supposit ecosystem respiration elements are to be funded in the first 2 years and in in the meantime.

00:51:42.030 --> 00:51:47.620
David L. Fluharty
It was not clear what that is one one of our our major concerns as an organization was.

00:51:48.910 --> 00:51:50.240
David L. Fluharty
This this is.

00:51:51.940 --> 00:52:05.830
David L. Fluharty
This was putting forward a 30 year plan when the the forest landscape restoration thing is a 10 year plan. Obviously, I suppose it could be redone and then it's.

00:52:07.150 --> 00:52:19.180
David L. Fluharty
Under the under the collaborative approach. It supposed to have all of these elements of leveraging local and other funding and I can't find the funding reports.

00:52:19.250 --> 00:52:30.840
David L. Fluharty
Come on, you know for for the other projects, either so this is something that I'm not sure. I'm looking in the right places, but it would be really helpful to be able to.

00:52:30.890 --> 00:52:40.090
David L. Fluharty
You will be able to track because that's how money gets spent is is almost as effective as boots on the ground.

00:52:40.960 --> 00:52:42.550
David L. Fluharty
Knowing what's happening so.

00:52:43.330 --> 00:53:14.810
Bail, Kristin - FS
Yeah, yeah, and it we've been impatiently waiting for us. To actually get funding for our CFRP project so that we can start having you know conversations with all of the folks who are you know have partnered with us. On on that proposal. We do have you know an individual that will serve as our point of contact for SL. But as you very rightly noted you know all these other funding streams are also.

00:53:14.870 --> 00:53:24.680
Bail, Kristin - FS
Going to need to be tracked and sequenced and identified and so you know, we are. We are looking to getting more capacity on the forest.

AR 12245

00:53:24.740 --> 00:53:53.900
Bail, Kristin - FS
And you know, I I sort of coordinator you know to help us with that, so that we can you know share and have it be very clear what's going on? Because you know there's different pots of money coming from different different places that are all all going to start to come into play. So you know, I'm sitting through meetings talking about you know spreadsheets and you know databases and GIS and all that stuff.

00:53:54.800 --> 00:53:58.290
David L. Fluharty
Right right well, more power to you, I mean?

00:53:58.350 --> 00:53:58.560
David L. Fluharty
Yeah.

00:53:59.970 --> 00:54:12.500
David L. Fluharty
I know I know it's it's it's not easy. I've I've I've worked for the Forest Service. One summer, so I'm I'm in Skykomish districts so you know it's it's.

00:54:14.060 --> 00:54:23.340
David L. Fluharty
I I know how hard it is to translate something is comes down from from somewhere else and into into.

00:54:24.070 --> 00:54:34.940
David L. Fluharty
Uh things out things happening on the ground. So now and we've seen huge changes in in the way things are are done and how things were approached I mean, this, this whole.

00:54:28.210 --> 00:54:28.670
Bail, Kristin - FS
Yeah.

00:54:35.840 --> 00:54:40.110
David L. Fluharty
Landscape level uh approach, I think is really dumb.

00:54:40.880 --> 00:54:50.240
David L. Fluharty
Uh really appropriate and you know, one that that particularly with climate change is now.

00:54:51.850 --> 00:55:20.560
David L. Fluharty
You know, we're we're really looking to, I mean, we, as an organization. They're looking for, for for us to become much more of a carbon sink than than anything else and and focus more on by biodiversity and then on so-called forest health, which seems to mean largely tree health, the way that it gets translated so that's where we are at least I think.

AR 12246

00:55:00.710 --> 00:55:01.120
Bail, Kristin - FS
Uh-huh.

00:55:20.620 --> 00:55:33.930
David L. Fluharty
That's where I think we are, and I've got Rick and Phil and and my wife. Lisa were all and as well as our other members who are all doing our best to pitch in.

00:55:36.090 --> 00:55:44.140
Bail, Kristin - FS
Yeah, and I I appreciate the fact that you brought up at the beginning. You know all volunteer organization you know that that that takes a lot of.

00:55:44.960 --> 00:55:59.090
Bail, Kristin - FS
Investment of time talent and probably treasurer to you know keep things keep things going and you know you're doing you're not getting paid to sit in on meetings and you know write write letters and stuff, so I I definitely appreciate your.

00:55:55.380 --> 00:55:55.630
+15*******82
Right.

00:55:59.590 --> 00:56:03.330
Bail, Kristin - FS
Uh you know your willingness to give up your you know personal time to do that.

00:56:04.990 --> 00:56:14.190
David L. Fluharty
Well, the attendee Part 2 is is I mean, we're I. I hate to say it but you know there. There's a are feeling is with the?

00:56:05.890 --> 00:56:06.140
+13*******92
Uh.

00:56:14.700 --> 00:56:26.000
David L. Fluharty
Uh the collaborative as designed the North Central Washington. Help Forest Health Collaborative, which is a derivative of the Columbia Basin. I mean, we know the history but.

00:56:24.980 --> 00:56:25.430
Bail, Kristin - FS
Uh-huh.

00:56:26.330 --> 00:56:38.410
David L. Fluharty

AR 12247

Uhm is has has all the right elements in there, but save when you look at the at you what you have or national organizations that are represented.

00:56:38.840 --> 00:56:47.330
David L. Fluharty
Uh for the environment and they're good organizations, but they tend to feel like they know far better than.

00:56:48.000 --> 00:56:50.760
David L. Fluharty
We volunteers and of course, we volunteers.

00:56:51.890 --> 00:57:02.690
David L. Fluharty
Uh kind of trying to say, Well, you're not you're not really representing you're not holding the line. Here you're you're compromising and and you know our our organization.

00:57:02.740 --> 00:57:21.820
David L. Fluharty
Uh was founded based on the advice of of a Chicago political scientist Graham McConnell and so I don't know if you've ever studied anything about public participation and and the public lands that he's written.

00:57:22.340 --> 00:57:34.680
David L. Fluharty
A powerful advocate for avoiding the agency capture and and things like that that you know are are are so, so.

00:57:35.510 --> 00:57:36.020
David L. Fluharty
Uh.

00:57:37.370 --> 00:57:50.910
David L. Fluharty
You know they they've been part of the history and they're part of the present and you know, making sure that we that that we have that free and open transparent interchange is really the the key to 2.

00:57:52.260 --> 00:57:56.570
David L. Fluharty
Doing that and and it's not easy, but it's it can be done.

00:57:57.320 --> 00:58:00.060
Bail, Kristin - FS
What's his name again? Yeah, yeah, I I'm intrigued by him.

00:57:59.030 --> 00:58:01.250
David L. Fluharty
Wrap wrap the call McConnell.

AR 12248

8-ER-1467

00:58:02.760 --> 00:58:06.020
David L. Fluharty
You wrote, I probably the best thing is a book he wrote.

00:58:06.070 --> 00:58:06.490
David L. Fluharty
Done.

00:58:07.000 --> 00:58:11.220
David L. Fluharty
The public lands in the public interest or I I can send you the reference.

00:58:11.540 --> 00:58:12.880
Bail, Kristin - FS
OK, yeah, please do.

00:58:11.590 --> 00:58:18.060
David L. Fluharty
Uh and couple couple things that you know it. It's it's you know, he's riding in the 50s.

00:58:19.060 --> 00:58:20.670
David L. Fluharty
And and 60s.

00:58:20.980 --> 00:58:28.440
David L. Fluharty
Uh so you know it's it's but you know the the the issues are are similar today so.

00:58:28.490 --> 00:58:43.250
David L. Fluharty
Uh uh and and we have his granddaughter is a member of our our board, so she's in and she's she's does law, not not public lands law but law so.

00:58:36.630 --> 00:58:37.560
Bail, Kristin - FS
Wow, that's cool.

00:58:42.220 --> 00:58:42.660
+15*******82
Thanks.

00:58:44.910 --> 00:58:51.810
David L. Fluharty
I'm sorry if I'm talking too much now, Flynn and Rick you probably want to close off here we're getting.

00:58:52.980 --> 00:58:53.970
David L. Fluharty
Most of the time.

AR 12249

8-ER-1468

00:58:53.440 --> 00:58:54.080
+13*******92
Well, I just

00:58:53.670 --> 00:58:59.390
+15*******82
Yeah, I'm done, I'm done, I I wanted to say that I appreciate very much your time, Kristen and.

00:58:55.830 --> 00:58:56.140
+13*******92
3.

00:58:59.980 --> 00:59:02.550
+15*******82
Uh yeah, and thank you for your patience.

00:59:04.510 --> 00:59:07.030
Bail, Kristin - FS
Well, thank you I yeah.

00:59:05.170 --> 00:59:05.750
+13*******92
Yeah, I just

00:59:06.550 --> 00:59:10.220
+13*******92
got the takeaway Christian will ask the collaborative for a minute.

00:59:10.880 --> 00:59:20.450
+13*******92
Uh we will have a scheduled meeting with Christopher at 20:00, 0.6. The February and then we'll talk to
you again in talking to 6 months.

00:59:21.690 --> 00:59:22.050
+13*******92
Right.

00:59:23.840 --> 00:59:34.030
Bail, Kristin - FS
Yep, I'm writing writing my To Do List. So I don't forget. I'll put my my calendar reminders and that's
that's how I keep things straight so yeah, and and.

00:59:32.160 --> 00:59:32.490
+13*******92
Then.

00:59:33.140 --> 00:59:41.070
+13*******92

AR 12250

And I'm sending you a link to the to the Journal so you can read our our last fall what we said in our Journal about the twist project.

00:59:42.420 --> 00:59:47.240
David L. Fluharty
Read read read read about other things we're not picking on you.

00:59:42.570 --> 00:59:43.990
Bail, Kristin - FS
Yeah, no thank thank you for that.

00:59:49.220 --> 00:59:50.270
+13*******92
Yeah, a lot of other stuff.

00:59:51.570 --> 01:00:17.060
Bail, Kristin - FS
I know I I as I said, I I do appreciate you know when something is not not working being able to have a dialogue and understand you know your interests and and certainly you know, we are. You know, we serve the public and that is in its broadest sense, so you know, I I'm I. I welcome being able to you know share information and look forward to our our public meeting.

01:00:17.100 --> 01:00:35.080
Bail, Kristin - FS
Uh and if and if you're not seeing something you know in a in a few days. Let me know. I'll try to. I'll go onto the website too. And I'll ask my public affairs staff officer. You know what the what the timeline is but I know I'm keeping her busy on a few other things, so.

01:00:36.020 --> 01:00:44.060
Bail, Kristin - FS
So I know it's going to kind of like a duck you know it might look. You know, I think she's paddling really fast underneath the water right now on a on a several items.

01:00:45.910 --> 01:00:49.920
+13*******92
Yeah, I'm looking on the project website right now and I don't see anything other than what was already there.

01:00:47.360 --> 01:00:47.710
+15*******82
Yeah.

01:00:50.660 --> 01:00:53.130
Bail, Kristin - FS
OK Alright I'll I'll monitor that.

01:00:51.970 --> 01:00:52.630
+13*******92
If it is he?

AR 12251

8-ER-1470

01:00:54.010 --> 01:00:57.860
+13*******92
If you can find the link to the meeting and just send that out that would be very cool.

01:01:00.030 --> 01:01:02.420
+13*******92
Said about Easter egg hunt OK.

01:01:02.300 --> 01:01:17.290
Bail, Kristin - FS
Well, I'll check with her when as to when when to expect that because it it may be that it's intentionally you know sent out closer to the meeting, so it doesn't get buried in someones email from you know a week and a half away or a week away.

01:01:20.030 --> 01:01:20.540
+15*******82
Yeah.

01:01:20.600 --> 01:01:21.140
+13*******92
That happened.

01:01:23.330 --> 01:01:25.690
+13*******92
Alright well, thanks again appreciate the time.

01:01:26.340 --> 01:01:31.370
Bail, Kristin - FS
Thank you and I'm going to end the recording.

01:01:26.840 --> 01:01:27.250
+15*******82
Yes.

01:01:32.860 --> 01:01:34.170
+13*******92
Yeah, me, too, right now.

01:01:34.900 --> 01:01:35.430
+13*******92
Ending.

01:01:35.210 --> 01:01:38.840
Bail, Kristin - FS
And yeah, and I I'll have I'll have to see.

01:01:39.910 --> 01:01:42.240
Bail, Kristin - FS
How how I make it available?

AR 12252

8-ER-1471

01:01:43.070 --> 01:01:43.680
Bail, Kristin - FS
So.

01:01:44.580 --> 01:01:45.670
+13*******92
Yeah, that'll be really I'm.

01:01:44.600 --> 01:01:46.070
+15*******82
So you so you're good.

01:01:46.930 --> 01:01:52.930
+13*******92
I got bumped off the teams call and call back in by phone. So I missed a couple of these 23 minutes
there.

01:01:47.290 --> 01:01:48.180
+15*******82
Yeah, yeah for sure.

AR 12253

Twisp Restoration Project, Okanogan-Wenatchee National Forest
Objection Resolution Meeting Notes
July 12, 2022

**Forest Service Meeting Participants:** Dave Warnack (Acting DRF), Kristin Bail (OWNF Forest Supervisor), Chris Furr (District Ranger), Rita Bennett (Acting Forest EC), Meg Trebon (District EC), Eireann Pederson (District Silviculturist/IDT Leader), Debbie Anderson (Regional Administrative Review Coordinator), Michelle Lombardo (Acting Regional Administrative Review Coordinator)

**Objector Meeting Participants:** Mike Liu (Conservation Northwest); Richard Bailey (North Cascades Conservation Council); David Fluharty (North Cascades Conservation Council); Michael Shaffer (Second Mile Ranch Community); Pearl Cherrington; Betty Wagoner; Tom Partin (American Forest Resources Council)

**Introduction Remarks of Objection Reviewing Officer (David Warnack)**
Dave thanked everyone to for attending the meeting and he recognized that this project was a long time in the making. He shared that his intent today was to hear from objectors, understand specific concerns they have with the project, and not to argue about any particular components of the project. He also stated that he was not planning to make any decisions in the meeting. Also, he added that he wants to gain a better perspective about how their concerns fit into the broader objectives of the project; and understand from different perspectives how this project will affect the landscape. He stated that the Responsible Official remains Kristin Bail, OWNF Forest Supervisor.

**Objector's Key Concerns and Resolutions: Each eligible objector had about 9 minutes to summarize their key concerns and proposed resolutions for the Objection Reviewing Officer and Forest Supervisor, with facilitated dialogue between the objectors and Objection Reviewing Officer and Forest Supervisor if there are questions.**

- **Mike Liu - Conservation Northwest:** Mike shared that his organization has been involved since the beginning of this project. He stated that their main objections relate to the following: use of the Forest Restoration Strategy (and work that DNR has done); issues related to fuelbreaks that are proposed and wouldn't be necessary if treatments are carried all the way to the road; issues with the steepness of slopes and tethered logging; loss of goshawk habitat; and other fires that have impacted overall watershed. He also shared that he wanted to give credit to District from improvements between the draft and final EA, but that they still have issue with removing large trees (not the LSR exceptions, however), so they would like to know how District plans to track large tree removal.

  Mike mentioned that there are specific units in the DNR assessment that should be left to restore naturally, associated with moisture stress. They outlined five units in their objection letter that won't have moisture stress (i.e., these units were not likely to experience drought stress in the future).

  Dave asked for Mike to elaborate on their concerns associated with steepness of slopes and tethered logging. Mike shared that sediment would migrate downhill and several of steeper units would have runoff into Poorman Creek. They are concerned about the resulting impacts to soil (erosion is key concern) and do not think that Forest Plan soil standards would be met. He stated that tethered logging has had mixed results, and some of the results depends on operator.

  Mike shared that he would like the District to be more transparent about removing large trees. They are concerned about goshawk units. They submitted a white paper about fuelbreaks and how ladder fuels carry the fire movement, so they think that the [non-shaded fuelbreak] treatments would be adequate and the fuel break along the road is not necessary. Also, he shared that they could point to several fire suppression efforts on the Forest where thinning sufficed, so even though EA argues for increased benefits, they do not agree.

AR 12282

8-ER-1473

- **Richard Bailey - North Cascades Conservation Council:** Ric shared that there are increasing concerns and controversy around this project and the Midnight project. He believes that the NEPA process has been circumvented and public involvement has not been equitable. They are supportive of collaborative groups, but the collaborative group has been given information that others have been denied. Ric states that the EA is inadequate and there is not enough specificity. He thinks that segmenting the two projects is not consistent with case law or current administration. He stated that an EIS should be required for both projects. He shared that they do not oppose thoughtful fuels work in the area, but this project goes too far and is not substantiated. Ric stated that they developed an alternative, but it was not included in the EA. They would like Forest Service to come up with more action alternatives since there are many different iterations that should be included.

  Dave asked if they could tell him more about collaborative having more outside influence on the project. Ric shared that at a collaborative group meeting last fall Chris Furr shared information about the Midnight project. And when they asked for this information, Chris said that he was not required to share it with them. This meeting was in November 2021 and the changes to the project weren't shared publicly until January 2022. He believes that the Forest's relationship with the collaborative group is stronger than with other members of the public.

  Ric also shared that they have an objection to the Forest Plan amendments that are proposed because they remove protections against old growth. He added that the amendments make it seem like the Forest Plan process was irrelevant if these protections can be removed.

- **Michael Shaffer - Second Mile Ranch Community:** Michael shared that he appreciates all the work that has gone into this project. He shared that it is an extremely diverse landscape and general prescriptions over the whole area do not seem like it is going to work. He stated that they had four main issues they would like to resolve. First, treatments need to be site-specific, and treatment areas should maintain no less than 40-60 trees per acre. Regen unit is in a steep slope within the drainage. They do not want trees greater than 21 inches DBH to be removed. The exception is not clear and could lead to large trees being removed. Also, certain riparian reserves should only have under story thinning or if the overstory is thinned, leave 40-80 trees per acre). He explained that for the shaded fuel break, it should follow matrix thinning instead. He stated that the burn piles should be reduced because they are concerned about machine piles being left behind and they would like to see prescribed burn plan. He also shared that there should be greater justification on fire lines to ensure that unnecessary fire lines are not included (they result in illegal OHV trails, invasives plants, etc.).

  Michael plans to email Debbie the list of specific units they have concerns about. Dave asked Chris to talk about the specificity of the units related to site conditions. Chris stated that the broader prescriptions are talked about in the analysis, but they do have site-specific prescriptions by the District Silviculturist, and they would factor conditions into the prescriptions.

- **Pearl Cherrington:** Pearl shared that there was a lot of interest in 2020 and the Forest paid attention to a lot of comments, but she now feels there is a lack of comments on the updated project. The project changed substantially, so the old comments may not apply or are outdated.

  She shared that the dozer lines are very damaging and bring in other issues, such as off-road vehicle use, motorcycles, and invasive weeds. She stated that she provided examples of a line that did not hold [on a nearby wildfire] and another line [from a wildfire] that looked like a "tornado" hit. She would like to see dozer lines not happen with this project.

AR 12283

Pearl stated that she was concerned about the funding to make sure restoration is done and followed through with. She would like to know what the funding would be applied to. The suppression efforts in Cedar Creek Fire created quite a bit of damage, and she hopes that this would be on the list of a place that could be restored.

She expressed concern about segmentation of the Twisp Aquatic Restoration Project and Midnight project. She found out about the Midnight project by word of mouth and eventually in the Methow Valley News. She stated that public comment on the changes would have been helpful.

Pearl shared that certain thinning prescriptions are helpful, but she would like to keep tree size to 21 inches DBH.

- **Betty Wagoner:** She explained that she is very concerned about Twisp River Roads End Campground being demolished. She has been up there since she was a kid. She suggested that a fence be placed on the northside of campground so fish can't see the people. She also mentioned that they are putting hundreds of logs in the Twisp River for the fish, so this should help and so they do not need to decommission the campground. She also requested that decommissioned roads should just have a berm put in at the end of road so it can go back to natural.

- **Tom Partin - AFRC:** Tom shared that he thought it was important to write comments to support this project. He said that they have spent a lot of time working with the collaborative group on this project. Tom said that there are reasons he feels that the project should go forward. He shared that he wanted to draw attention to the group about why the project was developed -- to restore watershed health and resiliency; Cedar Creek and Club Creek Fires; and we are facing more fires that are likely going to burn up more land, therefore, he thinks it is time to move forward.

He is interested in unique implementation methods, such as condition-based management. He stated that his members have economic interests, which does the work that needs to get done, so having a timber component helps pay for the work getting done out in the field. Tom mentioned that this isn't just a Forest Service project because there are three analyses completed and the project had a lot of support from the collaborative group and other outside groups.

Tom shared that he is passionate about managing the matrix lands and pointed out that the targets in the Northwest Forest Plan have never been met. The project would improve wildlife and fish habitat. There is a large reduction in road miles that will improve aquatics in the project area. They visited the WUI and there are houses that are bordered up to NFS lands and this should be an important feature of this project. Regarding tethered logging, a lot of work has been done on the Tonasket District for steep slopes, and there is less soil damage and sedimentation runoff. Tom concluded by stating that he would like to get something done before we lost it all.

**Conclusion and Next Steps**

Debbie thanked everyone for coming and shared that the objections will be reviewed by July 29, however, this may be extended for 30 days, which would be August 29. A team is currently reviewing the project and will prepare written responses to objections. If we have instructions or resolutions, then Kristin must apply them to her final decision. Dave sincerely thanked everyone for being part of the process. He shared that it means a lot to hear from people – reading the letters is important because it gives the space to articulate concerns but hearing them is valuable. He stated that he will be working with the Forest to understand how objections work with particular components of the project.

AR 12284

Chris Furr                                                                                          38

USFWS and WDFW to determine the duration and/or adjustments to the buffer distance.  Major project activities (i.e., road construction, logging, prescribed burning) may be restricted while the sites are active.  Distances and timing will be determined on a case-by-case basis in coordination with WDFW and USFWS.  With this design criteria, the potential for disturbance to a wolf den or rendezvous site during project implementation will be minimized.

Operation of chainsaws and heavy equipment in vegetation treatment areas and campgrounds and operation of helicopters, engines, and portable pumps in association with prescribed burning will result in noise above ambient conditions resulting in potential disturbance to gray wolves and their prey.  However, foraging forays are wide ranging and wolves travel large distances on a daily to weekly basis.  With the Project being implemented in 5 phases, in 5 different areas, core area within and around the project area, and large areas of remote habitat in Wilderness, and Inventoried Roadless areas adjacent to the project area, wolves are not expected to have significant effects to their ability to forage during project implementation.

The proposed activities to improve deer winter range, conduct prescribed fire, and vegetation treatments in the Project will result in an increase in habitat quality for wolf prey species.

*Summary of Effects to Gray Wolf*

Potential effects to wolves are disturbance related, through noise and activity of implementation or due to road access.  The negative effects associated with this proposal will be reduced by conservation measures, and of short duration for gray wolves and their prey, and therefore be considered insignificant and discountable.  Road density will increase during the Project, but there is no measurable net increase in public access expected.  Post project, there will be less drivable road density than currently exists, by approximately 1 mile of road per square mile.  Den sites and rendezvous sites, if discovered within the project area, will be protected throughout implementation with timing and distance buffers.  Some activities such as prescribed fire and vegetation treatments to improve mule deer winter range will result in beneficial habitat improvements for wolf recovery shortly after implementation.  Long-term effects on preferred prey (deer and elk) will be positive.  Therefore, the Project "may affect but will not be likely to adversely affect" the gray wolf.

Conclusion

Considering the current conditions in the project area and the anticipated effects, the USFWS concurs that the proposed Project "*may affect, but is not likely to adversely affect*" the Bull Trout, Northern Spotted Owl, Canada lynx, Grizzly Bears, Gray Wolf; and the Bull Trout, Northern Spotted Owl, and  Canada Lynx designated Critical Habitat.  This concludes consultation pursuant to the regulations implementing the ESA (50 CFR 402.13).  Our review and concurrence with your effect determinations is based on implementation of the Project as described.  Because of the unusually large project area, long duration of the Project, and uncertainties proposed with the "*condition based management*" approach, coordination of the monitoring plans and ongoing implementation, will help to insure effects of the Project are maintained within the bounds of the effects analyzed.  It is the responsibility of the federal action agency to ensure that the projects they authorize or carry out are in compliance with the

AR 12441

**Twisp Restoration Project, Environmental Assessment**
**Okanogan-Wenatchee National Forest**
**Objection Statements and Responses**
**July 2022**

| Objectors | Objection Number |
|---|---|
| Michelle Carfagno (MC) | 22-06-00-0000038-218 |
| Betty Wagoner (BW) | 22-06-00-0000041-218 |
| Pearl Cherrington (PC) | 22-06-00-0000049-218 |
| Conservation Northwest (CNW) | 22-06-00-0000056-218 |
| North Cascades Conservation Council (NCCC) | 22-06-00-0000057-218 |
| American Forest Resource Council (AFRC-Letter of Support) | 22-06-00-0000059-218 |
| Second Mile Ranch of Community Members (SMR) | 22-06-00-0000060-218 |

*NEPA/NFMA Violations*

**Overview and Objector's Suggested Remedies:** The objection issues focus on the objectors' concern that the project violated the National Environmental Policy Act (NEPA). Suggested remedies include: provide a new public comment period; start a new NEPA process and prepare an environmental impact statement (EIS); disclose the Forest Service relationship with the public has been unfair; ensure (with documentation) that all public will have equal access to information as well as ability to influence proposed actions at the same level of the project development phase; and include all parties, including AFRC, to participate in one resolution meeting if one is set up.

**Objector Statement #1:** The objectors state an opportunity for a formal public review was not provided for the revised proposal and analysis. The decision not to reopen for public comment violates NEPA. PC at 1; CNW at 1; NCCC at 9. Additionally, the objectors state, following the 2021 wildfire, revisions to the project caused significant changes to the original project in which a new public commenting period should be offered. PC at 3; NCCC at 9.

**Response:** I find the Responsible Official adhered to the required public engagement processes according to agency direction.

The Code of Federal Regulations (CFR) at 36 CFR 218.24 documents the requirements for public comments for an EA, noting that the Responsible Official determines the most effective timing for that opportunity to comment. There is no requirement to hold more than one 30-day comment period on an EA. In addition, the regulation at 36 CFR 218.218.8(d)(6) allows objection issues based on new information to be included in an objection, if that new information arose after any opportunities to comment.

Public involvement for the Twisp Restoration Project began with publishing the project in the November 2019 Schedule of Proposed Actions. Environmental Assessment (EA) at 19; Draft Decision Notice (DN) at 7. The Forest Service first offered a public scoping period, as required by 36 CFR 220.4(e)(1), which began on November 12, 2019. EA at 19; Draft DN at 7. Although not a regulatory requirement, the agency held a public meeting on November 21, 2019. EA at 19; Draft DN at 7. A 30-day public comment period on the Draft EA began on October 2, 2020, as required by 36 CFR 218.25(a)(1)(i). Also, on October 2, 2020, the notice of opportunity to comment was published in *The Wenatchee World*. EA at 19; Draft DN at 8. Although not a regulatory requirement, a public meeting was held on November 5, 2020. EA at

AR 12451

19; Draft DN at 8. The Forest Service considered public comments in the development of treatments and issues analyzed. EA at 19; Draft DN at 8.

In 2021, the Cedar Creek Fire burned into the northern portion of the project area. EA at 7. Therefore, rationale for reducing the project area by 69% is explained in the EA at 7-10. Some changes between the draft and final EA were in response to comments raised during the comment period, while changes resulting from the Cedar Creek Fire were primarily reductions of proposed treatments. On January 26, 2022, the Forest Service held a public meeting to discuss changes to the project since the Draft EA was publicly shared. Draft DN at 8. A recording of the public meeting is posted to the Forest's website.

The regulation at 36 CFR 218.8(c) states, "Issues raised in objections must be based on previously submitted specific written comments regarding the proposed project or activity and attributed to the objector, *unless the issue is based on new information that arose after the opportunities for comment* [emphasis added]." Therefore, the objection period also allowed the public the opportunity to provide input on any new information, such as possible changes made to the EA as a result of Cedar Creek Fire.

I conclude that the Responsible Official provided the public with adequate opportunities to respond to the project during the scoping period, 30-day comment period, public meetings, and objection period. Additionally, I find that the reductions in project area did not significantly change the project's proposed activities to warrant the need for an additional comment period.

**Objector Statement #2:** The objector states the public and objectors have been denied equal access to information and opportunities to influence decision making for the revision of the project and the additional projects segmented from the original project. NCCC at 13. Additionally, an objector states the District did not make a concerted outreach to effected communities which resulted in many unanswered questions (including an unanswered request to meet with the Ranger). SMR at 3.

**Response:** I find the Responsible Official provided adequate and equal opportunities for the public to participate in the development of this project. Regarding opportunities for the public to engage with the Forest Service on this project, please see response to Objection Statement #1 above.

The public was notified of changes to the project during the public meeting that occurred on January 26, 2022. Draft DN at 8. Most of the changes made are a reduction of the types of treatments already included in the proposed action during the public scoping period and 30-day comment period. EA at 7. The changes to the transportation system are discussed in the EA at 8, such as changing roads from open to closed roads after implementation and adding two previously identified temporary roads as system roads. The EA at 7-10 includes a detailed explanation of the changes to the proposal and why they were made. The public had the opportunity to comment on and object to any of the new information during the objection period, as described in 36 CFR 218.8.

I find the Forest Service included ample amount of information on the project's webpage. In addition to information being shared on the Forest's website, all comment periods and public meetings were preceded by public news releases and notifications to the project mailing list. EA at 19. The public engagement periods resulted in over 1,400 responses from individuals, organizations, businesses, and local government. EA at 19. This information was used to develop issues and create or modify alternatives, design features, mitigation measures, and environmental consequences. EA at 19-28.

AR 12452

The Okanogan-Wenatchee National Forest is an "ex officio member" of the North Central Washington Forest Health Collaborative, which means that the agency participates as requested in collaborative group meetings, is not a formal member of the group, and abstains from voting. All information the Forest shared with the collaborative group was posted to the Forest's website under the "supporting" folder for this project. Also, project-related information, including meeting notes, is posted to the collaborative group's website.

In my review of the record, I conclude the Responsible Official met the requirements for public engagement. Any publicly-shared information was made available on the Forest's website, thereby providing access for all to review.

**Objector Statement #3:** The objectors state the project failed to adequately account for the cumulative effects of the known projects that will occur in the area. The two new projects (Midnight Project and Twisp Aquatic Restoration Project), which were eliminated from the original project, are connected actions and should be analyzed in the same NEPA analysis. PC at 2. NCCC at 9.

**Response:** I find the EA appropriately discusses the cumulative effects associated with reasonably foreseeable actions.

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed project, including disclosing the cumulative effects.

As stated in the EA on page 8, the Twisp Restoration Project analyzed potential cumulative impacts associated with the Twisp Aquatic Restoration Project. It states, "The revised Twisp Restoration Project considers these treatments and all related actions as reasonably foreseeable future actions that will be addressed under cumulative effects as needed in specialists' reports." EA at 8.

The Midnight Restoration Project was not considered as a reasonably foreseeable project at the time the analysis for the Twisp Restoration Project was completed. According to documentation in the project record (email dated March 17, 2022 from Chris Furr), the Midnight Restoration Project is the area that was removed from original Twisp Restoration Project. Additionally, in the EA it states, "Areas dropped from the original project area are under assessment to determine the degree to which baseline vegetation and terrestrial habitat conditions were affected fire behavior and suppression activities from the Cedar Creek fire, and to assess whether previously identified or new needs for treatment exist. Areas in Wolf and Rader Creeks that were severely impacted by the Cedar Creek fire may benefit from fire restoration treatments. If these needs are identified, they would be addressed by initiating new projects and analyses." EA at 7-8. Once a proposal has been fully developed for the Midnight Restoration Project, then the NEPA process would be initiated, and the Twisp Restoration Project would be considered as an ongoing project in the cumulative effects analysis.

As described in 40 CFR 1508.25(a)(1), actions are connected if they automatically trigger other actions, cannot or will not proceed unless other actions are taken previously or simultaneously, and are independent parts of a larger action and depend on the larger action for their justification. I find that the actions removed from the project as a result of the Cedar Creek Fire were discrete actions not dependent on other activities within the project area. The Forest Service shared that the areas dropped from the project needed further review to determine if and what type of treatment may be needed as a result of the fire. EA at 7-8. Those future actions would not be dependent and are triggered by the activities proposed in the Twisp Restoration Project.

AR 12453

**Objector Statement #4:** The objector states the EA does not indicate which alternatives were dismissed and did not provide an explanation to rejected alternatives. The Forest Service did not allow NCCC to submit an additional alternative for consideration. NCCC at 3. Also, the objector states the Forest Service did not consider a reasonable range of alternatives and providing one action alternative defeats the purpose of NEPA. NCCC at 4.

**Response:** I find the Forest did not violate NEPA and that the EA considered a reasonable range of alternatives.

The regulation at 40 CFR 1502.14 requires that Federal agencies rigorously explore and objectively evaluate all reasonable alternatives and to briefly discuss the reasons for eliminating any alternatives not developed in detail. Also, the regulation at 36 CFR 220.5(e) states that no specific number of alternatives is required or prescribed.

In addition to the no action alternative and the proposed action alternative, the Forest considered eleven other alternatives, including some from the objector, and explained why those alternatives were eliminated from detailed study. EA at 23-28. In the response to comments in the record, the Forest also provided justification for the alternatives considered and explains why certain public comments did not result in additional alternatives. Project Record, TRP Comment Response #157. Thus, I conclude there was no further need under NEPA to analyze additional alternatives in detail.

**Objector Statement #5:** The objector states the action alternative fails to address: likely natural occurrences such as wildfires, a viable monitoring plan, and increased impacts from climate change. NCCC at 4.

**Response:** Project-level monitoring is discussed in the EA at 40-41 and Appendix B at 187-189. Also, the EA at 41 states, "the Forest Service is working with its partners in developing a broad monitoring strategy for implementation of the Twisp Restoration Project, effectiveness of the treatments and restoration actions, and validation of the project's underlying assumptions." Therefore, I conclude that the information presented in the EA regarding the Forest's monitoring strategy is sufficient. Also see response to Objection Statement #56.

Wildfires are considered as part of the project's baseline conditions since past management activities, such as fire suppression, have created conditions that are more susceptible to uncharacteristic effects from wildfires. EA at 15. Therefore, a need associated with this project includes restoring conditions so that the project area can respond to wildfires in a resilient manner. EA at 15. Regarding natural occurrences, such as wildfires, they are not considered to be reasonably foreseeable future actions that can be effectively analyzed since their occurrence and locations are unknown. However, general impacts of wildfire are discussed throughout Chapter 3 of the EA.

Similar to wildfire disturbance, the proposed action identifies climate change as a reason to develop, maintain, or restore healthy stand structures. EA at 15. Climate change, greenhouse gases, and carbon sequestration is analyzed in the EA at 121-125. Also see response to Objection Statement #55.

I conclude that the proposed action appropriately considered an approach to monitoring. Also, I conclude the proposed action would develop greater resiliency to disturbances such as wildfire and

AR 12454

changes in climate change. Draft DN at 3. The effects of the proposed action are adequately discussed in Chapter 3 of the EA.

**Objector Statement #6:** The objector states the EA fails to consider the benefits from the No Action alternative. NCCC at 4. Additionally, an objector asserts that the analysis for the No Action alternative arbitrarily limits responses to ongoing issues involving, roads, culverts, Road's End Campground, and forest structure to doing nothing, thus allowing alleged damage to continue. NCCC at 5.

**Response:** I find the EA contains a review of the proposed action alternative and a no action alternative to contrast the difference between taking no action and implementing the proposed action.

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed project, including disclosing the cumulative effects.

The No Action Alternative is described in the EA at 28-29. In this description, it provides the basis for comparison of taking no action and the proposed action. EA at 28. The description states that biological and physical processes would continue on their current trajectories, which would include associated "risks and benefits." EA at 29. The EA then summarized the effects from each resource in the corresponding sections in Chapter 3: Environmental Impacts of Alternatives. EA at 47-130.

**Objector Statement #7:** The objector states the Finding of No Significant Impact was arbitrary and capricious. Due to the scope and nature of the project an EIS should have been prepared. ESA-listed species, habitat for wildlife species, water quality and impacts to recreation (impacts to recreation specifically from logging activity) will have a significant impact from the actions proposed in the project. NCCC at 6 & 8. The objector also states that given the magnitude of the project area, scope and time, a watershed-level EIS is needed. NCCC at 8.

**Response:** I find that the Responsible Official adequately analyzed the applicable environmental effects to support a finding of no significant impact (FONSI). Also, I find the Responsible Official appropriately considered both the context and intensity when determining significance and provided rationale to support a FONSI.

The Council on Environmental Quality (CEQ) defines a FONSI as documentation briefly presenting the reasons why an action will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. The FONSI may incorporate the EA by reference. 40 CFR 1508.13. The Responsible Official determined that the project would not have a significant impact on the human environment as disclosed in the FONSI at 13-25.

Significance is defined by both context and intensity of effects, as described in the regulation at 40 CFR 1508.27, which explains that significance varies with the setting of the proposed action and depends upon the effects in the locale. The Draft DN explained the context of the project by explaining its size relative to the forest as a whole and states the proposed action affects less than 1% of the Okanogan-Wenatchee National Forest. Draft DN at 14. It also states that environmental effects would be localized to the project area and will not be measurable at a regional or larger scale. Draft DN at 14. The Draft DN also referenced resource effects analyses for placing the project's effects into context. The Responsible Official did not find any effects in any of the local, cumulative, or forest-wide contexts that rose to the level of significance and concluded that an EIS did not need to be prepared. Draft DN at 13-25.

AR 12455

**Objector Statement #8:** The objector states the EA violates NEPA by failing to disclose future actions, such as those necessary to keep the forest in post-project condition; they assert that impacts by natural forces, perpetual forest management, prescribed burning or other human actions are not described. Additionally, there is no articulation of how the project will meet the Needs over the long term. NCCC at 8.

**Response:** I find the cumulative effects analyses for this project logically evaluated ongoing and reasonably foreseeable future actions. Also, I find the EA appropriately outlines how the project will meet the desired conditions over the long term.

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed project, including disclosing the cumulative effects.

The EA incorporates by reference all resource specialist reports in the project record. EA at 6. On pages 47 to 48 of the EA, it outlines the various activities that were considered in the cumulative effects analyses, such as prescribed burning, aquatic restoration treatments, and thinning. A reasonably foreseeable future action is defined at 36 CFR 220.3, which states that it includes activities not yet undertaken, for which there are existing decisions, funding, or identified proposals (also see 40 CFR 1508.23). Therefore, the Forest Service is not required to analyze speculative circumstances such as natural forces or human actions not yet defined.

The draft DN/FONSI described how the selected alternative meets the need for action. Draft DN/FONSI at 3-6. Specifically, the draft DN/FONSI at 4 describes how the selected alternative will promote the development of large and medium trees and reduce the risk of large-scale habitat loss to wildfires.  In addition, the draft DN/FONSI at 5 documents how the project will reduce the amount of acreage that is likely to experience crown fire and how maintenance prescribed fire treatments will maintain these conditions over the duration of the project. Finally, the EA at 31, 36, 42, 93, 95, 118 and 143 as well as the specialist reports address maintenance burning treatments throughout the life of the project.

**Objector Statement #9:** The objector states the Draft Decision does not disclose how the revised project changes (reduction in acres, timeline, and elimination of LSRs and roadless areas) were integrated in other aspects of the project. NCCC at 9.

**Response:** I find the changes made to the project were adequately disclosed in the EA.

The public was notified of changes to the project during the public meeting that occurred on January 26, 2022. A recording of the meeting is posted on the Forest's website. Draft DN at 8. Most of the changes made are a reduction of the types of treatments already included in the proposed action. EA at 7. The changes to the transportation system are discussed in the EA at 8, such as changing roads from open to closed roads after implementation and adding two previously identified temporary roads as system roads. The EA at 7-10 includes a detailed explanation of the changes to the proposal and why they were made. In the description of these changes, it states the acres dropped from the project are currently being reviewed to determine whether previously identified or new needs for treatment exist as a result of the Cedar Creek Fire. EA at 7. It also states that the Forest would initiate new project(s) based on their review of post-fire conditions in the areas dropped from the Twisp Restoration Project. EA at 8.

AR 12456

**Objector Statement #10:** The objector states the Draft Decision does not describe how the project objective of reducing wildfire risk by altering forest structure will be achieved with the revised reduced acres of fuels reduction. NCCC at 9.

**Response:** I find the Forest did consider whether the acres included in this project will meet the needs associated with reducing wildfire risk and that this information is conveyed in the Draft DN.

The regulation at 36 CFR 220.7(b)(2) states that an EA "must briefly describe the need for the project."

The need for improving vegetation composition and structure in the project area can be found in the EA at 15. The EA states there is a need to modify vegetation structure, composition, and patterns to develop, maintain, or restore healthy stand structures to respond to disturbances such as wildfire. EA at 15. Additionally, the EA discusses how there is a need to modify the structure, composition, and patterns of forest stands within and adjacent to the Wildland Urban Interface to reduce and/or maintain fire intensity and the risk of crown fire initiation. EA at 16. The Draft DN outlines in the "Decision Rationale" how the specific needs will be met. For example, on page 4 of the Draft DN it states that the selected alternative will maintain and improve forest health on up to 91% and 96% of the project area respectively, which will improve resiliency to disturbances such as wildfire. Additionally, the Draft DN states that up to 23% of the lower Twisp River drainage and 6% of the Alder Creek drainage is likely to experience a reduced amount of crown fire behavior. Draft DN at 5. Fire intensity in the Wildland Urban Interface and along major access routes will also decline in up to 16% of the project area. Draft DN at 5.

The locations that were partially burned by the Cedar Creek Fire were removed from the project area, with the exception of a 100-acre portion of the area that remains within the project's boundary. EA at 7. Any future projects within the Cedar Creek Fire perimeter would be subject to NEPA.

**Final Remedies/Resolutions for NEPA/NFMA Violations:** The requirements under NEPA and NFMA were adequately addressed. No remedy or resolution is needed.

*Landscape Evaluation*

**Overview and Objector's Suggested Remedies:** The objection issues focus on the objector's concern that aerial data for the Landscape Evaluation was not collected after 2019. There are no suggested remedies.

**Objector Statement #11:** The objector states the Landscape Evaluation included data collection from aerial photography in 2015 and 2017. Objector states they found no other data gathered by air for the project since 2019 and these images would be different than the images cited (due to wildfire) in the EA. PC at 2.

**Response:** I find that the data used in the Twisp Restoration Project Landscape Analysis: Evaluation of Restoration Treatment Need and Comparison to Proposal (Jeronimo 2020) and the Twisp Restoration Project Landscape Evaluation (Downing 2018) to be applicable in informing the NEPA analysis for this project. The landscape analyses, in addition to the Okanogan-Wenatchee National Forest Restoration Strategy (USDA 2012), provides existing, historical, and projected conditions within the project area. The information was used to inform several needs in the project area associated with current conditions that have departed from desired conditions. EA at 13. The project area does not include areas affected by

AR 12457

the Cedar Creek Fire, with the exception of 100 acres. Therefore, the aerial imagery gathered prior to the fire is still relevant to forested conditions within the current project area.

**Objector Statement #12:** The objector states the Final EA does not provide adequate justifications for terrestrial treatments (Stand Improvement and Matrix Thinning, Riparian Reserve Thinning, Stand Regeneration, Shaded Fuelbreaks, etc.) with adequate scientific rationale and linked to landscape evaluation results. Additionally, condition-based NEPA does not provide adequate description as to what treatments will occur in what locations. SMR at 1.

**Response:** I find the EA adequately describes the need for harvest treatments and condition-based management. Also, I find that the Forest Service utilized the best available science.

The regulation at 36 CFR 220.7(b)(2) states that an EA "must briefly describe the need for the project."

The need to modify vegetation structure, composition, and patterns is discussed in the EA at 15. The EA describes how there is a need to restore stand structures to healthier and more resilient conditions. EA at 15. For example, it states that there is a higher percentage of densely stocked stands, fewer areas with stands comprised primarily of large trees, and increased conifer encroachment in unique habitats. EA at 15. Vegetation management needs associated with improving wildlife habitat and reducing fire intensity and risk of crown fire initiation are also discussed in the EA at 16.

In order to address the silvicultural goals (i.e., "Needs for the Proposal") outlined in the EA at 13-17, the proposed action developed thinning prescriptions to best restore forested stands (see Table 4, EA at 31-32). A thorough description of the vegetation thinning treatments is discussed in the EA at 34-36 and 41-43 and Appendix A: Proposed Treatment Descriptions at 131-142. The effects of the proposed vegetation treatments are disclosed in the EA at 67-70, which is based on the information found in the Twisp Restoration Project Final Vegetation-Silviculture Report (Pederson and Camenson, 2022). EA at 66. The effects analysis concludes that treatments would have a positive effect on forest health, structure, vigor, and species composition, thereby addressing the project's silvicultural needs. EA at 69. Also see responses to Objector Statements for Vegetation in this document.

Condition-based management is discussed in the EA at 29-30. The EA at 29 states that site-specific data will be collected and/or field reviews will be conducted before implementation to verify that conditions on site match those predicted. Also, it discusses how decision criteria will be applied for condition-based treatments. EA at 29. The types and extent of condition-based treatments are described in detail in Appendix A: Proposed Treatment Descriptions of the EA. Also, this information is summarized in a table in the EA (Table 4, EA at 31-32). Appendix E: Proposed Action Maps of the EA displays the proposed vegetation treatments.

Adequate consideration was given to best-available science and available literature when planning vegetation treatments to meet the purpose and need of the project. EA, Appendix C: References at 192-220.

In summary, I find that the landscape evaluations, EA, Vegetation-Silviculture Report, and supporting record provide justification and scientific rationale for the proposed vegetation treatments.

**Final Remedies/Resolutions for Landscape Evaluation:** The landscape evaluation for this project was adequately considered. No remedy or resolution is needed.

AR 12458

*Economic Report*

**Overview and Objector's Suggested Remedies:** The objection issues focus on the objectors' concern of the calculation of revenue generated from the project's reduced acres and the impacts to the local community. A suggested remedy is to obtain additional funding through collaboratives and Tribes.

**Objector Statement #13:** The objector states funding for the project was calculated using the 2020 acreage and not the revised reduced acreage. The objector states this will generate less revenue and is concerned the revenue will not financially provide completion of the "non-timber cutting aspect" as state in the Needs assessment. PC at 1.

**Response:** I find that the Responsible Official considered information that reflects the project's current scope.

The regulation at 36 CFR 220.7(b)(3)(iv) states that the EA "(m)ay discuss the direct, indirect, and cumulative impact(s) of the proposed action and any alternatives together in a comparative description or describe the impacts of each alternative separately."

A comparison of economic effects by alternative is displayed in the EA at 121. This information is based on values associated with thinning approximately 8,151 acres, which is the number of acres included in the alternative selected in the Draft DN. EA at 118 and Draft DN at 2.

The project record contains the Twisp Restoration Project Final Economics Report (McCelland 2022), which is summarized in the EA at 118-121. The EA states that non-timber projects "would be prioritized for implementation using general guidelines such as treatments that reduce fire risk in areas closest to the WUI and main access routes; treatments that could be implemented with little or no cost or generate funds that could pay for other treatments; and treatments with a strategic location that would have a greater effect on modifying fire behavior at the landscape scale." EA at 120. Also, the EA states that funding is likely to come from various sources. EA at 119.

In summary, I find that the Forest Service utilized calculations based on the updated amount of acreage; clearly describes the economic viability of the project; and discusses potential funding sources for non-timber-related aspects of the project.

**Objector Statement #14:** The objector states the project Needs would not be satisfied because board foot estimate was not provided of how much commercial timber would be removed. Therefore, there is no way to determine how much revenue logging will generate to accomplish non-commercial actions. NCCC at 6.

**Response:** I find that the Responsible Official considered accurate information regarding how much revenue would be generated from commercial harvest.

The regulation at 36 CFR 220.7(b)(2) states that an EA "must briefly describe the need for the project."

The EA states commercial thinning would occur on approximately 8,151 acres, thereby producing about 49,611 thousand board feet or 99,222 hundred cubic feet. EA at 118. The EA also includes a table which outlines the economic viability of the proposed action by comparing the estimated log price to the costs

AR 12459

of conducting the sale. EA at 119. The Twisp Restoration Project Final Economics Report (McCelland 2022) states that commercial harvest would generate $2,280,552 for use on restoration treatments associated with the project. Final Economics Report at 15; EA at 119. Regarding the non-timber restoration aspects of this project, the report also includes a discussion of funding availability and potential costs. Final Economic Report at 13-14. The report discloses that historically stewardship contracts and retained receipts have provided enough dollars to conduct restoration across the project area. Final Economic Report at 13-14.

For these reasons, I conclude that the Forest Service disclosed the costs of restoration work, potential amount of dollars that could help fund restoration work, and possible funding sources other than the values of timber from commercial treatments.

**Objector Statement #15:** The objector states the Economic Report did not analyze additional concerns such as impacts to recreation, noise, dust, and other impacts from commercial logging operations. NCCC at 6. Additionally, the objector states the Economic Report did not analyze the loss of revenue to the local community with the degradation of recreation quality in the Twisp Corridor due to logging activities and alteration of the natural setting. NCCC at 6.

**Response:** I find that the Economic Report is focused on the economic value of vegetation management through timber sales or stewardship contracts associated with this project. Impacts to recreation, noise, and dust, however, are discussed in other sections of the EA.

Impacts to recreation are discussed in the Twisp Restoration Final Recreation Report (Seifried 2022) and summarized in the EA at 113-115. In this analysis it states that the proposed action would have a short term, minor, negative effect on recreation; however, over the long term, improved resilience to severe wildfire would have a moderate, beneficial effect on recreation. EA at 114. The proposed action includes design features to lessen impacts to recreation, such as prohibiting log hauling and moving heavy equipment during weekends and holidays. EA at 127 and 172.

Project impacts associated with increased noise or noise above ambient conditions is described in various places in the EA. Noise impacts to Endangered Species Act-listed fish species are discussed in the EA at 65. Noise impacts to wildlife are discussed in the EA at 76 (northern spotted owl) and 77 (lynx). The effects of noise on local communities are also discussed in the EA at 128. The project also contains several project design criteria to lessen impacts associated with noise, such as W2 (EA at 183) and W8 (EA at 184).

Regarding impacts associated with dust, the effects of this project on air quality are addressed in the EA at 99-105. Impacts associated with dust from logging traffic on Forest Service roads would be minimal due to planned dust abatement on unpaved National Forest System roads used for log hauling. EA at 33, 108 and 128.

**Final Remedies/Resolutions for Economic Report:** The information and analysis contained in the Economic Report in sufficient; therefore, no remedy or resolution is needed.

*Fisheries*

**Overview and Objector's Suggested Remedies:** The objection issues focus on the objector's concern that some project actions could result in a "Take" to ESA-listed fish species, constituting a significant

AR 12460

impact, and that engineered logjams will provide more damage than provide benefits to fish and recent science was not provided regarding the use of engineered logjams. Suggested remedies include: provide more recent scientific literature since 2007 and fixing the root cause of decreased fish populations such as dams, commercial fishing, poaching, and water pollution.

**Objector Statement #16:** The objector states that engineered logjams will create more sediment, flooding during high water events, and are not esthetically pleasing to the natural environment. MC at 1.

**Response:** I find that Responsible Official adequately considered the direct and indirect effects of the proposed action on water quality.

The regulation at 36 CFR 220.7(b)(3)(iv) directs the agency to discuss the impacts of the proposed action and any alternatives. The regulation at 40 CFR 1508.7 defines a cumulative impact as the "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."

The EA at 8 states that aquatic habitat enhancement activities are no longer included in this project. Instream work, including engineered logjams, have been dropped from the project. Project Record, TRP Comment Responses, #946. Aquatic restoration activities, however, could occur under a separate project titled, Twisp Aquatic Restoration Project, using the Pacific Northwest Region Aquatic Restoration Environmental Analysis and Decision Notice. EA at 8. Therefore, I find that with regard to analysis of the effects from the proposed action on water quality, no analysis is warranted as engineered logjams are no longer included with the proposed action.

**Objector Statement #17:** Objector states recent science was not presented in the EA regarding engineered logjams. MC at 1.

**Response:** The regulation at 36 CFR 218.10(a)(4) states that objection issues not previously raised during a specified comment period can be set aside from review, unless that issue is based on new information that arose after opportunities to comment. While the objector did not previously comment on this issue, I note that aquatic habitat enhancement activities are no longer a part of the proposed project. Please see the response to Objector Statement #16.

**Objector Statement #18:** The objector states the Draft Decision identifies two actions in Alternative 2 may cause short-term, adverse effects to ESA-listed fish species that could result in Take. Such risk constitutes a significant impact. NCCC at 7.

**Response:** I find that the Responsible Official adequately assessed significant impact of the project including impacts to ESA listed fish species.

The regulation of 40 CFR 1508.28 defines "significantly" as used in NEPA requires consideration of both context and intensity. The context means that the significance of an action must be analyzed in several contexts such as society, affected region, and the locality. Intensity refers to the severity of the impact upon the 10 listed factors of: beneficial and adverse benefits, public health or safety, unique geographic area, degree to which the effects to the human environment are highly controversial, effects to the human environment are highly uncertain or involve unique or unknown risks, establish a precedent for

AR 12461

future actions, action is related to other actions that cumulatively have significant impacts, adversely affect districts, sites, highways or eligible for listing in the National Register of Historic places, degree to which action may adversely affect listed species or its habitat, and whether it the action threatens a violation of Federal, state or local law.

The criteria for Take and the criteria for NEPA significance are not the same. As defined by NOAA Fisheries), the definition for Take is to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct" and may occur from effects to individual animals (if ESA listed). The criteria for NEPA significance are different and more complex, considering the context of the effects and ten factors describing their intensity, and ultimately rests on how the action affects the quality of the human environment.

The rationale for the potential Take is described in the Final EA at 64-65 and the rationale for NEPA significance is described in the draft Decision Notice at 13-25. The determination for the Twisp Restoration Project is that Take may occur, but this is not significant in terms of NEPA.

**Objector Statement #19:** The objector states the hydrology and fisheries specialist reports do not provide adequate analyses of potential impacts (climate change, stream sedimentation, hydrologic processes in Poorman Creek, stream temperatures, overall ecological function of Poorman Creek, downstream ESA listed salmonids) by heavy equipment performing commercial thinning. Mitigation measures did not describe how they would address erosion, stream temperature due to riparian treatment and loss of cover and impacts to hydrologic regime due to reduction in vegetative coverage. SWC at 2.

**Response:** I find that the EA adequately disclosed the direct and indirect effects with respect to potential impacts to hydrology and fisheries, including impacts associated with climate change, stream sedimentation, hydrologic processes, stream temperature, and overall ecological function on the Twisp River and its subwatersheds, which includes Poorman Creek.

The regulation at 36 CFR 220.7(b)(3) requires disclosure of the direct, indirect and cumulative effects of the proposed action and any alternatives. The regulation 36 CFR 220.7(b)(3)(iii) directs the agency to describe the effects of the proposed action and any alternatives in terms of context and intensity. The regulation at 40 CFR 1505.3 states that mitigation and other conditions established in the environmental assessment and committed to as part of the decision shall be implemented by the lead agency of other appropriate consenting agency.

The purpose of this assessment is to determine the effects of the proposed project on fish and wildlife species that are federally protected under the Endangered Species Act of 1973 (as amended). This evaluation is intended to fulfill section 7(c) of the Endangered Species Act (ESA) and meet the requirements of Forest Service Manual direction (FSM 2670). It is intended to ensure that proposed management activities would not likely jeopardize the continued existence of the Federally listed species, nor result in the destruction or adverse modification of designated critical habitat (CH) or essential fish habitat, as defined in the Endangered Species Consultation Handbook (USDI and USDC 1998). Final Fisheries Biological Assessment (BA) at 3.

The Fisheries BA at 171-202 discusses the direct and indirect effects to temperature, large woody debris, sediment, substrate embeddedness, pool frequency/quality, large pool quantity, average width/depth ratio, streambank condition, change in peak/base flow, drainage network, road density/location,

AR 12462

disturbance history, riparian reserves, and disturbance regime for the project element of commercial harvest, yarding, landings. Additionally, direct and indirect effects to fish habitat viability were disclosed in the Twisp Restoration Project Final Aquatics Report at 13-18. Fish habitat viability is defined as the ability of project area streams to support robust local populations of salmon and trout species. Twisp Restoration Project Final Aquatics Report at 9.

All treatments in the Proposed Action, whether site-specific or identified through condition-based decision factors, would incorporate relevant design features and mitigation measures described in Appendix B (Design Features, Monitoring, and Mitigation Measures) to avoid or minimize potential environmental harm, repair disturbances caused by proposed treatments, and assure compliance with applicable laws, regulation, and direction. Final EA at 30-31. Descriptions of the proposed actions are in the Final EA at 29 with additional details on these actions in Appendix A. Design features and mitigations for the proposed actions are in Appendix D of the Biological Assessment at 22 and Appendix B in Final EA at 157.

The direct and indirect effects of the proposed action including mitigation measures were disclosed in Biological Assessment, while the direct and indirect effects from climate change are addressed in the EA at 123-124. Direct and indirect effects to stream sedimentation by heavy equipment performing commercial thinning is detailed in the final BA at 180-185, while impacts to hydrologic processes by heavy equipment performing commercial thinning are detailed in the BA at 197-199. Finally, direct and indirect effects to overall ecological function are detailed in the Twisp Restoration Project Final Aquatics Report at 13-18, while impacts to downstream ESA listed salmonids are detailed in the ESA Effects Determination section of the Final BA at 202-210.

Mitigation measures with the associated objective, efficacy rating, and responsible staff are detailed in the Final EA at 189-191. As such, I find that with regard to analyzing impacts to the Twisp River and its subdrainages which includes Poorman Creek, the EA and record include a thorough description of mitigation measures; adequate analysis was provided.

**Final Remedies/Resolutions for Fisheries:** Impacts to fisheries were adequately addressed. No remedy or resolution is needed.

### Roads

**Overview and Objector's Suggested Remedies:** The objection issues focus on the objectors' concern decommissioning roads will ruin the road and impacts of new roads were not adequately analyzed. Suggested remedies include: leaving the roads as they are; provide figures for present road use of Twisp River road and the projected increase in traffic due to logging and other project-related operations.

**Objector Statement #20:** The objector states decommissioning the roads will ruin them in addition to spreading noxious weeds. BW at 1.

**Response:** I find that the Responsible Official took a hard look at road decommissioning and provided information in the EA to appropriately disclose impacts.

The regulation at 36 CFR 218.10(a)(4) states that objection issues not previously raised during a specified comment period can be set aside from review, unless that issue is based on new information that arose after opportunities to comment.

AR 12463

While the objector did not previously comment on this issue, impacts of road decommissioning are discussed in the EA at 17, 24, 25, 38, 39, 40, 41, 50, 53, 55, 57, 62, 65, 67, 68, 77, 78, 79, 80, 81, 81, 100, 108, 112, 124, 147 and 148.

The project includes measures to minimize or reduce the potential for spreading noxious weeds. EA at 169-171. The EA also includes an evaluation of noxious weeds and subsequent management of noxious weeds. EA at 116 and 169.

**Objector Statement #21:** The objector states the impacts of opening and constructing of new roads were not adequately analyzed, such as impacts to listed salmonid populations, weeds, wildlife, human-caused fires, and increased unauthorized ATV use. NCCC at 6. Also, the objector states the impacts from heavy traffic of project operations have not been quantified for heavily used Twisp River road. NCCC at 8.

**Response:** I find that the Responsible Official took a hard look at the impacts associated with construction of new roads and traffic use, primarily on the Twisp River Road.

The regulation at 36 CFR 220.7(b)(3)(iv) states that the EA "(m)ay discuss the direct, indirect, and cumulative impact(s) of the proposed action and any alternatives together in a comparative description or describe the impacts of each alternative separately."

Impacts of road construction are discussed in the EA at 48-53, 55, 59, 61, 77-81, 85, 94, 104, 109, 119, 130, 147, and 155.

The transportation network is evaluated through a Travel Analysis Process (incorporated by reference) in the Final EA at 8 and 13. Road use is evaluated throughout the Final EA. Effects of the project's transportation system management to listed salmonid populations are detailed in the Biological Assessment at 179-180, 189-194, 196, and 200-201. For listed wildlife species, see Response to Objector Statement #54.

The project also includes design features to minimizes impacts to road construction. EA at 171, 183, 184, and 189.

Log haul was also addressed in the EA at 56, 62, 65, 108, 109, 114, 127, 128, and 146-148. Design features to minimize traffic impacts are described in the EA at 172. Impacts from log haul and other project traffic was included as an issue. EA at 20. Impacts to public health and safety is included in the EA at 127-128.

**Objector Statement #22:** The objector states they are concerned additional roads that will be needed are not disclosed in the EA and may be taken advantage of by off-road vehicles. The proposed changes to the road network in Poorman Creek do not appear to be adequate for the proposed treatment within the area. Additionally, it is unclear as to why road 4300482 will be receiving a Closed to Open treatment if it provides access to closed roads and will be at risk to invite unauthorized use to the area. SMR at 2.

**Response:** I find the Responsible Official reasonably evaluated the need for roads, as well as impacts of road development.

AR 12464

The regulation at 36 CFR 220.7(b)(3) requires disclosure of the direct, indirect and cumulative effects of the proposed action and any alternatives.

Changes to the locations of some temporary roads in the vicinity of Poorman Creek were made in the Final EA which reduced the miles of temporary roads by about 0.27 miles. EA 8, 50 and 109. These temporary road changes were made so that sites with more durable rocky soils would be used instead. I find the reasoning to construct temporary roads on lower slopes to be sound. The EA also discloses that improved access in areas such as Poorman Creek would improve the likelihood of successful fire suppression by shortening response times and providing additional locations for containment. EA at 101. Therefore, I find that the proposed road changes meet the project's needs described in the EA at 16-17. The rationale for making these changes in also described in the draft DN/FONSI at 5-6.

The impacts of road construction are discussed in the response to Objector Statement #21. The project includes several design features to lessen any impacts associated with potential illegal off-highway vehicle use. For example, in the EA at 162 it states that brush and other debris would be scattered on firelines where they intersect with roads or trails to limit access to off-highway vehicles. Also, after use and rehabilitation activities, the entrances of temporary roads should be blocked to prevent unauthorized off-highway vehicle use. EA at 178.

Table 42 in the EA outlines the proposed transportation changes by road number. EA at 148-155. NFS Road 4300482 is not discussed in the EA because it does not exist in the project area, and no action is proposed for this road. Any additional changes to the transportation system not documented in this project would be subject to analysis under NEPA.

**Final Remedies/Resolutions for Roads:** The transportation system was adequately addressed. No remedy or resolution is needed.

*Recreation*

**Overview and Objector's Suggested Remedies:** The objection issues focus on the objectors' concern of eliminating the Road End campground on Twisp River and impacts to recreation from logging activities. A suggested remedy is to install a fence above river for the campground.

**Objector Statement #23:** The objector states opposition for eliminating the forest campground "Roads End." BW at 1.

**Response:** I find that the Responsible Official took a hard look at the removal of the Roads End Campground, provided information to appropriately determine action impacts, and identified concerns around changes to recreation opportunity.

The regulation at 36 CFR 220.7(b)(3)(iv) states that the EA "(m)ay discuss the direct, indirect, and cumulative impact(s) of the proposed action and any alternatives together in a comparative description or describe the impacts of each alternative separately."

The project evaluates the loss of recreational opportunities from the closure of the Roads End Campground in the Twisp Restoration Project Final Recreation Report (Seifried 2022). In this analysis it states that impacts to recreation resources caused by this project are expected to be minor, with an adverse effect of losing campground sites. Final Recreation Report at 7 and 11. To address the impact of

AR 12465

losing the campsites at Roads End and Poplar Flats, however, an equal number of campsites would be created in Poplar Flats, South Creek, and Mystery Campgrounds. EA at 37 and 155. Therefore, the analysis concludes that offsetting the lost campsites by an equal number of additional campsites would result in long-term beneficial effects on net opportunities within the Twisp watershed. Final Recreation Report at 7.

The EA states that Roads End Campground contains a high-priority bull trout spawning area that has been impacted by forest visitors, resulting in disturbance and mortality. EA at 14. By decommissioning the campground, the analysis discloses that it would eliminate the potential for bull trout disturbance that has resulted in adult mortality. EA at 62. The Roads End Campground contains only four sites, two of which are so close to the river that fencing or otherwise constructing a barrier would effectively close these sites. Project Record, TRP Comment Response #17. Thus, I conclude the Responsible Official adequately considered the tradeoffs regarding undesirable impacts recreationists and beneficial effects to bull trout.

**Objector Statement #24:** The objector states the project fails to articulate, for recreation, why impacts from fire or insect and disease is less desirable than impacts from logging activities. NCCC at 8.

**Response:** I find the EA adequately discloses the project's impacts to recreation.

The regulation at 36 CFR 220.7(b)(3) requires disclosure of the direct, indirect and cumulative effects of the proposed action and any alternatives.

The impacts to recreation are discussed in the Twisp Restoration Project Final Recreation Report (Seifried 2022), which is also summarized in the EA at 113-115. The effects were found to be short term and minor. It also states that increasing resiliency on the landscape would help reduce the likelihood that disturbances from wildfires, insects and disease, and climate change would diminish the recreation values of the project area. EA at 114.

**Final Remedies/Resolutions for Recreation:** Recreational impacts were adequately addressed. No remedy or resolution is needed.

### *Vegetation/Silviculture*

**Overview and Objector's Suggested Remedies:** The objection issues focus on the objectors' concern the EA fails to adequately assess the current conditions of the Twisp Watershed as well as the need for change. Suggested remedies include: use an increment borer in determining old growth, use tree diameter to determine age, exceptions to the 21-inch DBH cut limit should be well documented and transparent to the public, drop units 315, 368, 405 and 477, consider natural forest succession, prepare an EIS to incorporate a broader variety of information regarding historic forest conditions that could present scenarios of a Historic Range of Variability (HRV) specific to the Twisp River Watershed, describe the end result rather than prescribing how to get there this would offer more flexibility in the EA such as allowing a variety of equipment use within the sale area.

**Objector Statement #25:** The objector states the Old Forest Multi Story (OFMS) acreage post-treatment would exceed the maximum ranges for OFMS and would be inconsistent with the stated need to "modify vegetation structure, composition, and patterns to develop, maintain, or restore healthy stand

structures in the project area that respond to disturbances such as wildfire and climate change in a resilient manner and are consistent with historic and future ranges of variability." CNW at 2.

**Response:** I find that the Responsible Official sufficiently addressed and disclosed estimated effects to stand structure as it relates to HRV / FRV and the purpose and need of the project.

The regulation at 36 CFR 220.7(b)(1) and 36 CFR 220.7(b)(2) state, respectively, that "the EA must briefly describe the need for the project," and "the EA shall briefly describe the proposed action and alternative(s) that meet the need for action." The Forest Service Handbook (FSH) at FSH 1909.15, 41.21 states that "the breadth or narrowness of the need for action has a substantial influence in the scope of the subsequent analysis." Additionally, the decision framework helps "ensure the scope is fully described and helps assure the purpose and need, proposed action, and alternatives are relevant to each other."

The EA at 13 through 17 clearly describes the need for action. A comparison of the two alternatives' ability to meet the purpose and need associated with vegetation treatments is described at page 27 of the Vegetation Report. The effects analysis in the EA at 23 of the Vegetation Report shows that an abundance of Old Forest Multi Story structure stage may be created over time through implementing the proposed action; the analysis also describes the unpredictability of structure shifts due to inherent unpredictability of disturbance patterns and timing within this landscape.

In addition, the Vegetation Report at 21-26 describes the overall beneficial effects of implementing the proposed action in comparison to the no action alternative. This section describes, in detail, the effects related to the proposed action and two identified resource indicator and measures; *"Overstocked young forest stands" and "Presence of medium and large trees".* The objection statement above is focused on one attribute of the potential effects (shift in OFMS) and the ability of the change in that attribute to meet the purpose and need. The analysis describes the overall estimated effects to all seven existing structure stages as well as species composition, density, spatial patterns and over all forest health. The analysis of all these attributes combined exhibits the ability of each alternative to meet the purpose and need.

The analysis adequately disclosed potential effects of the alternatives and showing how the overall effects of the proposed action would meet the purpose and need in comparison to the no action alternative.

**Objector Statement #26:** The objector states the project does not adequately address the need for proposed thinning in units which are currently underrepresented or within the Historic Range of Variability and Future Range of Variability for: UR-Understory Reinitiation, SEOC-Stem Exclusion Open Canopy, and SECC-Stem Exclusion Closed Canopy stand classes. CNW at 2-3

**Response**: The need for treatment and associated benefits of increasing forest health and resiliency to disturbance are clearly demonstrated in the EA. However, I find that the EA and Vegetation Report could clarify treatment within structure stages that are below or within HRV and FRV levels.

The regulation at 36 CFR 220.7(b)(2) states that an EA "must briefly describe the need for the project."

While sound justification and analysis is provided in the EA for treatment within young over stocked stands, it is not clear which structure stages are included within these stands. In addition, it is unclear

what types of treatments would take place within the identified structure stages and what the effects to those stages would be relative to HRV/FRV.

Although sound justification and analysis is provided for treatment within young over stocked stands, it is not clear which structure stages are included within these stands. In addition, it is unclear what types of treatments would take place within the identified structure stages and what the effects to those stages would be relative to HRV/FRV.

The EA at page 15-16 clearly describes a need for vegetation treatments within Needs 2 through 4 and are tied directly to the proposed actions described on page 29 and Appendix A. The EA at 66 describes the effects of proposed treatments on vegetation. A resource indicator of overstocked young forest stands was used to describe the current condition and beneficial effects of treatment. This section describes how treatments would move stand structure away from the current homogenous, over-stocked conditions into a more diversified pattern across the landscape. Treatments would reduce stocking and increase tree vigor.

The Vegetation Report at 12 describes the effects of treatment to young, overstocked stands utilizing the Young Forest Multi Story structure stage to describe the current conditions of young stands within the project and potential effects of treatment. Table 3 at 12 in the Vegetation Report displays current proportions of each structure stage within the project area and table 4 at page 13 displays the current proportion relative to HRV and FRV within the Lower Twisp Watershed. Table 7 at 23 in the Vegetation Report displays shifts in structure stage across the project area 40 years post treatment.

I asked the Forest staff to clarify how underrepresented stands will be treated. Treatments within the structure classes of UR, SEOC, and SECC would consist of overstory thinning and stand improvement thinning followed by prescribed fire. UR is the only underrepresented structure class within the project area; the amount of this structure class would not likely change throughout the life of the project because as some UR areas are treated and move out of this stage, others will move into it after treatments.

SEOC would also be maintained through treatments and would not move outside its HRV or FRV. SECC treatments may move into SEOC through overstory removal but would not move SECC to an underrepresented structure class. This information will be clarified in the final decision.

**Objector Statement #27:** The objector states the project fails to adequately protect large and old trees. CNW at 2.

**Response:** I find that the Responsible Official provided adequate scientific methods, project design criteria, scientific literature, and analysis to ensure protection of large and old trees.

The regulation at 36 CFR 220.7(b)(3)(iv) states that the EA "(m)ay discuss the direct, indirect, and cumulative impact(s) of the proposed action and any alternatives together in a comparative description or describe the impacts of each alternative separately."

In response to public comments about removing large and old trees, the maximum diameter in all overstory thinning prescriptions was reduced to 21" dbh with an exception to remove trees 21.1-25" dbh if they have a dwarf mistletoe rating of ≥ 2 and are within 30 feet of a healthy tree ≥ 18" dbh.

The Vegetation Report at 13-14 describes the method used to determine the classification of large trees as 25" dbh and greater. Appendix A of the EA at 134 further describes the methodology used to determine tree size classes and what constitutes a large tree for this project area. Appendix A at 135 also describes the method for identifying old trees using the Van Pelt 2008 Guide. The Vegetation Report at 11 responds to public concern over retaining all large and old trees. This section discusses the criteria for removing mistletoe infected trees up to 25" DBH and use of the Van Pelt Guide.

The Responsible Official utilized both a diameter limit and old tree characteristics to ensure retention of old and large trees across the project area while attempting to manage for forest health issues such as dwarf mistletoe. The criteria and method for determining the appropriate diameter limit for tree removal is stated multiple times throughout the EA and Vegetation Report.

**Objector Statement #28:** The objector states the project fails to incorporate the best available science in addressing treatment of large tree sustainability, such as the moisture deficit and suitable large tree sustainability model completed by Washington Department of Natural Resources. CNW at 2-3.

**Response:** I find that the Responsible Official utilized adequate scientific information to evaluate large tree sustainability across the project area.

The regulation at 40 CFR 1502.24 states that "Agencies shall insure that professional integrity, including scientific integrity, of the discussion and analyses in environmental impact statements." While this is an EA, the same principles apply.

The analysis clearly shows that proposed treatments would benefit the sustainability of large trees across the landscape. These findings are supported by multipole landscape evaluations as well as scientific studies for similar landscapes and specific to this project.

The Washington Department of Natural Resources (WA DNR) large tree sustainability model and the moisture deficit model are incorporated in the WA DNR Twisp River Planning Area Landscape Evaluation Summary. This document was used as one of the data sources for analysis, is located in the project record and is referenced at page 17 of the Vegetation Report. The EA at 15 under Need #2 clearly states the need for treatment based on over stocked stands and the associated elevated risk to disturbance such as wildfire and insects and disease. The Vegetation Report at 23 discusses the results of treatment on the presence of medium and large trees; O'Hara, 2014, Tappeiner et al., 2015, and Zhang et al., 2019 are scientific research papers cited to support these findings. Large sized trees (greater than 25" dbh) increase in occurrence from 8% to 39% of the project area under the proposed action.

**Objector Statement #29:** The objector states the project fails to adequately disclose the effects of ground-based harvesting on slopes greater than 35%. CNW at 3. There is a lack of rationale for ensuring the benefits of overstory thinning on slopes over 35% outweighs the risks. SMR at 2.

**Response:** I find that the Responsible Official adequately disclosed the indirect and direct effects with respect to the effects of ground-based harvesting on slopes greater than 35% in the project effects analysis and project record.

The regulation at 36 CFR 220.7(b)(3)(iv) states that the agency should consider the direct, indirect, and cumulative effects of the proposed action and any alternatives in an EA. The regulation at 36 CFR 220.7(b)(3)(iii) directs the agency to describe the effects of the proposed action and any alternatives in

AR 12469

terms of context and intensity. There is no requirement to develop a cost/benefit analysis with respect to the effects of an action versus the benefit resulting from that action.

The regulation at 36 CFR 218.10(a)(4) states that objection issues not previously raised during a specified comment period can be set aside from review, unless that issue is based on new information that arose after opportunities to comment. While objector CNW did not previously comment on this issue, the effects of ground-based harvesting on slopes greater than 35% is addressed in the Twisp Restoration Final Soil Resource Report at 14. Direct and indirect effects of project implementation on soil resource indicators of soil erosion; compaction, rutting and puddling; and organic matter, coarse woody debris and ground cover are displayed in the Twisp Restoration Final Soil Resource Report at 7-11.

The need to implement a vegetation treatment is based on the existing vegetation condition compared to the desired condition. Slope steepness is a consideration for analysis effects to soils and economics, not for determining the need for treatment.

**Objector Statement #30:** The objector states the analysis of removing trees up to 25 inches diameter cannot be evaluated because the EA did not provide the amount to be removed nor their locations. Additionally, the application of Based Management precludes accurate depictions of trees to be removed. NCCC at 6.

**Response:** I find that the Responsible Official provides an adequate level of analysis to determine the level of large tree component across the project area as well as the potential effects of large tree removal.

The regulation at 36 CFR 220.7(b)(3)(iv) states that the agency should consider the direct, indirect, and cumulative effects of the proposed action and any alternatives in an EA.

The Vegetation Report at 13-14 provides analysis on the presence of large trees across the landscape. This section provides an estimate of the acres containing medium to large trees as well as a map exhibiting the locations. Appendix A of the EA provides a full description of thinning prescriptions, thinning method, timing and decision criteria pertaining to condition-based management.

The specific location of individual trees or the exact amount that would be removed are attributes that are not discretely measurable on any project during the analysis process. Individual tree removal would be identified during implementation of timber sale layout and design, with an estimated number of trees by species and size class being determined statistically through timber cruise data. The EA and associated specialist reports adequatily describe potential removal of large trees and provide analysis to support the decision.

**Objector Statement #31:** The objector states depiction of the current conditions does not appear to be based on complete scientific investigation of what the Twisp Watershed conditions were prior to modern day firefighting and past logging practices. NCCC at 7.

**Response:** I find that the Responsible Official provided an in-depth analysis of current conditions in the EA, associated specialists reports, and supporting documents including multiple landscape evaluations.

The regulation at 36 CFR 220.7 does not require an affected environment section for an EA.

AR 12470

The project completed a Landscape Evaluation process that followed the OWNF's Forest Restoration Strategy. A summary of this process is described in the Vegetation Report at 5 and within the Methodology section 4 at page 15. The Twisp Landscape Evaluation is incorporated as a source of information listed on page 5-6 of the Vegetation Report. Specific information from the landscape evaluation is identified in Table 4 on page 13 of the Vegetation Report. The Vegetation Report also included the analysis completed by Resilient Forestry and is referenced on page 6 & 7 with Table 2 identifying the specifics for the Lower Twisp watershed. Section 4 on page 15 of the Vegetation Report identifies how the Forest Restoration Strategy was incorporated into the methodology and how the landscape evaluation was used to help identify departures from the historic conditions or future predicted conditions. The current landscape departure charts are included in the supporting documents within the project record.

**Objector Statement #32:** The objector states Condition-Based Management will allow departure from the projected impacts of proposed logging activities. NCCC at 7.

**Response:** I find that the Responsible Official provides an adequate analysis of the proposed action and activities associated with Condition-Based Management.

The regulation at 36 CFR 220.7(b)(3)(iv) states that the agency should consider the direct, indirect, and cumulative effects of the proposed action and any alternatives in an EA.

The EA at 29-32, 34, 35, 37 and 135-137 fully describes the condition-based method. The Vegetation Report at 12-13 describes the indicators and measures used to measure effects of implementing the proposed action utilizing condition-based management and the Vegetation Report at 21- 26 fully disclose potential effects of these proposed actions.

**Objector Statement #33:** The objector states the EA does not provide adequate or objective site-specific information illustrating how the Twisp Watershed is unnaturally overcrowded, how the forests have departed from HRV, or what the natural frequency of dense stands composed of different species was prior to fire suppression and logging activities. NCCC at 14. Additionally, no notation of the unique character of the Twisp forest being a naturally more dense than other east-side ponderosa pine-Douglas-fir forest is described. NCCC at 15. The EA fails to validate its claim that the Twisp Watershed does not meet "desired conditions". NCCC at 14.

**Response:** I find that the Responsible Official provides an adequate analysis and description of the Twisp River Watershed conditions and departure from HRV.

The regulation at 36 CFR 220.7(b)(3)(iv) states that the agency should consider the direct, indirect, and cumulative effects of the proposed action and any alternatives in an EA.

The Vegetation Report at 10 addresses the justification for terrestrial treatments to meet Needs 2, 3, 4 with a summary of the degree to which the project needs are met. Vegetation Report ate 27. The Vegetation Report at 6-7 (Tables 1 & 2) identify the terrestrial trends and the need for treatment. Table 13 (Vegetation Report at 30) further describes the effects to veg resources and the comparison of alternatives.

AR 12471

In addition, the Fire, Fuels and Air Quality Report at 9 and 10 also describes resource elements, indicators and measures for Needs 2, 3 and 4.  In addition, the Fire, Fuels and Air Quality report at 24 and 25 describes how each alternative addresses the project's needs and issues that were raised.

The Twisp Landscape Evaluation is incorporated as a source of information listed at page 5-6 of the Vegetation Report. Specific information from the landscape evaluation is identified in Table 4 at page 13 of the Vegetation Report.  The Vegetation Report at 6-7 also included the analysis completed by Resilient Forestry, while Table 2 identified the specifics for the Lower Twisp watershed. Desired conditions are characterized by meeting the HRV/FRV conditions. The Vegetation Report at 13 (Table 4) provides HRV and FRV levels associated with structure class for the Lower Twisp River Watershed. Table 7 (Vegetation Report at 23) provides current and estimated future HRV levels for structure class across the project area. The Twisp River Landscape Evaluation is a supporting document and provides detailed descriptions of current and desired conditions within the project area.

**Objector Statement #34:** The objector states prescriptions in the Draft Decision for tree densities of 15 trees per acre will leave the remaining trees susceptible to wind damage and increase the potential for blow down. NCCC at 15.

**Response:**  I find that the Responsible Official provides an adequate analysis and disclosure of tree densities associated with treatment prescriptions and associated effects.

The regulation at 36 CFR 220.7(b)(3)(iv) states that the agency should consider the direct, indirect, and cumulative effects of the proposed action and any alternatives in an EA.

Appendix A of the EA at 134 -135 provides detailed descriptions of treatment prescriptions. The 15 trees per acre stated in the objection letter is mis-represented as a final residual stocking level. The actual prescription listed at page 135 for FPOG stands speaks to retaining at least 15 trees per acre that are greater than 18" dbh in combination with other components of the prescription including crown closure requirements and retention of trees within smaller size classes as per the ICO prescription. EA Appendix A at 134. The 15 trees per acre retentions is only pertaining to one size class that will be retained, it does not describe the final stocking levels associated with the stated prescription.

**Objector Statement #35:** The objector states the portrayal of dense stands and excessive fuel loading differs across the Twisp Watershed and are not identified in the EA. NCCC at 15. The EA fails to establish that the Twisp Watershed forest is more susceptible to wildfire. NCCC at 14. Objectors point out that new information has emerged that contradicts the portrayal of "desired conditions" (see Ingalsbee et al. 2018). NCCC at 14.

**Response:** I find that the Responsible Official provides an adequate analysis of treatment need and existing versus desired conditions. See the response to Objector Statement #33.

**Objector Statement #36:** The objector states removal of "medium-sized" trees will reduce old growth recruitment resulting in decreased habitat for old growth-dependent species over the long term and increase dry ground fuels. NCCC at 15.

**Response:** I find that the Responsible Official adequately describes the rationale for treatment of ladder fuels, described as "medium-sized trees" by the objector.  I also find that the Forest adequately analyzed direct, indirect and cumulative effects to affected species.

AR 12472

The regulation at 36 CFR 220.7(b)(3) requires that an EA include a discussion of the environmental effects of the proposed project and any alternatives, including disclosing the direct, indirect and cumulative effects.

The EA at 66-68 describes the resource indicator of presence of large to medium trees for each alternative and documents how the treatments would promote and retain the healthiest trees while reducing competition-based mortality. The EA at 101 notes that decreasing crown densities could increase surface winds, which in turn can result in drier surface fuels.

The EA at 136 states that trees removed for ladder fuel treatments would have a dbh of less than 10". Other ladder fuels treatments would include pruning of trees up to 5 feet. EA at 137-138. An Ecosystem Management Decision Support (EMDS) landscape analysis was completed for the project and based on that analysis "medium" trees are defined as being 16"- 24.9" dbh. EA at 134. Also, treatment within areas that identified the current overstory as medium (16"-24.9" dbh) moved to large (>25" dbh) following treatments. Research shows that lowering stand densities enhances tree growth, reduces competition mortality and increases stand resiliency to disturbances and climate change (Zhang et al., 2019). EA at 23.

**Objector Statement #37:** The objector states the EA failed to describe the need or identify the rationale for a clear-cut in Unit 486, which is immediately upslope of a riparian reserve. Riparian reserve treatments in Units 486 and 206 require science-based justification given the steep slopes and erosion hazards in these units. SMR at 1.

**Response:** I find that the Responsible Official provided an adequate analysis of effects for treatment within these identified units.

The regulation at 36 CFR 220.7(b)(3)(iv) states that the agency should consider the direct, indirect, and cumulative effects of the proposed action and any alternatives in an EA.

There is no proposal for a clearcut in Unit 486. The proposal specifically identifies that this will not be a clear cut, but a regeneration harvest using a seed tree with reserves or shelterwood with reserves method, as stated in the EA at 138-139. In addition, this unit was discussed during the resolution meeting and Forest staff have clarified that it has been substantially reduced in size during preliminary unit layout.

Riparian reserve treatments were identified specifically as issues 4 & 10 (EA at 20-21) and within the identified specialist reports listed in the addressed by column. Vegetation Report at 11-12 and 29. Concerns over harvest within riparian reserves is addressed within the Twisp Restoration Project Hydrology Report at 9-10, while the Hydrology Report at 27-32 describes potential effects and mitigations for treatments within riparian reserves.

Units that occur on steeper slopes (Units 486 and 206) will require a combination of logging equipment that are best suited for steeper slopes. Ground based harvest equipment may not exceed slopes of 45% and cable/aerial/tether harvest systems (herein cable) may be used on slopes 45-80%. Design criteria are in place to protect the soil resource for all Ground Based Harvest (GBH) on steeper slopes (35-45%) and cable logging. For design criteria for GBH on slopes >35%, see Appendix B in the Final EA, including,

AR 12473

AH3 at page 159, AH5 at page 160 and S9 at page 179. Design criteria for cable logging are also in Appendix B of the Final EA in AH22 at page 165, S9 at page 179, and S10 at page 179 and 180.

The Final EA at 52 and 58 (Tables 8 and 10) provides a comparison of how alternatives address key issues related to soils and hydrology. The Final Soil Resource Report at 3 and 14 addresses this as Issue #15. Finally, this is also addressed in response to comments and located in the project record at C/R #88, 137, 139, 321.

**Final Remedies/Resolutions for Vegetation/Silviculture:** As noted in the response to Objector Statement #26, I instruct the Responsible Official to include clarifying language in the final decision to describe which structure stages are considered "young, overstocked stands", which treatments would take place within the identified structure stages, and the effects of these treatments on those stages relative to HRV/FRV. No other remedy or resolution is needed.

### *Wildfire Risk Analysis/Treatment*

**Overview and Objector's Suggested Remedies:** The objection issues focus on the objectors' concern of the analysis of risk from wildfires and proposed treatments. Suggested remedies include: utilize the prescription for shaded fuelbreaks within the dry and rocky ridges of the project area and incorporated into the Matrix thin prescription rather than stand alone, evaluate each road segment proposed for shaded fuelbreaks for their anticipated effectiveness incorporating the matrix thin and prescribed burning surrounding them, develop alternatives that identify naturally occurring dense stands and protect them while thinning only in previously logged areas, validate the assumption of the claim the forest is going to remain static by disclosing what future actions will be needed, consider the cumulative impacts of the Cedar Creek fire, and thin to wide spacings in the wildland urban interface to 40 sq. feet of residual basal area.

**Objector Statement #38:** The objector states the project overly generalizes the effectiveness of the proposed shaded fuel breaks and fails to adequately address the need for fuel breaks considering the cumulative and beneficial effects of matrix thinning across the landscape on fire behavior. CNW at 3.

**Response:** I find that the Responsible Official provides an adequate analysis of effects pertaining to the effectiveness of shaded fuel breaks as they relate to the purpose and need of the project.

The regulation at 36 CFR 220.7(b)(3) requires disclosure of the direct, indirect and cumulative effects of the proposed action and any alternatives.

The EA at 36 and 104 discusses the effectiveness of shaded fuel breaks and lists relevant science (Agee et al. 2000). The EA at 138 describes the prescriptions associated with this treatment. The effectiveness and need for shaded fuel breaks are discussed further in the Fire, Fuels, Air Quality Specialist Report at 6, 12 and 16.

**Objector Statement #39:** The objector states the project inappropriately applies the effectiveness of shaded fuel breaks along roads in untreated landscape with the effectiveness of shaded fuelbreaks along roads in a thinned and unburned landscape. CNW at 3. Also, the objector states shaded fuelbreaks in areas with small timber patches, such as the area along the road to McClure Mountain, would not affect fire spread or behavior. CNW at 3.

AR 12474

**Response:** I find that the Responsible Official provides an adequate analysis of effects pertaining to the effectiveness of shaded fuel breaks as they relate to the purpose and need of the project.

See the response to Objector Statement #38 and #40.

**Objector Statement #40:** The objector states the proposed fuelbreak treatment would not enhance the ingress and egress of the communication site. CNW at 3.

**Response:** I find that the Responsible Official provides an adequate analysis of effects pertaining to the effectiveness of shaded fuel breaks as they relate to the purpose and need of the project.

The regulation at 36 CFR 220.7(b)(3) requires disclosure of the direct, indirect and cumulative effects of the proposed action and any alternatives.

The EA at 16 identifies the current fuel conditions around the communication site as supporting flame lengths that increase fire intensity. The EA at page 100 discusses the Resource Indicator of Flame Length and effects of the no action Alternative 1. Overall, the no action alternative would result in adverse, long-term, moderate to major effects on flame lengths. The EA at 101 discusses the impacts of the proposed action to flame lengths stating the proposed treatments would have a beneficial, moderate, long-term impact on reducing and maintaining potential flame lengths in the WUI and along major access routes.

See also the response to Objector Statement #38.

**Objector Statement #41:** The objector states the project fails to disclose the ability of the Forest Service to conduct prescribed burns in a timely manner. CNW at 4.

**Response:** I find that the Responsible Official provides an adequate analysis of prescribed burning techniques and methods.

The regulation at 36 CFR 218.10(a)(4) states that objection issues not previously raised during a specified comment period can be set aside from review, unless that issue is based on new information that arose after opportunities to comment.

While objector CNW did not previously comment on this issue, I note that NEPA analyses and decisions do not set discrete timeframes for completing prescribed burns because of considerations such as weather and smoke approval that are outside of the Forest Service's control. Other constraints that the agency has limited control over include budget, access, ESA or Forest Plan-related timing restrictions, staffing, and resource availability. The EA at 36 describes a plan for treatment and incremental steps (EA at 56 and 102), while implementation of prescribed fire in terms of smoke permit process is described in the EA at 143; Fire, Fuels, Air Quality Specialist Report at 6 and 7. Use of equipment to make implementation of prescriptions more efficient is described in the Fire, Fuels, Air Quality Specialist Report at 19, 21.

**Objector Statement #42:** The objector states additional alternatives must be provided to address conflicting science regarding the effectiveness of fuels reduction treatments in reducing wildfire risk. Additional alternatives must address whether logging is a viable solution to alleged unnatural fuel

AR 12475

loading and provide alternative treatments. These alternatives should also address if fuel loading within the Twisp River Watershed is indeed outside the Historic Range of Variability. NCCC at 4.

**Response:** I find that the Responsible Official provided an adequate analysis of the effectiveness of fuels reduction pertaining to reducing wildfire risk.

According to the regulation at 36 CFR 220.7(b), "An alternative should meet the purpose and need and address one or more significant issues related to the proposed action" and "...no specific number of alternatives is required or prescribed."

The EA at 23 -27 lists alternatives that were considered but eliminated from detailed study. The EA at 25 lists the request to develop an alternative to meet forest health needs through natural succession. This is analyzed as the no action alternative within the EA as well as in the Vegetation Report and Fire, Fuels, Air Quality Specialist report. Page 24 of the Fire, Fuels, Air Quality Specialist report concludes that "The no action alternative within the project area would result in adverse, long-term moderate to major impacts on both the amount of crown fire activity within each sub-watershed and potential flame length within the WUI and along major access roads and ridges. This would fail to address the project's Needs thereby allowing vegetation composition and structure and fuel loading to continue to move toward conditions that support high-intensity, stand-replacing wildfires." The supporting document titled Twisp River Landscape Evaluation also proposes fuel treatments to reduce fuel loading around harvest areas.

**Objector Statement #43:** The objector states impact (including long-term impacts of soil compaction, weeds, and unauthorized off-road vehicle use) from proposed fire lines are not adequately evaluated and their locations are not revealed. NCCC at 7.

**Response:** I find that the Responsible Official provided an adequate analysis of effects associated with fire line construction.

The regulation at 36 CFR 220.7(b)(3) requires disclosure of the direct, indirect and cumulative effects of the proposed action and any alternatives.

The Soils Resource Report at 7 specifically notes that fire line construction is one of the proposed actions that directly impact the soil resource. Appendix B of the EA at pages 162, 178 and 189 lists soil mitigation and rehabilitation measures associated with fire line construction.

The Invasives Plants Report at 6, 7 and 10 addresses effects pertaining to invasive species. The Invasives Plants Report at 6 specifically addresses this concern, stating that fireline construction would not have a substantial impact on invasive plants because of the design features to be implemented prior to and during project implementation. These design features, further described in Appendix B of the EA, include several effective actions that would help minimize or eliminate the spread of invasive species.

The Recreation Report at 9-10 addresses off road vehicle uses, noting that all hand and dozer line used for prescribed fire will include rehabilitation measures to help disguise and minimize unintended use. These measures include: restoring soil, organic layers or vegetative debris; blocking access to firelines from roads or trails, and camouflaging these points. Mitigations measures to prevent unintentional motorized and unmotorized use is discussed further in Appendix B of the Final EA, Mitigation #1.

In addition, the EA at 234 displays a map that shows the proposed locations of fire line construction.

AR 12476

**Objector Statement #44:** The objector states the project does not adequately analyze the effects from the proposed prescribed burning and the potential loss of control of these burns. NCCC at 7.

**Response:** I find that the Responsible Official provided an adequate analysis of effects associated with prescribed fire.

The regulation at 36 CFR 220.7(b)(3) requires disclosure of the direct, indirect and cumulative effects of the proposed action and any alternatives.

The effect of prescribed burning is well analyzed and documented throughout the EA and in associated specialist reports including the reports for soils, hydrology, fuels, vegetation, wildlife, invasive weeds, botany and aquatics. Prescribed fire is implemented under strict USFS protocol for safety and is only permitted under prescribed weather, air movement/flow and fuel moisture conditions. All forest management activities have some inherent risk and the agency strives to minimize those risks. The analysis of potential for a prescribe fire to escape is beyond the scope of this analysis. The Public Health and Safety section of the EA at 127-128 specifically addresses prescribed fire emissions and the need for burn plans.

**Objector Statement #45:** The objector states the standards for determining danger trees have not been sufficiently outlined and documentation of danger trees harming people or property on the Forest was not provided in the EA. NCCC at 7.

**Response:** I find that the Responsible Official provided an adequate description of the standards associated with danger tree identification.

The regulation at 29 CFR 1910 Subpart R: 1910.266 (C) defines danger tree as "A standing tree that presents a hazard to employees due to conditions such as, but not limited to, deterioration or physical damage to the root system, trunk, stem or limbs, and the direction and lean of the tree." 29 CFR 1910 Subpart R: 1910.266 (h)(1)(vi) provides occupational safety and health standards for logging operations stating, "Each danger tree shall be felled, removed or avoided." "…. If the danger tree is not felled or removed, it shall be marked and no work shall be conducted within two tree lengths of the danger tree unless the employer demonstrates that a shorter distance will not create a hazard for an employee." The Forest Service Manual (FSM 7700 Chapter 30) gives direction on providing safety measures on National Forest System roads.

Appendix A of the EA at 155-156 outlines the criteria in which danger trees would be assessed utilizing appropriate established field guides. Appendix A further states hazard trees and danger trees will be evaluated for failure potential as identified in Filip et al. 2014 and Filip et al. 2016, respectively. Exposure to danger trees is prohibited by occupational health and safety laws which dictate the need for danger tree evaluation and removal.

**Objector Statement #46:** The objector states the EA does not analyze the impacts from naturally occurring wildfires post project. The EA does not state how the project will maintain corrected problems from past fire suppression or measures taken to reduce the risk of unnaturally large fires post project. NCCC at 8.

**Response:** I find that the Responsible Official adequately analyzed the cumulative impacts of the project.

AR 12477

The regulation at 40 CFR 1508.7 describes cumulative impact as impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions.

The EA at 47 identified several ongoing and reasonably foreseeable future actions to analyze as potential cumulative effects. Future wildfires were not addressed as a reasonably foreseeable future action because their overlap in time and space with the project area and proposed actions is not predictable and as such, is outside the scope of this analysis.

**Objector Statement #47:** The objector states cumulative impacts from the Cedar Creek fire and the fire's suppression operations were not analyzed. NCCC at 11.

**Response:** I find that the Responsible Official provides an adequate analysis of cumulative effects associated with the Cedar Creek fire and associated suppression efforts.

The regulation at 36 CFR 220.7(b)(3) requires disclosure of the direct, indirect and cumulative effects of the proposed action and any alternatives.

The EA at 7-9, 15, 20, 29, 34, 41, 47, 54, 58, 61, 69, 93, 104 discusses the occurrence and effects of the Cedar Creek fire on the landscape within the project area. The EA at 47 describes how the Forest addressed cumulative effects, specifically identifying impacts of past actions (such as the 2021 Cedar Creek fire) when describing the existing condition for each resource indicator in Alternative 1. Effects are also documented within the aquatics, range, vegetation, fuels, soils, botany and wildlife reports.

**Objector Statement #48:** The objector states the EA disregards studies that show the project could facilitate conditions what would be more conducive to an unnaturally large wildfire (*Does Increased Forest Protection Correspond to Higher Fire Severity in Frequent-Fire Forests of the Western United States?* by Bradley et al; *Adapt to More Wildfire in Western North American Forests as Climate Change* by Schoennagel). NCCC at 15.

**Response:** I find that the Responsible Official adequately considered relevant science as part of the analysis for this project.

The regulation at 40 CFR 1502.24 states that "Agencies shall insure that professional integrity, including scientific integrity, of the discussion and analyses in environmental impact statements."

The Fire, Fuels, Air Quality Specialist Report analyzed the proposed project's treatments on reducing wildfire scale and intensity in compliance with the regulation and utilized the best available science and professional integrity. The Fire, Fuels, Air Quality Specialist Report at 5 states current evidence suggests that a combination of mechanical thinning, followed by prescribed fire will restore important forest vegetation characteristics, increase resilience to wildfires, and decrease fire hazard (Skinner 2005; Schwilk et al. 2009; Kalies and Kent 2016; Prichard et al. 2020). Additionally, the Fire, Fuels, Air Quality Specialist Report at 9-11 discusses the three indicators used to evaluate how the proposed action would meet the project's need address wildfire hazard. Each indicator cites multiple literature sources as to reasons to utilize them as evaluations as to effectiveness of reducing potential fire severity. In evaluation, the proposed action would help decrease fuels. Fire, Fuels, Air Quality Specialist Report at

AR 12478

19-20.  For further information on citations used within the report, see the Fire, Fuels, Air Quality Specialist Report at 32-39.

See also the response to Objector Statement #38.

**Objector Statement #49:** The objector states the project's claim the project's actions will reduce wildfire is inadequate. Logging in the project area would have a significant impact on the forest ecosystem, downriver homeowners, and reduce carbon storage thereby exacerbating climate change. Logging activity will open the forest canopy leading in quicker and more thorough drying of the ground fuels. The EA also fails to identify the type and intensity of the wildfire the project is supposed to protect against or what might result from alternate treatments. NCCC at 15 & 16.

**Response:** I find that the Responsible Official adequately analyzed the effects of proposed actions and the associated effectiveness of those actions in reducing the threat of wildfire.

The regulation at 36 CFR 220.7(b)(3) requires disclosure of the direct, indirect and cumulative effects of the proposed action and any alternatives.

The Fire, Fuels, Air Quality Specialist Report analyzes the effectiveness of the proposed actions compared to the no action alternative in respect to lowering the risk of uncharacteristic wildfire. The Fire, Fuels, Air Quality Specialist Report at 17-19 notes that the no action alternative would result in current conditions maintaining thereby allowing vegetation composition and structure and fuel loading to continue to move toward conditions that support high-intensity, stand-replacing wildfires. In comparison, the purposed action would result in decreased fuels thereby, decreasing fire behavior if a wildfire should occur. Fire Fuels, Air Quality Specialist Report at 19-24. See also the response to Objector Statement #38.

The EA at 121-125 discusses the impacts of the proposed project to Climate Change and Carbon Sequestration. Forest management activities such as harvests and hazardous fuels reduction have characteristics similar to disturbances that reduce stand density and promote regrowth through thinning and removal, making stands and carbon stores more resilient to environmental change (McKinley et al. 2011). Ultimately, the relatively small quantity of carbon released, and short-term nature of the effect will have a temporary influence. Over time, as the forest regrows, carbon will be transferred to the product sector where it may be stored for decades and substitute for more emission intensive materials or fuels. EA at 121-125.

**Objector Statement #50:** The objector states there is no ecological justification for the proposed ridgetop dozer line network in Poorman Creek as opposed to strategically positioned hand lines. This treatment will create negative effects such as disrupting wildlife, introduction of invasive weeds, increased unauthorized off-road vehicle use and increased fire hazard risk. Additionally, they assert that the District does not identify a plan for maintaining the proposed fire breaks (dozer lines) over time. SMR at 2.

**Response:** I find that the Responsible Official adequately analyzed the effects of creating dozer line.

The regulation at 36 CFR 220.7(b)(3) requires disclosure of the direct, indirect and cumulative effects of the proposed action and any alternatives.

AR 12479

Issue #14 (Fire Fuels, Air Quality Specialist Report at 7) addressed concerns associated with creation of dozer line, which are proposed as containment lines for prescribed fire. Construction of proposed fire line will be accomplished by hand or machine. Machine line will be prioritized where conditions (fuels and topography) allow for greater cost and time savings, when it will result in increased fire safety and when it is practical. Otherwise, handline construction will be utilized.

The effects on dozer line construction to wildlife are discussed within the EA at 76-92. The effects from line construction on the various wildlife indicators range from minor to no effect. Regarding the concern of invasive weeds, the EA at 117 addresses the introduction of invasive weeds from line construction will be addressed by utilizing project design features which include several effective actions that would help minimize or eliminate the spread of invasive plants prior to and during project implementation. The issue of dozer line promoting off road vehicle use is analyzed within the EA at 114. All dozer line used for prescribed fire include rehabilitation measures to help disguise fire lines and minimize unintended use. EA at 145. Further measures to prevent unintentional motorized use are described in Appendix B of the EA. Lastly, the Fire Fuels, Air Quality Specialist Report at 19 states construction of firelines are proposed to contain prescribed fire operations. Impacts of these actions are described and the report indicates treatments would reduce the amount of crown fire activity and reduce potential flame lengths in the Wildland Urban Interface and along major access routes. Therefore, these actions would help decrease fuels. Fire, Fuels, Air Quality Specialist Report at 19-20.

The EA at 187 discusses monitoring that would occur during or after project implementation. Specifically, fire and fuels personnel will informally assess fuel loading during and following the fuel treatments. Fuel treatment results would offer data to inform future treatments. Additionally, the Forest Service is working with its partners in developing a broad monitoring strategy for implementation of the Twisp Restoration Project, effectiveness of the treatments and restoration actions, and validation of the project's underlying assumptions. While this strategy is still in development, it is expected to create a monitoring partnership with collaborators and regular reporting of monitoring results. EA at 188-189.

**Objector Statement #51:** The objector states burning impacts in Poorman Creek drainage were inadequately evaluated in the Final EA and not communicated to the community. These treatments will result in significant biomass requiring extensive prescribed burning, carbon release and air quality impacts. Biochar was not evaluated as part the proposal which can minimize air impacts. SMR at 2

**Response:** I find that the Responsible Official adequately analyzed the effects of burning within the Poorman Creek drainage.

The regulation at 36 CFR 220.7(b)(3) requires disclosure of the direct, indirect and cumulative effects of the proposed action and any alternatives. A 30-day public comment period on the Draft EA began on October 2, 2020, as required by 36 CFR 218.25(a)(1)(i). In addition, the regulation at 36 CFR 220.7(b)(2)(i) directs an EA to include a proposed action and when there are no unresolved conflicts concerning alternative uses of available resources, the EA need only analyze the proposed action.

The Fire, Fuels, Air Quality Specialist Report at 6-7 address issues brought up by the public concerning creation of debris and air quality. The report states the proposed prescribed fire treatments would produce smoke and temporarily affect air quality for a very short duration (hours to days) for the lifetime of the project. The Fire, Fuels, Air Quality Specialist Report at 19-23 discloses effects of the proposed action pertaining to prescribed burning throughout the project area.

AR 12480

The potential for utilizing biochar processing is discussed within the EA at 142, with regard to biomass removal. While biomass removal may include public firewood utilization, debris may be partly or wholly processed into biochar onsite.

I find that the Final EA provided adequate analysis of proposed prescribed fire treatments, provided public commenting on the Draft EA, and identified when biochar may be used as a method for biomass removal.

**Final Remedies/Resolutions for Wildfire Risk Analysis/Treatment:** Fire risk analysis and treatments were adequately disclosed; no remedies or resolutions are needed.

***Wildlife and Endangered Species Act-Listed Species***

**Overview and Objector's Suggested Remedies:** The objection issues focus on the objectors' concern the project will not protect suitable goshawk habitat, have a significant impact on owl habitat, and unavoidable impacts to ESA-listed species habitat. Suggested remedies include: treatment within suitable goshawk habitat should retain structural components that make it currently suitable, and develop an alternative to preclude thinning in matrix stands that provide owl habitat.

**Objector Statement #52:** The objector states the project fails to adequately protect suitable goshawk habitat. CNW at 3.

**Response:** I find that the Responsible Official adequately describes the rationale for the reduction in suitable goshawk habitat.  I also find that the Forest adequately analyzed direct, indirect and cumulative effects to goshawk affected species.

The regulation at 36 CFR 220.7(b)(3) requires disclosure of the direct, indirect and cumulative effects of the proposed action and any alternatives.

While the direct effect of Alternative 2 to northern goshawk nesting habitat would be a reduction from 885 acres to 429 acres, the proposed activities in Alternative 2 are designed to re-establish the historic range of variability, increase productivity and diversity of forests for prey species, and lower the risk of high-severity fire.  These were determined to be the best management objectives for maintaining goshawks on the landscape (Reynolds et. al. 2017).  DM at 23 and 24; EA at 79; WR at 28 and 29.  The analysis also explains that no known nests exist in the project area and recently completed protocol surveys have not resulted in responses from individual goshawks within the project area.  DM at 23,24; EA at 79, and WR at 28. Design Feature W3 states that if there are any newly found raptor nests, the nest stand, and post-fledgling area (PFA) will be delineated and managed. Seasonal restrictions on any project activities within ¼ mile of the nest would also be implemented. EA at 183.  Design Feature W4 states that any active raptor nests or PFA's will be seasonally restricted.  EA at 183.

The Responsible Official adequately displayed the Project's effects to goshawk habitat.  Although some habitat would be reduced, the proposed activities are designed to maintain goshawks on the landscape and are in line with the objectors suggested remedy of retaining structural components of suitable goshawk habitat.

AR 12481

**Objector Statement #53:** The objector states the Draft Decision does not meet the Endangered Species Act by temporarily degrading habitat for listed species such as old growth owl habitat. The reduction in habitat with claim of future improvement would have a significant impact on owl habitat. NCCC at 5 & 7.

**Response:** I find that the Forest adequately analyzed direct, indirect and cumulative effects to affected species.

The regulation at 36 CFR 220.7(b)(3) requires disclosure of the direct, indirect and cumulative effects of the proposed action and any alternatives.

Potential impacts to listed and sensitive species are discussed and analyzed for the Twisp project area. EA at Chapter 3. The rationale for treating owl habitat is defined in the EA at 76. The analysis concludes that no high-quality nesting habitat is present within the project area and the vegetation mapped as NRF habitat does not have the nesting or roosting components as defined for suitable habitat (USFWS 2011) EA at 76. Effects to spotted owls and spotted owl habitat are further discussed in the BA at 101 – 106.

The analysis also concludes that although matrix thinning treatments would remove some nesting/roosting/foraging habitat and remove dispersal habitat, this treatment will be consistent with NWFP standard and guidelines for matrix management (USDA and USDI 1994, p. C-39-C-41). The only activities occurring within designated old growth stands are fuels treatments and these treatments would result in short-term degradation of old growth habitat (understory growth) which would result in a minor negative effect but would result in a long-term improvement of old growth habitat. EA at 84. The only fuel treatments that would occur within designated old growth include hand piling, pile burning, and underburning. EA at 43.

The Responsible Official adequately displayed the project's effects to spotted owls and spotted owl habitat. The Responsible Official also adequately explained the rationale for treatments within designated old growth habitat and matrix.

**Objector Statement #54:** The objector states that impacts to habitat for all seven ESA-listed species near the project area will be extensive and, regardless if the proposed activities are implemented with no issues, there will be unavoidable impacts. NCCC at 7.

**Response:** I find that the Responsible Official adequately analyzed direct, indirect and cumulative effects to all ESA-listed species as well as other affected species.

The regulation at 36 CFR 220.7(b)(3) requires disclosure of the direct, indirect and cumulative effects of the proposed action and any alternatives.

The lead federal agencies for implementing ESA are the U.S. Fish and Wildlife Service (FWS) and the U.S. National Oceanic and Atmospheric Administration (NOAA) Fisheries Service. NOAA stated in their Biological Opinion, "NMFS believes that the combination of no-cut buffers in riparian reserves, harvest and haul management that reduce dust and sediment delivery, proximity of harvest and haul activities from occupied habitat, and implementation of design criteria and minimizing measures reduces the effect of the proposed project to a point of insignificance. Accordingly, NMFS concurs with your determination that "may affect, not likely to adversely affect" for UCR spring-run Chinook salmon and UCR steelhead". A Fish and Wildlife Service Opinion is still pending for the remaining ESA-listed species: Columbia River bull trout, northern spotted owl, Canada lynx, gray wolf, and grizzly bear.

AR 12482

Potential impacts to ESA listed species are discussed and analyzed for the Twisp project area.  EA at Chapter 3.  Specifically, impacts to Upper Columbia River Spring-run Chinook and threatened Upper Columbia River steelhead and Columbia River bull trout and their designated critical habitat (EA at 60 – 65; and BA at 166 - 206); Northern Spotted Owl, Canada Lynx, Grizzly Bear and Gray Wolf (EA at 71-73 and 76-79; BA at 69-109) were considered. Project design features (EA at 158-165, 182-185) for fish and wildlife species and mitigation measures for fish species are prescribed. EA at 191-192. The EA also summarized the effects of Alternative 2 on the seven ESA listed species and their habitats for fish (EA at 64-65) and wildlife species (EA at 88).

**Final Remedies/Resolutions for Wildlife and ESA-listed Species:** Potential impacts to ESA-listed species were adequately addressed; no remedy or resolution is needed.

*Climate Change*

**Overview and Objector's Suggested Remedies:** This objection issue focuses on the objector's concern that the EA fails to evaluate the role climate change has in recent large wildfires. No remedies are suggested.

**Objector Statement #55:** The objector states the EA fails to evaluate the impacts climate change may have on recent large wildfires. The EA fails to establish the forest is more susceptible to wildfire due past logging and fire suppression. NCCC at 14 & 15.

**Response:** I find the Responsible Official has considered the impacts of climate change on wildfires and cumulative effects of past actions.

The regulation at 36 CFR 220.7(b)(3) requires disclosure of the direct, indirect and cumulative effects of the proposed action and any alternatives.

As stated in the EA at 13, the need for the project is based on information in the Okanogan-Wenatchee National Forest Restoration Strategy. On page 15 of the Okanogan-Wenatchee National Forest Restoration Strategy, it discusses that climate change is expected to lengthen fire seasons and result in larger and more severe wildfires. The Okanogan-Wenatchee National Forest Restoration Strategy on page 16 also discusses how timber harvest and fire suppression have transformed forest spatial pattern and landscape ecology. Therefore, the Responsible Official considered recommendations for climate change vulnerability and adaptations and states a need for this project is to restore healthy stand structures that respond to disturbances such as wildfire and climate change. EA at 13 and 15.

**Final Remedies/Resolutions for Climate Change:** Climate change was addressed; no remedy or resolution is needed.

*Monitoring*

**Overview and Objector's Suggested Remedies:** This objection issue focuses on the objector's concern the EA does not specify monitoring protocols. Suggested remedies include: develop compliance monitoring and quality control plans with extensive community involvement prior to the final approval of the EA.

AR 12483

**Objector Statement #56:** The objector states the EA does not specify monitoring protocols for ensuring project implementation adheres to the planning documents. The EA also does not contain standards or protocols contractors must comply with to ensure minimal ecological impacts. SMR at 3.

**Response:** I find the Responsible Official adequately considered monitoring protocols for ensuring project implementation adheres to the planning documents. I find the EA provides descriptions of the procedures used to monitor project implementation. Final EA at 39-41 and 187-188. These descriptions include that during contract development and project implementation, agency staff would regularly evaluate treatments to assure that design features are addressed as specified.

The National Forest Management Act of 1976 (NFMA) requires that all projects implemented on National Forest System lands comply with approved Forest Plans. Monitoring is not required to be included in individual projects.

Appendix B in the Final EA lists the design features included in the Proposed Action to avoid and/or minimize potential environmental impacts. The design features are based on Forest Plan direction, best management practices (BMPs), relevant science, professional experience with similar projects, and site-specific evaluations. During contract development and project implementation, agency staff would regularly evaluate treatments to assure that design features are addressed as specified. Analyses of environmental effects of this project are based on the implementation of these features. Mitigation measures include actions to address anticipated or potential impacts of fireline construction, equipment use, road construction, or prescribed burning. Final EA at 39-40.

Each design feature is tied to compliance with management direction, law, or policy as listed, or to an issue that was received during public scoping (Final EA at 157). Specific monitoring that would occur during or after project implementation is detailed in the Final EA at 39-41 and 187-188.

In addition, monitoring the potential and actual effects of treatments in Riparian Reserves starts before implementation by evaluating current, site-specific conditions to ensure that the design features in Appendix D can be applied to create the desired low-magnitude effects analyzed in this BA. Some actions such as machine piling and dozer fireline are prohibited altogether. If conditions indicate that greater impacts are likely, treatments would be reduced or eliminated prior to implementation, or a less-impactful treatment would occur (for example, if fuel loadings are likely to create high-intensity fire behavior during a planned underburn, they would be hand-piled and burned before underburning). During implementation, effects of treatments on soil and vegetation are routinely and frequently assessed by the sales administrator, contract inspector, burn boss, and others; inspections may also occur by soils scientist, botanist, hydrologist, and silviculturist, and other agency staff (Final BA at 66). Routine or required monitoring after implementation is detailed in the Final BA at 66-67.

Additionally, the Forest Service is working with its partners in developing a broad monitoring strategy for implementation of the Twisp Restoration Project, effectiveness of the treatments and restoration actions, and validation of the project's underlying assumptions. While this strategy is still in development, it is expected to create a monitoring partnership with collaborators and regular reporting of monitoring results. Monitoring results can be used to modify future treatments to better achieve the desired conditions (Final EA at 40).

Overall, I find that the EA identified specific monitoring protocols based on the Forest Plan and how forest staff will ensure minimal ecological impacts from contractors.

AR 12484

**Final Remedies/Resolutions for Monitoring:** The EA and BA includes monitoring protocols for ensuring project implementation adheres to the planning documents. In addition, the Forest Service is working with its partners in developing a broad monitoring strategy for implementation of the Twisp Restoration Project.  As such, no further final remedies or resolution is needed.

AR 12485

 **United States Department of Agriculture** | **Forest Service** | **Pacific Northwest Region** | **1220 SW Third Avenue (97204)** <br> **P.O. Box 3623** <br> **Portland, OR 97208-3623**

---

**File Code:** 1570; 1950
**Date:** July 26, 2022

Phil Fenner
North Cascades Conservation Council
Sent via email.

Dear Mr. Fenner:

This letter is in response to your objection (#22-06-00-0057-218(B)) to the draft Decision Notice (DN) and Finding of No Significant Impact (FONSI) for the Twisp Restoration Project, Methow Valley Ranger District, Okanogan-Wenatchee National Forest. I have read your objection and reviewed the project record, the draft DN/FONSI, and the final Environmental Assessment (EA). My review of your objection was conducted in accordance with the regulation at 36 CFR 218 (2013).

## PROJECT DESCRIPTION

The legal notice announcing the Notice of Availability and Pre-decisional Administrative Review (Objection) Period for the final Environmental Assessment (EA) and Draft Decision Notice and Finding of No Significant Impact (Draft DN/FONSI) for the Twisp Restoration Project was published in the *Wenatchee World* on April 30, 2022. In the Draft DN/FONSI, the Responsible Official selected the proposed action alternative (Alternative 2), which would authorize the following activities throughout the life of the project:

- Three project-specific Forest Plan amendments affecting standards and guidelines pertaining to Forest Plan Old Growth and deer winter range.
- Overstory harvest treatments on up to 8,151 acres, including prescriptions for commercial condition-based thinning on matrix lands (7275 acres), commercial harvest shaded fuelbreak thinning on matrix lands (759 acres), commercial thinning in riparian reserves (72 acres), and regeneration harvest and post-harvest tree planting (45 acres). Harvest operations in riparian reserves will require winter-only conditions unless the operator can provide a plan of operations that meets soil protection criteria described in the analysis (EA, page 177).
- Non-commercial understory stand-improvement thinning on up to 13,812 acres outside of overstory treatment areas.
- Prescribed burning, including underburning and pile burning, on up to 23,167 acres, with additional maintenance burning 16-20 years after initial treatments. Burn operations will entail construction of up to 102.6 miles of hand or machine fireline to provide containment. Mastication and biomass removal may occur to reduce fuels.
- Installation of four Aquatic Organism Passage (AOP) pipes on roads over Newby and Poorman Creek drainages and replacement of three undersized culverts with appropriate-sized culverts.

AR 12498

- Removal of the Roads End Campground and one campsite in the Poplar Flats Campground, with construction of 5 replacement campsites in Poplar Flats, South Creek, and Mystery Campgrounds.
- Hazard/danger Tree removal on up to 110.8 miles of roads.
- Transportation system changes including constructing National Forest System (NFS) roads (2.8 miles), opening currently closed NFS roads (6 miles); closing currently open NFS roads (3.7 miles), decommissioning NFS and unauthorized roads (31.4 miles); adding unauthorized roads to the NFS inventory (8 miles); designating roads for Administrative Use only (11.5 miles); and converting roads to non-motorized trails or stock driveways (3.1 miles).
- Road maintenance and reconstruction will occur as needed on NFS roads used for log hauling. Log hauling will be facilitated by the construction of 4.8 miles of temporary roads. Five existing rock pits on NFS lands will be used as sources of material to maintain and improve roads as needed. Up to 2.5 miles of private roads will be used for log hauling pending completion of road permit agreements with private landowners.

**OBJECTION ISSUE DISCUSSION AND RESPONSE**

Objectors raised a number of issues under the following topic areas: NEPA/NFMA violations; the Landscape Evaluation; the Economic Report; impacts to fisheries; roads and traffic; impacts to recreation; impacts to vegetation from the proposed treatments; the wildfire risk analysis and proposed fuel treatments; impacts to wildlife, including listed species; climate change, and monitoring.

The formal resolution meeting was held on July 12, 2022. I found the conversation helped me understand the objection issues in greater detail. Although no resolution of objections occurred, I did find one objection issue that will need clarification in the final DN. As noted in the response to Objector Statement #26 (enclosed), I instruct the Responsible Official to include clarifying language in the final decision to describe which structure stages are considered "young, overstocked stands", which treatments would take place within the identified structure stages, and the effects of these treatments on those stages relative to HRV/FRV. No other remedies or resolutions are needed.

**CONCLUSION**

I conducted my review of the objection issues based on the record, EA, response to comments and draft DN/FONSI. Based on my review and with the above clarification, I conclude the following:

- The draft decision describes the actions to be taken in sufficient detail that the reader can easily understand how the actions will be implemented and the effects of taking action.
- The draft decision considered a range of alternatives that was adequate to respond to the Purpose and Need. The purpose and need and alternatives considered in the EA reflect a reasonable range of alternatives, consistent with law, regulation and policy.
- The draft decision is consistent with or moves toward attainment of Forest Plan standards and guidelines.

AR 12499

- The draft decision is consistent with all direction, regulation, and law, and the EA contains adequate evidence to support the decision. The record contains site-specific documentation regarding resource conditions, and the Responsible Official's draft decision document is based on the record and reflects a reasonable conclusion.

This concludes my written review of the project. By copy of this letter and the enclosed response document, the Responsible Official must include the clarification noted above into the final decision, then sign the decision and notify interested and affected persons in accordance with the regulation at 36 CFR 218.12(b) and 36 CFR 220.7(d). This written response is the final administrative review by the Forest Service or the Department of Agriculture [36 CFR 218.11(b)(2)].

Sincerely,

DAVID WARNACK
Acting Deputy Regional Forester
Objection Reviewing Officer

Enclosure

cc:  Kristin Bail; Chris Furr; Andrew Hart; Rita Bennett; Meg Trebon; Debra Anderson; Michelle Lombardo: Christine Pyle

AR 12500



| **United States Department of Agriculture** | **Forest Service** | **Pacific Northwest Region** | **1220 SW Third Avenue (97204)** P.O. Box 3623 Portland, OR 97208-3623 |

---

**File Code:** 1570; 1950
**Date:** July 26, 2022

Tom Partin
Consultant
AFRC

Sent via email.

Dear Mr. Partin:

This letter is in response to your letter of support (#22-06-00-0059-218(B)) to the draft Decision Notice (DN) and Finding of No Significant Impact (FONSI) for the Twisp Restoration Project, Methow Valley Ranger District, Okanogan-Wenatchee National Forest. I appreciate your letter of support and am writing to inform you of the results of the review. I reviewed the project record, the draft DN/FONSI, and the final Environmental Assessment (EA). My review of the objections was conducted in accordance with the regulation at 36 CFR 218 (2013).

## PROJECT DESCRIPTION

The legal notice announcing the Notice of Availability and Pre-decisional Administrative Review (Objection) Period for the final Environmental Assessment (EA) and Draft Decision Notice and Finding of No Significant Impact (Draft DN/FONSI) for the Twisp Restoration Project was published in the *Wenatchee World* on April 30, 2022. In the Draft DN/FONSI, the Responsible Official selected the proposed action alternative (Alternative 2), which would authorize the following activities throughout the life of the project:

- Three project-specific Forest Plan amendments affecting standards and guidelines pertaining to Forest Plan Old Growth and deer winter range.
- Overstory harvest treatments on up to 8,151 acres, including prescriptions for commercial condition-based thinning on matrix lands (7275 acres), commercial harvest shaded fuelbreak thinning on matrix lands (759 acres), commercial thinning in riparian reserves (72 acres), and regeneration harvest and post-harvest tree planting (45 acres). Harvest operations in riparian reserves will require winter-only conditions unless the operator can provide a plan of operations that meets soil protection criteria described in the analysis (EA, page 177).
- Non-commercial understory stand-improvement thinning on up to 13,812 acres outside of overstory treatment areas.
- Prescribed burning, including underburning and pile burning, on up to 23,167 acres, with additional maintenance burning 16-20 years after initial treatments. Burn operations will entail construction of up to 102.6 miles of hand or machine fireline to provide containment. Mastication and biomass removal may occur to reduce fuels.
- Installation of four Aquatic Organism Passage (AOP) pipes on roads over Newby and Poorman Creek drainages and replacement of three undersized culverts with appropriate-

AR 12501

sized culverts.

- Removal of the Roads End Campground and one campsite in the Poplar Flats Campground, with construction of 5 replacement campsites in Poplar Flats, South Creek, and Mystery Campgrounds.
- Hazard/danger Tree removal on up to 110.8 miles of roads.
- Transportation system changes including constructing National Forest System (NFS) roads (2.8 miles), opening currently closed NFS roads (6 miles); closing currently open NFS roads (3.7 miles), decommissioning NFS and unauthorized roads (31.4 miles); adding unauthorized roads to the NFS inventory (8 miles); designating roads for Administrative Use only (11.5 miles); and converting roads to non-motorized trails or stock driveways (3.1 miles).
- Road maintenance and reconstruction will occur as needed on NFS roads used for log hauling. Log hauling will be facilitated by the construction of 4.8 miles of temporary roads. Five existing rock pits on NFS lands will be used as sources of material to maintain and improve roads as needed. Up to 2.5 miles of private roads will be used for log hauling pending completion of road permit agreements with private landowners.

**OBJECTION ISSUE DISCUSSION AND RESPONSE**

Objectors raised a number of issues under the following topic areas: NEPA/NFMA violations; the Landscape Evaluation; the Economic Report; impacts to fisheries; roads and traffic; impacts to recreation; impacts to vegetation from the proposed treatments; the wildfire risk analysis and proposed fuel treatments; impacts to wildlife, including listed species; climate change, and monitoring.

The formal resolution meeting was held on July 12, 2022. I found the conversation helped me understand the objection issues in greater detail. Although no resolution of objections occurred, I did find one objection issue that will need clarification in the final DN. As noted in the response to Objector Statement #26 (enclosed), I instruct the Responsible Official to include clarifying language in the final decision to describe which structure stages are considered "young, overstocked stands", which treatments would take place within the identified structure stages, and the effects of these treatments on those stages relative to HRV/FRV. No other remedies or resolutions are needed.

**CONCLUSION**

I conducted my review of the objection issues based on the record, EA, response to comments and draft DN/FONSI. Based on my review and with the above clarification, I conclude the following:

- The draft decision describes the actions to be taken in sufficient detail that the reader can easily understand how the actions will be implemented and the effects of taking action.
- The draft decision considered a range of alternatives that was adequate to respond to the Purpose and Need. The purpose and need and alternatives considered in the EA reflect a reasonable range of alternatives, consistent with law, regulation and policy.
- The draft decision is consistent with or moves toward attainment of Forest Plan standards

AR 12502

and guidelines.
- The draft decision is consistent with all direction, regulation, and law, and the EA contains adequate evidence to support the decision. The record contains site-specific documentation regarding resource conditions, and the Responsible Official's draft decision document is based on the record and reflects a reasonable conclusion.

This concludes my written review of the project. By copy of this letter and the enclosed response document, the Responsible Official must include the clarification noted above into the final decision, then sign the decision and notify interested and affected persons in accordance with the regulation at 36 CFR 218.12(b) and 36 CFR 220.7(d). This written response is the final administrative review by the Forest Service or the Department of Agriculture [36 CFR 218.11(b)(2)].

Sincerely,

DAVID WARNACK
Acting Deputy Regional Forester
Objection Reviewing Officer

Enclosure

cc:  Kristin Bail; Chris Furr; Andrew Hart; Rita Bennett; Meg Trebon; Debra Anderson; Michelle Lombardo: Christine Pyle

AR 12503

 **United States Department of Agriculture**    **Forest Service**    **Pacific Northwest Region**      **1220 SW Third Avenue (97204) P.O. Box 3623 Portland, OR 97208-3623**

---

**File Code:** 1570; 1950
**Date:** July 26, 2022

Michael Shaffer
Second Mile Ranch Community Members

Sent via email.

Dear Mr. Shaffer:

This letter is in response to your objection (#22-06-00-0060-218(B)) to the draft Decision Notice (DN) and Finding of No Significant Impact (FONSI) for the Twisp Restoration Project, Methow Valley Ranger District, Okanogan-Wenatchee National Forest. I have read your objection and reviewed the project record, the draft DN/FONSI, and the final Environmental Assessment (EA). My review of your objection was conducted in accordance with the regulation at 36 CFR 218 (2013).

**PROJECT DESCRIPTION**

The legal notice announcing the Notice of Availability and Pre-decisional Administrative Review (Objection) Period for the final Environmental Assessment (EA) and Draft Decision Notice and Finding of No Significant Impact (Draft DN/FONSI) for the Twisp Restoration Project was published in the *Wenatchee World* on April 30, 2022. In the Draft DN/FONSI, the Responsible Official selected the proposed action alternative (Alternative 2), which would authorize the following activities throughout the life of the project:

- Three project-specific Forest Plan amendments affecting standards and guidelines pertaining to Forest Plan Old Growth and deer winter range.
- Overstory harvest treatments on up to 8,151 acres, including prescriptions for commercial condition-based thinning on matrix lands (7275 acres), commercial harvest shaded fuelbreak thinning on matrix lands (759 acres), commercial thinning in riparian reserves (72 acres), and regeneration harvest and post-harvest tree planting (45 acres). Harvest operations in riparian reserves will require winter-only conditions unless the operator can provide a plan of operations that meets soil protection criteria described in the analysis (EA, page 177).
- Non-commercial understory stand-improvement thinning on up to 13,812 acres outside of overstory treatment areas.
- Prescribed burning, including underburning and pile burning, on up to 23,167 acres, with additional maintenance burning 16-20 years after initial treatments. Burn operations will entail construction of up to 102.6 miles of hand or machine fireline to provide containment. Mastication and biomass removal may occur to reduce fuels.
- Installation of four Aquatic Organism Passage (AOP) pipes on roads over Newby and Poorman Creek drainages and replacement of three undersized culverts with appropriate-sized culverts.

AR 12504

- Removal of the Roads End Campground and one campsite in the Poplar Flats Campground, with construction of 5 replacement campsites in Poplar Flats, South Creek, and Mystery Campgrounds.
- Hazard/danger Tree removal on up to 110.8 miles of roads.
- Transportation system changes including constructing National Forest System (NFS) roads (2.8 miles), opening currently closed NFS roads (6 miles); closing currently open NFS roads (3.7 miles), decommissioning NFS and unauthorized roads (31.4 miles); adding unauthorized roads to the NFS inventory (8 miles); designating roads for Administrative Use only (11.5 miles); and converting roads to non-motorized trails or stock driveways (3.1 miles).
- Road maintenance and reconstruction will occur as needed on NFS roads used for log hauling. Log hauling will be facilitated by the construction of 4.8 miles of temporary roads. Five existing rock pits on NFS lands will be used as sources of material to maintain and improve roads as needed. Up to 2.5 miles of private roads will be used for log hauling pending completion of road permit agreements with private landowners.

**OBJECTION ISSUE DISCUSSION AND RESPONSE**

Objectors raised a number of issues under the following topic areas: NEPA/NFMA violations; the Landscape Evaluation; the Economic Report; impacts to fisheries; roads and traffic; impacts to recreation; impacts to vegetation from the proposed treatments; the wildfire risk analysis and proposed fuel treatments; impacts to wildlife, including listed species; climate change, and monitoring.

The formal resolution meeting was held on July 12, 2022. I found the conversation helped me understand the objection issues in greater detail. Although no resolution of objections occurred, I did find one objection issue that will need clarification in the final DN. As noted in the response to Objector Statement #26 (enclosed), I instruct the Responsible Official to include clarifying language in the final decision to describe which structure stages are considered "young, overstocked stands", which treatments would take place within the identified structure stages, and the effects of these treatments on those stages relative to HRV/FRV. No other remedies or resolutions are needed.

**CONCLUSION**

I conducted my review of the objection issues based on the record, EA, response to comments and draft DN/FONSI. Based on my review and with the above clarification, I conclude the following:

- The draft decision describes the actions to be taken in sufficient detail that the reader can easily understand how the actions will be implemented and the effects of taking action.
- The draft decision considered a range of alternatives that was adequate to respond to the Purpose and Need. The purpose and need and alternatives considered in the EA reflect a reasonable range of alternatives, consistent with law, regulation and policy.
- The draft decision is consistent with or moves toward attainment of Forest Plan standards and guidelines.

AR 12505

- The draft decision is consistent with all direction, regulation, and law, and the EA contains adequate evidence to support the decision. The record contains site-specific documentation regarding resource conditions, and the Responsible Official's draft decision document is based on the record and reflects a reasonable conclusion.

This concludes my written review of the project. By copy of this letter and the enclosed response document, the Responsible Official must include the clarification noted above into the final decision, then sign the decision and notify interested and affected persons in accordance with the regulation at 36 CFR 218.12(b) and 36 CFR 220.7(d). This written response is the final administrative review by the Forest Service or the Department of Agriculture [36 CFR 218.11(b)(2)].

Sincerely,

DAVID WARNACK
Acting Deputy Regional Forester
Objection Reviewing Officer

Enclosure

cc:  Kristin Bail; Chris Furr; Andrew Hart; Rita Bennett; Meg Trebon; Debra Anderson; Michelle Lombardo: Christine Pyle

AR 12506

**Table 5. Resource indicators and measures for assessing effects**

| Resource Element | Resource Indicator | Measure (Quantify if possible) | Used to address: P/N, or key issue/concern? | Source (LRMP S/G; law or policy, BMPs, etc.)? |
|---|---|---|---|---|
| Forest Health- Structure and Composition | Overstocked young forest stands | Acres of young forest stands treated | Needs # 2, 3, 4 | OKA-WEN National Forest 2012 Restoration Strategy |
| Promoting Late & Old Forest Structure | Presence of Medium & Large Trees | % land with medium to large trees | Needs # 2, 3, 4 | LRMP, NWFP, OKA-WEN National Forest 2012 Restoration Strategy |

# 4.0 - Methodology

The FRS helped to guide the analysis by identifying watersheds in need of restoration. The FRS analysis provided details to the interdisciplinary team (IDT) to pursue restoration projects and identify a potential landscape treatment area (PLTA). For detailed information, including limitations and processes on the FRS reference the Okanogan-Wenatchee National Forest Restoration Strategy (USDA, 2012). The FRS process includes the use of an ecosystem management decision support tool. This process is outlined below.

Ecosystem Management Decision Support (EMDS) is a GIS-based set of tools used to analyze landscapes and compare the present condition with historic and future reference conditions of similar landscapes across the Interior Columbia Basin. EMDS was used to analyze six of the eleven sub-watersheds which make up the Twisp Restoration Project. The eleven sub-watersheds included in the PLTA are: Upper Twisp River, Middle Twisp River, Little Bridge Creek, Lower Twisp River, Thompson Creek, Alder Creek and small portions of Eagle Creek, South Creek, Wolf Creek, and Fawn Creek. Small portions of the following sub-watersheds: Eagle Creek, South Creek, Wolf Creek, and Fawn Creek, are included in the PLTA but did not receive an EMDS analysis. These sub-watershed portions are comparable to their neighboring sub-watersheds.

These sub-watersheds were delineated into hundreds of patches (polygons) with similar species composition, diameter class, canopy layers, tree and shrub canopy cover, and vegetation clumpiness. This was accomplished through aerial photo interpretation, local knowledge, and limited field verification. From that initial data, modeling was used to characterize these polygons by a multitude of stand structures, forest types, and insect and disease vulnerabilities.

Patches of similar vegetation composition and structure over 10 acres in size were delineated into polygons (forested stands) for the analysis area. A subset of these stands representing the variety of forest conditions within the analysis area were selected for field data sampling. The sampling included the installation of plots based on FSVeg Common Stand Exam protocols (USDA 2015). Measurements included species, diameter-at-breast height (dbh), live and dead status, height, live crown ratio, insect and disease conditions, plant association, and fuel model.

AR 12526

Once the polygons were characterized, statistical analysis using FRAGSTATS (McGarigal and Marks 1994) was applied to the data set. The results are tables of statistics regarding spatial patterns that provide insight to existing diversity, frequency and degree of fragmentation of the modeled characteristics that can be compared to the same metrics derived using the same methods from historical aerial photographs and maps of reference landscapes.

Reference conditions (the historic range of variability, or HRV) within the watersheds in the Twisp Restoration Project are based on four different Ecological Subregions (ESRs), areas with similar geo-climatic constraints as described further in Figure 2 of the Twisp Landscape Evaluation (Downing 2019). A given ESR is expected to contain a predictable range of vegetation conditions; thus, for the Twisp watershed as a whole, there are a number of different sets of expected conditions within the chosen ESRs. The ESRs included within the project area are described in the landscape evaluation and include ESR 5, ESR 6, ESR 11, and ESR 13. To model the effects for a Future Range of Variability given a warmer future climate with drier summers, warmer and drier reference conditions were used. The future conditions modeled for ESR 6 is ESR 5, for ESR 5 and 13 is ESR 11, and for ESR 11 is ESR 90. The target condition is the overlap of the historic and future ranges of variability.

EMDS focuses on landscape-level effects and does not accurately model stand-level dynamics. As such, it was not used to measure the impact of proposed actions on resource indicators. EMDS was used to coarsely model proposed changes in vegetation structure and species dominance. The modeling was conducted by ecologists from the Okanogan Wenatchee National Forest Supervisor's Office.

## 4.1 - Information Sources

After the PLTA was decided, field surveys began in 2018. Silvicultural and pre-cruise walk-thru exams were conducted in 2019 across the project area. Plots were randomly chosen throughout the PLTA. Data collected was based on overstory and understory vegetation characteristics such as trees per acre, basal area, stand height, species composition, plant associations, and insect and disease presence. Notes were also taken on previous treatments, disturbances, existing and needed access, and logging systems feasibility.

Several stands within the LSR portion of the original Twisp Restoration project area were surveyed in 2019 using the Region 6 Common Stand Exam (CSE) principles (USDA, 2015). Plots were taken throughout the LSR area on a scale of approximately one plot per 20 acres. Data collected at these plots followed the procedures for the R6 CSE Intensive Survey. Data was then entered into the USDA Forest Management Service Center (FSVEG) and then uploaded into the Forest Vegetation Simulator (FVS). FVS is a modeling system used by several agencies for predicting forest stand dynamics across the United States. FVS modeling is based on semi-distance-independent individual tree growth and yield models (Dixon, 2010). The East Cascades Variant 1987, updated in 2012, was used to account for local conditions during FVS simulations. Stands were selected for analysis based on their proposed treatment and data availability.

The next steps of the analysis were to compare the FVS-projected stand dynamic results from the No Action Alternative to the Proposed Action Alternative. FVS was used to analyze different thinning densities to meet the desired future condition. The effects were modeled over 40 years, 2023-2063, to adequately show treatment effects. FVS modeling parameters are described below and are shown in picture detail and provided under the analysis tab on the project website: https://www.fs.usda.gov/project/?project=56554. Images shown in this document highlight the comparison of Alternative 1 and Alternative 2 and are based on the modeling parameters described below.

AR 12527

**Table 6. Resource indicators and measures for Alternative 1.**

| Resource Element | Resource Indicator | Measure | Alternative 1 |
|---|---|---|---|
| Forest Health- Structure and Composition | Overstocked young forest stands. | Acres of young forest stands treated | None |
| Promoting Late & Old Forest Structure | Presence of Medium & Large Trees | % land with medium to large trees | 51% total Medium Trees= 43% Large Trees= 8% |

## 5.2 - Alternative 2 – Proposed Action

Alternative 2 proposes, overstory and understory vegetation management, prescribed fire treatments, and road decommissioning described in Chapter 2 and Appendix A of the EA. Silvicultural prescriptions for each thinning treatment are located in Appendix A of the EA.

Alternative 2 includes proposed overstory and understory vegetation treatments (thinning and prescribed fire) across a maximum of 23,167 acres. Alternative 2 includes a condition-based management approach across these acres within lands designated as Matrix, excluding Riparian Reserves and FPOG. Condition based management identifies decision points for treatments related to vegetation resources, upon being reached specific vegetation treatments would be applied. Decision points for the areas included within Matrix lands are identified in Chapter 2, of the EA. Some of these acres may be untreated, however, due to not meeting the decision points within the condition-based management areas and or limiting factors such as lack of road access, operational issues (slope, rock outcrops), resource concerns (riparian areas), and economic viability. Conditions vary widely across the project area and the number of treated acres would not exceed the maximum amount identified for treatment in Chapter 2 or be expected to remain continuous across the entire project area. Although actual acres treated would vary across the landscape, the effects of implementing every acre of proposed treatments will be analyzed to clearly show the maximum effect of the proposed treatments.

### 5.2.1 - Project Design Features, Mitigation Measures, and Monitoring

The design features, mitigation measures, and monitoring related to vegetation resources are described in Appendix B in the Environmental Assessment. The effects of the proposed actions on vegetation resources are based on following these criteria. Forest Service Manual direction requires reasonable assurance of adequate restocking within five years of harvest, as stated in sec. 2471.1, sec 2471.2, and sec 2471.3 (FSM 2470). To assure compliance with this direction, required monitoring would take place one year and three years' post-planting to ensure adequate stocking has been achieved by year five.

### 5.2.2 - Direct and Indirect Effects - Alternative 2

Direct effects of thinning and prescribed fire treatments in Alternative 2 would occur on up to 23,167 acres, including up to 8,151 acres of overstory thinning. Direct effects also include road decommissioning on approximately 10.9 miles of road, which would result in losing access for future vegetation treatments on approximately ~500 acres accessed by these roads.

AR 12532

*Resource Indicator and Measure: Overstocked young forest stands*

Under Alternative 2, thinning and prescribed fire treatments in overstocked young forest stands would have a beneficial, long-term, major effect because they would modify forest health, structure, and composition.

**Figure 5 Post treatment structure shifts across the project area.**



These treatments would shift stand structures from a homogenous young forest multi-story to a diversified structure pattern across the landscape. Treatments would reduce stocking and improve tree vigor by increasing the growing space for the residual stand, therefore improving the overall health of the stand. Table 7 references the HRV and FRV shifts following treatment, Table 8 references the likely shifts in acres, and Figure 5 identifies the spatial arrangement of these shifts. Treatments within the structure classes of YFMS, SI, UR, SEOC, SECC, and OFMS would consist of overstory thinning and stand improvement thinning followed by prescribed fire. UR is the only underrepresented structure class within the project area; the amount of this structure class would not likely change throughout the life of the project because as some UR areas are treated and move out of this stage, others will move into it after treatments. SEOC would also be maintained through treatments and would not move outside its HRV or FRV. SECC treatments may move into SEOC through overstory removal but would not move SECC to an underrepresented structure class. The only treatment proposed in OFSS is prescribed fire on an estimated 2 acres of this structure class. The shift in structure classes can move through different pathways based on thinning prescriptions. As an example, the difference between the Dry Forest Matrix

AR 12533

Thin compared to Moist Forest Matrix Thin prescription can influence this structure shift pathway. For this analysis, the forest structure pathway of moving YFMS to OFMS was chosen and designed based on proposed treatments to create large and old forest structure while maintaining a mix of forest structures across the project area. Treatments would modify current spatial patterns of forest structure, creating new patches of forest structure across the project area. As an example, treatments in what is currently YFMS would move the treated area into SEOC or potentially UR, and over time these areas would grow into large patches of either OFMS or OFSS. Other disturbances such as wildfire events and insect and disease outbreaks may cause shifts in forest structure over time, creating patches of SI or UR.

The effects of proposed treatments on these stages relative to the historic and future ranges of variability (HRV and FRV) are shown in Table 7, while Table 8 references the likely shifts in acres. The values shown for "40 years post-treatment" would be expected in the absence of any disturbance or further treatment other than proposed in this project. This information demonstrates that shifting the stand structure in the project area towards the desired end results would take a substantial amount of time beyond the estimated 20-year duration of this project because of the length of time it takes to stands to develop. While the maintenance underburning treatments proposed in this project would continue to help move stands in the predicted trajectory, further mechanized thinning and additional prescribed fire treatments would be necessary after this project is implemented to achieve the desired future condition. For example, in Table 7 below, old forest multi story (OFMS) would continue to increase towards 56% of the Lower Twisp Watershed in 40 years without further treatment. To keep this stand structure within the Desired Future Condition range of 0-23.4%, additional mechanized thinning and prescribed fire treatments would be necessary   to help move stands towards other desired structures such as UR, SEOC, SECC, and Old Forest Single Story (OFSS); these additional treatments would be included in a separate analysis in the future.

**Table 7 Lower Twisp watershed structure classes by percent of landscape compared to HRV and FRV.**

| Structure Class* | Current % | 40 years post-treatment % | Desired Future Condition | HRV (esr-13) | FRV (esr-11) |
|---|---|---|---|---|---|
| Stand Initiation | 2% | 1% | 1.0 – 21.9% | 1.0 - 21.9 | 0.0 - 22.8 |
| Young Forest Multi-Story | 45% | 1% | 1.3 - 32.0 | 1.3 - 32.0 | 0.0 - 38.6 |
| Stem Exclusion Closed Canopy | 5% | 2% | 1.1-8.5 | 1.1-16.4 | 0-8.5 |
| Stem Exclusion Open Canopy | 13% | 6%* | 6.9 - 24.4 | 6.9 - 24.4 | 2.6 - 46.2 |
| Understory Re-initiation | 7% | 1%* | 8.1 - 37.0 | 8.1 - 37.0 | 1.9 - 41.5 |
| Old Forest Multi Story | 1% | 56%* | 0-23.4 | 0.4-29 | 0-23.4 |
| Old Forest Single Story | <1% | 7% | 0-5.1 | 0-12.6 | 0-5.1 |

*Predicted structure classes can move between the designated structures depending on forest type and final silvicultural prescription criteria.

AR 12534

8-ER-1525

**Table 8 Predicted structure classes 40 years post-implementation compared to current conditions.**

| Structure Class* | Current Acres | Current % of Project Area | Acres immediately post treatment | Acres predicted in 40 years | % of Project Area Predicted in 40 yrs |
|---|---|---|---|---|---|
| Stand Initiation (SI) | 570 | 2% | 825 | 80 | 1% |
| Young Forest Multi Story (YFMS) | 10,525 | 45% | 18 | 316 | 1% |
| Stem Exclusion Closed Canopy (SECC) | 1241 | 5% | 0 | 380 | 2% |
| Stem Exclusion Open Canopy (SEOC) | 2924 | 13% | 3237 | 1317* | 6%* |
| Understory Re-initiation (UR) | 1730 | 7% | 1672 | 1672* | 1%* |
| Old Forest Multi Story (OFMS) | 240 | 1% | 9922 | 13,058* | 56%* |
| Old Forest Single Story (OFSS) | 1 | <1% | 2008 | 1682 | 7% |

*Predicted structure classes can move between the designated structures depending on forest type and silvicultural prescription criteria.

Prescribed fire would be used as a tool to reduce fuel loadings and treat areas with a non-mechanized approach. In addition, it would help remove small ladder fuels to reduce stand densities and improve growing space much like mechanized thinning treatments. Prescribed fire treatments would also be applied as a "maintenance" treatment in many areas on approximately a 16-20-year return interval to help maintain the reduced stand densities through time. See Fuels Specialist report for further information on maintenance burning or Chapter 2 of the EA for the decision points that trigger maintenance burning.

Treatments under Alternative 2 would also create a shift in species composition from areas dominated by Douglas-fir to the more drought tolerant fire-resistant species of ponderosa pine, which is also a climate adaptation strategy as identified in the Climate Change Vulnerability and Adaptation study conducted for the North Cascades Region (USDA, 2014). Table F3 of the Twisp Landscape Evaluation highlights the current cover type based upon percent of the landscape and its reference to HRV and FRV. It shows that Douglas-fir, subalpine fir, ponderosa pine and shrubland make up the dominant species within the watershed. In dry forest types such as those within the project area, ponderosa pine would be targeted as the preferred dominant species over Douglas-fir and subalpine fir. Ponderosa pine is considered more fire and drought tolerant in comparison to other species identified in the project area because of its fire-resistant bark, deep root system and reduced branch retention in the lower bole (O'Hara, 2014).

*Resource Indicator and Measure: Presence of medium and large trees*

Under Alternative 2, thinning and prescribed fire treatments would have a beneficial, long term, moderate effect on promoting, maintaining, and protecting medium to large trees, because these treatments would allow the residual stand to occupy more growing space, improve residual tree vigor, reduce competition-based mortality, reduce the hazards of insect and disease outbreaks, and help minimize losses to stand-replacing wildfire events (O'Hara, 2014; Tappeiner et al., 2015). By retaining the healthiest trees and increasing growing space, an increase in diameter growth is expected. Table 9 and Figure 6 identify the shifts in overstory size classes following treatments. As an example, treatment within areas that identified the current overstory as medium (16"-24.9" dbh) moved to large (>25" dbh) following treatments. Research shows that lowering stand densities enhances tree growth, reduces competition mortality and increases stand resiliency to disturbances and climate change (Zhang et al., 2019).

AR 12535

8-ER-1526

**Table 9 Predicted shifts in overstory size classes following treatment.**

| Overstory Size Class | Current Acres | 40 years Predicted Acres | Current % of Project Area | 40 years Predicted % of Project Area |
|---|---|---|---|---|
| Medium sized trees (16-25" dbh) | 10,065 | 5,193 | 43% | 22% |
| Large sized trees (greater than 25" dbh) | 1,860 | 9,091 | 8% | 39% |

**Figure 6 Post treatment predictions for overstory size classes.**



AR 12536

Decommissioning 10.9 miles of NFS roads as proposed directly affects both resource indicators above by removing road access to approximately 1500 acres, limiting or eliminating future vegetation and prescribed fire treatments that would maintain desired stand densities and continue to promote the development of medium to large trees. These areas may have a prescribed burn under the maintenance treatment to help maintain low levels of stocking and reduce the impacts from losing road access to treat these areas with mechanized equipment.

Indirect effects caused by this alternative include building resiliency to disturbances such as insect and disease outbreaks by improving tree vigor and promoting species that are not as susceptible to insect and disease outbreaks, and reducing the threats associated with large stand-replacing wildfire events by reducing stand densities and overall fuel loadings. In Matrix lands within the project area, these treatments also indirectly help provide a sustainable timber supply by promoting the health and resilience of trees.

**Table 10. Resource indicators and measures for Alternative 2 direct/indirect effects.**

| Resource Element | Resource Indicator | Measure | Alternative 2 Direct/Indirect Effects |
|---|---|---|---|
| Forest Health-Structure and Composition | Overstocked young forest stands. | Acres of young forest stands treated | 23,167 acres |
| Promoting Late & Old Forest Structure | Presence of Medium & Large Trees | % land with medium to large trees | 61% Medium trees=22% Large trees=39% |

## 5.2.4 - Cumulative Effects – Alternative 2

*Past, Present, and Reasonably Foreseeable Activities Relevant to Cumulative Effects Analysis*

The activities listed below are ongoing and/or reasonably foreseeable future actions within or adjacent to the project area that are considered as cumulative effects because they would modify forest structure and composition similar to treatments proposed in this project:

- Thinning on up to 397 acres of adjacent WA DNR lands in the Poorman Creek and Alder Creek areas (estimated 2023-2025) and prescribed burning on up to 432 acres (estimated 2025-2030).

- Road maintenance (blading & brushing along roads)

- Mission Restoration Project: commercial & non-commercial thinning and prescribed fire treatments on 3,824 acres in Buttermilk Creek.

*Resource Indicator: Overstocked Young Forest Stands*

The cumulative effect of the proposed action along with these ongoing and reasonably foreseeable future actions would be a long term, moderate, beneficial impact upon overstocked young forest stands. The thinning treatments described above would reduce stocking in other areas of young forest stands adjacent to the project area, within the greater Twisp River watershed. These thinning treatments along with prescribed fire treatments would help reduce stand densities to improve stand health, build resilience to insect and disease outbreaks and return fire to the landscape to help maintain low fuel loadings. Road maintenance would not have a measurable effect on overstocked young forest stands because this action focuses on vegetation brushing and pruning within approximately 5-10 feet from the roadway and would

AR 12537

8-ER-1528

# 11.0 - References Cited

Agee, J. K.  2003.  Historical Range of Variability in eastern Cascades forest, Washington, USA. Landscape Ecology 18: 722-740. https://www.fs.fed.us/rm/pubs/rmrs_gtr292/2003_agee.pdf

Bauhus, Jürgen & Puettmann, Klaus & Messier, Christian. (2009). Silviculture for old-growth attributes. Forest Ecology and Management. 258. 525-537. 10.1016/j.foreco.2009.01.053. https://www.sciencedirect.com/science/article/pii/S0378112709000905

Dodson, Erich Kyle. Ares, Adrian. Puettman, Klaus J. (2012). Early responses to thinning treatments designed to accelerate later successional forest structure in young coniferous stands of western Oregon, USA. Canadian Journal of Forest Research. Volume 42, Number 2. February 2012. https://cdnsciencepub.com/doi/10.1139/x11-188

Downing, Timothy. 2019. USDA Forest Service.  Twisp Landscape Evaluation. 27 pages.

Hanley, D.P; Baumgartner, D.M.; Mcarter, J. 2002. Forest Ecology in Washington EB1943.  [Extension Bulletin]. Washington State University Extension & U.S. Department of Agriculture. 12 p. https://courses.washington.edu/fm323/Readings/ForEcoInWA-eb1943.pdf

Hessburg, P.F.; Salter, R.B.; Richmond, M.B.; Smith, B.G. 2000. Ecological subregions of the Interior Columbia Basin, USA. Uppsala. Sweden: Opulus Prss. 163-180 p. https://www.fs.fed.us/pnw/pubs/journals/pnw_2000_hessburg002.pdf

Jeronimo, Sean. 2020. Resilient Forestry. Twisp Restoration Project Landscape Analysis: Evaluation of Restoration Treatment Need and Comparison to Proposal. 14 pages.

Kolb, Thomas & Agee, James & Fulé, P.Z. & McDowell, N.G. & Pearson, K. & Sala, A. & Waring, Richard. (2007). Perpetuating old ponderosa pine. Forest Ecology and Management. 249. 141-157. https://www.sciencedirect.com/science/article/pii/S0378112707004318

Latham, P., Tappeiner, J., Response of old-growth conifers to reduction in stand density in western Oregon forests, Tree Physiology, Volume 22, Issue 2-3, February 2002, Pages 137–146. https://academic.oup.com/treephys/article/22/2-3/137/1660631

McGarigal, K.; Marks, B. 1994. FRAGSTATS Spatial Pattern Analysis Program for Quantifying Landscape Structure. PNW-GTR-35. https://www.fs.fed.us/pnw/pubs/pnw_gtr351.pdf

Nyland, R. D. (2002). Silviculture: Concepts and applications. Long Grove, IL: Waveland Press. pg 395-396

Oliver, C. D., & Larson, B. C. (1996). Forest stand dynamics. New York: Toronto.

O'Hara, K. (2014). *Multiaged silviculture: Managing for complex forest stand structures*. Oxford: Oxford Univ. Press.

Schwilk, D. W., Keeley, J. E., Knapp, E. E., Mciver, J., Bailey, J. D., Fettig, C. J., . . . Youngblood, A. (2009). The national Fire and Fire Surrogate study: Effects of fuel reduction methods on forest vegetation structure and fuels. Ecological Applications, 19(2), 285-304. doi:10.1890/07-1747.1. https://esajournals.onlinelibrary.wiley.com/doi/full/10.1890/07-1747.1

Smith, D. M., Larson, B. C., Kelty, M. J., Ashton, P. M. S., & Bowersox, T. W. (January 01, 1997). *The Practice of Silviculture - Applied Forest Ecology, Ninth Edition*.

AR 12548

Tappeiner, J. C., Maguire, D. A., Harrington, T. B., & Bailey, J. D. (2015). *Silviculture and ecology of western U.S. forests*.

USDA Forest Service. 1989. Okanogan National Forest land and resource management plan. USDA Forest Service, Pacific Northwest Region, Okanogan, WA. https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/stelprdb5315031.pdf

USDA Forest Service. 1995. Twisp River Watershed Analysis.  USDA Forest Service, Pacific Northwest Region, Okanogan National Forest, Methow Valley Ranger District, Twisp, WA..

USDA and USDI. 1994. Record of Decision for Amendments to Forest Service and Bureau of Land Management Planning Documents within the range of the Northern Spotted Owl (Northwest Forest Plan). USDA Forest Service and USDI Bureau of Land Management. Portland, OR. April 1994. https://www.fs.fed.us/r6/reo/library/downloads/documents/NWFP-ROD-1994.pdf

USDA Forest Service. 2012. The Okanogan-Wenatchee National Forest restoration strategy: adaptive ecosystem management to restore landscape resiliency. Okanogan-Wenatchee National Forest. https://www.fs.fed.us/rm/pubs/rmrs_gtr292/2010_okanogan_wenatcheee.pdf

USDA Forest Service. 2014. Climate Change Vulnerability and Adaptation in the North Cascades Region, Washington. Pacific Northwest Research Station, PNW-GTR-892. September 2014. https://www.fs.usda.gov/treesearch/pubs/47131

USDA Forest Service. 2015 Region 6 Common Stand Exam Users Guide. 155p. https://www.fs.fed.us/nrm/documents/fsveg/cse_user_guides/R6FG.pdf

Washington Department of Natural Resources (DNR). 2020. Twisp River Planning Area: Landscape Evaluation Summary (2020). Forest Health Division.  7 pages.

Zhang, J., Finley, K. A., Johnson, N. G., & Ritchie, M. W. (August 01, 2019). Lowering Stand Density Enhances Resiliency of Ponderosa Pine Forests to Disturbances and Climate Change. Forest Science, 65, 4, 496-507. https://www.fs.fed.us/psw/publications/zhang/psw_2019_zhang005.pdf

AR 12549

# Twisp Restoration Project
## Errata Sheet
## July 2022

The Twisp Restoration Project Final Environmental Assessment (EA) was released in April 2022. This revised Final EA contains the list of errata below that describes changes to the text of the April 2022 Final EA. These changes address errors and clarifications in the April 2022 Final EA or reflect instruction provided by the Objection Reviewing Officer in July 2022. Similar changes were made to the Final Vegetation-Silviculture Report and the Final Biological Assessment. These corrections are consistent with direction given in Forest Service Handbook 1909.15, Chapter 10, Section 18. There are no changes to the project or significant new circumstances identified in this errata sheet that affect the analysis and conclusions in the Twisp Restoration Project Final Environmental Assessment.

The revised sections in each document are listed below in bold text. Language with a strikethrough is deleted from the EA and any associated specialist's report, and underlined language is added.

**Final EA Errata**

- **Page 40, first paragraph, and page 188 under the heading "Project Monitoring"** - This section is updated as follows to clarify the duration and use of monitoring:

    Specific monitoring that would occur during or after project implementation ~~includes:~~ is listed below. This monitoring would continue for the life of the project, unless otherwise described. Monitoring results would be used to modify treatments as needed to remain consistent within the effects analyzed under this analysis.

- **Page 64, section titled "Effects to ESA Fish Species"** - This section is updated as follows to clarify ESA effects of campsite construction in the Final EA:

    The proposed removal of Roads End Campground ~~and campsite relocation~~ has an ESA determination of Likely to Adversely Affect for a short term for upper Columbia River spring chinook, Columbia River bull trout, and upper Columbia River steelhead species and their designated critical habitat.

- **Page 65, second paragraph** - This section is updated as follows to clarify ESA effects of campsite construction in the Final EA:

    The remaining proposed actions collectively would result in a few small, inconsequential negative effects to ESA-listed fish and some long-term, insignificant beneficial effects. Construction and use of five new campsites at Poplar Flats, Mystery, and South Creek campgrounds in the Twisp River drainage would have a "May Affect, Not Likely to Adversely Affect" determination. This action has little to no potential to contribute sediment to the river or provide direct access to the channel because the campsites would be built at least 75-100' away from the riverbank on a flat gradient (Gene Shull, personal communication, July 13, 2022).

- **Page 68, section titled "Effects of Forest Plan Amendments on 2012 Planning Rule Substantive Requirements"** - This section is updated as follows to correct a clerical error in

AR 12582

# Chapter 1: Need for Action

## Introduction

**Forest Service staff propose to conduct vegetation and aquatic restoration treatments including thinning, prescribed burning, stream habitat enhancement, fish passage, and transportation system changes within the 24,140-acre Twisp Restoration project area on the Methow Valley Ranger District of the Okanogan-Wenatchee National Forest.**

The Twisp Restoration Project Interdisciplinary Team (IDT) prepared this final environmental assessment (EA) to determine whether implementation of the treatments listed above may significantly affect the quality of the human environment and thereby require the preparation of an environmental impact statement. By preparing this EA, we are fulfilling agency policy and direction to comply with the National Environmental Policy Act (NEPA). Details of the proposed actions are included in Chapter 2 and Appendix A of this document. This analysis incorporates by reference the Project Record (40 CFR 1502.21), available for review at the Methow Valley Ranger District Office, 24 West Chewuch Road, Winthrop, WA 98862.

## Project Area Overview

The project boundary is primarily located in the lower Twisp River and Alder Creek drainages within Township 32 North, Ranges 21-22 East; Township 33 North, Ranges 20-22 East; and Township 34 North, Ranges 18-21 East, Willamette Meridian (Figure 1).

**Figure 1. Project vicinity map**



AR 12593

The project also contains locations where campground actions are proposed in the upper Twisp River drainage within Township 34 North, Ranges 18-19 East (Figures 24 and 25 in Appendix E). Approximately 39 miles of the project boundary borders private lands, with another 8.5 miles bordering lands administered by Washington State Departments of Natural Resources (WA DNR) and Fish and Wildlife (WA DFW), and Bureau of Land Management (BLM). This project area includes 40 acres of Bureau of Land Management (BLM) lands southeast of Twisp, WA where BLM staff propose treatments analyzed as part of this project, as well as private lands that lie within the administrative boundary of the forest. The Forest Service is the lead agency on this project and will complete the environmental analysis and all required consultation to comply with the Endangered Species Act and National Historic Preservation Act. The authorization to implement projects on NFS and BLM lands will be made by the respective authorizing official for each agency.

## Changes between Draft and Final Environmental Assessments

After the Draft Environmental Assessment (EA) public comment period ended in December 2020, the IDT made several changes to the proposed action to address public concerns, and prepared final analyses for summary in the Final EA. Just before the Final EA was completed, the Cedar Creek Fire burned into the northern portion of the project area in August 2021, causing mild to severe fire effects in the Wolf, Rader, and Little Bridge Creek drainages (Figure 2). In addition to these effects, related fire suppression actions including fireline construction and fuelbreak thinning occurred in portions of the Little Bridge Creek and middle/upper Twisp River drainages.

After considering public input received during the Draft EA comment period and the impacts of the 2021 Cedar Creek Fire, the IDT revised the project with the following key changes:

- Because of wildfire and suppression-related impacts and the need to re-assess the baseline condition in many areas, the project area has been reduced by 69% by dropping proposed thinning and prescribed fire actions and most transportation-related changes in the Wolf, Rader, and Little Bridge Creeks and upper and middle Twisp River sub-watersheds. These changes affected treatment proposals as follows:

    o Project Needs were revised to reflect the needs applicable to the smaller project boundary. Understory (non-commercial) thinning declined by 55%; overstory (commercial) thinning declined by 63%; and prescribed fire treatments dropped by 55%. Aside from the removal of Roads End Campground, no proposed actions (including firewood salvage or public firewood gathering) remain in late-successional reserves (LSRs). Five of the three Forest Plan/Northwest Forest Plan project-specific amendments and all proposed actions in the Sawtooth Inventoried Roadless Area (IRA) were dropped, as was trail construction proposed in the Chickadee area. Temporary haul roads and haul routes were reduced and/or modified in consideration of the smaller project area.

    o 100 acres of the Cedar Creek fire lie within the revised project boundary and have understory (non-commercial) thinning and prescribed fire treatments proposed. The need for these treatments would be evaluated in 8-10 years after vegetation, groundcover, and surface fuel have re-established.

    o Areas dropped from the original project area are under assessment to determine the degree to which baseline vegetation and terrestrial habitat conditions were affected fire behavior and suppression activities from the Cedar Creek fire, and to assess whether previously identified or new needs for treatment exist. Areas in Wolf and Rader Creeks that were severely impacted by the Cedar Creek fire may benefit from fire restoration

AR 12594

treatments. If these needs are identified, they would be addressed by initiating new projects and analyses.

- After the Draft EA comment period, the IDT changed the proposed post-project status of most proposed new road construction from open to closed or administrative access only to address concerns about wildlife impacts. The transportation proposal also changed after a review of more detailed imagery revealed several additional unauthorized roads scattered throughout the project area. The interdisciplinary team added these roads to the Travel Analysis Process and included them in the transportation proposal in Alternative 2. During post-fire revision of the project, the IDT also identified two roads proposed for temporary construction on ridges along the project boundary in Canyon Creek and Little Bridge Creek drainages that would be beneficial for future access to treat locations within and adjacent to the project area. Rather than building these roads, decommissioning them, and rebuilding them for future treatments in and adjacent to the project area, the IDT proposes that these roads be added as NFS roads and closed post-project. Two temporary road locations were changed to use sites with more durable rocky soils, reducing the total area of landscape disturbance by 0.27 miles. These changes are described further in the Transportation section in Chapter 3 (see "Proposed Road Changes Since Draft EA).

- Aquatic habitat enhancement treatments including large wood installation, most culvert and aquatic organism passage installations, and all beaver dam analog sites became the Twisp Aquatic Restoration Project, using the Pacific Northwest Region Aquatic Restoration Environmental Analysis and Decision Notice (PNWAR EA and DN). District staff determined that effects of the Cedar Creek fire and related suppression actions did not change the need for these treatments or baseline conditions used to analyze effects. The PNWAR EA addresses effects of these treatments and uses a separate public involvement process that is underway during winter-spring 2022. Compliance with the PNWAR Decision Notice is expected by late April 2022, with implementation beginning soon after. The revised Twisp Restoration Project considers these treatments and all related actions as reasonably foreseeable future actions that will be addressed under cumulative effects as needed in specialists' reports.

- The duration of project activities was changed from 30 years to 20 years in response to concerns raised during public comment periods about the longer duration. The two proposed actions that would have been underway for up to 30 years in the Draft EA (prescribed fire and non-commercial stand-improvement thinning) have been reduced.

- In response to concerns about removing large and old trees, the maximum diameter in all overstory thinning prescriptions was reduced to 21" dbh with an exception to remove trees 21.1-25" dbh if they have a dwarf mistletoe rating of $\geq 2$ and are within 30 feet of a healthy tree $\geq 18$" dbh. Overstory thinning prescriptions now identify and retain old trees ($\geq 150$ years). Consideration of environmental zones is more explicitly described in thinning prescriptions.

- Proposed WATV routes have been dropped from the project in response to public concerns that this type of activity be evaluated in a more comprehensive, district-wide travel analysis. Mastication was added for consideration as a fuel reduction treatment. Three nearby existing rock pits on NFS lands are identified as sources of material that would be used for project-related transportation actions such as road maintenance or construction.

- In response to public concerns about the loss of four campsites at Roads End Campground, the IDT added a proposal to construct four replacement campsites at Poplar Flats, Mystery, and South Creek campgrounds in the Twisp River drainage. In addition, one campsite at Poplar Flats

AR 12595

8-ER-1534

Campground that is eroding into the Twisp River was identified as a sediment impact that would be addressed through proposed removal and replacement.

- Several issues raised during the Draft EA public comment period were added to the previous list of issues published in the Draft EA, and similar issues were combined for response. These issues are detailed in Chapter 2 and addressed as described in Table 3. Similarly, additional alternatives were proposed and are addressed in Chapter 2 under "Alternatives Considered".

**Figure 2: Twisp Restoration Project boundary changes since Draft EA**



Several changes made prior to the Draft EA and Cedar Creek Fire remain in the revised Twisp Restoration Project:

- Thinning and prescribed fire treatments within Riparian Reserves and Forest Plan Old Growth, and those using shaded fuelbreak and regeneration thinning prescriptions, are site-specific with no condition-based management.

- Transportation changes incorporate requests for continued recreation access by hikers, horseback riders, and/or mountain bikers, and some roads are administrative access only in agreement with existing easements or wildlife concerns4.

AR 12596

8-ER-1535

- Proposals to use stage-zero restoration to reconnect streams with floodplains and create side-channel habitat were not included in the project for lack of adequate site-specific information.

- Coordination with BLM staff continues to include analysis of treatment effects on 40 acres of adjacent BLM lands in the Alder Creek area in this environmental analysis.

- Coordination with BLM and WA DNR staff continues to provide for their construction and use of up to 0.6 miles of temporary roads on NFS lands in the Alder Creek area to allow for treatments on adjacent BLM and WA DNR lands.

- Up to 550 acres of private lands remain under analysis for prescribed fire treatments that would allow for a more comprehensive hazardous fuel reduction treatment, pending agreement of landowners.

## Management Direction

This EA is tiered to the  Final Environmental Impact Statement (FEIS) for the Okanogan National Forest Land and Resource Management Plan (USDA Forest Service, 1989); the Final Supplemental EIS on Management of Habitat for Late-Successional and Old-Growth Forest Related Species within the Range of the Northern Spotted Owl Record of Decision (USDA and USDI, 1994, amended 2001 ); the Pacific Northwest Regional Invasive Plant Program FEIS (PNW Invasive Plant FEIS, USDA 2005); and the Okanogan-Wenatchee National Forest Forest-Wide Site-Specific Invasive Plant Management EIS (OWNF Invasive Plant FEIS, USDA Forest Service 2017). The Okanogan National Forest Land and Resource Management Plan (Forest Plan or LRMP, USDA, 1989), as amended by the Record of Decision for Amendments to Forest Service And Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl and S&Gs for Management of Habitat for Late-Successional and Old-Growth Forest Related Species within the Range of the Northern Spotted Owl (Northwest Forest Plan or NWFP, USDA 1994, amended 2001); the 2005 PNW Invasive Plant ROD; and the 2017 OWNF Invasive Plant ROD, is incorporated by reference. The Forest Plan as amended provides a forest-level strategy for managing land and resources and the Northwest Forest Plan provides a regional strategy for management of old-growth and late-successional forest ecosystems on federal lands. The plans provide direction, land allocations or management areas, and S&Gs for the management of National Forest lands within the project area as summarized below.

The Twisp River, Middle Methow River, and Lower Methow River Watershed Analyses (USDA 1995, 1997, and 1999) are incorporated by reference. These documents provide the Responsible Official with comprehensive information upon which to base land management decisions and establishes a consistent, watershed level context to project level analysis. The watershed analyses provide descriptions of the reference, historic, and existing conditions of the important physical, biological, and social components of the fifth field watersheds. The studies analyzed activities and processes that cumulatively altered the project landscapes over time and recommends watershed management activities based upon landscape and ecological objectives. The watershed analyses are used to characterize elements of the watersheds, provide background information for the cumulative effects analyses, and provide recommendations for management activities that move the systems toward reference conditions or management objectives.

The Okanogan-Wenatchee National Forest Road Analysis Report (USDA, 2003) is incorporated by reference. The forest road analysis provides the responsible official with information needed to identify and manage a road system that is safe and responsive to public needs and desires, is affordable and efficient, has minimal adverse effects on ecological processes and ecological health, diversity, and productivity of the land, and is in balance with available funding for needed management actions.

AR 12597

landowners. While this analysis will address the effects of proposed treatments on select private lands, the decision on implementing these activities would be made by specific landowners.

**Figure 5. Wildland Urban Interface areas delineated in Okanogan County CWPP**



## Need #1 – Hydrologic Function and Aquatic Habitat

Protect and maintain aquatic, riparian, and hydrologic resources and restore areas impacted by past management. Increase watershed resiliency to existing and anticipated disturbances, including those tied to predicted changes in climate.

- National Forest System (NFS) roads and unauthorized roads add and/or funnel undesirable levels of sediment into streams and artificially increase the drainage network, causing water to leave project area drainages more rapidly in comparison to unroaded areas. Some of these areas drain into critical habitat for Threatened and Endangered (T&E) aquatic species. Some road culverts block fish passage or are too small to function properly during normal high-flow events, which are likely to occur more frequently with predicted changes to the region's climate.

- At Roads End Campground, a high-priority bull trout spawning area has been impacted by forest visitors, resulting in disturbance and mortality. At Poplar Flats Campground, a campsite is eroding into the Twisp River and adding sediment.

AR 12601

8-ER-1537

- Past fire suppression and timber harvest have altered riparian forest species composition and structural diversity compared to historical conditions, resulting in less diverse habitat and greater susceptibility to uncharacteristic effects from wildfires and insect and disease outbreaks.

## Need #2 – Vegetation Composition and Structure

Modify vegetation structure, composition, and patterns to develop, maintain, or restore healthy stand structures in the project area that respond to disturbances such as wildfire and climate change in a resilient manner and are consistent with historic and future ranges of variability.

Habitat within and adjacent to the project area and across the Okanogan-Wenatchee National Forest has been substantially diminished by recent wildfires. This habitat loss increases the need to reduce the risk of wide-scale disturbances such as insect and disease outbreaks and stand-replacing wildfire events within the project area to maintain and develop functional, interacting late-successional and old-growth forest ecosystems. Past management practices, including timber harvest and fire suppression, helped change the structure, species composition, and spatial arrangement of forested vegetation in comparison to historical and/or predicted future conditions. These conditions exist in multiple management designations including Forest Plan Old Growth (FPOG), Matrix, and Riparian Reserves (RRs). Changes in forested vegetation compared to historical and/or predicted future conditions include:

- A higher percentage of densely stocked stands with multiple canopy layers or closed canopies in the dry forest type, with a high proportion of young shade-tolerant tree species such as Douglas-fir and subalpine fir.

- Fewer areas with dry and moist forest stands comprised primarily of large trees; where these stands do exist, they are smaller in size.

- In densely stocked stands, understory vegetation species diversity and plant composition has diminished because dense tree canopies and sub-canopies inhibit available sunlight from reaching the forest floor. This condition helps reduce ecosystem productivity and resilience by limiting biomass production, soil fertility, post-fire vegetation recovery, and availability of food for wildlife species.

- Areas burned by the 2021 Cedar Creek Fire are likely to have increased levels of fuel created by snags collapsing, which can negatively impact late successional habitat and delay habitat recovery by elevating the fuel loading over time and increasing the possibilities for short return intervals of more severe, stand-replacing wildfire events.

- Increased conifer encroachment in unique habitats such as meadows and aspen stands has reduced the availability of nutrients, water, and sunlight to these habitats and species.

- Because of the stress created by denser forests, dry and moist forested stands are more susceptible to insect and disease outbreaks. In dry forest types, denser stand conditions have created an uncharacteristically continuous flow of vegetation from the forest floor to the upper canopies across large areas. This condition then increases the likelihood of uncharacteristically severe fire behavior and effects such as elevated risk of crown fire initiation and spread over larger areas with higher mortality. The intensity of impacts from these natural disturbances is likely to increase in dry and moist forest vegetation in the project area with projected warmer and drier climate (Raymond et al., 2014).

AR 12602

8-ER-1538

## Need #3 – Wildlife Habitat

Protect, develop, and/or enhance late and old forest stands for wildlife species dependent on them and reduce the risk of large-scale habitat loss to fires by increasing resilience of habitats to wildfire. Protect remaining lynx habitat to minimize further losses and keep this feature on the landscape. Protect remaining bitterbrush habitat on high-density mule deer winter ranges to minimize further losses. Changes from desired conditions include:

- Fewer stands of late and old forest structure (LOS) consisting of large diameter trees and snags, large, downed logs, and high canopy cover exist in the project area. Existing LOS stands, including Forest Plan Old Growth, are smaller in size and widely scattered compared to historical conditions. These conditions result in less habitat and/or limited habitat connectivity for northern spotted owls, American marten, northern goshawk, white-headed woodpecker, and other species. Existing limited stands of LOS are vulnerable to an increased likelihood of uncharacteristically severe wildfire behavior as described in Need #2.

- The recent Crescent Mountain and Cedar Creek wildfires substantially reduced the amount of lynx habitat (lodgepole pine, Engelmann spruce, and subalpine fir forests) in and adjacent to the Twisp River watershed, increasing the need to protect remaining stands of lynx habitat until stands affected by wildfire have recovered.

- The recent Carlton Complex, Chelan Complex, and Okanogan Complex wildfires substantially reduced bitterbrush habitat on mule deer winter ranges in the Methow Valley, increasing the need to maintain remaining areas of bitterbrush habitat on high-density mule deer winter ranges in the project area.

## Need #4 – Access & Wildfire Hazard in the Wildland Urban Interface

Modify the structure, composition, and patterns of forest stands within and adjacent to the WUI to reduce and/or maintain fire intensity and the risk of crown fire initiation and enable the use of more direct firefighting strategies to protect life and personal property. Reduce fire intensity along major access routes and ridges within and outside of the WUI to minimize the hazards of ingress/egress and provide effective suppression anchor points that limit fire spread during wildfires.

- Current fuel conditions near and adjacent to private lands and the Methow Valley's primary communication site on McClure Mountain support flame lengths that increase fire intensity and the likelihood of crown fire initiation. These conditions reduce the ability of suppression resources to directly contain and suppress fires and help increase fire spread through spotting, resulting in increased risks to life and property.

- Current fuel loading and stand structures along portions of main access routes and key unroaded ridges support fire behavior with flame lengths that limit direct suppression tactics and provide a continuous path for fires to cross between drainages. Along roads, these conditions increase hazards for Forest visitors trying to leave the area and suppression resources trying to access the area during wildfires. On ridgetops, these conditions increase the likelihood that wildfires will cross into adjacent drainages towards developed areas and limit suppression opportunities without substantial preparation.

## Need #5 – Roads

Provide a transportation system that is affordable, safe, and efficient for administration, public use, and protection of NFS lands while also providing access for forest management. Reduce the risk to Forest

AR 12603

visitors from trees categorized as "danger trees" along open NFS roads. Current conditions affecting the transportation system include:

- Some roads do not meet current safety or design standards or are not needed as frequently as in the past because of changes in logging system practices or management objectives. Existing undersized culverts increase the risk for road failure. The project area also contains over 31 miles of "unauthorized roads"; many of these were created by past management actions and considered decommissioned by past standards that did not restore hydrologic stability. Others were created by forest users and are not needed for current land management. Management direction requires that these roads be evaluated along with existing NFS roads during landscape-scale project analysis such as the Twisp Restoration project.

- Some live and dead trees along open NFS roads and trails have become increasingly unstable and threaten the safe use of the transportation system.

## Consultation and Public Involvement

The IDT sought input from the following entities during the development analysis of this project.

### Tribal Consultation

Consultation letters were mailed to Confederated Tribes of the Colville Reservation (CTCR) and Yakama Nation (YN) staff on November 5, 2019. Heritage resource staff from the Forest Service met with CTCR representatives on June 25, 2019, to discuss this project. After revising the project boundary after the 2021 Cedar Creek Fire, new consultations were sent to both Tribal entities on April 8, 2022.

On December 11, 2019, the Yakama Nation's Natural Resources Program responded and provided additional alternatives for aquatic habitat improvements in the watershed, especially those affecting high value tribal resources such as anadromous fish populations.

On December 18, 2019, the Colville Tribes History and Archaeology Program responded, concurring with the APE as well as with the methods described to identify potential cultural resources within the APE. They highlighted that the project area falls within the traditional territory of the Methow Tribe, a constituent member of the CTCR. In addition, they shared that the project area contains traditional cultural properties (TCPs), areas with important traditional cultural values. The CTCR Tribal Historic Preservation Officer (THPO) requested that these TCPs be considered during the archaeological surveys and in the determination of project effects. The CCT requested that: traditional-use plant information be documented and provided to the tribe; treatments enhance traditional-use plants wherever possible, particularly huckleberry; a Traditional Cultural Property report be completed for the project; and that additional information and consultation occur during each phase of heritage survey for the project. Staff from the Yakama Nation responded in support of the watershed restoration plan for the project area, with specific interest in improving fish habitat.

### Government Agency Consultation

Consultation letters were mailed to Okanogan County Commissioners on November 5, 2019. No written response was received from the Commissioners. Forest Service staff met with the County Commissioners on January 21, 2020, at which time the commissioners expressed interest in how proposed road decommissioning would affect public access.

AR 12604

Discussions with staff from Bureau of Land Management, WA DFW and WA DNR about potential treatments on federal and state lands adjacent to the project area have been underway since winter 2019. No joint treatment proposals were received from WA DFW staff. WA DNR staff are developing treatment proposals on DNR lands adjacent to the project area and would complete all required associated public engagement and environmental analysis. These actions are considered as possible cumulative effects in this project. As part of their project, DNR staff requested that this project include proposals for roads on NFS lands to access DNR lands in the Alder Creek area, described further in Chapter 2. Treatments on 40 acres of adjacent BLM lands are included in this analysis as described above.

Endangered Species Act (ESA) Section 7 consultation for this project will use two pathways. Treatments consistent with activities covered in the 2013 Reinitiation of Aquatic Restoration Activities in States of Oregon and Washington programmatic Biological Opinions (ARBO II; USDC-NMFS 2013 & USDI-FWS 2013) will follow ARBO-II consultation (Table 2, "Proposed Actions Covered under ARBO II Consultation"). Other activities listed in Table 2 will undergo separate project-specific consultation. Consultation will address effects to Federally threatened and endangered fish and wildlife species through proposed treatments on NFS, BLM, and any private lands associated with the project through two pathways. Consultation under both ARBO II and non-ARBO II pathways will be completed before any decision is issued regarding this project.

**Table 4. ESA Consultation Coverage Pathways for Twisp Restoration Project treatments.**

| Proposed Actions Covered under ARBO II Consultation | Proposed Actions Covered under Non-ARBO II Consultation |
|---|---|
| AOP and stream culvert installation<br><br>Removal of Roads End Campground and campsite at Poplar Flats Campground; campsite construction at Poplar, South Creek, and Mystery Campgrounds | All commercial harvest, and non-commercial thinning, including tree planting, mastication, and biomass removal<br>Hand and machine-piling debris, and upland underburning, and fireline construction<br>Road maintenance, reconstruction<br>Road decommissioning/closure<br>Temporary and permanent road construction<br>Log hauling<br>Changing road maintenance levels<br>Hand-piling, pile burning, and underburning, and fireline construction in Riparian Reserves |

Consultation with the Washington State Historic Preservation Office (SHPO) regarding effects to heritage resources from proposed treatments on NFS, BLM, and private lands in the project is underway. A Programmatic Agreement between Region 6 and the SHPO was signed in 2020 in consideration of increasingly large and complex landscape-scale projects being undertaken nation-wide. Appendix E of this agreement allows for a phased approach which provides the Region 6 forests with the authority to proceed with a phased analysis when such situations are encountered. Since this Programmatic Agreement does not apply to BLM in the project area, heritage consultation on activities on these lands will be completed prior to BLM signing a decision to authorize activities on those lands. The Forest Service will assure that consultation is completed for NFS and BLM lands in the project area per Section 106 of the National Historic Preservation Act prior to the implementation of any actions included in this project. Heritage survey and consultation on any private lands treated in association with this project would be completed by FS staff prior to implementation of any activities on those lands.

AR 12605

## Public and Collaborator Involvement

Public involvement for the Twisp Restoration Project began with publishing the project in the November 2019 Schedule of Proposed Actions.  All comment periods and public meetings were preceded by public news releases and notifications to the project mailing list. A scoping letter was sent to 368 individuals, groups, and agencies on November 12, 2019, including adjacent landowners and interested individuals and organizations. A news release was sent to local media and the project mailing list on November 12, 2019, to invite comments and participation in a public meeting held on November 21, 2019.  Responses came from 55 individuals, organizations, businesses, and local government during this period. Notices for the opportunity to comment on the Draft EA period were sent to media and the 448 individuals, groups, and agencies on the project mailing list on October 2, 2020, and ended December 18, 2020, after two extensions; 1,029 responses were received during this time. A news release sent to local media and the project mailing list on November 12, 2020, invited the public to participate in a virtual public meeting held on November 5, 2020. District staff engaged with members of the North Central Washington Forest Health Collaborative during project development. The list of contacts is on record in the project file.

Other public, agency, and organization contacts include Curtis Bryan, Katherine Russell, and Erik Ellis of the BLM Spokane office; adjacent landowners interested in having their lands included in prescribed burning proposed by this project; Bill White; North Central Washington Forest Health Collaborative members; Methow Trails Collaborative members; Tom and Gina McCoy (C6 Forest to Farm); Derek Churchill, WA DNR; Buttermilk Firewise community; Fire Adapted Methow; Sky Ranch community; Scott Fitkin, retired Washington Department of Wildlife staff; and retired U.S. Forest Service employees Ann Glidden,  Kent Woodruff, and Robert Naney.

# Issues

The IDT considered all comments received for this project. Based on these comments and internal review, the IDT found three types of issues for consideration in this analysis and addressed them as follows to resolve any conflicts (36 CFR 220.7(b)(2)(i)):

- Issues were used to develop, or modify alternatives, design features, or mitigation measures to address the effects of proposed activities.

- Issues were analyzed in terms of environmental consequences but did not lead to a new, or modified alternative.

- Issues were not analyzed in detail because generally they were addressed through project design; were outside the scope of the analysis; were already decided by law, regulation, the Forest Plan, policy, or program; or were address through resource protection measures including design features and standard operating procedures.

Table 3 describes key issues and how they were addressed in this project. In addition, several design features in Appendix B respond directly to these issues (Table 43 under column "Ensures Compliance With or Addresses".

**Table 5. Twisp Restoration Project Key Issues**

| Issue /Concern | Addressed by |
|---|---|
| 1.  Project activities will limit public access and opportunities for recreation, firewood gathering, and other uses, and will damage trails. Closing Roads End Campground will restrict recreation opportunities and overburden existing | The effects of temporary and permanent road closures on public access for recreation, firewood collection, and other uses are described in the Recreation report and summarized in Chapter 3 of this EA. |

AR 12606

| Issue /Concern | Addressed by |
|---|---|
| | Securing funding sources for proposed actions is outside of the scope of NEPA analysis.<br><br>Funding procured through various sources is generally awarded over a short timeframe (i.e., one to three years) and for discrete tasks (i.e., noncommercial thinning on a specific number of acres) rather than as a lump sum for all available work. While these funding sources are generally not predictable, the Methow Valley Ranger District regularly receives funding for prescribed burning, road decommissioning, non-commercial thinning (i.e., Stand Improvement Thin in this project), and other treatments proposed in this project. District staff routinely apply for and are awarded state and federal grants through various sources and work with Tribal, local, and national partners to procure funding for project implementation. The project lies within the Central Washington Initiative as one of ten priority landscape selected as part of the Forest Service's 10-year wildfire strategy. The project is also within the newly funded North Central Washington Collaborative Forest Landscape Restoration Project. Both initiatives will increase the funding and opportunities to complete service work over the next few years.<br><br>The Economics report describes proposed actions that would be completed by timber sale contractors or could be funded through timber sale receipts. |

# Chapter 2: Alternatives

Section 102(2)(E) of the National Environmental Policy Act (NEPA) requires the Forest Service to study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources. The IDT accomplished this as described below.

## Alternatives Considered but Eliminated from Detailed Study

Federal agencies are required by NEPA to rigorously explore and objectively evaluate all reasonable alternatives and to briefly discuss the reasons for eliminating any alternatives that were not developed in detail (40 CFR 1502.14). Some public comments received in response to the proposed action provided suggestions for alternative methods for achieving project needs. The following alternatives were considered but dismissed from detailed consideration for the reasons summarized below.

### Do not open closed roads or build temporary or permanent new roads

The IDT considered an alternative that did not open currently closed roads, build temporary roads, or build new NFS roads for project implementation in response to public concerns about the impact these actions would have on wildlife. Without these roads, access to approximately 5,105 acres (63% of proposed thinning treatments) would not occur and these areas would not be treatable by mechanical means. Dropping these treatments would considerably reduce the ability to meet Needs #2, 3, and 4

AR 12610

because without these treatments, a substantial portion of the landscape would remain at elevated risk for more severe fire behavior and effects that would have a detrimental effect on vegetation, wildlife habitat and wildfire hazards in the WUI. For these reasons, this alternative was not developed further.

As described in the Wildlife section of this EA, short-term adverse effects to wildlife caused by opening closed roads or building temporary roads for project implementation would have minor effects on wildlife species analyzed for this project, with the tradeoff of extensive long-term benefits gained by treatments that help promote habitat resilience to wildfire disturbances. Most proposed new permanent road construction would be closed to public access after thinning treatments were completed, minimizing effects of use on wildlife, all temporary roads would be decommissioned immediately after use. Existing closed system roads that would be opened for use during project implementation would generally be closed within 18 months after thinning treatments were completed. Road density requirements described in the Forest Plan would not be exceeded during project implementation or after project completion. Refer to the Wildlife section for further details on the impacts of proposed road actions on wildlife and discussion of tradeoffs between these actions and the treatments they support.

## Use different diameter cap limits & pruning

The IDT considered an alternative that imposed diameter caps in thinning treatments ranging from 15" to 21" diameter at breast height (DBH), along with treatments that pruned lower branches of trees rather than cutting them, to address public concerns about protecting wildlife habitat, retaining the largest trees, and promoting late forest seral structure. Alternative 2 uses a 21" dbh limit with exceptions for diseased trees up to 24.9" as described in Appendix A. Alternatives using at 15" or 18" dbh limit were not developed further because using these upper diameter limits would decrease stand diversity (age, structure, and habitat), facilitating movement towards more even-aged stands over time which departs further from the historical and future ranges of variability desired in treated areas. This in turn would limit development of desired late-successional habitat and continue to increase density-induced mortality and elevate risks of disturbances (fire, insect & disease), impacting wildlife habitat (Need #3) and wildfire hazards in the Wildland Urban Interface (Need #4). Thinning prescriptions proposed in this project would limit impacts on wildlife, retain the largest trees wherever possible, and promote late forest seral structure by "thinning from below" (removing trees from the lower overstory canopy and retaining large and old trees). In keeping with the goals of that prescription as described above and in Appendix A, most overstory thinning prescriptions specify upper diameter limits of 21inches dbh except for where specific forest health issues exist in trees between 21-25 inches dbh.

## Maximize aquatic and wildlife restoration

The IDT considered an alternative to maximize aquatic and wildlife habitat restoration in the project area to address public concerns that the IDT did not consider public comments requesting development of this alternative, and that eliminating this alternative was "arbitrary and capricious" since "best available science" shows that a proposal to maximize aquatic and wildlife restoration through the removal of livestock and decommissioning roads would best meet project needs. The IDT acknowledges the restoration benefits of closing and decommissioning roads and proposes to decommission 30% of existing system and unauthorized roads post-project.

While closing and decommissioning more roads meets Need #1, this alternative was not developed further because it would substantially reduce access for proposed and future vegetation and fuels management, fire suppression, and public use and enjoyment of the project area to meet Needs #2, 3, 4 and 5. Eliminating proposed new road construction would remove ground access to 5,105 acres of proposed overstory thinning treatments and future vegetation and fuels management treatments, limiting implementation to more costly helicopter logging methods that are less likely to be accomplished. Without these treatments, the ability to meet Need #2 by modifying vegetation structure, composition,

AR 12611

8-ER-1544

and patterns would be reduced by 63%. Closing or decommissioning more roads or not building new roads would also reduce the ability to implement treatments that meet Need #3 (protect, develop, and/or enhance late and old forest stands and reduce the risk of large-scale habitat loss to wildfire) and Need #4 (treat stands within and adjacent to the WUI to reduce and/or maintain fire intensity and the risk of crown fire initiation and enable the use of more direct firefighting strategies. Elimination of grazing was not considered as a proposed action or alternative in this project because monitoring data demonstrates that the impacts of this activity are within acceptable limits, are effectively addressed by current allotment management plans, and do not limit or prevent attainment of restoration objectives.

The project includes proposes aquatic organism passages wherever fish passage to viable, inaccessible fish habitat is currently impeded by roads. Several additional aquatic restoration treatments were considered during development of the initial proposed action analyzed in the Draft EA; these were not included at the time because discussions with proponents determined that they were not fully developed or had uncertain outcomes with the information available at the time (e.g., stream channel development). Most proposed actions that enhance and restore watershed function and aquatic habitat were dropped from this project and are under analysis in the Twisp Aquatic Restoration Project using the Pacific Northwest Region Aquatic Restoration EA and Decision, expected to be completed in spring 2022. See Proposed Treatment section below and Appendix A for types and descriptions of aquatic restoration treatment proposals.

The IDT also decided not to develop an alternative that maximizes wildlife habitat restoration over all other project needs because the proposed treatments already focus on maintaining or improving these habitats. The habitat in the current project area contains primarily low-elevation, ponderosa-pine stands favored by species such as white-headed woodpeckers, western bluebird, American kestrel, and mule deer. Proposed treatment prescriptions for these areas are designed to sustain and perpetuate these stands with varying stand densities depending on biophysical environment, while prescriptions for treatments in Riparian Reserves and FPOG would favor higher tree densities that favor species like red squirrel and goshawk. While closing or decommissioning more roads may create more core area for grizzly or wolves, it would limit access for future vegetation and fuels management treatments that would help sustain and develop habitat for other species as described above.

## Meet "forest health" needs through natural succession.

The IDT considered developing an alternative that would meet the project's forest health needs through natural succession to address concerns that the project needs to incorporate this method into a "holistic approach to land use management" and provide for "nature's self-healing restoration". This proposal will be addressed in the "No Action" alternative, which would provide for natural succession by taking no active management. The effects of this alternative will be addressed by the project silviculturist and fuels specialist, along with other resource specialists as needed.

## Treat WUI with Cohen "Fine Fuels Removal Method"

The IDT considered a proposed alternative that only treated fuels in the WUI by implementing the "Cohen fine fuels removal method" to address concerns the project should include treatments that reduced the probability that homes would ignite during wildfires. The commenter provided excerpts of research and opinion papers completed by Dr. Jack Cohen that concluded that the best way to ensure survivability of homes is to clear fine fuels immediately adjacent to the structures (i.e., within 10- 20 meters), and that vegetation and fuels management beyond this point would not change the risk of ignition from flame exposure or substantially reduce ignitions from firebrands. This alternative was not developed further because district staff already contacted adjacent landowners early during project development to see if any were interested in allowing prescribed fire treatments on their properties through this project; few responded with any interest. Fuel reduction treatments on many private lands adjacent to the project area

AR 12612

8-ER-1545

are already completed or planned by interested landowners through a county-wide "Fire Wise" program (funded in part by the Forest Service), with support of staff from Washington State Department of Natural Resources, Okanogan County Conservation District, and other partners to provide expertise and funding to homeowners adjacent to the project area to reduce home ignition hazards. Further reducing the ignitability of homes in the WUI is subject to many variables beyond the control of the Forest Service (including homeowner preferences, location, building materials, private land access, etc.). Meanwhile, the proposed action includes treatments in and adjacent to the WUI such as thinning and prescribed fire that are intended to reduce crown fire initiation and spread and promote direct suppression methods that can help minimize the risk of wildfires crossing between NFS and private lands.

## Consider post-fire flood risks

The IDT considered a proposed alternative to minimize post-fire flood risks and sedimentation to address concerns that past wildfire activity would worsen impacts of floods on human infrastructure such as roads, culverts, and development. The potential for post-fire floods and sedimentation were considered in the development of Alternative 2 through proposals to enlarge culverts and decommission or close roads. These actions would help restore hydrologic continuity during heavy rain events and reduce sedimentation of streams by lowering the number of stream crossings, miles of riparian roads, watershed road density, and the artificial increase in the stream networks posed by the transportation system. Enlarging culverts and decommissioning roads also builds resiliency to future predicted disturbances likely to impact area watersheds due to climate change, such as increased storm flow.

## No Forest Plan or NWFP Amendments

The project no longer includes proposed NWFP amendments because treatments that needed these amendments are no longer included in the project. The IDT considered an alternative that did not amend any Forest Plan S&Gs to address concerns that plan amendments violate the Forest Plan and that project needs can be met without amending any standards and guidelines. Plan amendments do not violate the Forest Plan; under the National Forest Management Act and its implementing regulations at 36 CFR 219 (2012 Planning Rule), a plan may be amended at any time. The intent of amendments in general and the amendment process used for this project are described below under "Forest Plan Amendments", along with the purpose for each amendment and the amount affected by each one. Further benefits of each amendment are described in Chapter 3 in several sections under the heading "Forest Plan Amendments & 2012 Planning Rule Substantive Requirements". The IDT decided not to develop an alternative without Forest Plan amendments because these purposes and benefits are tied to meeting Needs # 2, 3 and 4 as discussed below under "Forest Plan Amendments". Eliminating the remaining amendments would reduce the ability to meet these Needs because 100% of FPOG in the project area would not be treated to increase resilience to wildfire, climate, and other disturbances. In addition, 57% of deer winter range in the project area would be treated less extensively, with reduced resilience to wildfire and no secondary benefits of increased forage to help deer survive winters. Where deer winter range overlaps with WUI, reduced levels of treatment would result in fewer treatments to reduce and/or maintain fire intensity and the risk of crown fire initiation and enable the use of more direct firefighting strategies to protect life and personal property

## Phased Approach

The IDT considered an alternative that would break the proposed action into five separate phases for analysis, decision, and implementation to address concerns that the project's objectives, inclusion of proposed Forest Plan amendments, and proposed treatments required additional time to address with more opportunities for public input and to gather monitoring data to inform successive efforts. This alternative would limit this analysis to the initial overstory thinning treatment conducted in the first proposed timber

AR 12613

sale area and would similarly break up other proposed treatments (prescribed fire, aquatic habitat enhancement, etc.) into three phases, roughly tripling the time spent on analysis and implementation, deferring implementation of treatments proposed in Alternative 2, and delaying planning efforts for other restoration projects on the district. Because of these impacts, this alternative was not developed further. District staff provided for public comment periods as required by NEPA and adapted public meetings and field trips to Covid-19 restrictions by providing virtual meeting platforms and online tours of the project area. The effects of treatments proposed in this project are well-documented and do not set precedents. The Forest Plan amendments proposed for this project have been used in several other projects with beneficial results. Monitoring included in this project, and under development with partners, will help inform treatments as they occur as well as future treatments elsewhere on the district.

## Short Implementation Period

The IDT considered an alternative that would include only prioritized management actions to be implemented within a 3-5-year time frame to address concerns that the 30-year duration of the project as proposed in the Draft EA did not allow for adequate public oversight and would be unable to adapt to new information. Limiting the proposed action to treatments that could be accomplished in 3-5 years would reduce the ability of this project to meet the Needs stated above in a timely manner. While some of the aquatic restoration treatments could occur during this timeframe if funding allowed, only a small fraction of thinning, prescribed fire, and road closures/decommissioning would occur. Prescribed fire treatments following thinning treatments may not be completed in this short timeframe because of the time needed to pile debris, wait for it to cure, and find the right conditions to meet burn objectives while allowing for smoke dispersal. Landscape-scale prescribed fire treatments that encompass overstory thinning treatments would not likely be accomplished because they cannot be implemented until initial piling and pile-burning treatments reduced the slash created by thinning treatments, fireline was installed, burn plans were written, and favorable weather conditions allowed burn implementation.

In response to concerns about the length of the project, the IDT shortened the implementation timeframe to 20 years. The size of the project and the total acres of the two treatments (non-commercial stand-improvement thin and prescribed burning) that were pushing the implementation timeframe to 30 years have been substantially reduced. New information or changing conditions that relate to the environmental impacts of this project (such as a wildfire, designation of new critical habitat, or monitoring results) would be evaluated as they occur per Forest Service Handbook 18.1 (Review and Documentation of New Information Received After Decision Has Been Made). This review may result in a correction, supplement, or revision to the EA, or treatments may be deferred or changed so that their effects are consistent with the effects covered by this analysis.

## Buffer Against Harm

One commenter requested an alternative in which the proposed actions would "buffer against harm". The commenter did not describe specific concerns that would help the IDT reasonably address this alternative, and it is not addressed further. Beneficial and adverse impacts of the proposed actions are described in Chapter 3, and the proposed action includes multiple design features to prevent or minimize harm, as well as actions to repair damage that may occur (Appendix B).

## Thin to Various Stand Densities

Commenters suggested that the overstory thinning prescriptions used in this project thin more trees per acre to increase restoration efforts and provide more timber, or fewer trees per acre to avoid impacting wildlife habitat or to remain consistent with the environmental zones in the project area. Most of these requests did not provide enough details to reasonably address as an alternative. One proposed alternative included the following proposal to meet concerns that current prescriptions were not ecologically or

AR 12614

scientifically based, would alter the Ponderosa pine-dominated forests, leave too few trees behind to survive windthrow, and be "unsightly":

- Retain a minimum of 40 trees per acre, with 50-80 basal area preferred.
- Increase spatial variability to mimic naturally clumpy tree distribution with small openings and some dense areas (variable-density thinning).
- Change prescription to variable-density thinning from below.
- Retain all old trees (>100 years old) and all large trees (>20 inches DBH).
- Retain all large snags, especially those >12 inches DBH.
- Design and execute the sale, to the extent possible, in a manner that is compatible with a Scenic/Aesthetic Mitigation Plan.

Current thinning prescriptions used in this project were developed in consideration of silvicultural goals and environmental zones in the project area (Appendix A). The proposed density of trees per acre after thinning is based on density management guidelines per species and Forest Restoration principles outlined in Appendix B of the Forest Restoration strategy. Overstory thinning prescriptions already use 40 trees/acre as the residual target; however, consistent with the Forest Restoration Strategy (Appendix B, pg. 104), prescriptions do not specify standard basal area objective for Dry Forest Treatments. Prescriptions already provide for variable densities by using "Individual – Clump – Opening" approach and specify thinning from below. Refer to Eastern Washington Cascades Reference Stand Summary Tables & Figures and the ICO implementation guidelines (Churchill et al. 2014, Churchill et al. 2016) and Appendix A. Old trees would be retained by using guidelines as described in Van Pelt and guidance from the Forest Restoration strategy that identifies desired snag targets per size class and forest type (Table 6, Forest Restoration Strategy). The largest snags would be retained during thinning operations unless they posed a hazard to personnel; if felled, they would remain onsite to provide coarse woody debris and associated benefits. The visual impacts of this project are addressed in the Scenic Resources report and summarized in Chapter 3. The effects of proposed thinning treatments on wildlife and timber volume are addressed in the respective wildlife and economics reports and disclosed in Chapter 3.

## Alternative 1 – No Action

The No-Action Alternative provides the basis for comparing how project needs are met by describing current conditions and how they would trend if no management actions were taken. In this alternative, standard resource protection and recurrent maintenance activities would continue, including road access management, fire suppression, limited hazard tree abatement, and routine scheduled road and trail maintenance. Ongoing uses and activities would also continue such as dispersed and developed camping and other outdoor recreation; firewood gathering as currently authorized; grazing managed under allotment management plans; special use permits like outfitting and guiding, communication site operations and waterline or ditch permits; and invasive plant treatments as authorized by the PNW Invasive Plant ROD and OWNF Invasive Plant ROD.

If this alternative were selected, no Forest Plan amendments would occur, and no actions would be authorized by the USFS or BLM to improve watershed function or aquatic habitat for Threatened and Endangered (T&E) species, or to modify vegetation species, composition, and patterns to restore and maintain a resilient stand structure. No actions would be taken to improve late and old stands and wetland habitat used by wildlife and reduce the risk of habitat loss to wildfires. No treatments would occur to reduce fire intensity along main access routes and ridges or adjacent to private lands, or to reduce the risk of crown fire initiation elsewhere in the project area. The transportation system would remain unchanged and continue to degrade as road maintenance funding declines. Aquatic habitat would continue to function at below desirable levels in some locations, barriers to suitable fish habitat would remain in place, and sediment impacts from area roads would continue to impact water quality. Soil disturbance and

AR 12615

disturbances to wildlife and aquatic species related to proposed treatments would occur, nor would sediment impacts from road decommissioning and instream work. No air quality impacts would occur from prescribed burning associated with this project.

Since the existing environment is not static, environmental consequences from selecting this alternative are expected. Current biological and physical processes would continue their present trajectories along with associated risks and benefits. Fire exclusion would likely continue given the values at risk within and adjacent to the project area. Except for suppression tactics associated with wildland fire, forest management would occur through natural processes such as wildfires and insect and disease outbreaks. No additional projects at the landscape scale are anticipated for at least the next 20 years in this planning area, except possibly in response to an event such as a flood or fire.

# Alternative 2 - Proposed Action

The IDT developed a variety of treatments and transportation system changes in this alternative to address the Project Needs described above, using the Forest Plan as amended, other relevant policy and guidance, inventory data and modeling results, field visits and interdisciplinary discussion, and input from the public and partners received during public comment periods.

## Condition-based Management

This alternative includes both pre-identified site-specific treatments and a condition-based management approach that supports responsiveness and flexibility between planning and implementation on a landscape that is subject to rapid environmental changes. This latter approach uses a suite of tools to address these fluctuating conditions, with site-specific data collection and/or field reviews conducted before implementation to verify that conditions on site match those predicted and to apply decision criteria for condition-based treatments (described below). These steps assure that the right activity occurs on the right location to move the landscape towards the desired condition. While this approach allows for making changes based on updated information from field reviews, it differs from what is conventionally referred to as adaptive management. In areas under consideration for condition-based management, this project will propose and analyze a suite of potential treatment types and intensities as a response to specific resource conditions. While the IDT expects that some of these areas would not be treated because they do not meet the decision criteria, they used the maximum estimates of condition-based treatments to determine effects in their analyses for this project.

Approximately 21,149 acres of the project are under consideration for condition-based thinning and prescribed fire treatments (Figure 6). These areas exclude Riparian Reserves, FPOG, the portion of the project area burned in the 2021 Cedar Creek fire, and locations proposed for regeneration thinning and shaded fuelbreak thinning in response to public concerns that specific locations or treatments should be pre-identified. Site-specific locations and treatments have been identified for these locations. Outside of these exclusions, the entire area would be considered for prescribed burning, shown with further detail in Appendix E. The orange-shaded areas on Figure 6 show the specific stand locations where overstory treatments are under consideration; the remaining areas would be considered for understory stand-improvement thinning.

The types and extent of condition-based treatments are summarized in Table 4, detailed in Appendix A, and displayed in Appendix E. Areas considered for condition-based management were screened using a combination of pre-established selection criteria and vegetation/fuels conditions (described as "Decision Criteria" below). Appropriate treatments for each type of vegetation/fuels condition found in these areas have been determined. Using existing vegetation/fuels data, the IDT used these conditions and criteria to

AR 12616

8-ER-1549

estimate the maximum amount of thinning and prescribed fire treatments that would be implemented using condition-based management; all analyses for this project assume that this maximum amount would be implemented. Where hazard tree/danger tree felling is proposed along open roads in the project area, the accepted criteria described in Appendix A would be used.

**Figure 6. Potential condition-based treatment areas within project boundary**



## Proposed Treatments

Tables 4 and 5 list the treatments proposed in this alternative, the maximum amount proposed, and the project Needs they address. Connected actions include construction of temporary roads for log hauling, fireline around prescribed fire units, road maintenance and reconstruction, and using existing rock borrow pits for materials to maintain roads. In addition, temporary access agreements would be sought from specific landowners to facilitate log hauling from adjacent NFS lands. Temporary roads proposed to access treatment areas on NFS lands are proposed to provide access to adjacent BLM and WA DNR lands for treatment. Unless specified as "condition-based management", the locations for the treatments described below have been pre-determined. Refer to Appendix A for detailed information on treatment goals, prescriptions, methods, duration, timing, and staff completing treatments. All treatments in this alternative, whether site-specific or identified through condition-based decision factors, would incorporate relevant design features and mitigation measures described in Appendix B (Design Features, Monitoring, and Mitigation Measures) to avoid or minimize potential environmental harm, repair disturbances caused

AR 12617

by proposed treatments, and assure compliance with applicable laws, regulation, and direction. See Appendix E for maps showing locations of the proposed treatments.

**Table 6. Alternative 2 proposed treatments (refer to Figures 13-25, Appendix E).**

| Treatment Type | Treatment Name | | | Maximum Amount | Project Need Addressed |
|---|---|---|---|---|---|
| Understory Vegetation Thinning (outside of Overstory Vegetation Treatment areas) | Stand Improvement Thin | Hand | Site-specific: | 607 acres | #1, 2, 3, 4 |
| | | | Condition-based: | 7,104 acres | |
| | | Machine* | Condition-based: | 6,101 acres | |
| | *Total Understory Vegetation Treatments* | | | *13,812 acres* | |
| Overstory Vegetation Treatments | Matrix Thin (condition-based; includes 40 acres of BLM lands) | | | 7,275 acres | #1, 2, 3, 4 |
| | Matrix Shaded Fuelbreak Thin (specific sites) | | | 759 acres | |
| | Regeneration Harvest & tree planting (specific site) | | | 45 acres | |
| | Riparian Reserve Thin (specific sites) | | | 72 acres | |
| | *Total Overstory Vegetation Treatments* | | | *8,151  acres* | |
| Fuel Reduction *Note that where underburning is proposed, maintenance underburning may also occur on up to 12,820 acres (1,449 site-specific and 11,371 condition-based).* | Hand-piling and pile burning only | | Site-specific: | 144 acres | #1, 2, 3, 4 |
| | | | Condition-based: | 1,538 acres | |
| | Machine-piling and pile burning only | | Site-specific: | 109 acres | |
| | | | Condition-based: | 1,147 acres | |
| | Hand-piling and pile-burning, Underburning | | Site-specific: | 535 acres | |
| | | | Condition-based: | 5,566 acres | |
| | Machine piling and pile-burning, Underburning (Includes BLM lands) | | Site-specific: | 695 acres | |
| | | | Condition-based: | 12,268 acres | |
| | Underburning Only (Includes private lands) | | Site-specific: | 536 acres | |
| | | | Condition-based: | 629 acres | |
| | Landing pile burning | | Condition-based: | 412 landings | |
| | *Total Prescribed Fire* | | | *23,167 acres* | |
| | Hand Fireline | | Specific sites | 4.6 miles | |
| | | | Condition-based | 53.3 miles | |
| | Machine Fireline | | Condition-based | 44.7 miles | |
| | *Total Fireline* | | | *102.6 miles* | |

AR 12618

| | | | |
|---|---|---|---|
| Aquatic habitat enhancement | Aquatic Organism Passages (AOPs; specific sites) | 4 sites | #1 |
| | Roads End Campground removal (specific site) <br> Poplar Flats Campsite removal (specific site) | 4 campsites <br> 1 campsite | |
| Transportation Management | Hazard/Danger tree removal (condition based) | Up to 110.8 miles of open roads | #1, 5 |
| | Replace undersized culverts with larger culverts (specific sites) | 3 culverts | |
| | Temporary road construction associated with log hauling (specific sites) | 4.8 miles | #2-4 |

*Indicates where this treatment could be accomplished by masticator or biomass removal on slopes up to 45%. If masticator is infeasible, thinning would occur by hand.

In addition to the Transportation Management activities described in Table 4, this alternative proposes changes to roads in the project area as summarized in Table 5 to address Needs #1 and #5.

**Table 7. Alternative 2 proposed transportation changes (refer to Figures 18-21 in Appendix E).**

| Road Type | Existing Road Miles | Post-Project Miles | | | | | |
|---|---|---|---|---|---|---|---|
| | | Open NFS Roads (ML 2, 3, 4) | Open NFS Roads - Admin Access (ML2A) | Closed NFS Roads (ML1) | Decommissioned Roads | Private Roads | Decommission to Trail or Stock Driveway |
| Current Open NFS Roads (ML2, 3, 4) | 51.7 | 38.7 | 5.4 | 3.7 | 1.2 | 1.1 | 1.6 (stock) |
| Current Closed NFS Roads (ML1) | 31.1 | 2.1 | 3.9 | 17.0 | 8.0 | - | 0.1 (trail) |
| Unauthorized Roads* | 31.6 | 0.5 | 1.5 | 6.0 | 22.2 | - | 0.9 (trail) <br> 0.5 (stock) |
| New Permanent Road Construction | - | - | 0.7 | 2.1 | - | - | - |
| Total Miles | 114.4 | 41.3 | 11.5 | 28.8 | 31.4 | 1.1 | **1.0 (trail)** <br> **2.1 (stock)** |

"Unauthorized" roads: roads found in project area that are not in NFS road inventory. Includes user-built roads and those built by the FS but dropped from the road inventory in the past when no longer desired, and often not decommissioned to current standards.

The closed or open status of roads in the project area during implementation is summarized in Table 6. It is unlikely that the full extent of open roads as described would occur at any given time during

AR 12619

implementation because changes in road status and temporary road construction would mirror the phases of proposed harvest operations described above. This would result in roads would be opened or constructed in some areas while they are being closed or decommissioned in other locations. Additional transportation-related connected actions in this project include pre-haul road maintenance on an estimated 74 miles of open NFS roads used for log hauling, with more substantial maintenance or road reconstruction on approximately 46 miles of closed NFS roads opened for log hauling. Approximately 20 miles of NFS roads outside of the project area in the Buttermilk, Little Bridge Creek, and Canyon Creek drainages would also be used for log hauling rather than construct new roads within the project boundary.

Similarly, log hauling traffic would use adjoining county roads and state highways during implementation of overstory thinning treatments. During log hauling, chemicals such as Lignin could be used on an estimated 10.4 miles of NFS gravel and natural surfaced roads for dust abatement, with restrictions to protect water quality (Appendix B). If winter harvest operations occur, snowplowing may occur on groomed snowmobile routes either on approximately 1.7 miles of FSR 4300 from its junction with FSR 4300475 to its junction with FSR 4300300, or on 5.6 miles of FSR 4300300 from its junction with FSR 4300 to the sno-park. Three rock pits on NFS lands within and adjacent to the project area would be used as source material for rock to use during road maintenance.

**Table 8. Project road status during implementation**

| Road Type | Roads Status During Project Implementation (Miles) |
|---|---|
| Closed NFS Roads (ML 1) | 2.8 |
| Open Existing NFS Roads (ML 2, 2A, 3, 4) | 88.0 |
| Open New NFS Roads (ML 2) | 2.8 |
| Unauthorized Roads used for log hauling | 15.2 |
| Temporary Roads used for log hauling | 4.8 |
| **Total Miles** | **113.6** |

## Overview of Proposed Activities

This section provides a brief description of proposed actions included in this alternative, with further details provided in Appendix A. Proposed condition-based actions include the decision criteria that would be used to determine whether that action is appropriate. Project implementation may begin immediately after a decision is signed on this project, currently estimated to be summer 2022, and continue for up to 20 years until work is completed as funding becomes available through agency, partner, or other external sources. Some work may begin immediately, while other treatments such as commercial and non-commercial thinning may require further layout, contract preparation, and contract award. Implementation of some proposed actions would occur over a short period (i.e., culvert replacement or AOP installation) while others would occur throughout the project area for its duration (prescribed burning). Operating seasons vary from year-round to specified seasons depending on type of treatment and location. Work would be completed by Forest Service (FS) staff, partners, contractors, cooperating agencies, volunteers, and members of the public using a range of hand tools and mechanized equipment.

AR 12620

## Vegetation Thinning Treatments

<u>Stand-improvement Thin Prescription:</u> This non-commercial treatment would thin dense stands of understory conifers less than 10 inches diameter at breast height (DBH) that lie outside of overstory thinning units, which may include plantations, areas of natural regeneration, and areas with substantial multi-storied vegetation (i.e., ladder fuels) that allow surface fire to easily travel into the overstory canopy. This treatment would be applied to site-specific locations within one FPOG stand, RRs, and within the footprint of the 2021 Cedar Creek fire. Within Matrix lands outside of these areas, this prescription would be applied where the following conditions are met.

Decision Criteria for Stand-Improvement Thin Prescription in Matrix:

- Slope is less than 80% and within one mile of an NFS road

- Forested stand has naturally regenerated or was planted following disturbance (i.e., wildfire, insect outbreak, or past thinning).

- Current stocking level of trees < 10" dbh exceeds 150 trees per acre.

<u>Overstory Thinning Prescriptions:</u> This project includes four overstory thinning prescriptions (Table 4) that would use mechanical equipment to thin trees from below to meet prescription goals (i.e., remove trees starting from the understory, then the midstory and lastly the overstory, leaving predominately larger diameter trees to achieve desired stand density). Commercial harvest associated with these treatments would likely occur in three phases, with each phase typically implemented over a three to five-year period, or over the next 3-7 years (Figure 7). Implementation of Phase 1 (Lookout) would likely begin within the first year of project implementation with Phase 2 (Newby) and Phase 3 (Woodpecker) likely starting at one-year intervals after the initial phase. All three phases of these treatments may be underway during years 3-5 in different portions of the project area. Work associated with these treatments, including building new and/or temporary roads and opening closed roads, would be completed early in each phase by the timber sale purchaser or agent prior to any log hauling. Further information on road-related actions is provided below and in Appendix A.

**Figure 7. Proposed phases of commercial thinning**

AR 12621



The goal of each thinning prescription is briefly described below, with further details in Appendix A. Refer to Figures 13-16 in Appendix E for locations of these treatments. The following thinning prescriptions are designed to meet Needs # 1-4:

<u>Matrix Thin Prescription:</u> This overstory thinning treatment addresses the imbalance of young stand structures in the project area on Matrix lands, excluding RRs. Thinning would help develop stands of young, small trees into medium to larger trees over time. Within Matrix lands outside of these areas, this prescription would be applied to no more than 7,275 acres of the 21,149-acre "Condition-based management area" identified in Figure 4. This comprises 32% of Matrix lands within the project area and 30% of the entire project area. These acres would be evaluated using the decision criteria below.

*Decision Criteria for Matrix Thin:*

- Slope is less than 80% and within one mile of an NFS road

- Current stocking level of trees > 7" dbh exceeds 50 trees per acre

- One of the following stand structures exists: young forest multi story (YFMS), stem exclusion closed canopy (SECC), understory re-initiation (UR), or stem exclusion open canopy (SEOC). (Stand structures are defined in Appendix A.)

- Units thinned with ground-based harvest systems would generally need to provide at least four thousand board feet (MBF) per acre from trees from 7-30" dbh to be commercially viable; 6 MBF per acre for cable/tethered logging systems; and 8-10 MBF for harvest operations using helicopters.

AR 12622

- Areas that do not meet these decision criteria would then be considered for understory thinning (SI Thin) using the decision criterion described above.

Matrix Shaded Fuelbreak Thin Prescription: This overstory thinning treatment would thin vegetation in a buffer up to 200 feet wide along pre-identified major access routes and ridges to help reduce fire intensity and create anchor points for suppression actions. Reducing fire intensity along major routes would also help reduce hazards to the public and firefighters evacuating from or accessing a fire.

Matrix Regeneration Harvest Prescription: This overstory thinning treatment is proposed in a pre-identified stand within Matrix lands to address extensive insect and disease infestations that have substantially degraded stand health. Due to the extent of impacts from these infestations, up to 90% of trees would be removed, with some healthy trees retained to provide seed sources and/or shelter. Tree planting would occur after thinning and prescribed fire treatments were completed to attain a desired stocking.

Riparian Reserve Thin Prescription: This site-specific overstory prescription is tied to meeting NWFP Aquatic Conservation Strategy objectives by promoting large and old trees, maintaining and improving understory shrub species and multiple canopy layers, and providing shade and nutrients in RRs.

## Prescribed Fire Treatments

Proposed prescribed fire and associated fireline are shown in Figure 17, Appendix E. These treatments would reduce concentrations of debris created by thinning treatments (activity fuels) and accumulations of natural fuels that have accrued in the absence of wildfires. In addition, underburning would help achieve desired ecological, thinning, and/or site preparation objectives.  Debris from thinning treatments would be available for firewood utilization or biomass removal where it is near an open NFS road and consistent with current district firewood removal requirements and design features included in this project. If not removed, debris would be reduced through prescribed fire treatments as described below.

In most areas, up to three prescribed fire treatments would occur in site-specific locations within FPOG and RRs. On Matrix lands, in areas outside of these management designations, prescribed fire treatments would occur using the criterion described below. These treatments would begin approximately three years after project implementation began, allowing time for thinning treatments to occur and debris to cure, and extend over the next 20 years as needed. The initial fuels treatment in most locations may entail piling debris by hand or machine and burning piles after sufficient drying (generally within 1-2 years after thinning); this would occur as needed where thinning left debris concentrations heavy enough to create undesirable fire intensity during underburning. Piling and burning these debris concentrations before underburning would help retain overstory trees and minimize potential control problems adjacent to burn unit boundaries. An initial underburning treatment would follow pile burning within approximately 1-3 years in most locations or may be the initial prescribed fire treatment to reduce debris and/or to prepare for replanting where this activity is proposed in the regeneration harvest unit. Finally, maintenance underburning may occur when the mean historic fire return interval has passed (approximately 16-20 years for most of the project area) after the initial underburn treatment to help maintain desired fuel levels and stand structure.

Hand-piling and pile burning may be the only prescribed fire treatment in some areas where no underburning is proposed, such as some aspen stands. Landing piles would be created near harvest areas where trees from thinning units were stripped of limbs and tops; materials in these piles would be available for biomass or firewood utilization where open road access allowed and would be burned after approximately 1-2 years if not used for these purposes. Prescribed burning would be completed by agency personnel with assistance from adjacent state agencies and contractors as available and necessary and

AR 12623

would occur under weather and fuel moisture conditions that are conducive to low to moderate-intensity fire to retain desired post-treatment stocking levels and major ecological processes on the landscape.

*Decision Criteria for Prescribed Fire Treatments outside of RRs and FPOG:*

Prescribed fire treatments would focus on restoring historic fire regimes and creating or maintaining conditions that allow direct attack by firefighters working with hand tools during weather conditions that are common during the peak of the fire season. The decision to implement prescribed fire on Matrix lands would be based on the characteristics that influence the frequency, intensity, and severity of wildland fires. Typical conditions that would trigger a prescribed fire treatment are as follows:

### Pile Burning

- Within overstory thinning units, machine piling would be used when surface fuel loading following thinning exceeds 10 tons per acre or residual slash exceeds 12 inches in depth. Machine piling or slash dispersal may occur when residual slash exceeds 6 inches in depth within 10 feet of leave trees or 50 feet of prescribed fire control lines where residual slash. This will be followed by pile burning after approximately one year of curing. This activity is subject to other requirements as described in Appendix B (Design Features).

- In Stand Improvement thinning units, hand piling would be used to pile all residual slash, including a portion of the existing dead and down woody debris where needed to prevent woody debris from connecting adjoining piles. This will be followed by pile burning after approximately one year of curing. This activity is subject to other requirements as described in Appendix B (Design Features).

### Underburning

- Following pile burning or where no pile burning is expected, the initial underburn may occur when the time since last fire exceeds the historic mean fire return interval (MFRI, approximately 16 to 20 years for most of project area). Most of the project area already exceeds the historic MFRI; in these locations, the initial underburn may occur within 1-3 years after pile burning or immediately after project implementation begins where no pile burning is expected.

- Maintenance burning may be implemented when the time since last fire exceeds the historic MFRI.

Burn units would be designed to minimize fireline construction by including large continuous areas within the burn unit and using existing roads, trails, or other natural barriers wherever possible. Where these features are not available, or where smoke management considerations necessitate burning smaller areas, additional fireline included in the total analyzed for this project may be constructed by hand or by machines such as a dozer as described in Figure 4 and in Appendix A. Fireline impacts would be mitigated through rehabilitation as described in Appendix B.

## Aquatic Habitat Enhancements

Aquatic organism pipes (AOPs) pipes would be installed in specific locations where access to suitable fish habitat is limited or blocked (Figure 23, Appendix E).

Roads End Campground, along with a campsite at Poplar Flats that is eroding into the Twisp River, would be removed within the first five years of project implementation to increase protection for endangered fish species and their critical habitat. The last portion of FSR 4440465 accessing the campground would be decommissioned; this would not affect access to Gilbert Trailhead. As a mitigation measure for the loss of

AR 12624

the campsites at Roads End and Poplar Flats, an equal number of sites would be created in Poplar Flats, South Creek, and Mystery Campgrounds in the Twisp River corridor. (Figure 24-25, Appendix E)

## Transportation Management

Hazard and Danger Tree Removal: Trees within 200 feet of open NFS roads (including proposed new permanent road construction and NFS roads designated for administrative use only) and at developed recreation facilities such as campgrounds and trailheads would be assessed to determine if they meet the "hazard" or "danger" tree criteria using appropriate established field guides (Filip et a. 2014; Filip et. al. 2016). Haul routes shall be treated for danger trees in pre-haul, during, and post haul maintenance activities so that haul routes are safe for use by purchaser/permittee (USDA Forest Service Manual (FSM) 7700, Chapter 30), likely starting the first year of project implementation and continuing for approximately 7 years. Debris from this activity may be left on site for habitat enhancement or removed by the public for firewood as determined by FS personnel if consistent with current district firewood removal guidelines.

Culvert Replacement: Undersized culverts in pre-identified locations would be replaced by culverts of an appropriate size to withstand 100-year storm flows, promote adequate drainage, and reduce the risk of road failure (Figure 23, Appendix E).

Road Use Changes, New NFS Roads, and Temporary Roads: Refer to Figures 18-21, Appendix E. Existing NFS roads proposed for staying open after implementation are those that the IDT determined would be needed for frequent, recurring public use or for vegetation, fuels, or fire management. Existing NFS roads proposed for closure post-project are those that the IDT determined would not be needed for recurring access in the immediate future, but would be needed for long-term vegetation, fuels, and fire management. Where these roads were used for log hauling, they would be closed within 12-18 months after thinning treatments were completed, except for approximately 2.6 miles that would remain open until the initial prescribed fire underburn treatment occurred. Wherever possible, roads would be closed in such a way as to allow for non-motorized access.

NFS and unauthorized roads proposed for decommissioning are those that would not be needed in the long-term, and/or are degrading water quality in critical fish habitat. Decommissioning would recontour the road surface to the extent necessary to improve hydrologic connectivity and soil stabilization and provide for revegetation. Some roads would be decommissioned to a trail or stock driveway for use by recreationists in the Coal Creek vicinity or by grazing permittees. Roads proposed for decommissioning post-project that would be used for log hauling during project implementation would be decommissioned after overstory thinning treatments were completed as agency or partner funding became available; this work may be completed by the timber sale purchaser or agent depending on the type of timber sale contract used (conventional versus stewardship).

Nine roads totally 11.3 miles would be designated as "administrative access" for permittees and agency personnel to access and maintain existing facilities. These roads are either gated or would have gates installed by FS staff or the permit holder.

By the end of this project, no unauthorized roads would remain in the project area. As described above, these roads would be added to the NFS road inventory or decommissioned.

Log Hauling Routes and NFS/Temporary Road Construction: As commercial thinning operations occur across the project area, the status of several roads would temporarily shift from closed to open to provide access for log hauling (Table 6). Because changes in road status and temporary road construction during implementation would mirror the phases of proposed harvest operations described above, roads would be

AR 12625

opened or constructed in some areas while they are being closed or decommissioned in other locations. The full extent of open roads described in Table 6 may occur for up to three years during implementation if all three phases overlap. Prior to use as log hauling routes, the timber sale purchase or agent would conduct road maintenance, reconditioning, or reconstruction to minimize damage to road surfaces during log hauling. Some closed roads would be opened for log hauling, then would either be closed, decommissioned, or remain open after log hauling or the initial prescribed fire underburn. Likewise, some currently open roads that would be used for log hauling would be closed or decommissioned in the same manner. Approximately 2 miles of roads on private lands would be used for log hauling pending completion of road use agreements with landowners.

Temporary roads (including select unauthorized roads) would be constructed or improved to the minimum standard needed in pre-identified locations to provide access for overstory thinning treatments, then decommissioned by the timber sale purchaser or agent within approximately 18 months. An exception to this involves two temporary roads totaling 0.6 miles proposed in the Alder Creek area that would be built to access proposed thinning treatments on NFS lands; these roads would be closed after log hauling was completed, but left available for up to 3 years to provide access to adjacent BLM and WA DNR lands, then decommissioned by these agencies after use (these temporary road miles are included in the total miles of temporary roads listed in Table 6).

This project would add 10.9 miles of permanent roads to the NFS road inventory. These roads would be improved or constructed as needed at different times during project implementation; approximately 10.3 miles would be closed after use for log hauling. Of the total amount, approximately 8.1 miles are existing unauthorized roads that currently provide access to private land, existing campgrounds, or facilities permitted by special use authorizations; or are needed for current and future land management activities. These unauthorized roads are already in use in most locations and would require minimal improvement to bring them to standard. The remaining 2.8 miles of new permanent roads would be constructed for immediate and long-term vegetation and fuels management access on NFS lands.

Temporary road construction would occur in pre-designated locations to access areas identified for overstory thinning treatments. Some unauthorized roads would also be used for log hauling and would be improved or built to the minimum standard necessary for safe use, then decommissioned within 18 months after construction.

New NFS roads and temporary roads are proposed to access portions of Matrix lands where condition-based overstory thinning treatments may occur. The roads would be constructed by the timber sale purchaser or agent only if the forested stands accessed by these proposed roads met the decision criteria listed above for the thinning prescription Matrix Harvest Thin and if the market value of the timber provided by the sale in that area supported the expense of building new roads. These roads would not be constructed otherwise.

## Design Features, Mitigation Measures, and Monitoring

Appendix B lists the design features included in the Proposed Action to avoid and/or minimize potential environmental impacts. The design features are based on Forest Plan direction, best management practices (BMPs), relevant science, professional experience with similar projects, and site-specific evaluations. During contract development and project implementation, agency staff would regularly evaluate treatments to assure that design features are addressed as specified. Analyses of environmental effects of this project are based on the implementation of these features. Mitigation measures include actions to address anticipated or potential impacts of fireline construction, equipment use, road construction, or prescribed burning.

AR 12626

# Chapter 3: Environmental Impacts of Alternatives

This section summarizes the environmental effects of two alternatives (the No Action and the Proposed Action alternatives) and provides the necessary information to determine whether an environmental impact statement would be needed. As described previously, Alternative 2 includes condition-based thinning and prescribed fire treatments; conditions vary widely across the project area and resource and/or operational concerns would likely result in fewer acres being treated than proposed. Specialists on the IDT completed analyses and prepared technical reports to address effects of the proposed actions on their resource area.  Effects analyzed for this project are based on following the design features in Appendix B. Analyses completed for this project are based on the maximum level of treatment that could occur. This section summarizes these reports and may only reference technical data upon which conclusions were based; portions of specialists' reports that are not included in Chapter 3 are incorporated by reference (40 CFR 1502.41) and are available under the "Analysis" tab on the project website at https://www.fs.usda.gov/project/?project=51107. These reports include the regulatory framework applicable to the project area and each resource, including desired conditions; the analysis framework used to assess resource indicators specific to each resource (including analysis methodology and information, the spatial and temporal contexts used for the analysis, and intensity level definitions); the existing condition and the environmental effects of Alternatives 1 and 2 on resource indicators; a summary of how proposed actions meet the project's needs for action and/or address issues; compliance with the regulatory framework applicable to that resource area; and references used in the analysis.

This analysis also addresses the effects of proposed actions on 40 acres of adjacent BLM lands and 550 acres of adjacent private lands. In addition, 0.9 miles of temporary road construction on NFS lands is proposed in this project to provide access to adjacent WA DNR lands for treatment. This analysis will address the effects of constructing these roads and the possible cumulative effects of adjacent WA DNR treatments, while WA DNR staff will complete the environmental analysis of actions they propose on state lands.

As described above, this project proposes three project-specific amendments to the Forest Plan. Based on the direction provided in 36 CFR 219, the Responsible Official must determine the appropriate scope and scale of forest plan amendments and apply those provisions of 36 CFR 219.8 through 219.11 that directly apply to the proposed amendments. The substantive requirements that would likely be affected by the amendments are described by resource section below where applicable. None of the substantive requirements within 36 CFR 219.8 through 219.11 would be adversely affected by the proposed amendments.

In addressing cumulative effects, the IDT considered the impacts of past actions when describing the existing condition for each resource indicator in Alternative 1. The IDT considered several ongoing and reasonably foreseeable future actions as potential cumulative effects, identifying those actions that affected their specific resource indicators and overlapped in time and space with the effects of this project. These actions include prescribed burning across the district; firewood gathering; recreation uses (developed & dispersed camping, boating, hiking, biking, hunting, skiing, snowmobiling, fishing, etc.); road maintenance and brushing on NFS roads; limited hazard/danger tree abatement; grazing on the allotments in the project area; mushroom gathering in Cedar Creek Fire perimeter; thinning, prescribed fire, transportation-related actions, and aquatic restoration treatments in the Mission Restoration project; large wood, beaver dam analog, and culvert and AOP installations proposed in the Twisp Aquatic Restoration Project; aquatic restoration treatments outside of NFS lands in the Twisp River drainage; ongoing invasive plant treatments and special use permits, including outfitters, lands permits (waterlines, roads, ditches), and the McClure communication site; and proposed treatments on adjacent WA DNR

AR 12634

lands in the Alder Creek and Poorman Creek (up to 397 acres of commercial thinning estimated in 2023-2025 and 432 acres of prescribed burning estimated in 2025-2030).

# Soils

This section is summarized from the Twisp Restoration Project Final Soils Report (Cerise and Christopherson 2022). The issues raised during public comment periods that are related to soil resources would be addressed by each alternative as described in Table 8. Direct, indirect, and any cumulative effects of each alternative on soil resource indicators are shown in Table 9.

## Alternative 1: Direct and Indirect Effects

The baseline environment for soil resources includes the effects of past harvest activities, roads, and wildland fires in the project area.

### Resource Indicator: Soil Erosion

This alternative would not alter the current soil erosion and mass wasting regimes in the project area. Erosion from road prisms throughout the project area would continue to some extent in this alternative. Natural and human-caused wildfires could affect the project area and cause consumption of the protective layer of litter and duff on the soil surface. Based on the slope structures and fine fragment content in most of the soils in the project area, erosion and mass wasting potential following a severe fire could be major. Colluvial activity may increase in areas where structural support from trees is lost; however, sediment transport would not occur on the rocky slopes. Loss of productive organic horizons through fire consumption would adversely impact soil productivity.

### Resource Indicator: Compaction, Rutting, and Puddling

This alternative would not alter the current soil compaction, rutting, and puddling in the project area. Compaction from road prisms, trails, user-built roads, etc. throughout the project area would continue to some extent in this alternative.

### Resource Indicator: Organic Matter, Coarse Woody Material & Ground Cover

This alternative would not alter the current soil organic matter or ground cover in the project area. Organic matter and additions of woody biomass and ground cover would occur naturally throughout the project area to some extent in this alternative. Natural and human-caused wildfires could affect the project area and cause consumption of the protective layer of litter and duff on the soil surface.

## Alternative 2: Direct, Indirect, and Cumulative Effects

Direct effects from project activities on soil resources would occur from machine harvesting trees, machine piling for fuel management, construction of mechanical and hand fireline, temporary and permanent road construction, and road maintenance. Project design features will limit additional surface erosion from project activities to less than 1%. This project would not address existing impacts from livestock grazing to soil resources in the project area; these impacts are managed through the allotment management plans. Indirect effects would include increased or accelerated run-off from compaction, and the associated erosion that would happen during a large storm event. These indirect effects would be reduced or eliminated by following soil design features and mitigations described in Appendix B.

AR 12635

Resource indicator: Soil Erosion

Implementing the prescribed burning, fireline, temporary and permanent road construction, harvesting, and post-harvest operations would result in adverse, short-term, negligible surface erosion because these activities would create bare soil that could be eroded by water or wind. This effect would be minimized by implementing design features and BMPS that would limit the creation of bare soil (Clayton and Megahan 1997; Robichaud and Hungerford 2000), including Region 6 BMPs that maintain soil productivity and reduce the risk of soil erosion (such as leaving organic material on the soil surface, reducing the area impacted by skid trails, and maintaining hydrologic function). In addition, implementing specific erosion control measures such as water bars, placing slash on bare soils, and vegetating disturbed soils would conserve the soil resource. The volcanic ash mantle is highly susceptible to erosion; however, using the mitigation measures and BMPs would help retain the organic layer and vegetation, minimizing or eliminating any erosion that would take place from management activities.

Prescribed burning in the project area should not produce any new or foreseeable soil erosion because it would generally create low to moderate burn temperatures in the spring/fall when soil moisture is present and soil temperatures do not overheat, the main cause of soil hydrophobicity that leads to erosion. When hydric soils are encountered, low impact techniques would be used in place of fireline construction to reduce impacts on sensitive, water-saturated soil types.

Temporary and permanent road construction can have a major impact on soil stability by creating bare soil and increased compaction along the running surface. Approximately 0.2 miles of the total 4.8 miles of temporary roads in this project are proposed on Highly Erosive Soils and would be decommissioned shortly after use. Following soil BMPs/design features would result in sufficient ground cover to minimize soil erosion and promote native plant growth by seeding, slashing, and de-compacting the soil to match the native soil adjacent to it. Some soil erosion would be expected from the road prisms throughout the year. Proposed road maintenance on NFS roads would initially cause soil disturbance during implementation but would result in a more stable road system and reduce erosion through proper water drainage and road surfacing.

Analysis on the effects of proposed temporary and permanent road construction was conducted to evaluate whether these actions were proposed on Highly Erosive Soils (HES). Closed roads that would be reopened temporarily for this project are considered part of the baseline condition as these road prisms existed prior to this project and would return to a closed status within 18 months of opening, kept open, or decommissioned depending on proposed changes to the transportation network in this alternative. This alternative would increase the mileage of permanent roads in two ways; first, with construction of new permanent roads (2.8 mi), and second, by adding some unauthorized roads to the NFS road inventory (8 mi). Unauthorized roads that would change to permanent NFS roads would cause a negligible change in the current condition to the soil resource since the road prism and associated detrimental soil conditions existed prior to this project. New permanent road construction would cause adverse, long-term impacts through some erosion, compaction, and loss of organic matter. Soil types that are mapped by the Natural Resources Conservation Service as Highly Erosive Soils (HES) are of particular concern for new road development in this project (Soil Survey Staff, 2014) because of their susceptibility to displacement.

Of the roads analyzed, only two short sections of two temporary haul roads (approx. 0.2 miles) intersected soil map units with HES. These roads would only be built if a permit to use a nearby road on private lands did not occur; as of the Final EA, acquiring this permit is well underway and is anticipated by the time implementation occurs in this location. Additionally, prior to construction, these roads would be assessed by Forest Service staff to confirm whether HES exists at these sites and if additional erosion control measures are needed. All temporary roads would be built to the minimum extent necessary to provide for safe use, then subsequently decommissioned and rehabilitated per BMPs and design criteria immediately

AR 12636

after use. Given the short distance of temporary roads that occur on HES, the brief duration that they would exist, full decommissioning after use, and rehabilitation using mitigation measures in Appendix B, detrimental soil conditions from this activity are not expected to exceed Forest Service standards and guidelines.

Changes to the locations of some temporary roads in the vicinity of Poorman Creek were made after the Draft EA public comment period to reduce the total area (miles) of landscape disturbance. A portion of temporary road #1035 was dropped, and temporary #1036, which is better aligned with more durable, rocky soils on Lookout Ridge, was extended. The changes to these two temporary roads from the Draft to Final EA resulted in construction occurring on a lower slope angle (i.e., less prone to soil displacement) and a net reduction of landscape disturbance since the road lengths were reduced by -0.27 miles.

## Resource indicator: Compaction, rutting and puddling

Prescribed burning, temporary road construction, harvesting, and post-harvest operations activities would result in adverse, short-term, minor impacts to soil disturbance because they would cause detrimental soil compaction, rutting, and puddling. Using soil BMPs and project specific design criteria would keep soil porosity within soil management objectives outlined by the Okanogan LRMP and Region 6 Soil Management Standards. New permanent roads would cause adverse, long-term impacts with respect to compaction; however, the spatial extent of this new disturbance would be minimal and would not cause detrimental soil conditions to exceed Forest Plan standards. The regular maintenance of new roads will help prevent and minimize rutting and puddling.

## Resource indicator: Organic matter, coarse woody material, and ground cover

Prescribed burning, temporary road construction, harvesting, and post-harvest operations activities would result in beneficial, long-term, major impacts for soil organic matter, woody material, and nutrient cycling, because the proposed activities would leave a variety of organic matter on the site that provides for microbial populations which helps maintain site productivity (A.E. Harvey et al 1994). Vegetation and organic matter protects the soil surface from raindrop impact, dissipates energy of overland flow, binds soil particles together, and dampen soil temperature extremes and daily fluxes (Robichaud and Hungerford 2000).

All harvest prescriptions would leave a portion of the existing stand on the site with coarse woody material (material greater than 3 inches in diameter) left from designated standing and down leave trees, and from breakage of limbs and broken tops that would occur during harvest. Leaving larger-sized, faster-growing trees onsite would create a future source of larger coarse wood; as these trees eventually die and collapse, they would contribute debris greater than 15 inches in diameter that would persist for longer durations and provide greater benefits to soil development than smaller coarse wood. To the extent feasible, the largest coarse wood (snags or logs) would be left on-site to satisfy coarse woody material requirements for each treatment unit.

Post-treatment levels of coarse woody material (CWM) would vary by habitat type. Proposed vegetation management and prescribed fire treatments would retain or allow for production of coarse wood as described in the Soils report for this project to maintain future soil productivity. The proposed overstory and understory treatments would likely leave slash on the ground through the winter and into late summer/fall before prescribed burning would occur, providing the opportunity for the nutrients in the slash to leach into the soil (Palviainen and others 2004). Any increase in groundcover and/or fine logging slash through harvest may be offset by prescribed fire treatments that may reduce the amount of organic matter and groundcover in the short-term (5-10 years after treatment). In the long-term (greater than 10

AR 12637

8-ER-1563

years), re-growth of vegetation and annual needle drop would provide groundcover and leaf and litter material necessary for soil organic matter development.

New and temporary road construction would adversely impact ground cover and surface organic matter by removing these resources from the road prism. If design criteria and BMPs are followed, major impacts from temporary road construction are expected to recover in the short-term. Permanent road construction has a long-term major impact on ground cover and soil organic matter so the spatial extent has been limited (2.8 mi) such that DSC do not exceed Forest Plan standards and guidelines.

The status of other nutrients is unknown although there are no site indicators which would point to a problem with nutrient availability or cycling in the units. Removal of potassium in whole tree harvests is modest in comparison to soil reserves according to (Jurgensen et al 1981). Tree growth and ground cover is within the range expected for the site conditions. DeLuca's research has shown the positive benefits of reducing fuel loading and renewing the growth of desirable understory plants through using fire or harvest or a combination of both. Prescribed fire following a selection or shelterwood harvest was found to have a short-term increase in mineral nitrogen followed by a long-term decline in available nitrogen (ibid). This may seem like a negative impact of fire reintroduction; however, the reduced stand density has a lower nitrogen demand. In addition, the Nitrogen: Potassium ratio would be in better balance increasing the trees resistance to disease and insects.

By maintaining organic matter and ground cover on at least 80 percent of the site, nutrient cycling and availability would not be altered. This is supported by study results described above. The mitigations and Region 6 soil quality guidelines are prescribed to achieve this desired outcome. Localized losses may occur at landings or where severe fire occurs.

## Cumulative Effects

Present and future actions with effects that overlap in time and space with this project for the soils resource include grazing, dispersed camping, and off-road vehicle use. The combined effects of these activities along with those proposed by this project are shown in Table 9.

# Summary

Alternative 1 would not add to cumulative soil effects unless, or until, fires outside of the normal range of variability occur. There would be no additional detrimental soil effects since ground-based logging would not occur, and noxious weed populations would persist except where currently authorized treatments reduce them. In contrast, Alternative 2 would produce additional soil disturbance that overlaps in time and space with the existing soil conditions. This disturbance would be minor to moderate immediately after project implementation but using soil BMPs will ensure that these impacts are short-term. Illegal OHV use, firewood gathering, and road maintenance activities are the most likely on-going and reasonably foreseeable actions that would cumulatively affect soil resources in treatment units. Mitigations and BMPs will insure Alternative 2 meets the Okanogan Forest LRMP and Region 6 standards and guidelines.

The issues raised during public comment periods that are related to soil resources would be addressed by each alternative as described in Table 8.

AR 12638

**Table 10. Comparison of how alternatives address key issues related to soils**

| Issue/Concern | Alt 1 | Alt 2 |
|---|---|---|
| **Issue #2:** Opening closed roads and/or building temporary or permanent roads will […] damage soils […]. | No additional detrimental soil conditions beyond the current baseline because no closed roads would be opened nor would temporary roads be added. | This alternative removes more roads than are added which would result in a net reduction of detrimental soil effects over time. Permanent new road construction would adversely impact 6.8 acres (less than 1% of the project area) in four locations. Minor to moderate detrimental soil effects would occur immediately after project implementation but the use of soil BMPs and design criteria would ensure that these impacts do not exceed the Okanogan Forest LRMP and Region 6 standards and guidelines. |
| **Issue #7:** Treatments on recently burned areas will […] compact soil […]. | No compacted soil in burned areas because no treatments would occur | No soil compaction expected since there would be no mechanized treatments, skid trails, or landings in the ~100 acres of previously burned forest. Proposed treatments in this area include hand thinning and piling, pile burning, then possible underburning. |
| **Issue #15:** Harvest on steep slopes > 35% and machine piling will damage soil and cause erosion. Restrict operating seasons to winter to limit soil compaction. | No soil damage, erosion, or compaction from treatments because no treatments would occur. | Detrimental soil conditions would be limited within acceptable limits by using design criteria and advancements in technology such as tethered and aerial cable logging. Ground Based Harvest (GBH) would not require a tether/cable and may operate on slopes up to 45%. The preferred management practice on steeper slopes (35–45%) for GBH equipment is slash dispersal during thinning/harvest which eliminates or reduces the need for machine piling. Soil design criteria for GBH equipment on steeper pitches is expected to reduce the number of passes made by heavy equipment in one area. For example, wood may be shuttled down to skidders on gentler slopes (which would reduce the number of passes). Furthermore, GBH equipment would operate under winter conditions or an equivalent low- impact method in RRs and in Aspen stands. For those upland areas that will be treated outside of the winter season, soil design criteria such as the use of slash mats to reduce compaction, additions of organic material to bare soil to help prevent erosion, and de-compaction of skid trails and landings will limit compaction to within Forest Service guidelines.<br><br>Cable/aerial/tether harvest systems (herein cable) may be used on slopes 45-80%. When a tethered machine is anchored to a fix point, lateral movements are extremely limited. The limited lateral movement combined with a power assist for descents and ascents minimizes potential soil disturbances. Tethered logging and cable systems are designed for slopes 45-80% in the Twisp Restoration Project and will meet ONF-LRMP, R6, and National soil management standards and guidelines. |

The effects of each alternative on soils resource indicators are summarized in Table 9.

AR 12639

Table 11. Soil resource indicators and measures for Alternatives 1 and 2

| Resource Element | Resource Indicator | Measure | Alternative 1 | Alternative 2 | | |
|---|---|---|---|---|---|---|
| | | | | Direct & Indirect Effects | Past, Present, and Future Actions | Cumulative Effects |
| Soil Erosion | Soil Erosion | Fireline on slopes greater than 10% | 0% | 1-3% | 2-5% | 3-8% |
| Soil Disturbance | Compaction, Rutting, & Puddling | Percent of total unit | 5-10% | 5-10% | 5-10% | 10-20% |
| Site Productivity & Nutrient Cycling | Organic Matter, Coarse Woody Material & Ground Cover | Tons per Acre per treatment polygon | 2-8 tons/acre | 5-24 tons/acre | 2-8 tons/acre | 7-32 tons/acre |

# Hydrology

This section is summarized from the Twisp Restoration Project Final Aquatics Report (George 2022). The issues raised during public comment periods that are related to hydrologic resources would be addressed by each alternative as described in Table 10. Direct, indirect, and any cumulative effects of each alternative on hydrology resource indicators are shown in Table 11.

## Alternative 1: Direct and Indirect Effects

The extensive road network is one of the primary drivers impairing current watershed and aquatic ecosystem function. Roads in the project area alter sediment delivery, increase the drainage network, change run-off timing, and limit infiltration. Taking no management action would result in no increased project-related sediment, surface erosion, and water quality because no additional areas would be disturbed by harvest or fuels operations and road construction. In the long term, there would be no potential benefits from restoration of currently compacted areas through road decommissioning/closing roads, no hydrologic improvement from upsizing culverts, or reduced risk of high-severity fire due to proposed thinning and prescribed fire treatments. Risk of detrimental sediment effects from high-severity wildfire would not be reduced through thinning and prescribed fire treatments. Existing soil compaction from previous harvest activities would recover slowly as natural vegetation and physical processes restore soil function. Long-term reduction in sediment yields to streams due to road decommissioning and road closure would not occur.

Potential effects from high-intensity wildfires include loss of soil nutrients from vaporization, increased rates of soil erosion and stream sedimentation, and loss of riparian stream shading with resulting increases in water temperature. Sediment production from wildfire would be higher than the current condition and what would be expected to occur from Alternative 2. The risk of sedimentation post-wildfire would continue to episodically threaten water quality within the project boundary for short periods (3-5 years) post fire until post fire groundcover is reestablished. It is unlikely that sediment-related exceedances of water quality standards (turbidity) related to wildfires would be detectable at the State sampling locations due to their distance downstream from the project area. Depending on the severity of the fire and hydrologic cycle turbidity could also dramatically increase at sampling locations downstream during spring runoff or severe storms. Sediment inputs from existing roads would remain the same as none of the

AR 12640

~52 miles of open roads, ~31 miles of closed roads and ~32 miles of unauthorized roads would be decommissioned or closed.

The access road to Roads End Campground would continue to be a chronic source of fine sediment. A campsite at Poplar Flats proposed for rehabilitation would continue to erode into the Twisp River, adding sediment.

### Resource Indicator: Road Density

High road density in the project area is directly tied to increased sediment levels in several catchments. This alternative would have a direct, long-term, negative, moderate effect on road density because roads in RRs and the project area would continue to exist in current locations at current densities that would continue to contribute sediment to nearby streams.

### Resource Indicator: Road Drainage Network Increase

Roads in the project area create an artificial drainage network that captures precipitation and snowmelt and increases the amount of sediment they carry into nearby streams due to increased discharge and velocity. This alternative would have a direct, long-term, negative, moderate effect on the road drainage network increase because roads in RRs and the project area would continue to exist current locations at current high densities with an increased rate of drainage from roads.

### Resource Indicator: Riparian Road Density

Riparian roads in the project area act as sediment sources, diminish instream wood recruitment, and constrict channels. This alternative would have a direct, long-term, negative, moderate effect on riparian road density because roads in RRs and the project area would continue to exist where they at current densities.

### Resource indicator: Road-stream crossing density

The density of stream crossings in the project area is high in several locations; these locations provide the most direct and frequent opportunity for sediment from roads to enter stream channels. Taking no action would have a direct, long-term, negative, moderate effect on road-stream crossing density because the road crossings within the project area would continue to produce similar amounts of sediment per year. No crossings would be removed, and no watershed benefits associated with culvert removal on closed or decommissioned roads would occur.

### Resource indicator: Groundcover

The No Action alternative would have a direct, long-term, beneficial, negligible effect on groundcover because this project would not implement actions that would change groundcover within the RRs and upper watersheds. Levels of groundcover within the RRs were observed to be effective at trapping and filtering sediment under existing conditions where vegetation and topography exclude livestock.

Cover consists primarily of grass, forb vegetation, shrubs, and needle cast/litter. Most bare soil within the project area is related to road surface area. The 2014 Little Bridge Creek Fire, 2015 Twisp River Fire, and 2021 Cedar Creek Fire removed groundcover to varying degrees within/near the project area. Ground cover would continue to be reestablished as vegetation grows back to pre-fire conditions.

AR 12641

## Alternative 2: Direct, Indirect, and Cumulative Effects

### Resource indicator: Road density

Proposed actions would have a direct, beneficial, long-term, moderate effect on road density because decommissioning ~31 miles (additional ~3 miles converted to trails or stock driveways) or hydrologically closing about ~29 miles of roads within the project area would lead to a decrease in open roads from ~52 miles to ~42 total miles post-project. Six catchments would have lower rankings in road density including 6 lowered from high to moderate. Many catchments show improvements to density but do not meet the threshold for lowering ranking. This would reduce sediment transport from the road system.

### Resource indicator: Road drainage network increase

This project would have a direct, beneficial, long-term, moderate impact on road drainage network increase because decommissioning and hydrologically closing roads as described above would reduce the amount of the project area drained artificially in 6 catchments. Many catchments show improvements to this metric but do not meet the threshold for lowering rankings; this includes lowering 6 catchments rated as moderate to low.

### Resource indicator: Riparian road density

The project would have a direct, beneficial, long-term, moderate effect on riparian road density because it would reduce the total length of roads within RRs in 5 catchments. This includes lowering 5 catchments rated as high to moderate or low. Many catchments show improvements to this metric but do not meet the threshold for lowering rankings. Closing and decommissioning roads would reduce soil compaction in the riparian zone and over time restore soil porosity and allow vegetation to become established, lowering the amount of sediment reaching the stream channels. The establishment of vegetation on decommissioned roads would also improve stream temperature.

### Resource indicator: Road-stream crossing density

This project would have a direct, beneficial, long-term, moderate effect on stream crossing density by reducing the number of stream crossings in 7 catchments. This includes lowering 7 catchments rated as high to moderate or low. Many catchments show improvements to this metric but do not meet the threshold for lowering rankings. Stream crossings are important point source areas for sediment transported down the road to enter the stream network. Lowering the number of crossings would reduce sedimentation to project area streams.

### Resource indicator: Ground cover

Activities related to thinning, prescribed burning, and road construction would have a direct, adverse, short-term, minor effect on groundcover and potential sedimentation because they would create ~2800 acres of bare soil (~5 acres in RR, due to winter harvest requirements). These areas would be at higher risk for erosion and potential sediment delivery to streams and wetlands if there were runoff-producing storm events during implementation and before vegetation became reestablished. These areas would persist throughout the implementation of post-thinning machine piling and burning, handpile burning, and underburning activities. Field review indicates that bare soil created by fuels treatments (i.e., prescribed fire) recovers to effective groundcover levels within 2-10 years post treatment.

Several BMPs, design features, and mitigations would help avoid, minimize, or repair the creation of bare soil in this project (Appendix B), and should result in no measurable increase in fine sediment from the

AR 12642

proposed treatments. Design features applicable to temporary road locations would minimize the delivery of sediment to any stream channels (avoiding stream crossings and RRs wherever possible). Temporary roads would also be decommissioned within the same season the vegetation is treated. Sediment production in RRs would be avoided, minimized, and mitigated by limiting bare soil creation in floodplain areas. Thinning and prescribed fire activities would be designed to maintain effective groundcover and utilize existing roads, skid trails, and landings wherever possible to minimize the creation of more disturbed soil and should generate no measurable increase in sediment yield due to buffers and other design criteria. Up to 5 acres bare soil would be created by harvest and fuels treatments in RRs, but design features and mitigation measures would maintain low potential for generating short-term fine sediment, prevent substantial impacts to riparian buffer efficacy, and minimize sediment delivery to streams. Almost all fine fines are delivered annually by the road system and grazing impacts (see roads section above). In addition, the minimal amount of sediment generated by these activities would be limited by design features that restrict the amount of project area that can be treated with prescribed burning within any 6th HUC watershed in any given year, and by the 10 to 20-year timeframe for completing treatments.

In addition to the effects described above, the following proposed actions also improve hydrologic function in the project area by upsizing 3 culverts and installing 4 AOPs, which would improve hydrologic function/fish passage by conveying 100-year events more effectively. Upsizing these culverts and AOPs to the bankfull width of the stream channel would lessen the possibility of catastrophic culvert failure by allowing the culvert to convey water and sediment in concert with natural stream variability. Undersized pipes can produce aggradation at the culvert inlet and degradation of the channel at the outlet due to increased stream power through the culvert.

In addition to the transportation system changes and the vegetation and fuels treatments described in Chapter 2 of the EA, the project includes the following proposed actions that would affect hydrologic resources:

- Riparian Reserve commercial harvest and small tree thinning;
- Construction of ~4.8 miles of temporary roads for log hauling;
- Tree planting in one regeneration thin unit;
- Hand and dozer fireline construction for prescribed burns; and
- The construction of 2.8 miles of new permanent roads, along with adding 8 miles of existing unauthorized roads to the NFS road inventory.

These actions (except temporary road building and fireline construction) would meet Need #1 by improving soil resources and hydrologic function in the project area over time or have no measurable effect due to design features. Temporary and permanent road building and machine fireline construction would be done outside of riparian and other sensitive areas and should not increase sediment production to streams in a measurable fashion. Log hauling associated with this project can produce short-term increases in fine sediment delivery.

Cumulative Effects

Past activities that contribute to the existing condition are described under Alternative 1. Present and reasonably foreseeable future actions that affect sediment and overlap with the spatial and temporal bounds for this analysis include grazing, prescribed burning, firewood gathering, recreation (developed & dispersed camping, boating, hiking, biking, hunting, skiing, snowmobiling, fishing, etc.), road maintenance, commercial & non-commercial thinning and prescribed fire in the Mission Restoration Project, mushroom gathering in Crescent Fire perimeter, aquatic habitat restoration in the Twisp Aquatic

AR 12643

Restoration Project and the Mission Restoration project (including private lands), special use permits (outfitter guides, waterlines, roads, irrigation ditches), and thinning and prescribed fire treatments planned on adjacent WA DNR lands in Poorman and Alder Creek areas previously described.

All these present and reasonably foreseeable future actions above overlap in time and space with proposed activities in this project and may affect sediment by slightly increasing sediment delivery, especially the DNR treatments. However, after harvest and burning, sediment levels will return to normal within a few years and the risk of uncharacteristically severe wildfire adjacent to USFS lands will be reduced. These activities have no measurable effect on any resource indicators used in this analysis within the project area. Grazing does impact sediment delivery in the project area; the grazing impacts to stream sediment levels in the Twisp River watershed were concluded to be insignificant based on the Little Bridge – Lookout Mountain Allotment Management Plan (AMP) Renewal Biological Assessment (USDA 2011b) and supporting NMFS and FWS Biological Opinions (USDC 2011 & USDI 2011).

Proposed road decommissioning and closing in the Buttermilk and Libby Creek drainages will occur as authorized by the Mission Restoration Decision and would overlap in time and space with similar actions proposed in this project. These actions and those proposed by this project would have a cumulative beneficial long-term negligible effect on these resource indicators within the project area because closing/decommissioning roads, removing or upsizing culverts, etc. improves all the resource indicators but only ~1% of the of each watershed overlaps with the Twisp Restoration Project.

The Alder Mine site borders the project area and actively leaches contaminants into Alder Creek (Wolff, McKay, and Norman, 2004). Design criteria and an avoidance zone for harvest and prescribed fire around the mine site should not alter the hydrologic regime to impact water discharge or quality at the mine site. Remediation of the mine is outside of the control of the USFS as it is on private land, and this action would be under Washington State Department of Ecology jurisdiction.

## Summary

The effects of Alternatives 1 and 2 are summarized in Table 11. Compared to Alternative 1, Alternative 2 would have a lasting beneficial effect on water quality and watershed habitat within and downstream of the project area by reducing fine sediment coming from NFS lands through decommissioning and closing roads, improving conditions in 11% to 15% of the catchments in the project area (depending on resource indicator). Many other catchments show improvements but do not meet the threshold for lowered rankings. Reductions in sediment would have continued beneficial effects on water quality. Sedimentation would be reduced by eliminating ~8 road crossings (~33% of total), improving the ranking of 5 catchments riparian road density. Culvert replacement and AOP installation at 7 road crossings would reduce impacts to water quality by improving the road drainage network. Fine sediment levels may increase temporarily for 1-3 years after treatment, but design features would minimize these effects to negligible levels. All applicable water quality and aquatic standards and guides would be met with the project design features. No changes to 303d listings are expected to occur within the project area.

While Alternative 2 would create more bare soil over the life of the project than Alternative 1, these short-term, minor adverse impacts to sedimentation are expected to be offset by long-term beneficial reductions in sediment associated with high-severity wildfire. Alternative 1 does not address these needs and is inconsistent with the NWFP Aquatic Conservation Strategy objectives by not addressing sediment production. While this alternative would create bare soil through proposed thinning and prescribed fire treatments, the likely effect of not implementing these treatments includes an increased risk of high-severity fire with a substantial increase in bare soil and sedimentation.

AR 12644

Proposed actions comply with the Clean Water Act as amended by using National Watershed BMPs and project-specific design-criteria to prevent or minimize impacts to water quality or stream flow. There are several locations outside of the project area with 303(d) Category 5, 4A, 4C, 1 and 2 Assessed Waters. Twisp River downstream of the project area is listed for Dissolved Oxygen (DO), Temp, instream flow, ammonia, and bacteria, and is listed for Temp within the project area. Alder Creek is listed for Cadmium, Zinc, and pH within the project area as a result of an inactive mine located on the border of NFS lands that is actively leaching mine waste into Alder Creek (Wolff, McKay, and Norman, 2004). No impacts to 303d listings are expected from actions proposed in this project.

Table 10 shows how each alternative addresses the issues raised during public comments tied to hydrologic resources.

**Table 12. Comparison of how alternatives address key issues related to hydrology**

| Issue/Concern | Alt 1 | Alt 2 |
|---|---|---|
| **Issue #4:** Thinning and prescribed fire in RRs will adversely affect designated aquatic habitat and species. | No thinning or prescribed fire treatments in RRs, treatments in 100 acres of Cedar Creek Fire within the project boundary, dozer fireline, or operations on slopes > 35%. No associated creation of bare soil from the removal of groundcover that could add sediment to streams. | Design Criteria (DC) and Best Management Practices (BMPs) would be used to minimize impacts of thinning and prescribed fire in RRs nt. Buffers for thinning would limit any impacts. |
| **Issue #7:** Treatments on recently burned areas will […]  add sediment to streams […]. | | 100 acres of non-commercial thinning and prescribed fire outside of RRs. Treatments would not occur for several years post fire when surface fuel loading until groundcover has re-established |
| **Issue #14:** Dozer fireline will […] increase sedimentation […]. | | No machine fireline will be constructed in RRs. Design features and mitigation measures in Appendix B require waterbars and rehabilitation to minimize potential erosion and sedimentation. |
| **Issue #15:** Harvest on steep slopes > 35% and machine piling will damage soil and cause erosion. Restrict operating seasons to winter to limit soil compaction. | | No skidding/harvest will occur on slopes > 35% in RRs. Harvest in RRs would occur in the winter unless an acceptable plan is proposed for summer operations that provides the same level of soil protection as winter-only operations. Refer to soils report for assessment of harvest impacts on soils on slopes > 35%. |
| **Issue #16:** Project will increase impacts from cattle grazing by allowing more access to sensitive areas such as wetlands and RRs. | | Design features, including no-treatment buffers, would minimize increased cattle access to RRs that may occur due to thinning treatments in this project. |

AR 12645

| Issue/Concern | Alt 1 | Alt 2 |
|---|---|---|
| **Issue #21:** Proposed actions will create sediment and remove shade that degrade water quality. | | Proposed thinning, prescribed fire, and road construction would create bare soil and potentially increase sedimentation on approximately 2800 acres (5 acres in RRs) over the life of this project. These areas would be at higher risk for erosion and potential sediment delivery to streams and wetlands if runoff-producing storm events occurred during implementation and before vegetation became reestablished.<br><br>Appendix B lists aquatics and hydrology design features that would maintain low potential for generating short-term fine sediment, prevent substantial impacts to riparian buffer efficacy, and minimize sediment delivery to streams. Prescribed burning is limited to 10% of any 6th HUC to allow time for groundcover to re-establish. Mitigations to address bare soil include seeding and decompaction. Treatments are designed to not alter shading in a measurable way. |

Table 11 summarizes effects of each alternative on hydrology-related measures.

**Table 13. Summary of effects of Alternatives 1 and 2 on hydrology resource indicators.**

| Resource Element | Resource Indicator | Measure | Alternative 1 | Alternative 2* |
|---|---|---|---|---|
| Sediment | Road density | Number of catchments ranked at low, moderate, and high for each indicator | High: 20; Mod: 9; Low: 19 catchments | High: 14; Mod: 9; Low: 25 catchments.<br><br>**(6 catchments lowered)** |
| | Road drainage network increase | | High: 1; Mod: 10; Low: 37 catchments | High: 1; Mod: 4; Low: 43 catchments.<br><br>**(6 catchments lowered)** |
| | Riparian road density | | High: 20; Mod: 1; Low: 27 catchments | High: 17; Mod: 2; Low: 29 catchments.<br><br>**(5 catchments lowered)** |
| | Road-stream crossing density | | High: 9; Mod: 15; Low: 24 catchments | High: 5; Mod: 12; Low: 31 catchments.<br><br>**(7 catchments lowered)** |
| | Groundcover | Acres of bare soil | Unknown but likely minimal including existing trails and roads and continuing recovery from fires | ~2800 acres** project wide<br><br>(~5 acres within RRs) |

AR 12646

8-ER-1572

*Many catchments show modest improvements; some of these did not meet the "lowering ranking" threshold.

** Includes landings, temporary road construction, harvest operations, burning, etc. This is a highly conservative, worst-case estimate.

# Aquatic Resources

This section is summarized from the Twisp Restoration Project Final Aquatic Resources Report (Shull 2022)**.** The issues raised during public comment periods that are related to aquatic habitat resources would be addressed by each alternative as described in Table 12. Direct, indirect, and any cumulative effects of each alternative on aquatic habitat resource indicators are shown in Table 13.

## Alternative 1: Direct and Indirect Effects

The project analysis area contains habitat for federally endangered Upper Columbia River Spring-run Chinook and threatened Upper Columbia River steelhead and Columbia River bull trout and their designated critical habitat. Regional Forester's Sensitive Species (R6 Sensitive) Westslope cutthroat and interior redband rainbow trout are found throughout the project area. Each of these species plus non-native eastern brook trout in the project area are Management Indicator Species (MIS). In addition, the project area contains Essential Fish Habitat (EFH) designated under the Magnuson-Stevens Fishery Conservation and Management Act that is consistent with historic spring chinook and coho salmon ranges.

### Resource Indicator: Fish Distribution

Fish barrier surveys conducted in 2018 and 2019 across the project area identified multiple culverts that block fish passage on Forest Service lands. Of these culverts, four were identified as priorities in the Twisp Restoration Project because they partially or completely block access to 5.1 miles of spawning, rearing, and high flow refugia habitat important for species persistence, survival, and recovery (Park et al. 2008). Once culverts become fish barriers, they can cause severe fragmentation of important fish habitat (Warren and Pardew 1998; Pringle et al. 2000).

The No Action alternative would have an adverse, minor, long-term effect on fish distribution because it would not remove barriers to 5.1 miles of suitable fish habitat, which would remain fragmented with partial or no access. While the habitat blocked by these barriers is marginal in the amount or quality, it is important to remove them existing fish habitat capacity is limited and highly fragmented, with few options for juvenile and adult fish to find refugia from warmer temperatures and predators, find feeding areas, and reproduce successfully. All the most important spawning and rearing habitat for Federally Threatened and Endangered species and other sensitive species is already accessible. Habitat connectivity is important for resilience from natural disturbances and will be increasingly important with anticipated changes in climate such as increased stream temperatures and lower base flows. Maintaining barriers to suitable habitat in this alternative would limit localized fish production and hinder recovery efforts for at-risk fish species.

### Resource Indicator: Fish Habitat Viability

Past riparian logging, road development, instream wood removal, irrigation ditch withdrawal, floodplain development, recreation, and riparian livestock grazing are the key stressors that contribute to low base flows and high water temperatures that impact several fish species life stages in the lower river. Most of the river's floodplain has been cut off below Buttermilk Creek, thereby reducing the amount of important off-channel rearing habitat for juveniles. Large wood levels and recruitment potential in the lower river

are well below potential (UCRTT 2017). Aquatic habitat in Poorman Creek and other headwater streams are considered functioning at risk or non-functioning because of past riparian management, riparian roads, and other land management activities. Fish barriers exist that block or limit accesses to some spawning and rearing habitat. Road-related sediment delivery, coupled with recent increases from wildfires, has increased fine sediment levels in fish streams across the project area, adding another stressor to fish habitat viability. Cattle grazing is an ongoing activity that increases fine sediment levels in the Twisp River, Newby Creek, and Poorman Creek. Poorman Creek within NFS lands is used by resident rainbow trout for rearing and possibly spawning. Existing low wood loading due to past riparian harvest and further sedimentation from streamside road construction are additive adverse habitat effects. As a result of these deficiencies, overall fish habitat viability in the project area is considered functioning at risk, with fish abundance and production reduced compared to historical levels (USDA 1995).

The 2018 Crescent Mountain Fire contributed some wood to the upper Twisp River and tributaries that will naturally increase habitat complexity and improve floodplain connectivity. Spawning and rearing habitat quality will improve within the fire perimeter, leading to minor increases in fish habitat viability. Roads along both sides of the river limit tributary wood recruitment and sources of future woody debris is lacking in several areas along the river due to past riparian harvest that removed trees adjacent to streams. To a lesser degree, the portion of the 2021 Cedar Creek fire will result in some headwater stream wood recruitment, but small stream sizes and existing roads will limit any beneficial effects of the fire.

Visitor use at Road's End Campground, located at the upper end of the most important fluvial bull trout spawning area in the Methow basin, poses a threat to the population of fish there. Redds are commonly found adjacent to the campground and the fish are highly visible, with documented poaching, harassment, and inadvertent trampling and disturbance. Hazard tree removal and firewood gathering associated with campground use cause a small loss of recruitment of LWD. Campsites on the riverbank cause about 50' of partially exposed bank and some sediment delivery. This site warrants greater protection because of the importance of the Twisp River local bull trout population to the remaining Methow River sub-basin.

This alternative would result in a long-term, minor adverse effect on fish habitat viability in the project area because the current "functioning at risk" fish habitat viability indicator would not change. Without proposed treatments, there would be no short-term, adverse impacts to water quality, channel conditions, and fish migration. However, aquatic stressors like the extensive road network in Poorman Creek would continue to contribute excessive fine sediment levels to resident spawning habitat and sensitive fish habitat in the Twisp River. Recreational use at the Roads End Campground would continue to disturb or possibly kill adult bull trout. Aquatic and watershed restoration treatments that address these habitat threats and others would not occur and the current fish habitat quality and viability condition would remain. While natural recruitment of trees would continue along project area streams, most riparian forests would not be mature enough to provide adequate instream wood for several decades. Artificial barriers that block fish passage to 5.1 miles of spawning and rearing habitat would remain, limiting carrying capacity for at-risk fish species.

## Alternative 2: Direct, Indirect, and Cumulative Effects

### Resource Indicator: Fish Distribution

Installing AOPS at 4 sites would have a direct, beneficial, minor, long-term effect on fish distribution by restoring fish access to 5.1 miles of spawning and rearing habitat, increasing overall fish habitat in the project area by 6%. This action would help achieve optimal spawning and rearing habitat capacity and would be a cost-effective way to boost fish production in the project area, which would likely increase

overall fish production at the sub-watershed scale. Restoring access at these sites would provide full fish access that is important for fish survival and production.

## Resource Indicator: Fish Habitat Viability

Several of the proposed actions would cause direct and indirect effects to fish habitat viability with some short-term adverse and long-term beneficial effects. Short-term, adverse, minor effects such as increased stream sedimentation and temperatures, reduced organic inputs, reduced streambank and channel stability, altered hydrology, and reduced recruitment of instream wood (Everest & Reeves 2007; Dwire et al. 2016) could occur during treatments directly within or above fish habitat (e.g., at road crossings), including AOP construction; road maintenance, log hauling, and road decommissioning; hazard tree felling; and decommissioning of Roads End Campground and the riverside campsite at Poplar Flats Campground. Indirect effects from treatments in the uplands, or headwater streams above the end of fish use are likely to occur from headwater stream culvert upgrades, road work (maintenance, log hauling, decommissioning, closure, and road reconstruction), prescribed burning, commercial harvest and log skidding and non-commercial thinning in Riparian Reserves, and hazard tree felling that occur along or near streams upstream of fish habitat. Tree planting would have no effect to streams or fish habitat because its proposed outside of any Riparian Reserve and well away from any streams.

AOP construction may also cause physical harm, acute mortality, or behavioral changes to individual fish. Juveniles are the mostly likely life stage to be impacted because they are more abundant. Adult fish are few and would likely move out of the area and be unharmed during treatments. To minimize adverse effects, instream-work would occur during the designated instream work window when fish spawning and redd stages are not present. Additionally, the AOP construction sites would be de-fished and isolated from flows. Juvenile fish could still be physically harmed or crushed during worksite isolation or fish removal by electric current, or they would be displaced to areas where they are vulnerable to predators. AOP construction, underburning up to streams, and road maintenance and log hauling over fish streams (Poorman Creek) would occur in proximity and timing and may result in direct effects to resident fish habitat, including increased sediment, streambank erosion, loss of streambank vegetation, and minor reductions in stream shade. These impacts are not expected to last more than a few months but could occur every year in different portions of the project during implementation. Following appropriate BMPs and design criteria, direct effects to fish and their habitat would be reduced.

In contrast to these adverse effects, this alternative would have a beneficial, long-term, minor effect on fish habitat viability by restoring access to 5.1 miles of suitable fish habitat would directly improve habitat function as described above. Thinning and prescribed fire treatments in RRs would directly help restore riparian and aquatic function by promoting the development and maintenance of large tree structure that provides shade and wood recruitment for streams and promotes complex riparian forest structure that is preferred by riparian dependent species. Additionally, thinning and prescribed fire treatments in and adjacent to RRs would reduce the risk of a stand-replacing wildfire within the RRs and across the landscape by reducing stand density and fuel loading to promote more characteristic low-severity fire behavior as described in the Fuels report. Restorative road treatments like upsizing stream culverts, road maintenance, and closing and decommissioning roads would reduce chronic sediment delivery, reduce the road drainage network, reduce the likelihood of culvert failures during storms, and increase functioning riparian habitat. Removing Roads End Campground and relocating campsites would eliminate the potential for bull trout disturbance that has resulted in adult mortality. Collectively, these restorative treatments would improve some habitat elements and move the habitat viability in key streams towards properly functioning condition.

AR 12649

Cumulative Effects

*Resource Indicator: Fish Distribution*

Four barrier culverts in the Buttermilk Creek drainage will be replaced with AOPs as authorized by the Mission Restoration Project Decision Notice. This will improve increase fish distribution within the Twisp River watershed by an additional 2 miles. Additionally, the Twisp Aquatic Restoration Project proposes to restore passage at five barrier culverts. These actions would restore fish passage to 8.4 miles of spawning and rearing habitat. The treatments proposed under TRP, coupled with the Mission Project and Twisp Aquatic Restoration Project treatments, would have a long-term, minor beneficial effect to fish distribution in the project area.

*Resource Indicator: Fish Habitat Viability*

Present and reasonably foreseeable future actions that could negatively affect fish viability include cattle grazing, recreation, road maintenance, some Mission Restoration Project actions, and irrigation withdrawals. These actions could adversely affect fish habitat viability by adding fine sediment to the stream network, thereby reducing spawning and rearing habitat quality. When combining the adverse effects of the proposed actions with those of the present and reasonably foreseeable future actions in the project area, the cumulative effects would be short-lived (days to months) and minor intensity to fish habitat viability and would not reduce it in the long-term.

In the long-term, proposed actions in this project in combination with AOP replacement in the Buttermilk watershed and additional wood placement near Scaffoldcamp Creek would increase fish habitat complexity and quality and would improve fish habitat viability.

## Summary

Alternative 1 would not remove barriers to over 5 miles of suitable fish habitat, resulting in continued fragmented habitat that is unusable for spawning and rearing fish. Existing shortages of refugia and feeding/spawning areas would remain, limiting localized fish production and hindering recovery efforts for at-risk fish species. No AOP-related fish mortality or sediment production would occur. The road network would continue to contribute sediment. Recreational use at Roads End Campground would continue to negatively impact bull trout populations. The project area would maintain "functioning at risk". For these reasons, this alternative would not meet Need #1.

In contrast, Alternative 2 would replace four barrier culverts with AOPs, resulting in long-term access to 5.1 miles of suitable fish habitat with additional spawning/rearing habitat and refugia that would benefit the recovery of at-risk fish species. AOP installation would cause short-term adverse sediment production and some fish mortality. Some thinning and prescribed fire and road treatments would cause short-term, minor adverse impacts to fish habitat viability from increased sediment delivery. In the long-term, treatments would reduce habitat stressors like high aquatic risk roads. In all, these actions would have an overall net positive effect on fish habitat access and habitat for ESA/Sensitive/MIS fish species when compared to Alternative 1.

The issues raised during public comment periods would be addressed by each alternative as shown in Table 12. Neither alternative provides for firewood collection in Riparian Reserves.

AR 12650

**Table 14. Comparison of how alternatives address key issues related to aquatics**

| Issue/Concern | Alt 1 | Alt 2 |
|---|---|---|
| **Issue #1:** Closing Roads End Campground will restrict recreation opportunities. | No campground removal occurs; fish habitat viability maintained in its current state with adverse impacts to bull trout. | Campground removed with long-term, minor beneficial effects to Bull Trout due to the removal of a stressor and improved habitat quality. |
| **Issue #5:** Thinning and firewood collection in Riparian Reserves will adversely affect aquatic habitat and species | No thinning or prescribed fire treatments in RRs. Fish habitat viability maintained in current state. | Mixed effect on fish habitat viability through 72 acres of commercial overstory thinning and 460 acres of non-commercial thinning in RRs that would cause negligible short-term, adverse effects from treatments due to riparian vegetation disturbances with negligible, long-term beneficial effects from improved RR stand conditions. |

Table 13 summarizes the effects of each alternative on aquatic resources.

**Table 15. Summary of effects of Alternatives 1 and 2 on aquatic resources.**

| Resource Element | Resource Indicator | Measure | Alternative 1 Direct/Indirect Effects | Alternative 2 | | |
|---|---|---|---|---|---|---|
| | | | | Direct/Indirect Effects | Cumulative Effects | Total |
| Fish Habitat Access | Fish Distribution | Miles of stream accessible to fish | 0 miles | 5.1 miles | 2 miles | 7.1 miles |
| Habitat for ESA, R6 Sensitive, MIS fish species | Fish Habitat Viability | Degrade, maintain, or improve | Maintain as "Functioning at risk" | Improve towards "Properly Functioning" | | |

## Effects to ESA Fish Species

The proposed removal of Roads End Campground and campsite relocation has an ESA determination of Likely to Adversely Affect for a short term for upper Columbia River spring chinook, Columbia River bull trout, and upper Columbia River steelhead species and their designated critical habitat. All other activities proposed in Alternative 2 have an ESA determination of May Affect, Not Likely to Adversely Affect for these species and their designated habitat.

AR 12651

Decommissioning Roads End Campground and one riverside campsite at Poplar Flats Campground has the potential for short-term, direct and indirect adverse effects to ESA-listed fish species that could result in "Take". Associated activities include ground disturbing work on the banks of the Twisp River that may deliver sediment to the river when steelhead, chinook, or bull trout are present during site removal. Although unlikely, the bucket from an excavator could enter the river channel during the campsite deconstruction work and may crush or harass an individual fish. The most likely scenario would involve some sediment entering the river, temporarily increasing turbidity; or noise from the equipment alters normal feeding, sheltering, and predator avoidance behaviors and could displace fish to areas less suitable or where they are more vulnerable to predators. Life stages potentially affected include juveniles, sub-adult, and adult trout and salmon. Adult fish are few and they would likely move out of the area and be unharmed. Of all the life stages at risk, juveniles are the mostly likely stage to be impacted because they are more abundant and do not swim as fast. No other direct effects to ESA-listed fish would occur. Indirect effects would occur from other project actions, but they would be insignificant.

The remaining proposed actions collectively would result in a few small, inconsequential negative effects to ESA-listed fish and some long-term, insignificant beneficial effects. The project includes some road related activities, like road maintenance, reconstruction, opening closed roads, and log hauling that are expected to cause localized short-term increases in turbidity and substrate embeddedness in tributary streams to the Twisp River and lower Poorman Creek. The closest point road maintenance would occur to any critical habitat would be one crossing that is 1/3 of a mile upstream. Sediment generated at this location would be minor and immeasurable compared to background levels in critical habitat downstream. The closest road culvert constructed for log hauling would occur at least ½ mile upstream from any critical habitat. Foltz et al. (2008) found that replacing culverts, when using BMPs, resulted in no measurable increase in fine sediment levels at ½ mile downstream. Therefore, these areas would be well upstream from critical fish habitat and these distances, coupled with the project design features, would reduce the fine sediment effects to critical habitat to inconsequential levels. In the long-term, the proposed road decommissioning and closure would reduce the number of chronic sediment sources and that will improve the baseline. All other would have little to no effects to fish critical fish habitat downstream. Therefore, the project would cause inconsequential negative or neutral effects to ESA listed fish or their critical habitat.

## Effects to Region 6 Sensitive Species and Management Indicator Species

Similar to the ESA fish species, direct impacts to individual fish and small-scale, localized habitat impacts could result in some harm to individual trout and their habitat with the Roads End Campground removal and campsite relocation actions, AOP installations, and some road maintenance. Long-term habitat improvement would follow treatments. Following design criteria and BMPs, the habitat effects would not be substantial nor long-term. Alternative 2 may impact individuals or habitat but will not likely contribute to a trend towards federal listing or cause a loss of viability to the population or species of Interior Redband Rainbow Trout, Westslope Cutthroat Trout, or Eastern Brook Trout.

## Effects to Essential Fish Habitat (EFH)

Impacts to combined steelhead and spring Chinook critical habitat, as a rough coho surrogate, are considered short-term and not substantial, based on the Biological Assessment. Some negative impacts to EFH are expected, but they would be insignificant and well below adverse modification.

AR 12652

# Vegetation

This section is summarized from the Twisp Restoration Project Final Vegetation-Silviculture Report (Pederson and Camenson, 2022). The issues raised during public comment periods that are related to vegetation resources would be addressed by each alternative as described in Table 15. Direct, indirect, and any cumulative effects of each alternative on vegetation resource indicators are shown in Table 16.

## Alternative 1: Direct and Indirect Effects

Stands across the project area are starting to degrade due to the lack of growing space and effects from insect and disease outbreaks.

### Resource Indicator: Overstocked Young Forest Stands

Young multistory stands are present across approximately 23,167 acres (96% of the project area), consisting of small patches broken in a fragmented pattern (Landscape Evaluation 2018) caused by fire suppression and previous timber harvest practices. These small broken patches are similar enough in their character that they create an almost uniformly high-risk landscape with respect to fire and insect and disease (Downing 2018).

Under this alternative, as individual trees occupy more growing space, the trees per acre and stand density of conifers would continue to increase, leading to a long term, moderate, adverse impact. Dense stocking levels would lead to increased competition for resources (water, light, nutrients) and susceptibility to insects and disease and reduce resiliency to disturbances (Hanley and Baumgartner 2002). The continued trajectory of overstocked stands that would result with this alternative would contribute to elevated hazards of crown fire risk and large-scale stand-replacing wildfires. The development of high-density stands shifts in species composition, and the passage of time would combine to increase total available fuels and would continue to make these forest more susceptible to large, severe fires (Tappeiner et al. 2015).

### Resource Indicator: Presence of Large to Medium Trees

Fire exclusion and cutting of large pine and Douglas-fir trees have impacted the diversity of old growth characteristics across the landscape. The decline in old forest has been overcome by young forest with dense understories that have developed from these conditions (USDA 2012). The landscape evaluation identifies that the Lower Twisp watershed is expected to have higher levels of old forest (up to 12% and 29% for Single-story and Multi-story, respectively (Downing, 2018)). The other watersheds analyzed under the landscape evaluation also show reduced levels of old forest and remnant large trees ranging from 1% to less than 11%.

This alternative would result in a moderate, adverse, long-term effect on the presence of large to medium trees, with the dominant trend of a continued decrease in medium (16-25" dbh) to large (> 25" dbh) trees across the project area and resulting loss of late and old forest structure. These tree size classes would continue to be impacted by density-caused mortality, insect and disease outbreaks, and the increased risk of large-scale stand-replacing wildfire events. Declines in trees of these size classes would lead to losses of stands characterized as "Forest Plan Old Growth" (FPOG). The loss of late and old forest structure would alter habitats for species that are dependent upon these habitats and take several years to return to the landscape.

AR 12653

## Alternative 2: Direct, Indirect, and Cumulative Effects

Alternative 2 includes proposed overstory and understory vegetation treatments (thinning and prescribed fire) across a maximum of 23,167 acres. Direct effects also include the actions associated with road decommissioning on approximately 10.9 miles of road, which would result in losing access for future vegetation treatments on approximately ~1500 acres accessed by these roads.

### Resource Indicator and Measure: Overstocked young forest stands

Thinning and prescribed fire treatments in overstocked young forest stands would have a beneficial, long-term, major effect on this resource indicator because these treatments would substantially shift these stand structures from a homogenous feature to a diversified structure pattern across the landscape (Table 14). Treatments would reduce stocking and improve tree vigor by increasing the growing space for the residual stand, therefore improving the overall health of the stand. Prescribed fire would reduce fuel loadings and treat areas with a non-mechanized approach, targeting the removal of small-diameter ladder fuels to reduce stand densities and improve growing space. Maintenance burning approximately 15-20 years after the initial underburn treatment would help maintain the reduced stand densities through time.

**Table 16. Predicted structure classes 40 years post implementation compared to current conditions.**

| Structure Class* | Current Acres | Predicted Acres in 40 years | Current % of Project Area | Predicted % of Project Area in 40 years |
|---|---|---|---|---|
| Stand Initiation (SI) | 570 | 80 | 2% | <1% |
| Young Forest Multi Story (YFMS) | 10,525 | 316 | 45% | 1% |
| Stem Exclusion Closed Canopy (SECC) | 1241 | 380 | 5% | 2% |
| Stem Exclusion Open Canopy (SEOC) | 2924 | 1317* | 13% | 6%* |
| Understory Re-initiation (UR) | 1730 | * | 7% | * |
| Old Forest Multi Story (OFMS) | 240 | 14,730* | 1% | 64* |
| Old Forest Single Story (OFSS) | 1 | 1682 | <1% | 7 |

*Predicted structure classes can move between the designated structures depending on forest type and silvicultural prescription criteria.

Treatments in this alternative would also shift species composition in areas dominated by Douglas-fir to the more drought-tolerant ponderosa pine species. As shown in Appendix F of the Twisp Landscape Evaluation (Downing 2016; available on project website), Douglas-fir, subalpine fir, and ponderosa pine currently make up the dominant species within the watersheds included in the landscape evaluation. In dry forest types such as those within the project area, ponderosa pine would be targeted as the preferred dominant species over Douglas-fir and subalpine fir because it is considered more fire and drought tolerant in comparison to other species due to its fire-resistant bark, deep root system and reduced branch retention in the lower bole (O'Hara 2014).

### Resource Indicator and Measure: Presence of medium and large trees

Thinning and prescribed fire treatments in this alternative would have a beneficial, long term, moderate effect on promoting, maintaining, and protecting medium to large trees because these treatments would retain the healthiest trees and allow the residual stand to occupy more growing space, improving residual tree vigor, reducing competition-based mortality and the hazards of insect and disease outbreaks, and helping to minimize losses to stand-replacing wildfire events (O'Hara 2014, Tappeiner et al. 2015) and

AR 12654

8-ER-1580

climate change (Zhang et al. 2019). In Matrix lands within the project area, these treatments also indirectly help provide a sustainable timber supply by promoting the health and resilience of trees.

Decommissioning 10.9 miles of NFS roads as proposed directly affects both resource indicators above by removing road access to approximately 1500 acres, limiting or eliminating future vegetation and prescribed fire treatments that would maintain desired stand densities and continue to promote the development of medium to large trees. These areas may have a prescribed burn under the maintenance treatment to help maintain low levels of stocking and reduce the impacts from losing road access to treat these areas with mechanized equipment.

## Cumulative Effects

Ongoing or reasonably foreseeable future actions considered as cumulative effects to the resource indicators in this analysis include thinning and/or burning on up to 432 acres of WA DNR lands, routine road maintenance on FS roads (blading & brushing), and thinning and prescribed fire treatments on 3,824 acres in the Buttermilk Creek portion of the Mission Restoration Project.

### Resource Indicator: Overstocked Young Forest Stands

These actions, along with those proposed by this project, would have a cumulative, long term, moderate, beneficial impact on overstocked young forest stands because they would reduce stocking in other areas of young forest stands adjacent to the project area within the Twisp River watershed. Reducing stand densities and reducing fuel loading in these areas would contribute to stand health and help increase resilience to insect and disease outbreaks and wildfire in the Twisp River watershed. Road maintenance would not have a measurable effect on overstocked young forest stands because this action focuses on vegetation brushing and pruning within approximately 5-10 feet from the roadway and would cause little overall change in stand structure, with immeasurable impacts on forest structure and composition.

### Resource Indicator: Presence of Large to Medium trees

These actions, along with those proposed by this project, would have a cumulative, long term, moderate, beneficial impact on promoting large to medium trees because these treatments would retain the healthiest trees and reduce stand density, with effects like those described above that promote the growth of large trees across the landscape. Doing so would help increase areas within the Twisp River watershed where these features are maintained for wildlife habitat and have increased resiliency to disturbances. Road maintenance would not have a measurable effect on the presence of medium to large trees because this action focuses on vegetation brushing and pruning within approximately 5-10 feet from the roadway, and no medium to large trees would be removed unless they are considered a danger tree.

## Effects of Forest Plan Amendments on 2012 Planning Rule Substantive Requirements

Amending Forest Plan S&G 5-1 would allow for natural fuels treatments on 65 acres of the only stand of FPOG in the project area. This amendment would likely have a long term, moderate, beneficial effect on the ability of terrestrial ecosystems in the planning area to adapt to change (36 CFR 219.8(a)(1)(iv)) and on opportunities for landscape scale restoration (36 CFR 219.8(a)(1)(vi)). Currently, the inability of these ecosystems to adapt to disturbance regimes and stressors, such as overstocking, insect and disease, and climate change, are degrading current FPOG because these areas have not been managed and the rate and intensity of disturbances and stressors have increased. Thinning treatments allowed by this amendment would improve the ability of this FPOG stand to adapt to change because they would improve tree vigor, promote diameter growth, and reduce stocking, increasing resilience to disturbance and resulting in stands that would be more likely to maintain old growth characteristics longer into the future (Latham 2002,

AR 12655

Kolb 2007, USDA 2012). In doing so, the treatments allowed by this amendment would contribute to landscape-scale restoration because they would maintain and protect FPOG. Without this amendment, this FPOG stand would continue to see density-caused mortality in the larger trees, insects and disease outbreaks would expand, and resiliency to other disturbances, such as wildfire, could result in losses of existing FPOG.

## Summary

In Alternative 1, no mechanical or prescribed fire treatments would be implemented and stand densities would continue to increase, creating unhealthy stand conditions that would be increasingly susceptible to insect and disease outbreaks and stand-replacing wildfire events. The presence of medium and large trees would likely decline where they exist in 63% of the project area due to stressors such as density mortality, insect and disease, and possible losses to stand-replacing wildfire. For these reasons, this alternative would not meet Needs #2, 3, or 4. In contrast, Alternative 2 would implement mechanical and prescribed fire treatments on up to 59,285 acres (77% of the project area) with a pronounced positive effect on forest health, structure, vigor, and species composition (USDA 2012, Schwilk et. al, 2009). These treatments would address Needs #2, 3, and 4 by improving overall stand health and vigor through reducing conifer densities among young forest stands; modifying structure and composition in the project area, including areas within WUI, to increase resilience to disturbances, such as wildfire, insects, disease, and drought (Nyland 2002). Treatments under Alternative 2 would be designed to meet Need #3 by protecting the existing large trees and accelerating growth of medium trees to move them into the large tree category to promote and increase late and old forest structure throughout the project area.

The issues raised during public scoping ties to vegetation resources would be addressed by each alternative as shown in Table 15.

**Table 17. Comparison of how the alternatives address the key issues related to vegetation.**

| Issue | Alt 1 | Alt 2 (acres) |
|---|---|---|
| **Issue #7:** Treatments on recently burned areas […] are not needed for fuels reduction. Treatments in burned areas are necessary to promote recovery and restoration. | No treatments are implemented on 100 acres within the project area that burned in the 2021 Cedar Creek Fire. Growth of regeneration likely inhibited where excessive fuel loadings are predicted and by promoting less desirable shade tolerant species in the new understory. | The need for treatments to reduce natural regeneration stocking in burned areas would be assessed after the fire area has begun to recover. Up to 100 acres of stand improvement thinning and prescribed fire treatments would help the development of these stands by reducing fuel loadings and by reducing the understory stocking to an average of 50 TPA to allow for resources such as water and sunlight to reach the forest floor to accelerate the growth of the younger trees which aids in the development of large to medium size trees. Treatments would protect the existing large trees and promote a healthy resilient understory while minimizing impacts to wildlife habitat, sediment delivery, and soil compaction and displacement. |

AR 12656

| Issue | Alt 1 | Alt 2 (acres) |
|---|---|---|
| **Issue #8:** Project "needs" should include enhancement and sustainment of economic and sociological benefits to show that restoration treatments benefit local economy and socio-ecological values (jobs, wood products, resilient landscapes). | No thinning or prescribed fire treatments occur across 23,697 acres in the project area. Lack of treatments would promote undesired homogenous forest structures across the project area, encouraging density mortality, increased insect and disease outbreaks and large tree die off, followed by increased risks of uncharacteristic wildfire events. | 23,167 acres treated with thinning and prescribed fire to promoting a healthy, resilient, and sustainable forest which enhances and sustains sociological values (jobs and wood products) that depend on landscapes that are resilient to insects and disease, wildfire, and projected effects of climate change. |
| **Issue #10:** Thinning and fuels treatments in Riparian Reserves are not consistent with the Aquatic Conservation Strategy and are not supported by site-specific rationale and analysis. Removing stream-side trees will impact future wood recruitment. | No thinning and prescribed fire treatments occur in Riparian Reserves, resulting in an increase of undesirable species composition and structural diversity and increased risks to Riparian Reserves and desired habitat conditions. | 72 acres of RR treated to meet ACS objective #8, promoting desired species composition and forest structural diversity by encouraging the growth of large, healthy trees that would contribute to riparian coarse wood recruitment in the future. |
| **Issue #11:** Shaded fuel breaks outside of WUI are ineffective, do not address landscape departures. | No shaded fuel break treatments would occur, impacting landscape-level treatments by isolating portions of the project area that would not receive treatment. Forest conditions in these areas would remain in a departed condition with increased risks of high-severity wildfire effects and insect and disease outbreaks. | 759 acres treated to address landscape departures. Treatments within shaded fuel breaks would use a similar silvicultural prescription to Dry Forest Matrix Thin that would move departed conditions towards desired stand structures, and with time create the structure class old forest single story. |

Table 16 summarizes the impacts of each alternative on the resource indicators analyzed for vegetation.

**Table 18. Summary of effects of Alternatives 1 and 2 on vegetation resources.**

| Resource Element | Resource Indicator | Measure | Alternative 1 | Alternative 2 | | |
|---|---|---|---|---|---|---|
| | | | | Direct/Indirect Effects | Present, and Future Actions | Cumulative Effects |
| Forest Health-Structure and Composition | Overstocked young forest stands. | Acres of young forest stands treated | 0 acres | 23,167 acres | 4,221 acres | 26,991 acres |
| Promoting Late & Old Forest Structure | Presence of Medium & Large Trees | % land with medium to large trees | 51% total<br><br>43% Medium<br><br>8% Large | 61% total<br><br>22% Medium<br><br>39% Large | 6%<br><br>6% Medium | 67% total<br><br>28% Medium<br><br>39% Large |

AR 12657

8-ER-1583

# Wildlife

This section is summarized from the Twisp Restoration Project Final Wildlife Report (Rohrer and Nyland, 2022)**.** The issues raised during public comment periods that are related to wildlife resources would be addressed by each alternative as described in Table 18. Direct, indirect, and any cumulative effects of each alternative on wildlife resource indicators are shown in Table 19.

## Alternative 1: Direct and Indirect Effects

### Resource Indicator: Suitable habitat for northern spotted owl.

Northern spotted owl surveys were first conducted in the Twisp River area in the late 1980s. Between 1986 and 1992 northern spotted owls were documented 9 times in the area along the Twisp River between South Creek campground and War Creek campground. Based on these documented sightings, 4 activity centers or "known owl sites" were established. One of these surveys in 1988 resulted in an active nest being discovered in the vicinity of the War Creek trailhead. This area was surveyed annually after that through 2001 but subsequent surveys did not ever find that nest site to have been active again, and no other nest sites or pairs of northern spotted owls have been documented in the Twisp River area. After 1992 there were no detections until a single owl was heard vocalizing at the Eagle Creek trailhead in October 2010. The most recent surveys of the project area were conducted in 2019 and 2020 according to current protocol (USFWS 2012) and was supplemented with an experimental survey using automated recording units. No northern spotted owls were detected during these surveys. The current proposed Twisp Restoration project area is a subset of a larger area that was surveyed. Areas adjacent to the north and west of the current project area were surveyed. No northern spotted owls were detected during any surveys in the project area. Barred owls and great horned owls were detected in numerous locations throughout the project area. "Spot check" surveys were completed in 2021 with no detection and will continue in the project area at all stations where barred owls were detected until implementation.

The current Twisp Restoration project area is a subset of a larger area where habitat was modelled and mapped. Areas adjacent to the north and west of the current project area were also analyzed. Field reviews and stand exam information were used to confirm this owl habitat layer, resulting in a few minor changes to the stands initially identified as highest quality nesting (RA32) habitat. Stands in this category are a subset of nesting/roosting/foraging habitat as described in Recovery Action 32 of the Revised Recovery Plan as high-quality habitat (USFWS 2011). Within the 24,140-acre Twisp project area, LiDar modeling identified 1203 acres (5% of project area) of suitable nesting/roosting/foraging (NRF) habitat and 8437 acres (35% of project area) of dispersal habitat. The only highest quality nesting habitat stands were outside and west of the current project area boundary. These 44 acres of RA32 habitat were spread out in 24 stands, the largest of which was 9.5 acres. Field review of many of the larger of these stands confirmed that they all lack one or more of the key characteristics necessary to be RA32. Many had been subject to timber harvest in the past as evidenced by old stumps, a lack of large snags, large, downed logs, and other decadence components. The acres mapped as NRF did not have the nesting or roosting components of NRF habitat and were, at best, foraging habitat. Large diameter trees were present only as scattered individuals or clumps within a stand dominated by smaller diameter trees. Thus, the vegetation mapped as NRF habitat has low suitability to the point that nesting is unlikely due to the absence of the combination of primary constituent elements for spotted owl nesting and roosting habitat.

The current stand structure of the existing nesting/roosting/foraging habitat is susceptible to stand-replacing wildfire because its condition is departed from its historical range. Decades of fire suppression have resulted in dense understories of small to medium sized Douglas-fir and higher fuel loadings as described in the Vegetation and Fuels portions of Chapter 3).

AR 12658

Alternative 1 would have a negative, long-term moderate effect on northern spotted owl habitat because without proposed thinning and prescribed fire treatments, the project area and its northern spotted owl habitat stands would remain in their current condition and remain highly susceptible to stand-replacing wildfire. The likelihood of further habitat loss, coupled with the amount of time it would take to replace suitable habitat, would make it harder for northern spotted owls to survive in the project area.

## Resource Indicator: Suitable habitat for lynx

Lynx have not been documented within the boundaries of the Twisp Restoration project area. The Twisp project area falls within parts of 5 lynx analysis units (LAUs): Crescent Mountain, Milton Mountain, Snowshoe Ridge, Spirit Mountain, and Twisp with 11,450 acres of lynx habitat (subalpine forest stands (subalpine fir, Engleman spruce, lodgepole pine) spread across the 5 LAUs. The largest area of lynx habitat within the Twisp project area is in the Milton Mountain LAU in the headwaters of Little Bridge Creek and Canyon Creek. Each of the LAUs, except for Milton Mountain, were heavily impacted by the 2018 Crescent Mountain wildfire. The Milton Mountain LAU was impacted to a lesser extent by the 2014 Little Bridge fire. Models used to indicate possible lynx habitat did not indicate that any was present in the project area, which was later confirmed by field verification the confirmed that the Twisp Restoration project area does not contain any suitable lynx habitat.

Designated critical habitat for lynx was mapped by the USFWS in 2014 (USFWS 2014). The Twisp Restoration project area contains 2358 acres of designated critical habitat for lynx, however it is all outside of LAUs. None of the areas of designated critical habitat that are outside of LAUs are suitable habitat for lynx because the combination of physical and biological features identified for critical habitat are absent. Areas designated as critical habitat lie on south facing slopes of shrubland and grassland or stands of dry forest types along Lookout Ridge and Newby Ridge that lack prolonged persistent deep winter snow. The forested stands within these areas are Ponderosa pine and Douglas-fir not comprised of complex multistoried forest stands; they are not suitable habitat for lynx or snowshoe hare. Some of the forested stands may meet the definition of secondary vegetation (Canada Lynx Conservation Assessment and Strategy 2013) except that they are not interspersed with or adjacent to the primary lynx vegetation types of subalpine forest. As a result, the combination of essential physical or biological features for lynx habitat are absent or missing required features in combination to be suitable for snowshoe hare and lynx.

Alternative 1 would have a neutral, long-term, minor effect on lynx habitat because taking no action would result in a higher probability of stand-replacing fire moving from lower elevations in the project area into lynx habitat in the future, which would result in a temporary loss of lynx habitat.

## Resource Indicator: Undisturbed habitat for grizzly bears

The project area is within the North Cascades Grizzly Bear Recovery Zone and falls within the Libby Creek and Upper Twisp River BMUs. The project area does not fall within the Upper Methow BMU, however a road at the northern boundary of the project area that is proposed to be decommissioned would result in an increase in core area in the Upper Methow BMU, so that BMU is included in this analysis. Most of the project area (77%) is within the Upper Twisp River BMU. The project area ranges from approximately 2200-5700 ft in elevation and contains most of the vegetation types typical of the eastern Cascade Range with mostly low to mid-elevation forest types of Ponderosa pine and Douglas-fir, along with areas of sage-steppe, riparian, and aspen habitats. The preferred grizzly bear habitats on the east portion of the North Cascades are montane meadow, shrubfield, deciduous forest and riparian forest in the early season and alpine/subalpine meadow, shrubfield, wet open forest and montane meadow in the late season (North Cascades Grizzly Bear Management Subcommittee Technical Team, 2002). Other than riparian forest, there are no substantially large areas of any of these cover types within the project area, though they do occur in adjacent areas at higher elevations and within the same BMUs. Approximately

AR 12659

125,000 acres of recently burned habitat from fires between 2014-2021 lies adjacent to and within the project area. Burning mesic montane sites, aspen stands and many forest types improves habitat for bears by stimulating shrub and forb growth (IGBC 1987). There are 1,403 acres of Riparian Reserve within the project area, although many of these acres are upland forest types rather than riparian forest types.

Current percent core area by BMU and open road and total road densities for the project area are shown in Table 17. For this analysis, open roads consist of open roads (ML 2, ML 3, ML 4) and unauthorized roads, and total roads consist of open roads plus closed (ML 1) roads. Road densities by discrete MA units in Table 17 are shown for the entire MA units which may exceed the project area. The Forest Plan standard for MA 5 is 3 mi./sq.mi.; one of the 3 discrete MA5 units currently exceeds this due to unauthorized roads within those units. The Forest Plan standard for MA 14 is 2 mi./sq.mi.; none of the 2 discrete MA14 units exceed that standard. The Forest Plan standard for MA 25 is 3 mi./sq.mi.; none of the 3 discrete MA25 units exceed that standard. The Forest Plan standard for MA 26 is 1 mi./sq.mi.; one of the 2 discrete MA26 units exceeds this due partly to unauthorized roads within that unit.

Alternative 1 would have a neutral, long-term, minor effect on grizzly bear habitat because if no action were taken, there would be no disturbance to grizzly bears during project implementation and there would be no opportunity to reduce road densities and increase core area percentages.

## Resource Indicator: Undisturbed habitat for gray wolf

The Twisp Restoration project area is in the northern portion of territory of the Lookout wolf pack, first documented in 2008 when they were discovered using a rendezvous site in Libby Creek, approximately 1 mile south of the project area. Radio telemetry on pack members showed that they denned and established rendezvous sites within the Twisp Restoration project area in 2015 and in 2020. Deer are found across the Twisp Restoration project area year-round and provide a reliable prey base for wolves. The lower elevations of the project area were mapped as mule deer winter range in the Okanogan NF LRMP (1989). During winter the Lookout Pack concentrated its movements on these winter ranges in the lower elevations of Little Bridge, Coal, and Myer Creeks north of the Twisp River and Newby, Poorman, and Alder Creeks south of the Twisp River. There is a substantial acreage of recently burned habitat within or adjacent to the project area which likely influences distribution of wolves and their prey from initial post-fire vegetation recovery to long-term regeneration.

Across the analysis area, gray wolves use a broad range of elevations and habitats. The vegetation types and riparian areas of the project area may offer some support to gray wolf, while other areas in the project vicinity are not typical vegetation or topography for wolves and may result in lower probability of future gray wolf occupancy. Habitat quality for gray wolves is based largely on availability of their preferred prey, ungulates. Deer and moose provide prey for gray wolves in the analysis area, which move across the landscape as herds of prey move. Road density and access by humans is directly related to habitat quality. Security habitat provides seclusion from human disturbance and persecution.

The analysis of core area under Alternative 1 for grizzly bears is pertinent to gray wolves. Alternative 1 would have a neutral, long-term, minor effect on grizzly bear habitat because if no action were taken, there would be no disturbance to grizzly bears during project implementation and there would be no opportunity to reduce road densities and increase core area percentages.

AR 12660

Resource Indicator: Suitable habitat for Regionally sensitive species.

### *Northern goshawk*

There is no known northern goshawk nest site within the project area. Northern goshawks use late/old structure forest, aspen stands, and large trees. The project area contains 885 acres of suitable habitat for northern goshawks, or 3.7% of the project area. Each of these stands were surveyed in June/July 2020 for goshawks by walking through and broadcasting taped goshawk calls at regular intervals (Woodbridge and Hargis 2006). No goshawks were detected.

Alternative 1 would have a neutral, long-term, moderate effect on goshawk habitat because taking no action would not alter current suitable nesting stands. However, none of the proposed project activities that would help reduce the high hazard of stand-replacing wildfire and promote stand health and survival of large trees would be implemented, leaving the project area and the few goshawk nesting stands in their current condition which is susceptible to stand-replacing wildfire.

### *White-headed woodpecker*

White-headed woodpeckers are a focal species for dry forest management. They use Ponderosa pine stands with large diameter trees and low to moderate canopy cover. The project area contains 1065 acres of suitable habitat for white-headed woodpeckers, 4.5% of the project area. Most of this habitat is within the Poorman Creek drainage. This species benefits from dry forest restoration activities (Gaines et. al. 2007, Mellen-McLean et. al. 2013). The project area contains many acres of Ponderosa pine cover type that could be improved for white-headed woodpecker by reducing the canopy cover while maintaining large diameter Ponderosa pine. White-headed woodpeckers prefer open stands with canopy closures of less than 40%.

Alternative 1 would have an adverse, long-term, moderate effect on white-headed woodpecker habitat because without implementing proposed treatments, stands would remain in their current condition and there would be no additions to suitable habitat via understory and canopy cover reduction to levels favored by white-headed woodpecker. None of the proposed project activities that are designed to reduce the high hazard of stand-replacing wildfire and to promote stand health and survival of large trees would be implemented, leaving the project area and the white-headed woodpecker habitat stands in their current condition which is susceptible to stand-replacing wildfire.

## Resource Indicator: Suitable marten habitat

Marten habitat is upper elevation, mesic conifer forest dominated by subalpine fir, Engelmann spruce, lodgepole pine, and Douglas fir (Buskirk and Ruggiero 1994, Thompson et. al. 2012). They associate closely with late successional stands and especially those with large amounts of woody debris and other structure near the ground (Buskirk and Ruggiero 1994). The project area contains 335 acres of potentially suitable habitat for marten, 1.4% of the project area. Marten habitat is currently limited within the project area with most of this habitat within the upper Poorman Creek area.

Alternative 1 would have a mixed, long-term, moderate effect on marten habitat, because no actions would occur that change current marten habitat stands. However, these stands would have none of the proposed project activities that are designed to reduce the high hazard of stand-replacing wildfire and to promote stand health and survival of large trees. This would leave the project area and the marten habitat stands in their current condition which is susceptible to stand-replacing wildfire.

AR 12661

## Resource Indicator: Mule deer winter range habitat

Mule deer winter range was identified during the Forest planning process and mapped as Management Areas 14, 26 and portions of MA5. The project area contains 3 discrete units of MA14, 2 units of MA26, and portions of 3 discrete units of MA5 in deer winter range that total 15,101 acres. The Forest Plan described winter cover as snow-intercept thermal cover and winter thermal cover with specific structural definitions (USDA 1989). The Forest Plan includes standards and guides to manage for snow-intercept thermal cover on 15% of the winter range and winter thermal cover on 25% of the winter range.

Mule deer winter range within the project area was impacted in 2015 by the Twisp River fire. Approximately 3280 acres of that fire burned forested cover and forage habitat on mule deer winter range in the project area. Outside the project area but within the Methow Valley, mule deer winter range was heavily impacted by the 2014 Carlton Complex fire and the 2015 Okanogan Complex fire. Currently, within the project area, most of the stands that meet the Forest Plan definition of winter thermal cover and snow-intercept thermal cover are too dense to be sustainable in the long-term due to their susceptibility to stand-replacing wildfire in a warming climate. Open road densities for the 8 discrete winter range management units are displayed in Table 17. The Forest Plan standard for MA 5 is 3 mi./sq.mi.; one of the 3 discrete MA5 units exceed that standard due to unauthorized roads within those units. The Forest Plan standard for MA 14 is 2 mi./sq.mi.; none of the 2 discrete MA14 units exceed that standard. The Forest Plan standard for MA 26 is 1 mi./sq.mi.; one of the 2 discrete MA26 units exceed that standard partially due to unauthorized roads within those units. In addition, several of the roads in deer winter range are seasonally closed to motorized use from October 1 to March 31, making the road density figures lower than shown in Table 17.

Alternative 1 would have a mixed, long-term, moderate effect on mule deer winter range habitat. With no action there is a higher probability that the cover provided by these stands would be lost to wildfire in the near future.

## Resource Indicator: Suitable habitat for cavity excavators

Primary cavity excavator habitat (dead and defective trees) exists throughout the forested stands of the project area. It is currently not limiting due to insect activity, root rot, competition between trees, and recent wildfires. Approximately 125,000 acres of recently burned habitat from fires between 2014-2021 lies adjacent to and within the project area. Of this amount, 4900 acres lie within the project area (20% of the area). Depending on intensity, fire can burn and consume older, soft snags but creates many new snags, usually resulting in many acres with very high densities of snags. The Okanogan-Wenatchee National Forest allows the public to harvest down or standing dead trees for fuelwood provided they obtain a permit and follow the fuelwood harvest regulations. These regulations include, among other things, that wood to be removed must be within 200 feet of an unblocked, signed NFS road, and must not be within late successional reserve (LSR), within 300 feet of fish-bearing streams, nor within 150 feet of other streams, ponds, lakes, and wetlands. Based on these regulations there are approximately 1744 acres (7.2% of project area) that are currently open to snag removal through fuelwood harvest.

Alternative 1 would have a mixed, long-term, minor effect on primary cavity excavator habitat because if no action is taken, the current dead and defective tree habitat would not be altered. However, if none of the proposed project activities that are designed to reduce the high hazard of stand-replacing wildfire and to promote stand health and survival of large trees are implemented, the currently unburned portion of project area would remain susceptible to stand-replacing wildfire. This would likely result in a future loss of older, soft snags, and a large increase in fire-killed snags.

AR 12662

## Alternative 2: Direct, Indirect, and Cumulative Effects

### Resource Indicator: Suitable habitat for northern spotted owls

The proposed actions in Alternative 2 would have mixed, long-term moderate effect on northern spotted owl habitat. Project activities would not disturb any known nesting pairs of northern spotted owls. Surveys conducted according to protocol (USFWS 2012) in 2019, 2020, and 2021 resulted in no detections of northern spotted owls in or near the project area, nor are there any known nesting pairs of northern spotted owls within or adjacent to the project area. Spot check surveys would continue near suitable nesting stands until project implementation is complete, though it is unlikely that there is currently enough nesting/roosting/foraging habitat in the project area to support a nesting pair of northern spotted owls. Project design criterion restricts activities that remove northern spotted owl nesting, roosting, or foraging habitat to outside the breeding season (March 1 to Jul 31), unless the area is surveyed to protocol and no spotted owl nests are located. If such surveys do not detect nesting spotted owls, activities can proceed until survey currency expires (generally until the next breeding season). If nesting spotted owls are detected, treatments would be modified to retain nesting, roosting, and foraging habitat above threshold levels.

In addition, a project design criterion restricts activities that create smoke or noise above ambient forest conditions to outside the early breeding season (March 1 to July 31) or beyond disturbance distance from nesting or roosting habitat, unless the area is surveyed, and no nesting spotted owls are detected. If surveys do not detect nesting spotted owls, activities can proceed until survey currency expires. If nesting spotted owls are detected, activities would be conducted outside the breeding season, or restricted to areas outside the 0.7-mile core-use area buffered by a distance associated noise levels from the activity. If a pair of spotted owls is detected (non-nesting), timing restrictions would be implemented during the early breeding season (March 1 to July 31) with the same distance restrictions.

Northern spotted owl habitat would be directly modified by actions proposed in Alternative 2 from the 5 proposed thinning treatments (acres are of owl nesting/roosting/foraging habitat within each prescription; refer to Appendix A for detailed descriptions of thinning prescriptions included in this project). Understory thinning, overstory thinning, other vegetation treatments, and transportation management results in a combination of mixed effects to habitat: temporary removal, downgrade, or degrade with no permanent loss of habitat. No high-quality nesting habitat (RA32) is present within the project area and the vegetation mapped as NRF habitat does not have the nesting or roosting components as defined for suitable habitat (USFWS 2011). Existing function of some habitat remains after project implementation and some habitat retains its function although in a degraded state. There are approximately 80 stands totaling 1203 acres of NRF habitat, primarily outside designated critical habitat. A total of 877 acres of low-quality NRF will be removed from the project area (4% in designated critical habitat), reducing the amount of NRF habitat to 326 acres. There are approximately 8437 acres of dispersal habitat in the project area. The project actions would remove 5141 acres, reducing the amount of dispersal habitat to 3302 acres.

The designated critical habitat area has potential dispersal habitat that provides poor structural primary constituent elements for spotted owl nesting and roosting habitat. The vegetation mapped as NRF habitat has low suitability to the point that nesting is unlikely due to the absence of the combination of primary constituent elements for spotted owls, except at a marginal level. This was ground verified by the district biologist familiar with the project area and the historical distribution of spotted owls on the district. There is a historical absence of spotted owls in the project area and known occurrences of competitor barred owls. In addition, the fragmentation of suitable habitat created by past and recent wildfires has isolated the vegetation in the project area from designated critical habitat to the west in the northern cascades. The

AR 12663

small amount of mapped NRF in the designated critical habitat area are distributed among four isolated stands. There is not enough habitat in amount or suitable condition to support a nesting pair and it is not providing connectivity to any other activity center or spotted owl habitat. With suitable northern spotted owl habitat reduced to 300 acres of nesting/roosting/foraging and 3040 acres of dispersal in a 24,140-acre area, it is even more unlikely that northern spotted owls would be able to successfully nest here.

The project area is on the east edge of the distribution of northern spotted owls in Washington. It is not located directly between any activity centers.  The project area is 38% dispersal habitat.  Only 1,102 acres of the 24,140-acre project area (5%) is designated as critical habitat for northern spotted owls and that is all in the northwest corner of the project area.  The proposed treatments in the project area would not break any important connectivity corridors for northern spotted owls.

The actions proposed in Alternative 2 that do not involve tree thinning would have minor or no effects to northern spotted owl habitat. Road decommissioning and tree planting would have beneficial, long-term minor effects.  Prescribed burning would have a mixed, medium-term, minor effect in that it would result in a loss of habitat for owl prey items immediately after the burn followed by an increase in habitat for owl prey items usually within 1-2 years.  New permanent road construction, temporary road construction, and hazard tree removal would result in an adverse, medium-term, minor effect because of the loss of snag habitat, an important component of owl habitat.  Dozer and hand line construction for prescribed fires and temporary road construction outside owl habitat would have minor to no effect due to condition of vegetation to provide suitable habitat for the species.

## Resource Indicator: Suitable habitat for lynx.

Alternative 2 proposes no activities within suitable lynx habitat nor within any LAU. There are treatments proposed within the USFWS designated critical habitat areas, but none are within forested stands that are suitable lynx habitat.  All these acres are dry forest types dominated by Ponderosa pine and Douglas-fir. In the final rule designating critical habitat for lynx, matrix habitat was defined as hardwood forest, dry forest, non-forest, or other habitat types that do not support snowshoe hares and that occur between patches of boreal forest in close juxtaposition (at the scale of a lynx home range) such that lynx are likely to travel through such habitat while accessing patches of boreal forest within a home range (USFWS, 2014).  The areas of designated critical habitat in the project area are questionable as matrix habitat because they are not between patches of boreal forest (Figure 27).  These 2358 acres of treatment are outside of any LAU.

Indirect effects of other thinning treatments in areas outside of suitable lynx habitat would include a lower probability of high-severity wildfires that start at lower elevations in the project area moving up to higher elevations and lynx habitat.  The proposed thinning and fuel reduction treatments on dry, non-lynx habitat forest stands would lower the probability of stand-replacing wildfires moving into lynx habitat.

The actions proposed in Alternative 2 that do not involve tree thinning would have minor or no effects to lynx habitat including road decommissioning, tree planting, prescribed burning, new road construction, hazard tree removal, and dozer and hand line construction for prescribed fires.

Lynx are capable of traveling large distances on a daily to weekly basis (Interagency Lynx Biology Team 2013) outside habitat used for foraging and denning. Equipment operations would result in noise above ambient conditions resulting in potential disturbance to lynx. Over the duration of implementation these activities have the potential for disturbance effects to lynx, but the Canada Lynx Conservation Strategy indicates those potential effects are unlikely to be noteworthy. Effects to the lynx are not expected to substantially disrupt normal behaviors (i.e., the ability to successfully feed, move, and/or shelter), and are

AR 12664

therefore considered insignificant. Project actions are not expected to impede lynx movement because they do not occur in a linkage area.

## Resource Indicator: Undisturbed habitat for grizzly bears

Alternative 2 would result in a beneficial, long-term moderate effect on grizzly bear habitat because it would directly modify undisturbed habitat for grizzly bear sort-term, primarily through road management actions that cause loss of undisturbed habitat during project implementation, followed by an increase in undisturbed habitat post-project. The proposed activities include permanent new road construction (2.8 miles), temporary road construction (4.8 miles), opening and use of currently restricted roads (28.3 miles), and, after implementation, decommissioning (31.4 miles) roads. Current total roads include unauthorized roads (31.6 miles).

The proposed action would result in an increase in human use of the project area and result in a negative, short-term, minor effect to grizzly bears. The % core area in Upper Twisp River BMU would decrease slightly during project implementation because project area road densities would increase during project implementation as ML1 and unauthorized roads were opened and new and temporary roads were built. In the first seven to nine years, open road density would increase as different sale activity occurs and ends. Closed NFS roads used for haul would be opened and necessary temporary haul roads would be constructed as sales and other vegetation treatments are scheduled, then these roads would be closed (if consistent with the proposed action) or decommissioned (any temporary road) once vegetation projects are completed. Since the commercial operator would have 18 months to close the NFS road, commercial timber sales ending at year 7 would extend into year 9 potentially before all road closures associated with the sale are completed. Although the core area in the Upper Twisp BMU would be decreased during implementation the core area in all 3 BMUs would increase after the project was completed and the project area road densities would decrease substantially.

The actions proposed in Alternative 2 that do not involve road management would have minor or no effects to grizzly bear habitat. Thinning treatments, tree planting, and prescribed burning would have a beneficial, long-term minor effect because they would result in an increase in quantity and quality of forage for bears and for deer, the primary prey item for wolves. Hazard tree removal, prescribed fire, and dozer and hand line construction for prescribed fires, would have no effects on bear habitat because these actions would not impact habitat that is currently undisturbed.

## Resource Indicator: Undisturbed habitat for gray wolf

There will be no long-term loss of security habitat for gray wolves associated with this project. Elevated levels of disturbance associated with temporary roads will persist for the duration of the vegetation management projects, dozer and hand line construction for prescribed fires, and prescribed fire operations after which all temporary and unauthorized roads would be decommissioned resulting in a reduced drivable road density per square mile. Meanwhile, vegetation and fuels treatments and use of temporary roads would likely result in brief and localized displacement of a small number of deer and elk, which may slightly reduce foraging opportunities for gray wolf below current incidental levels within the project area. The loss would be inconsequential to individuals. All other temporary roads that would be used are within vegetation treatment areas that are closer to high use roads, and campground modifications would occur at high-use activity centers; therefore, construction and temporary use of these temp roads and campground modifications would not pose substantial new disturbance to wildlife.

Forest thinning and prescribed fire proposals would decrease coniferous forest canopy cover resulting in an increase in abundance and quality of shrubs, forbs, and grasses. Thus, the proposed activities to

AR 12665

improve deer winter range, conduct prescribed fire, and vegetation treatments in the project would result in an increase in habitat quality for wolf prey species.

Resource Indicator: Suitable habitat for Regionally sensitive species.

### Northern goshawk

There are no known northern goshawk nesting sites in the project area. If one were discovered prior to implementation of the project, it would be protected by wildlife design features (Appendix B). All the stands identified as suitable nesting habitat for northern goshawks were surveyed in June/July 2020 for goshawks by walking through and broadcasting taped goshawk calls at regular intervals (Woodbridge and Hargis 2006). No nesting areas were identified.

The proposed actions in Alternative 2 would have mixed, long-term moderate effect on northern goshawk habitat. Some treatments "may impact individual goshawks but would not lead to a trend for Federal listing or to a loss in viability". Northern goshawk habitat would be directly modified primarily by 5 treatments as follows (acres are of goshawk habitat within each prescription): the understory Stand Improvement Thin (172 acres) would cause a minor reduction in habitat quality for these stands but they would still maintain their function as suitable nesting stands for goshawks. The Riparian Reserve Thin (8 acres) prescription would reduce the habitat quality and the function of these stands by thinning to reduce ladder fuel and competition around existing large trees. Canopy cover would be reduced to 40%, which is less than ideal for northern goshawk nesting, but these acres would still provide some nesting habitat. Goshawks choose the densest stands with highest canopy cover that is available for nesting, and thinning stands to 40% canopy cover would reduce their value as nesting habitat. The Matrix Harvest Thin (415 acres) and Matrix Shaded Fuelbreak Thin (42 acres) prescriptions would result in the loss of suitable goshawk nesting habitat on most of those acres because thinning that reduces ladder fuel and competition around existing large trees would reduce canopy cover to less than 40%, which would be too low to provide nesting habitat for northern goshawks. The direct effect of Alternative 2 to northern goshawk nesting habitat would be a reduction from 885 acres to 429 acres. Indirect effects to goshawk nesting habitat would be providing for stands with a large tree component with less competition for water, sunlight, and soil nutrients, and a higher chance to survive summer drought and wildfires. The large tree component would be able to continue to grow and have a higher probability of remaining alive and green into the future. After a 20-year study of goshawk nesting habitat, Reynolds et. al. (2017) concluded the best management objectives for maintaining goshawks on the landscape were to re-establish the historic range of variability, increase productivity and diversity of forests for prey species, and lower the risk of high-severity fire. The proposed activities in Alternative 2 are designed to achieve these goals (refer to Vegetation and Fuels reports for further details).

The actions proposed in Alternative 2 that do not involve tree harvest would have minor or no effects to northern goshawk habitat. Road decommissioning and tree planting would have beneficial, long-term minor effects. Prescribed burning would have a mixed, medium-term, minor effect in that it would result in a loss of habitat for goshawk prey items immediately after the burn followed by an increase in habitat for goshawk prey items usually within 1-2 years. New road construction and hazard tree removal would result in an adverse, medium-term, minor effect. Dozer and hand line construction for prescribed fires would have a neutral effect because these activities would not alter suitable goshawk nesting habitat.

### White-headed woodpecker

The proposed actions in Alternative 2 would have a beneficial, long-term major effect on white-headed woodpecker habitat in the project area. Alternative 2 "may impact individual white-headed woodpeckers,

AR 12666

but would not lead to a trend for Federal listing or to a loss in viability". The proposed activities in Alternative 2 could possibly disturb nesting pairs of white-headed woodpeckers if implementation occurred during the breeding season. White-headed woodpeckers are known to exist within the project area, but there are no known nesting sites.

White-headed woodpecker habitat would be modified by actions proposed in Alternative 2, particularly through various thinning treatments. In 1,065 acres of existing suitable white-headed woodpecker habitat, the following thinning treatments would improve conditions (acres are of existing stands of white-headed woodpecker habitat within each prescription): Matrix Harvest Thin (558 acres), Matrix Shaded Fuelbreak Thin (67 acres), and Stand Improvement Thin (434 acres). These proposed treatments would directly affect white-headed woodpecker habitat by reducing canopy cover to 40% or less while maintaining large diameter Ponderosa pines and at least 20-30 trees per acre of the largest trees available, with a species preference of Ponderosa pine. Stands treated with these prescriptions would all continue to have the characteristics necessary to function as white-headed woodpecker habitat.

In addition, Alternative 2 proposes the following treatments that would create more suitable habitat for white-headed woodpeckers (acres are of stands with potential white-headed woodpecker habitat within each prescription): understory Stand Improvement Thin (602 acres), underburn-only treatment (approximately 630 acres), Riparian Reserve Thin (49 acres), Matrix Harvest Thin (315 acres), and Matrix Shaded Fuelbreak Thin treatments (92 acres), for a total of 1,689 acres. The current acres of suitable habitat that would be improved, along with the proposed treatments that would result in suitable habitat, would result in a total of 2,754 acres of suitable white-headed woodpecker habitat post-project. This would constitute a long-term, major beneficial effect for white-headed woodpeckers in the Twisp Restoration project area. Indirect effects to white-headed woodpecker habitat would be providing for stands with a large tree component with less competition for water, sunlight, and soil nutrients, and a higher chance to survive summer drought and wildfires. The large tree component would be able to continue to grow and have a higher probability of remaining alive and green into the future.

The actions proposed in Alternative 2 that do not involve tree harvest would have minor or no effects to white-headed woodpecker habitat. Road decommissioning, prescribed burning (along with future maintenance burning) and tree planting would be beneficial, long-term minor effects. New road construction and hazard tree removal would result in an adverse, medium-term, minor effect. Dozer and hand line construction for prescribed fires would have a neutral effect because these activities would not alter suitable white-headed woodpecker habitat.

## Resource Indicator: Suitable marten habitat

The proposed actions in Alternative 2 would have both adverse and beneficial effects to marten habitat. Overall, there would be a mixed, long-term moderate effect on marten habitat, mostly through proposed thinning treatments that would directly modify this habitat by understory Stand Improvement Thin treatments (256 acres) would reduce the habitat quality and the function of these stands. These stands would be thinned to reduce ladder fuel and competition around existing large trees, reducing canopy cover down to 40%, but these acres would still provide some patchy habitat. Martens favor stands with high canopy cover for protection from predators, and thinning stands to 40% canopy cover would reduce their value as protective cover. The Matrix Harvest Thin (93 acres) and Matrix Shaded Fuelbreak Thin (8 acres) treatments would result in the loss of suitable marten habitat on most of those acres because thinning to reduce ladder fuel and competition around existing large trees would reduce canopy cover to less than 40%, which would not be enough to provide good habitat for martens.

Indirect effects of thinning treatments on marten habitat would be promoting future stands with a large tree component with less competition for water, sunlight, and soil nutrients, and a higher chance to

AR 12667

survive summer drought and wildfires. The large tree component would be able to continue to grow and have a higher probability of remaining alive and green into the future.

The actions proposed in Alternative 2 that do not involve thinning would have minor or no effects to marten habitat. Road decommissioning and tree planting would have beneficial, long-term minor effects. Prescribed burning would have a mixed, medium-term, minor effect in that it would result in a loss of habitat for marten prey items (rodents) immediately after the burn followed by an increase in habitat for marten prey items, usually within 1-2 years. New road construction and hazard tree removal would result in an adverse, medium-term, minor effect. Dozer and hand line construction for prescribed fires would either occur outside of marten habitat or have a neutral effect because they would not alter suitable marten habitat.

## Resource Indicator: Mule deer winter range habitat

The proposed actions in Alternative 2 would have both adverse and beneficial effects to deer winter range habitat, but overall, a beneficial, long-term moderate effect on mule deer winter habitat in the Twisp Restoration area. Thinning and prescribed fire treatments would have a long-term, moderate benefit to mule deer winter habitat because propose thinning and prescribed fire treatments would increase the quality and quantity of forage areas and increase the resilience of forested cover stands to disturbances such as wildfire. Proposed thinning treatments and road changes would modify mule deer winter habitat the most. The forested cover and forage amounts on mule deer winter range in the project area should the proposed actions be implemented are described in detail in the Wildlife report.

Direct effects to snow-intercept thermal cover and winter thermal cover would be a change to non-cover/forage habitat on acres that are proposed for Matrix Shaded Fuelbreak Thin (645 acres) and Regeneration Harvest (45 acres). These acres would have canopy cover and hiding cover reduced to the point that they would no longer function as cover but would provide good foraging habitat. Additionally, direct effects to snow-intercept thermal cover and winter thermal cover habitat would be a change to other forest cover on the acres that are proposed for Matrix Harvest Thin (7275 acres), Riparian Reserve Thin (70 acres), and understory Stand Improvement Thin (3894 acres). Some of these acres would be thinned to reduce ladder fuel and competition around existing large trees, reducing canopy cover to approximately 30-40%. These stands would no longer meet the Forest Plan definition of snow-intercept thermal and winter thermal cover because of the high level of canopy cover required. However, winter cover for mule deer can be maintained in stands that do not meet the Forest Plan definitions. Stands with 30-40% canopy cover with large conifer trees provide winter cover for deer and a forage component at the same time (Serrouya and D'Eton 2008, Coe et. al. 2018). In addition, several recent studies have questioned the importance of thermal cover for ungulates (Freddy 1986, Hobbs 1989, Cook et. al. 1998, Mysterud and Ostbye 1999, Moore 2003, Cook et. al. 2005). The Okanogan-Wenatchee Forest Restoration Strategy (USDA Forest Service, 2012) suggests that emphasizing the reduction of road density and enhancement of forage can allow reduction in thermal cover while meeting the intent of standards for deer winter ranges. Indirect effects of Alternative 2 to winter mule deer habitat would be providing forested stands with a large tree component with less competition for water, sunlight, and soil nutrients, and a higher chance to survive summer drought and wildfires.

Road densities in all the discrete winter range units would change under Alternative 2; in 7 of the 8 units, road densities would increase during implementation due to opening roads and/or constructing new or temporary roads. None of these new roads would be used during winter. In each unit the post project density would be below the Forest plan standard for that MA, and for 7 of the 8 units it would be lower than current levels.

AR 12668

The actions proposed in Alternative 2 that do not involve tree harvest or road management would have minor or no effects to deer winter habitat. Prescribed burning (along with future maintenance burning) and tree planting would have beneficial, long-term minor effects because they would result in an increase in forage quantity and quality for deer. Hazard tree removal, dozer and hand line construction for prescribed fires, and aquatic organism passage projects would either occur outside of deer winter range or have a neutral effect. In addition, for the reasons stated, proposed activities would not negatively impact mule deer as a prey source for the gray wolf.

## Resource Indicator: Suitable habitat for cavity excavators

The proposed project would have a mixed but overall negative, long-term minor impact on habitat for cavity excavators because some actions proposed in Alternative 2 would directly reduce this habitat, including hazard tree removal, the thinning treatments, and prescribed fire. Snag removal would be part of the proposed hazard tree removal treatment along all open roads. Snag removal would not be part of proposed thinning treatments unless dead trees are identified as hazardous to workers, in which case, they may be felled and left on site to provide large woody debris. Retention clumps within each harvest unit would be focused on areas with current snags (Design Feature W1). No cedar, aspen, cottonwood or other deciduous trees would be cut (Design Feature B8). Prescribed burning would result in some loss of old, soft snags, but also creates new, hard snags. Several studies have been conducted on the Okanogan-Wenatchee National Forest evaluating the effects of thinning and prescribed burning on snags (Gaines et al. 2007, Lyons et al. 2008, Gaines et al. 2010). Their results indicated that mechanical thinning by itself resulted in reduced snag densities, but prescribed fire and mechanical thinning followed by prescribed fire resulted in increased snag densities. Indirect beneficial effects to cavity excavator habitat would result from proposed road closures and decommissioning that would help promote snag abundance by reducing the miles of roads open for firewood removal. Snags that develop in the future along these closed and decommissioned roads would not be subject to removal by fuelwood harvest. Dozer and hand line construction for prescribed fires would have a neutral effect because they would not alter suitable cavity excavator habitat. Youkey (2011) evaluated snag habitat for the Okanogan-Wenatchee National Forest primary cavity excavator species using regional population trend predictions, DecAid tolerance levels, and data comparing current and historic conditions. He concluded that by managing towards conditions within the historic range of variability, and by being consistent with the Northwest Forest Plan, the population viability of these 10 species would be maintained. Alternative 2 would result in the project area being managed toward historic range of variability and would generally be consistent with the Northwest Forest Plan. It would maintain the population viability of the 10 primary cavity excavator species.

## Cumulative Effects

The effects of past events such as timber harvest, recent wildfires, and prescribed burning have been considered while assessing the current condition of the project area. Present and reasonably foreseeable future actions that may affect the wildlife resource indicators in this analysis include permitted grazing by domestic livestock in the analysis area; proposed timber harvest on 397 acres and prescribed underburning on 829 acres of adjacent WDNR lands; firewood gathering within the analysis area; recreational use (developed & dispersed camping, boating, hiking, backpacking, biking, hunting, skiing, snowmobiling, fishing, etc.) within the analysis area; road maintenance (blading & brushing along roads) within the analysis area; commercial & non-commercial thinning, prescribed fire, and aquatic restoration in the adjacent Buttermilk and Libby Creek drainages within the Mission Restoration project area; invasive plant treatments within the analysis area; and permitted special uses (outfitters, waterlines, roads, ditches, McClure communication site) within the analysis area.

AR 12669

8-ER-1595

*Resource Indicator: Suitable habitat for northern spotted owls.*

Each of the present and reasonably foreseeable future projects listed above would have a negligible effect on northern spotted owls. This effect would be due to the slight potential for disturbance to any nesting pairs that went undetected during the analysis process. When considered together with the direct and indirect effects of the proposed activities in Alternative 2, these negligible effects would not change the overall determination stated above for northern spotted owls and their habitat.

*Resource Indicator: Suitable habitat for lynx.*

The present and reasonably foreseeable future projects listed above would have either no effect or a negligible effect on lynx. This effect would be due to the slight potential for disturbance to lynx. When considered together with the direct and indirect effects of the proposed activities in Alternative 2, these negligible effects would not change the overall determination stated above for lynx and their habitat.

*Resource Indicator: Undisturbed habitat for gray wolf and grizzly bears*

Grazing by domestic livestock can increase the potential for conflict with these species and could possibly lead to negative consequences. Recreational use of trails can result in a reduction of core area which would be a minor negative effect. The Mission Restoration Project has not yet been implemented and would occur within 2 of the same BMUs as this project, Libby Creek BMU and Upper Twisp River BMU, and the core area of these function for the gray wolf as well. The Mission project would include an increase in open roads during project implementation. If the Mission project were to be implemented at the same time as the proposed Twisp Restoration project, the effect to the percent core area in the Libby and Upper Twisp River BMUs would decrease slightly (Table 17).

**Table 19. Core area by BMU with Mission Restoration Project occurring simultaneously.**

| BMU | % Core Area | | |
|---|---|---|---|
| | Current | Twisp Restoration Only | Twisp and Mission Restoration at same time |
| Libby | 56.8% | 56.4% | 55.6% |
| Upper Methow | 66.9% | 66.7% | 66.7% |
| Upper Twisp River | 69.6% | 68.8% | 68.1% |

The other present and reasonably foreseeable future projects listed above would have either no effect or a negative minor effect on these species due to the potential for disturbance. When considered together with the direct and indirect effects of the proposed activities in Alternative 2, these minor effects would not change the overall determination stated for gray wolves and grizzly bears described above.

*Resource Indicator: Suitable habitat for Regionally sensitive species.*

**Northern goshawk**

Each of the present and reasonably foreseeable future projects listed above would have a negligible effect on northern goshawks. This effect would be due to the slight potential for disturbance to any nesting pairs that went undetected during the analysis process. When considered together with the direct and indirect effects of the proposed activities in Alternative 2, these negligible effects would not change the overall determination stated above for northern goshawks and their habitat.

AR 12670

8-ER-1596

*White-headed woodpecker*

The present and reasonably foreseeable future projects listed above would have either no effect or a negligible effect on white-headed woodpecker habitat. When considered together with the direct and indirect effects of the proposed activities in Alternative 2, these minor and negligible effects would not change the overall determination stated above for white-headed woodpecker habitat.

*Resource Indicator: Suitable marten habitat*

Each of the present and reasonably foreseeable future projects listed above would have either no effect or a negligible effect on marten habitat.  When considered together with the direct and indirect effects of the proposed activities in Alternative 2, these negligible effects would not change the overall determination stated above for marten habitat described.

*Resource Indicator: Mule deer winter habitat*

Domestic livestock can compete with mule deer for browse on winter range, which could be a minor negative effect. The other present and reasonably foreseeable future projects listed above would have either no effect or a negligible effect on deer winter range habitat.  When considered together with the direct and indirect effects of the proposed activities in Alternative 2, these minor and negligible effects would not change the overall determination stated above for deer winter range habitat.

*Resource Indicator: Suitable habitat for cavity excavators*

The present and reasonably foreseeable future projects listed above would have either no effect or a negligible effect on primary cavity excavator habitat.  When considered together with the direct and indirect effects of the proposed activities in Alternative 2, these negligible effects would not change the overall determination stated above for primary cavity excavators.

## Effects of Forest Plan Amendments on 2012 Planning Rule Substantive Requirements

The substantive requirements of 36 CFR 219.8 through 219.11 that would likely be affected by the amendments and are tied to wildlife resources are described below. None of the substantive requirements within 36 CFR 219.8 through 219.11 would be adversely affected by the proposed amendments.

Amending Forest Plan S&G19-8 would allow for natural fuels treatments (prescribed burning) on up to 65 acres of FPOG. Prescribed fire treatments allowed by this amendment would likely have a mixed effect on integrated resource management for wildlife species, habitat, and habitat-connectivity (36 CFR 219.10(a)(1)), specifically northern spotted owl, northern goshawk, marten, and white-headed woodpecker.  Habitat modification in this stand would be limited as the proposed treatments would be designed to maintain the stand in a structural condition that will still meet the definition of FPOG (Design Criteria V6). Sub-canopy forest structure may be impacted in small patches from underburning as fire consumes some understory growth in an uneven distribution. This would cause a short-term degradation of old growth habitat which would result in a minor negative effect but would result in a long-term improvement of old growth habitat due to reduction in competition for water, sunlight, and soil nutrients afterward available to the large, old tree component of the stands.

Amendments to Forest Plan S&Gs 14-6A and 26-6A would allow for reductions in winter thermal cover and snow-intercept thermal cover, as defined in the Forest Plan, on a total of 4,131 acres of deer winter range in MA14 and MA26.  Reductions would occur through treatments as described for Resource Indicator "Mule deer winter range".  In MA 14, snow-intercept thermal cover is already below the 15% standard and would be reduced further on 807 acres by treatments implemented in this project, while

winter thermal cover would be reduced by 2449 acres below the 25% standard. In MA26 snow-intercept thermal cover is already below the 15% stand and would be reduced further by 10 acres, while winter thermal cover would be reduced by 865 acres below the 25% standard. These amendments would likely have a beneficial effect on the same provision (36 CFR 219.10(a)(1)), specifically on mule deer and winter habitat for mule deer. Canopy cover would be reduced but maintained to at least 30-40%. With a canopy cover reduced to 30-40%, these stands would no longer meet the Forest Plan definition of snow-intercept thermal and winter thermal cover; however, winter cover for mule deer can be maintained in stands that do not meet the Forest Plan definitions. Stands with 30-40% canopy cover with large conifer trees provide winter cover for deer and a forage component at the same time (Serrouya and D'Eton 2008, Coe et. al. 2018). In addition, several recent studies have questioned the importance of thermal cover for ungulates (Freddy 1986, Hobbs 1989, Cook et. al. 1998, Mysterud and Ostbye 1999, Moore 2003, Cook et. al. 2005). The Forest Restoration Strategy (USDA Forest Service, 2012) suggests that emphasizing the reduction of road density and enhancement of forage, can allow reduction in thermal cover while meeting the intent of standards for deer winter ranges, to resolve the potential conflict between restoring forests and winter range thermal cover. Thinning and prescribed fire treatments allowed by these amendments would have a mixed effect on winter range cover habitat. They would cause a short-term degradation of winter thermal cover and snow-intercept thermal cover, as defined in the Forest Plan, which would result in a negligible negative effect, but would have a long-term improvement of winter cover habitat due to the reduction of competition for water, sunlight, and soil nutrients for the large, old tree component of the stands, and a higher chance to survive summer drought and wildfires. This would be a major beneficial effect. Without these amendments there would be a higher chance of losing the entire stands to wildfire.

## Summary

Table 18 describes how each alternative addresses issues related to wildlife resources. Alternative 2 complies with the Migratory Bird Treaty Act because it does not include any activities that would pursue, hunt, take, capture, purchase, etc. any migratory bird. This alternative also complies with the Bald and Golden Eagle Protection Act because there are no known nesting, communal roosting, or foraging areas within the project area

**Table 20. Comparison of how the alternatives address key issues/concerns related to wildlife**

| Issue | Indicator/Measure | Alt 1 | Alt 2 |
|---|---|---|---|
| **Issue #2:**<br>Opening closed roads, building temporary or permanent roads, and/or trail building will adversely affect wildlife […]. | Undisturbed habitat for grizzly bear, wolf.<br><br>Undisturbed mule deer winter habitat<br><br>Qualitative discussion for other resource indicators | 0 miles of roads opened, closed, or built:<br><br>Grizzly bear, wolf: neutral, long-term, minor effect. No disturbance, no reduction in road density, & no increase core area.<br><br>Mule deer: No effect<br><br>No directly related effects would occur to other wildlife species analyzed | 2.8 miles of new permanent road, 4.8 miles of temporary roads built; 28 miles of closed roads opened.<br><br>Northern spotted owl: new temporary road construction: no effect; new permanent road construction: adverse, medium-term, minor effect due to potential for loss of snag habitat to fuelwood collection.<br><br>Lynx: new/temporary road construction: outside of lynx habitat. Opening |

AR 12672

| | | | |
|---|---|---|---|
| | | | closed roads: no effect outside of lynx habitat.<br><br>Grizzly bear, wolf: adverse, long-term, minor effect during implementation from increase in human use. Beneficial, long-term moderate effect post-project from reduced road density and increase in core area.<br><br>Mule deer: minor effect, new roads constructed in winter range, but not used during winter and closed to use after project implementation. |
| **Issue #7:**<br><br>Treatments on recently burned areas will negatively affect wildlife, […]. | Suitable habitat for northern spotted owls<br><br>Suitable habitat for lynx<br><br>Undisturbed habitat for grizzly bear, wolf<br><br>Suitable habitat for Regionally sensitive species (northern goshawk and white-headed woodpecker)<br><br>Suitable marten habitat<br><br>Mule deer winter range habitat<br><br>Suitable habitat for cavity excavators | 0 acres of treatments in burned areas.<br><br>No direct effects to wildlife species. | Northern spotted owls, lynx, northern goshawk, marten; recently burned areas not providing habitat; no effect. Grizzly bear; negative, short-term, minor effect from disturbance,<br><br>Mule deer winter range: treatments not located within winter range; no effect.<br><br>White-headed woodpecker and primary cavity excavators; 97 acres treated of 55,187acres recently burned; negligible effect. |
| **Issue # 9:**<br><br>Project should retain all large and old trees (i.e., greater than 21" or 25" DBH), consider biophysical environments in thinning prescriptions, and use tree size classes and diameter limits as described in the Forest Restoration Strategy. | Suitable habitat for northern spotted owls<br><br>Suitable habitat for lynx<br><br>Undisturbed habitat for grizzly bear, wolf<br><br>Suitable habitat for Regionally sensitive species (northern goshawk and white-headed woodpecker)<br><br>Suitable marten habitat | 0 acres of thinning<br><br>Northern spotted owl: negative, long-term moderate effect. No habitat change, high risk of loss from wildfire.<br><br>Lynx: neutral, long-term, minor effect. No habitat change, high risk of loss from wildfire.<br><br>Grizzly bear, wolf: neutral, long-term, minor effect. No disturbance, but no | ~22,000 acres of thinning. Diameter limits for all harvest prescriptions.<br><br>Northern spotted owl: Thinning: mixed, long-term moderate effect. Reduction in habitat, large trees promoted, reduced risk of loss from wildfire & drought.<br><br>Lynx: Thinning: positive, long-term, minor effect. Reduced risk of high- |

AR 12673

| | Mule deer winter range habitat<br><br>Suitable habitat for cavity excavators | reduction in road densities and no increase core area percentages. | severity fire moving into habitat.<br><br>Grizzly bear, wolf: negative, short-term, minor effect during implementation from increase in human use. Beneficial, long-term minor effect post-project from an increase in quantity and quality of forage for bears and prey for wolves. |
|---|---|---|---|
| **Issue #14**<br><br>Dozer fireline will [...] change wildlife use [...]. | Suitable habitat for cavity nesters, northern spotted owls, Canada lynx, and grizzly bears | 0 acres affected | Cavity nesters: neutral effect<br><br>Northern spotted owl: minor to no effect due to condition of vegetation to provide suitable habitat for the species<br><br>Lynx: no activities within suitable lynx habitat<br><br>Grizzly bear: no effect on bear habitat because these actions would not impact habitat that is currently undisturbed. |
| **Issue #19**<br><br>Proposed Forest Plan amendments set precedence, relaxes standards created to protect the environment and public access, are not supported by science. | Suitable habitat for northern spotted owls<br><br>Suitable habitat for lynx<br><br>Undisturbed habitat for grizzly bear, wolf<br><br>Suitable habitat for Regionally sensitive species (northern goshawk and white-headed woodpecker)<br><br>Suitable marten habitat<br><br>Mule deer winter range habitat<br><br>Suitable habitat for cavity excavators | 0 acres of treatments in Forest Plan Old Growth stands | 65 acres of burning in Forest Plan Old Growth stands.<br>All species; long-term, negligible, negative effect; Design Criteria V6 requires treatments in FPOG to not degrade the stand from FPOG status. |

AR 12674

8-ER-1600

## Effects to ESA Species

The proposed project "may affect, but would not likely adversely affect" the northern spotted owl. The project "may affect, and would likely adversely affect" designated critical habitat for the northern spotted owl. There are no known active nest sites for northern spotted owls within the project area. The project area was surveyed to accepted protocols and spot-check surveys would continue until implementation. To manage fuels, reduce the risk of high severity wildfire and return the landscape to conditions closer to the historic range of variability, the amount of suitable nesting/roosting/foraging habitat and dispersal habitat would be reduced through thinning treatments.

The proposed project "may affect, but would not likely adversely affect" the lynx or its designated critical habitat for the lynx. Most of the proposed activities would occur outside of suitable lynx habitat.

The proposed project "may affect, but would not likely adversely affect" the gray wolf or grizzly bear. The proposed project would result in a slight reduction in undisturbed habitat within the project area during implementation followed by a slight increase in undisturbed habitat following implementation of all the road management activities.

## Effects to Region 6 Sensitive Species

The proposed project "may impact individuals but would not lead to a trend for Federal listing or to a loss in viability" for northern goshawk and white-headed woodpecker. It would have "no impact" on any of the other terrestrial species on the Region 6 Sensitive Species list.

## Effects to Okanogan LRMP Management Indicator Species

The proposed project would not lead to a loss of population viability for marten, mule deer, or primary cavity excavators; or for any of the other terrestrial management indicator species listed in the Okanogan Forest Plan.

Table 19 summarizes the effects of each alternative on resource indicators related to wildlife.

**Table 21. Summary of effects of Alternatives 1 and 2 on wildlife resources.**

| Resource Element | Resource Indicator | Measure | Alternative 1 Existing Condition | Alternative 2 Proposed Action |
|---|---|---|---|---|
| Federally listed species: northern spotted owl, lynx, grizzly bear, and gray wolf. | Suitable habitat for northern spotted owl | Acres of habitat within project area. | N/R/F habitat – 1203 acres<br>Dispersal – 8437 acres<br><br>Existing northern spotted owl habitat would remain. They would remain susceptible to stand-replacing wildfire. | N/R/F habitat – 300 acres<br>Dispersal – 3040 acres<br><br>Nesting/roosting/foraging habitat would be treated to protect and enhance large trees. Foraging and dispersal habitat would be reduced. Potential for stand-replacing wildfire would be reduced. |
| | Suitable habitat for lynx | Acres of habitat within project area | No suitable habitat<br><br>Existing lynx habitat would remain unless burned by high-severity wildfire. | No suitable habitat<br><br>Likelihood of habitat-changing wildfire reduced by treatments in adjacent forest stands. |

AR 12675

8-ER-1601

| Resource Element | Resource Indicator | Measure | Alternative 1 Existing Condition | Alternative 2 Proposed Action |
|---|---|---|---|---|
| | Undisturbed habitat for grizzly bear with core area by BMU and road densities by project area and discrete MA. | Percent core area by bear mgt unit | Libby Creek: 43%<br>Upper Methow: 54%<br>Upper Twisp River: 60%<br><br>Undisturbed habitat as measured by core area would not change. | During Project<br>Libby Creek: 43%<br>Upper Methow: 54%<br>Upper Twisp River: 59%<br><br>Post* Project<br>Libby Creek: 43%<br>Upper Methow: 54%<br>Upper Twisp River: 60%<br><br>Undisturbed habitat as measure by core area would decrease slightly during project implementation but then increase in all 3 BMUs after all road treatments are completed. |
| | | Road densities by project area (mi/sq mi) | Open roads: 2.2 mi/sq mi<br>Total roads: 3.0 mi/sq mi | During project<br>Open: 3.4 mi. /sq. mi.<br>Total: 3.4 mi. /sq. mi.<br><br>Post* project<br>Open: 1.3 mi. /sq. mi.<br>Total: 2.2 mi. /sq. mi. |
| | | Road densities by discrete MA | MA5-02:    3.1 mi./sq.mi<br>MA5-03:    2.8 mi./sq.mi<br>MA5-05:    0.6 mi./sq.mi<br>MA14-9:    0.4 mi. /sq. mi.<br>MA14-10:   2.0 mi. /sq. mi.<br>MA25-12:   2.5 mi./sq.mi<br>MA25-14:   1.7 mi./sq.mi.<br>MA25-15:   0.8 mi./sq.mi.<br>MA26-5:    3.0 mi. /sq. mi.<br>MA26-6:    0.4 mi. /sq. mi.<br><br>Undisturbed habitat as measured by road densities in project area would not change |         During   Post*<br>MA5-02:    3.1      2.9<br>MA5-03:    3.4      2.3<br>MA5-05:    1.1      1.0<br>MA14-9:    1.1      0.3<br>MA14-10:   2.3      1.6<br>MA25-12:   2.8      2.4<br>MA25-14:   2.2      1.3<br>MA25-15:   0.8      0.7<br>MA26-5:    3.4      2.0<br>MA26-6:    0.3      0.3<br><br>Undisturbed habitat as measured by road densities would increase during project implementation. Open road density would decrease after all road treatments are completed. |

AR 12676

| Resource Element | Resource Indicator | Measure | Alternative 1 Existing Condition | Alternative 2 Proposed Action |
|---|---|---|---|---|
| Regionally sensitive species: northern goshawk & white-headed woodpecker | Suitable habitat for Regionally sensitive species | Acres of habitat within project area. | Northern goshawk: 885 ac<br><br>White-headed WP: 1,065 ac<br><br>Existing habitat for these 2 species would remain unless burned by wildfire. | Northern goshawk: 885 ac<br>White-headed WP: 1065 ac<br><br>Northern goshawk habitat would be reduced. White-headed woodpecker habitat would triple in amount due to treatments that reduce canopy cover but maintain large trees. Likelihood of loss of habitat for these species from wildfire reduced by treatments in adjacent forest stands. |
| Forest Plan Management Indicator Species: marten (mature/old growth forest), mule deer (winter range) and primary cavity excavators. | Suitable marten habitat | Acres of habitat within project area. | 335 ac<br><br>Existing marten habitat would remain unless burned by wildfire. | 234 acres<br><br>Marten habitat would be reduced. Potential for stand-replacing wildfire would be reduced. |
| | Deer winter range habitat | Acres and percent of cover and forage. | Snow-intercept thermal: 1035 ac (7%)<br><br>Winter thermal: 7151 ac (47%)<br><br>Other Forest Cover: 2228 ac (14%)<br><br>Non Forest/Forage: 4687 ac (31%)<br><br>Existing winter range cover habitat would remain unless burned by wildfire. | Snow-intercept thermal: 5907 (39%)<br>Winter thermal: 924 (6%)<br>Other Forest Cover: 2228 (15%)<br>Nonforest/Forage: 4336 (29%)<br><br>Winter range cover as defined in the LRMP would be greatly reduced. Forest cover (that does not meet LRMP definition) would remain. Remaining forest cover would have much less potential for loss to wildfire. |

AR 12677

| Resource Element | Resource Indicator | Measure | Alternative 1 Existing Condition | Alternative 2 Proposed Action |
|---|---|---|---|---|
| | | Road density by winter range in mi./sq. mi. | MA5-02:  3.1 mi./sq.mi<br>MA5-03:  2.8 mi./sq.mi<br>MA5-05:  0.6 mi./sq.mi<br>MA14-9:  0.4 mi. /sq. mi.<br>MA14-10:  2.0 mi. /sq. mi.<br>MA26-5:  3.0 mi. /sq. mi.<br>MA26-6: 0.4 mi./sq. mi.<br><br>Undisturbed winter habitat as measured by road densities would remain the same. |       During  Post*<br>MA5-02:   3.1      2.9<br>MA5-03:   3.4      2.3<br>MA5-05:   1.1      1.0<br>MA14-9:   1.1      0.3<br>MA14-10: 2.3      1.6<br>MA26-5:   3.4      2.0<br>MA26-6:   0.3      0.3<br><br>Undisturbed winter habitat as measured by road densities would decrease during project implementation, then return to same level post-project. |
| | Suitable habitat for cavity excavators | Acres and % of project area available to fuelwood harvest. | 1744 acres (7.2%) | 1039 acres (4.3%) |

*Post project core area and road density calculations assume all proposed road decommissioning occurs.

# Botany

This section is summarized from the Twisp Restoration Project Final Botany Report (Baraibar 2022)**.** The issues raised during public comment periods that are related to botany resources would be addressed by each alternative as described in Table 20. Direct, indirect, and any cumulative effects of each alternative on botany resource indicators are shown in Table 21.

## Alternative 1: Direct and Indirect Effects

### Resource Indicator: Change in unique habitat vigor, plant biodiversity and occupied S&M/ R6 Sensitive population viability.

One population of a Survey and Manage Category D fungi species occurs within the project boundary: snowbank fairy helmet (*Mycena overholtsii*).

In dry east-side forests, aspen and wetland ecosystems are limited across the landscape and are biodiversity hotspots for wildlife and plant species. These unique habitats usually have deeper, richer soils than the surrounding coniferousforests. The partial shading overstory and rich soil in the understory supports many herbs, forbs, and grasses in the understory community (Seager et al. 2013). Aspen's palatable twigs and foliage, and tendency to develop cavities, make it valuable habitat for wildlife such as deer (*Odocoileus* sp.), elk (*Cervus elephas*), woodpeckers, and songbirds (Swanson et al. 2010). Mature competing conifers can suppress aspen overstory trees, and conifers of any size can suppress growth of aspen suckers.  In addition, conifers compete strongly for soil moisture with aspen in an environment where moisture is often in short supply (ibid). Succession of aspen to conifers in our area is driven by both the greater shadetolerance of the conifers and by competition for moisture (ibid). Conifers intercept more moisture than aspen, especially snow (DeByle 1985c). This indicator measures aspen stand and riparian vegetation vigor by the change in

AR 12678

vegetation and biodiversity of plant species. Unique and Sensitive Plant Habitats are dominated by aspen and other deciduous riparian vegetation. Aspen stands within some vegetation polygons have a multi-age structure where mature aspen dominate the overstory and younger aspen are establishing where the overstory canopy has opened. Other stands have a single age structure where mature aspen dominate the overstory, but young aspen regeneration is limited by both conifers and mature aspen. Conifer encroachment in the overstory and understory within these habitats are limiting available sunlight, nutrients, and water on which the riparian vegetation depends. As a result, aspen stands are declining in comparison to historic conditions and are at risk for competing with conifers for sunlight, soilmoisture, and nutrients.

Conifer encroachment and closed canopies are limiting available nutrients, water, and sunlight to the riparian vegetation in unique and sensitive plant habitats. Seager (2013) et al. state, "Thus, conifers thatinvade meadows and associated aspen stands decrease soil moisture, soil resources, and overstory sunlight that are necessary for aspen persistence".

Riparian Reserves, including streamside habitats, provide favorable conditions for R6 Sensitive and S&M plant species.  Many of the floodplain habitats are classified in the Douglas-fir series and fall into the Douglas-fir/Snowberry ((*Pseudotsuga menziesii/Symphoricarpos albus*) Floodplain Plant Association.  Seasonally available soil moisture downed woody debris and species diversity are important habitat components of this type.  The Douglas-fir/Snowberry-Floodplain sites are generally near the lower elevation distribution of forest zones and occasionally adjacent to shrub-steppe (Kolvalchik and Clausnitzer 2004).  Mature Douglas-fir/Snowberry-Floodplain stands are characterized by an abundance of Douglas-fir and common snowberry. Other trees are seral opportunists and include bigleaf maple, western larch, lodgepole pine, ponderosa pine, quaking aspen, and black cottonwood. Shrubs, especially common snowberry, dominate the ground cover. Other shrubs with high constancy or cover include Douglas maple, Saskatoon serviceberry, Oregon holly grape, red-osier dogwood, myrtle pachistima, western thimbleberry, and shiny leaf spiraea (Kolvalchik and Clausnitzer 2004). Shrubs in this association form a rich thicket on some of the moister sites.  However, most riparian sites and stream sides on FS lands are presently, and in the recent past managed as buffer zones where treatments have been avoided. The Wenatchee Forest Plant Association Guide states that it is typical of this type to have a dense overstory since they have not been logged since the turn of the century.  Thick stands of young Douglas-fir <10" dbh are choking out the understory shrub component and contributing to fire conditions that are occurring outside of their biophysical baseline conditions.  In the past, fire probably played a large role in stand development.  Given the dense overstory and heavy fuel loading, fires would have burned hot with extensive crown damage. The tendency for moist conditions to reduce fire frequency may be overcome by the more continues fuel available in this type (Lillybridge et. al 1995).

Alternative 1 would have a long-term, moderate adverse impact on this resource indicator. Under a no-action alternative, unique and sensitive habitat conditions would deteriorate over time due to the continued encroachment of conifers from lack of thinning and prescribed fire treatments. Hazard tree removal would not occur under this alternative.  Therefore, firewood gatherers would not be permitted to remove habitat that downed woody trees provide for Survey and Manage plant species.  Without the Riparian Reserve Thin treatments, riparian habitats would not be expanded or restored. Aspen would remain stable in the short-term, but aspen vigor would decrease due to competition for light, water, and nutrients from dense over/understory vegetation. In the long-term, taking no action would increase the risk of wildfire, and insect and disease to unique and sensitive habitats that are occupied by R6 Sensitiveand S&M plant species. This would result in local decreased viability in populations of these species.

AR 12679

Resource Indicator: Change in amount and diversity of understory native vegetation

Numerous forb and graminoid plant species occur in the analysis area, this includes traditional-use plants that are culturally important for the Tribes. However, in areas of a closed canopy of overstory trees, these species are either limited or shaded out. Current conditions in forested areas within the Twisp watershed, as compared to historical or predicted future conditions, are described in detail in the Vegetation report. These conditions include a higher percentage of densely stocked stands with multiple canopy layers or closed canopies with a high proportion of young shade-tolerant tree species. In densely stocked stands, understory vegetation species diversity and plant composition has diminished because dense tree canopies and sub-canopies inhibit available sunlight from reaching the forest floor. This condition helps reduce ecosystem productivity and resilience by limiting biomass production, soil fertility, post-fire vegetation recovery, and availability of food for wildlife species.

Current understory conditions of 100 acres of the Cedar Creek fire within the project boundary are varied. Fire response shrub species are recovering in areas where fire burned in a mosaic pattern and did not burn the soil, plant crowns or underground rhizomes with high intensity. These species include: spirea (*Spiraea betulifolia*), ceanothus (*Ceanothus velutinus*), serviceberry (*Amelanchier alnifolia*), and Scouler's willow (*Salix scouleriana*). Grass and forb species are also revegetating in areas with moderate to low fire burn intensity and include but are not limited to: yarrow (*Achillea millefolium*), silverleaf phacelia (*Phacelia hastata*), silky leafed (*Lupinus sericeus*), strawberry (*Fragaria virginiana*), blue wildrye (*Elymus glaucus*), pinegrass (*Calamagrostis rubescens*), and bromes.

Under Alternative 1, invasive plant introduction and spread into native plant communities by project vehicles and equipment from opening and closing roads would not occur. However, vehicle travel would still be allowed on roads infested by invasive plants, thus perpetuating spread and establishment. Invasive plants would still be treated through the District Invasive Plant program; however, establishment may still occur. The spread and establishment of invasive plants would cause an adverse, moderate, long-term effect on plant communities by displacing native vegetation. Alternative 1 would have an adverse, long-term, moderate effect on the amount and diversity of understory native vegetation. Thinning and prescribed fire treatments would not occur which would have opened the forest canopy, allowing more light to reach the forest floor, resulting in less competition for soil resources and water. As a result, there would be a decrease in plant vigor and diversity and forest vegetation characteristics would not be within the estimated historical and future ranges of variability to improve forest resiliency to insect, disease, and wildfire events.

## Alternative 2: Direct, Indirect, and Cumulative Effects

### Resource Indicator: Change in unique habitat vigor, plant biodiversity and occupied S&M/ R6 Sensitive population viability.

Thinning and prescribed fire treatments within unique habitats would have a direct, moderate, beneficial, long-term effect on this resource indicator because it would increase plant biodiversity as well as population and stand vigor. Treatments would also help reduce the likelihood of stand-replacement fire and maintenance underburning would help perpetuate these conditions.

Riparian Reserve thinning treatments would enhance and expand unique habitat and plant biodiversity suitable for S&M and R6 Sensitive species. The Implementation Procedures for the Riparian Forest Restoration Strategy (Bigley et al., 2006) states that treatments within Riparian Reserves naturally

AR 12680

dominated by conifers would improve riparian reserve habitats by controlling conifer densities to promote large and old trees, maintain and improve riparian dependent understory shrub species, and provide shade and nutrients to riparian plant communities. Structurally complex riparian forest conditions are characterized by an overstory dominated by very large diameter trees, high leaf areas characteristic of multistoried stands, high rates of productivity resulting in large amounts of fine and coarse woody debris, and a well-developed understory. It is assumed that these forests will best support all riparian ecosystem functions required for salmon habitat recovery. This riparian management strategy will primarily use stand thinning to hasten the development of riparian stands toward a mosaic of structurally complex riparian forests and restore riparian habitat functions while not appreciably reducing riparian ecosystem benefits in the short-term (ibid). Proposed treatments within Riparian Reserves in the Douglas-fir-Snowberry Floodplain Plant Association and along streams would focus on meeting these riparian management goals. A minimum 40% canopy cover would be maintained which would create understory species diversity, snags would be created and maintained, and recommended levels of downed woody would be left on site. Landings within RRs would be scarified, seeded, and scattered with organic debris after harvest activities are complete. Any soil compaction where skid trails cross intermittent/perennial streams would be decompacted with equipment. These actions would provide organic material that would provide a medium for plant recovery and regrowth, help compete with potential introduced weeds, and decrease soil    compaction which could be a limiting factor for sprouting vegetation.

Hazard tree removal would occur on 110.8 miles of open road, and firewood gathering would be allowed from downed trees. Removal of hazard trees would have a long-term, minor, adverse impact on S&M plant habitat. Downed woody debris retains moisture and are hosts to some S&M species. Since some trees could be removed by firewood cutters, potential habitat would also be removed. Aged, downed wood provides habitat for S&M plant species. A reduction of downed trees resulting from hazard tree removal would occur on open roads, however, where roads are closed or decommissioned, hazard trees would remain on the ground. The design features for downed woody debris retention would follow the Standards and Guidelines set forth in Appendix C of the NWFP S&G (1994), ensuring adequate amounts of debris for S&M plant species.

Design features such as recommended patch retention and canopy covers of 40-60% (in Riparian Reserve units), light-intensity spring underburns to promote retention of large, downed woody debris, and keeping burn piles distant from aspen trees would help avoid mortality to the mycelia network. Design features require that proposed treatments would follow the Standards and Guidelines set forth in Appendix C of the NWFP S&G (1994). Management of all known sites and high priority sites would occur as required for Category B and D Survey and Manage species. Protection buffers outlined in Appendix B would protect any R6 Sensitive and S&M plant populations and habitats.

There are no known occurrences or habitats involved in the opening and closing of roads. There is no impact of edge effect from new road construction on R6 Sensitive and S&M plant species, as known occurrences do not occur in or adjacent to these proposals. Edge effects of existing road systems on R6 Sensitive and S&M plant species is negligible, as the one known S&M population is far enough off the road that the absence of shade from the road does no impact habitat requirements. Roads could influence fire by acting as fuel breaks, depending on the adjacent tree stands and plant habitats.

As each timber sale occurs over a 3-5 year period per sale area, a fraction of the potential R6 sensitive and S&M habitat disturbance for this project would be created as described above. These impacts may overlap in time with those of other timber sales and activities, such as hazard tree removal, that would occur due to this project with up to 7 years of impact in the Twisp River drainage. At no time would the impact exceed the overall impact described above. Design features in potential habitats that recommend patch retention, minimum canopy covers, and retention of downed woody debris, and mitigations measures

AR 12681

including seeding/scarifying disturbed soils and landings in Riparian Reserves, would ensure habitat suitability and viability.

## Resource Indicator: Change in amount and diversity of understory native vegetation

The use of slash mats by heavy equipment used for overstory thinning during summer months would cause adverse, short term, moderate damage to understory vegetation. Landings associated with harvest treatments would have adverse, long term, moderate effects on understory native vegetation because bare ground would be created, and soil would be sterilized when landings slash is burned. These impacts would be addressed through project mitigation measures that would require areas of heavily disturbed soils (including landings, main skid trails, decommissioned roads, log storage areas for large wood used in stream restoration treatments, and constructed road cut and fill slopes) be reseeded, which would effectively restore site conditions over time. Prescribed fire would also reduce vegetation cover in the short term. Opening and closing roads has the potential for the spread and establishment of invasive plants. However, roads that are left open to the public that have infestations would be closed through this project, thus reducing the spread. Actions involving closing and opening roads will follow design features that would reduce the likelihood of invasive plant spread.

Thinning and prescribed fire treatments would have a long term, moderate benefit to understory vegetation (including tradition-use plants) by increasing plant vigor and diversity because these treatments would open up the tree canopy, allowing more light to get to the ground and less competition for soil resources such as water. More understory vegetation would grow, with more diversity of forb and graminoid species. Maintenance underburning would help perpetuate these conditions. As each timber sale occurs over a 3-5 year period per sale area, a fraction of the overall understory vegetation and soil disturbance for this project would be created as described above. These impacts may overlap in time with those of other timber sales that would occur through this project with up to 6 years of impact in the Twisp River drainage, but at no time would the impact exceed the overall impact described above. The native seed mix prescribed to revegetate disturbed areas are locally and genetically adapted to the Twisp River, with early seral species that quickly reestablish to prevent erosion and compete with invasive plants. Monitoring has shown that shrubs, herbs and grasses begin to re-establish within 1 year of disturbance. Most of the vegetation on skid trails is retained and vegetation is also present on landings. Underground plant parts that are still intact allow for quick resprouting and recovery.

Effects of thinning and prescribed fire treatments on specific plants and pollinators are as follows:

- Snowberry (*Symphoricarpos albus*) occurs in portions of the project area and is used by wildlife such as deer and grouse. Disturbance by heavy equipment operating during summer logging or prescribed fire line construction would damage snowberry tops but its underground rhizomes would allow it to persist. With more open canopy, the species could increase with time (Morgan and Neuenschwander 1988; Nelson et al. 2008; Noste and Bushey 1987; Stark et al. 2006).

- Small amounts of willow (*Salix scouleriana*) a shrub that wildlife browse, occur in upland areas; if the top of a willow plant is damaged by logging or prescribed fire treatments, it could resprout from the roots and maintain itself (Harrod and others 2008; Leege 1979; Noste and Bushey 1987).

- Strawberries (*Fragaria vesca* and *F. virginiana*), which produce berries consumed by wildlife, can suffer damage to tops from hot fire (McLean 1969) or logging. With time, Fragaria would tend to increase after disturbance (Armour et al. 1984; Nelson et al. 2008; Stark et al. 2006; Sullivan et al. 2008).

AR 12682

8-ER-1608

- The shrub kinnikinnick (*Arctostaphylos uva-ursi*) produces a fruit used as food by wildlife species, and is susceptible to tops of the plants burning; with time it would tend to increase after prescribed fire (Harrod et al. 2008; Nelson et al. 2008; Sullivan et al. 2008).

- By opening the overstory canopy, proposed treatments would result in an increase of flowering forbs and shrubs that better support pollinators, e.g. butterflies and bumblebees (Miller and Hammond 2007; Neill and Puettmann 2013; Pengelly and Cartar 2010). More pollinators would promote seed production and help maintain understory species.

- By opening up the overstory canopy, proposed treatments would result in an increase of flowering forbs and shrubs that would better support pollinators, e.g., butterflies and bumblebees (Miller and Hammond 2007; Neill and Puettmann 2013; Pengelly and Cartar 2010). More pollinators would promote seed production and help maintain understory species.

## Cumulative Effects

Cumulative effects to botany resources that overlap in time and space with actions proposed by this project would be caused by ongoing cattle grazing, and recreation uses (including legal and illegal OHV use, snowmobiling, dispersed and developed camping,), firewood gathering, treatments implemented in the adjacent Mission Restoration project area, and ongoing weed control.

### *Resource Indicator: Change in unique habitat vigor, plant biodiversity and occupied S&M/ R6 Sensitive population viability*

Thinning and prescribed fire treatments in Riparian Reserves (RRs) would have design features that retain vegetation buffers that would help limit cattle access to unique and sensitive habitats. These treatments outside of RRs would help increase forage in the uplands by reducing canopy cover, as described above, which would help attract cattle to the uplands (Gillen et al 1984).

Recreational activities such as dispersed camping occur in current disturbance footprints, therefore, the impact of most dispersed camping activities to habitat would be none, long term, and negligible.

Invasive plant treatments are not planned near sensitive plant populations. Treatments compliant with the Forest-wide Site-Specific Invasive Plant Management ROD (USDA 2017) would continue in the future but mitigate as necessary around sensitive plant populations by using appropriate chemicals and physical shields, thereby causing no adverse effects. Controlling invasive plants keeps them from invading unique and sensitive plant habitats and competing with sensitive plants, causing a beneficial effect to this resource indicator but one that is not substantial enough to be measurable. For this reason, this activity is not considered to contribute towards cumulative effects in this project.

The effects of proposed actions in Alternative 2, when combined with the effects of cattle grazing and recreation use are not measurable because the impact would be isolated and difficult to quantify, and not likely to change unique habitat vigor, plant biodiversity and occupied S&M/ R6 Sensitive population viability due to the small scale of disturbed area. Additionally, grazing practices are managed by current allotment management plans; changing grazing allotment boundaries or numbers of cattle is outside of the scope of this project". Access to cattle is currently open in active allotments, and minimal amount of cattle use is evident in unique habitats and occupied S&M/R6 Sensitive populations. Currently heavy use recreation activities are not occurring near known sensitive plant populations or in unique habitats.

The effects of the proposed actions in Alternative 2, when combined with treatment activities in the Mission Restoration Project area, are not measurable because any adverse impacts are separated spatially. However, the cumulative impacts of treatments in the Mission Restoration and DNR projects boundaries

AR 12683

would have a beneficial impact on unique habitats and occupied sites by making the landscape more fire resilient and improved.

*Resource Indicator: Change in amount and diversity of understory native vegetation*

Thinning and prescribed fire activities would open the overstory and increase forage for cattle on over 18,000 acres in the project area, primarily in upland areas. This would help reduce grazing in riparian areas, and therefore cause less impact to riparian vegetation. Overall, cattle impacts are expected to be spread over a larger area, lessening concentration of impact to understory vegetation. Cattle grazing on the amount and diversity of understory native vegetation may change in isolated locations when combined with the effects of the proposed action.

The 2017 OWNF Invasive Plant ROD provides for continued invasive plant treatments in the project area. The control of weeds would cause little or no adverse effect to other species of vegetation. Treating invasive weeds would decrease the chance of these species displacing native vegetation. Controlling invasive species would allow for larger populations of native plants, and potentially a more diverse understory which would be able to outcompete invasive plants.

Firewood gathering could adversely impact isolated patches of native vegetation when logs are dragged over the ground. This impact would be isolated and difficult to quantify, and not likely to affect overall plant communities due to the small scale of disturbed areas.

The effects of proposed actions in Alternative 2, when combined with the effects of cattle grazing, are not measurable because the impact would be isolated and difficult to quantify, and not likely to affect overall understory native amount and diversity. Potentially affected areas would be where treatment activities have created isolated patches of bare ground or have sterilized the soil (i.e., barren cores from landing pile burning).

The effects of the proposed actions in Alternative 2, when combined with treatment activities in the Mission Restoration Project area are not measurable because any adverse impacts are separated spatially. However, the cumulative impacts of treatments in the Twisp, Mission Restoration and DNR projects boundaries would have a beneficial impact on understory native plant vegetation by thinning and fuels treatments that promote plant diversity and fire resilience.

## Effects of Forest Plan Amendments on 2012 Planning Rule Substantive Requirements

The substantive requirements that are likely affected by the amendments and are tied to botany resources are described below.

Amending Forest Plan S&G 19-8 would allow for natural fuels treatments on up to 65 acres of FPOG. This amendment would likely have a beneficial, moderate, long-term effect on habitat conditions for plants commonly enjoyed and used by the public and for gathering in collaboration with federally recognized Tribes (36 CFR 219.10(a)(5)). Currently, these habitat conditions have an accumulation of ladder fuels and understory trees competition which are factors that attribute to wildfire and insect and disease risks. Prescribed fire treatments allowed by this amendment would improve habitat conditions because they would reduce fuel loadings, thus decreasing the risk for high-severity fire behavior that would reduce plant biodiversity as well as population and stand vigor. Without this amendment, there would also be an increased risk of unfavorably impacts from uncharacteristically severe wildfire behavior and effects, and from insect and disease outbreaks.

AR 12684

Amendments to S&Gs MA14-6A and MA26-6A would allow for reductions in deer winter range on up to 4194 acres (3319 acres in MA 14-6A; 875 acres in MA26-6A). These amendments would likely have a long-term, moderate beneficial effect on the same substantive provision for the reasons described above.

These amendments would also likely have a beneficial effect on the diversity of native tree species similar to that existing in the plan area (36 CFR 219.9(a)(2)(iii)). Currently, species diversity in both age, structure and is decreasing and changing particularly in aspen stands. Thinning and prescribed fire treatments allowed by these amendments would have a long term, moderate beneficial effect on this diversity because they would promote health and vigor of aspen by removing competing confers. Thinning of conifers within aspen strands would help create a diverse age structure that could provide protection against the effects of wildfire, insects and disease, and browsing. Without these amendments, conifer encroachment would suppress young aspen from sprouting and would compete with older aspen for water, nutrients and sunlight. Conifer encroachment can suppress aspen sprouts and overtop and kill the aspen overstory though vegetative competition for lights and soil resources) Shepperd et al., 2001a; Jones et al., 2005).

## Summary

Table 20 describes how each alternative addresses issues related to botany resources.

**Table 22. Comparison of how the alternatives address key issues/concerns related to botany**

| Issue | Alt 1 | Alt 2 |
|---|---|---|
| **Issue #2:** Opening closed roads and/or building temporary or permanent roads will adversely affect […] sensitive plant habitat | No impacts to sensitive plant habitat. | Negligible impacts to sensitive plant habitat. Project contains mitigation measures to rehabilitate impacts if they occur. |
| **Issue #16:** Project will increase impacts from cattle grazing by allowing more access to sensitive areas such as wetlands […]. | Adverse, long-term, moderate impacts to access to wetland areas because no treatments would occur that increase understory forage production that encourages broader cattle distribution and helps move them out of these sensitive areas. | Beneficial, long-term, moderate impacts to cattle use of wetland areas with over 18,963 acres of understory forage production in project-area allotments that help expand cattle distribution outside of sensitive areas. |

Table 21 displays the effects of Alternatives 1 and 2 on the resource indicators used for botanical resources. Acres of "unique and sensitive habitat treated" overlap with "acres of forest canopy opened". Compared to Alternative 1, Alternative 2 meets project Needs related to Botany resources more effectively because it would restore understory vegetation species diversity and plant composition (part of Need #2). Thinning and prescribed fire treatments in approximately 896 acres of riparian forests and wetlands would decrease shade and competition for nutrients and sunlight that would benefit unique and sensitive plant habitats and help reduce the likelihood of stand-replacement fire. Thinning and/or prescribed fire treatments on over 23,000 acres would create a long term, moderate benefit to understory native vegetation, including traditional plants, by opening the canopy, favoring the growth of understory plant species. Invasive plant treatments authorized by the 2017 OWNF Invasive Plant ROD and included in this project as design features are also an important part of maintaining the diversity of understory plant species and composition consistent with the historical range of variability.

AR 12685

**Table 23. Summary of effects of Alternatives 1 and 2 on botany resources**

| Resource Element | Resource Indicator | Measure | Alternative 1<br>Direct & Indirect Effects | Alternative 2<br>Direct & Indirect Effects |
|---|---|---|---|---|
| Unique and S&M/R6 Sensitive Populations and Habitats | Change in habitat vigor, plant biodiversity and occupied S&M/ R6 Sensitive population viability. | Acres of unique and sensitive habitat treated | 0 acres | ~896 acres |
| Understory Vegetation Composition | Change in amount and diversity of understory native vegetation | Acres of forest canopy treated | 0 acres of forest canopy opened.<br>Sparse or no understory in areas with closed canopy | ~23,167 acres |

### Effects to R6 Sensitive and Survey and Manage (S&M) Plant Species

There is little potential for adverse, direct/indirect or cumulative effects to R6 Sensitive and S&M plant species through proposed project activities. Design features and mitigation measures are expected to reduce the level of habitat impacts to minor levels. In the long-term, treatments would result in moderate, beneficial improvements to habitat quality, resulting in more resilient and viable R6 Sensitive and S&M plant species.

Direct impacts to individual R6 Sensitive or S&M plant species and small-scale, localized habitat impacts could result in some harm to individual plants and their habitat. Following design features and BMPs, the habitat effects would not be substantial nor long-term. Alternative 2 may impact individuals or habitat but will not likely contribute to a trend towards federal listing or cause a loss of viability to the population or species of R6 Sensitive or S&M plant species.

## Fire/Fuels & Air Quality

This section is summarized from the Twisp Restoration Project Final Fire, Fuels, and Air Quality Report (Page and Campbell, 2022). Although substantial evidence suggests a warmer and drier future for the project area and a 5-10% increase in more annual area burned (Raymond et al. 2014; Halofsky et al. 2020), no attempt was made to incorporate these effects into the current modelling framework except as noted for the crown fire activity resource indicator. The issues raised during public comment periods that are related to fire, fuels, or air quality resources would be addressed by each alternative as described in Table 23. Direct, indirect, and any cumulative effects of each alternative on fire, fuels, or air quality resource indicators are shown in Table 24.

### Alternative 1: Direct and Indirect Effects

This alternative considers all past activities that affected fuel loading and fire behavior, including past wildfires and fuel treatments, and as such represents the existing conditions and trends with no active management (i.e., natural succession) within the project area.

AR 12686

8-ER-1612

### Resource Indicator: Crown Fire Activity

Existing conditions within the two sub-watersheds suggest that during a wildfire, crown fire activity would likely occur on much of the forested area during peak fire season weather conditions and that the amount experienced would be at the high end of their DRV. If no action is taken in the forested portions of each sub-watershed, continued successful fire suppression would result in the addition of shade-tolerant conifers to the understory and increases in surface fuel loading (Hessburg et al. 2000b). Additionally, the shrub and grassland vegetation communities within each sub-watershed are expected to shrink in size as conifers continue to encroach (Hessburg et al. 2000b). The combination of these changes would both increase the area susceptible to crown fire activity (more forested area) and lower the canopy base height in most forested stands, thereby making crown fires more likely. Overall, this would result in adverse, long-term, moderate to major effects on crown fire activity.

### Resource Indicator: Flame Length

The current extent and distribution of potential flame lengths in the project area suggest a mixture of conditions. Those areas that have recently experienced wildfires (e.g. Twisp River) are currently in a state that would support successful fire suppression operations. Locations of most concern regarding current potential fire behavior are located on and around McClure Mountain, where high fire intensities would be expected near private lands and the key communication site in the Methow Valley.

Under the no action alternative, fuel loading would continue to accumulate, while stand density would likely increase if it was unaffected by wildfire or insect and disease outbreaks. The lack of fuels treatments within the WUI and along major access roads would result in high fire intensities and difficult suppression operations for firefighters. Although some of the WUI and key access points are currently in a state that would support successful fire suppression operations (flame lengths < 4 feet) due to recent wildfire activity, the lack of maintenance treatments would ultimately move these locations back to undesirable conditions. Overall, the no action alternative would result in adverse, long-term, moderate to major effects on flame lengths.

### Resource Indicator: Particulate Matter

The project area is currently influenced most by off-site particulate matter emissions from prescribed fire activity on nearby private, state, or other NFS lands. The impact of these activities is difficult to quantify as their influence is strongly dependent upon the size of the area being burned and specific weather conditions. Given that smoke usually disperses with distance, the closer the prescribed fire activity, the more likely it affects existing conditions.

Under this alternative, wildfire rather than prescribed fire would continue to impact the project area. Wildfires typically burn under drier conditions than prescribed fires and therefore consume more fuel and produce higher smoke emissions (Liu et al. 2017). Estimating the impact of wildfires on smoke emissions is difficult as the timing and location of wildfires is inherently difficult to predict. Wildfire emissions tend to occur during short periods with high fire danger, which produces short but intense impacts to surrounding communities (Schweizer et al. 2019).

## Alternative 2: Direct, Indirect, and Cumulative Effects

Proposed actions would directly alter the surface, ladder, and canopy fuels within the treatment area, which would indirectly decrease potential fire behavior during peak fire season conditions.

The proposed action substantially modifies the existing road system within the project area through decommissioning, closing, or adding roads. The proposed addition of approximately 2.8 miles of new

AR 12687

roads near Alder, Canyon, Cow, and Poorman Creeks; and adding another 8 miles of unauthorized roads to the NFS road inventory would indirectly affect fuels and fire behavior by facilitating planned vegetation treatments. Improved access to locations where stand improvement thinning, and prescribed fire are planned would lower the cost of and speed up implementation. Additionally, these changes would improve the likelihood of successful fire suppression by shortening response times and providing additional locations for containment.

Effects described below are tied to principles of fire resistance for dry forests (Table 22). Fuels treatments in this project would implement one or more of these principles to change potential fire behavior.

**Table 24. Principles of fire resistance for dry forests (Agee & Skinner, 2005)**

| Principle | Effect | Advantage | Concerns |
|-----------|--------|-----------|----------|
| #1 Reduce surface fuels | Reduces potential flame length | Control easier; less torching | Surface disturbance less with fire than other techniques |
| #2 Increase height to live crown | Requires longer flame length to begin torching | Less torching | Opens understory; may allow surface wind to increase |
| #3 Decrease crown density | Makes tree-to-tree crown fire less probable | Reduces crown fire potential | Surface wind may increase and surface fuels may be drier |
| #4 Keep big trees of resistant species | Less mortality for same fire intensity | Generally restores historic structure | Less economical; may keep trees at risk of insect attack |

### Resource Indicator and Measure: Crown Fire Activity

Thinning and prescribed fire treatments would have a beneficial, moderate, long-term effect on decreasing the amount of crown fire activity within the two sub-watersheds. Compared to the no action alternative, the sub-watersheds (Lower Twisp and Alder Creek) would be expected to experience a 23 and 6% drop in the amount of area likely to experience a crown fire during peak fire season weather conditions. These indirect effects would be expected since the proposed treatments would directly reduce surface fuels (Principle #1) and increase the height to live crown (Principal #2). Maintenance burning, approximately 11 years after the initial prescribed fire treatment, would help sustain low levels of surface fuels and understory vegetation.

### Resource Indicator and Measure: Flame Length

The proposed treatments would have a beneficial, moderate, long-term impact on reducing and maintaining potential flame lengths in the WUI and along major access routes. Compared to the no-action alternative, almost all (~96%) of the relevant area would be expected to have flame lengths less than 4 feet, which would increase the ability of suppression resources to control and contain wildfires. The proposed treatments would directly reduce surface, ladder, and canopy fuels and thus decrease potential fire behavior.

Ongoing maintenance prescribed burning would be needed to maintain low fuel loading and vegetation structure consistent with the desired condition for the project area. The follow-up underburning treatments should occur within the historic mean fire return intervals to keep potential fire behavior consistent with the fire regimes in the project area.

AR 12688

8-ER-1614

*Resource Indicator and Measure: Particulate Matter*

The proposed prescribed fire treatments would have an adverse, moderate, very short-term impact on air quality and human health over the life of the project. Repeated prescribed burning during the life of the project would produce smoke that typically lasts 1-3 days per burn. Several burns could be conducted each year but the area that can be burned is limited to no more than 20% of any sub-watershed per year, which roughly translates into no more than 5,000 acres. The timing and duration of prescribed fire treatments are described in more detail in Appendix A.

Current evidence suggests a positive association between particulate matter emissions and all-cause mortality and respiratory morbidity, especially for sensitive groups, which includes people with respiratory diseases, older adults, children, and pregnant women (Cascio 2018). Limiting the impact of these effects would be accomplished through regulation, permitting, and careful consideration of burning windows. Smoke production from the proposed prescribed burning would be permitted and regulated by the Washington State Department of Natural Resources (DNR), which limits approvals to when weather and atmosphere conditions are favorable for smoke dispersal (Appendix B, Design Feature AQ1). District Prescribed Fire Managers, in conjunction with the DNR and Washington State Department of Ecology, would monitor favorable atmospheric conditions and limit emissions from prescribed burning treatments to curtail potential adverse smoke impacts in the affected airsheds (Appendix B, Design Features AQ1 and AQ4). The public would also be notified of prescribed fire activities before implementation (Appendix B, Design Feature AQ3). Together, these measures should limit both the intensity and duration of air quality impacts.

Hand and machine fireline, described in Chapter 2 and Appendix A of the EA, would be required to contain the proposed prescribed fire operations. A substantial amount of this fireline would be used to break up larger burn units into smaller-sized units if needed to obtain smoke approval. This practice represents a compromise between additional ground disturbance and increased implementation costs to receive smoke approval for smaller ventilation windows.

## Cumulative Effects

Grazing, fuelwood gathering, and adjacent landowner thinning and prescribed fire emissions represent the only present or reasonably foreseeable actions within the spatial or temporal context of the effects analysis that would affect the resource indicators used in the analysis. These effects are difficult to quantify but are not estimated to change the intensity of impacts when combined with the proposed action as described qualitatively below.

*Resource Indicators: Crown Fire Activity and Flame Length*

Grazing by cattle removes fine fuels, i.e. grasses, forbs, and other herbaceous material, which are strongly associated with fire behavior potential (Barrows 1951; Strand et al. 2014). Fuelwood gathering, to the extent that it occurs as permitted by the current district firewood policy, reduces the amount of dead and down debris and standing snags within proximity to open NFS roads. Reducing the amount and continuity of fine fuels follows Principle #1 (reduce surface fuel loading), which is anticipated to reduce fire behavior potential directly proportional to the amount of material removed. Therefore, the effects of ongoing grazing and fuelwood gathering along with the effects of the proposed action would result in a long-term, moderate, and beneficial effect on crown fire activity and potential flame length in the WUI and along major access routes.

Adjacent landowners, including the Washington Department of Natural Resources (DNR) and private individuals, plan (or may plan) to conduct thinning and prescribed fire operations within the temporal horizon of this analysis. These activities would occur within the same watersheds and defined WUI as the

proposed actions and would potentially impact crown fire activity and flame lengths. The timing and location of the thinning by private landowners is unknown and therefore not considered here. The proposed thinning and burning by the DNR along with the effects of the proposed action would result in a long-term, moderate, and beneficial effect on crown fire activity and potential flame length in the WUI and along major access routes and ridges. The planned thinning and prescribed fire activities by the DNR are expected to implement Principles 1-4.

*Resource Indicator: Particulate Matter*

Particulate matter created by burning debris would be reduced by some unmeasurable amount to the extent that the public gathers debris near open roads as allowed by the district's current firewood collection program. Prescribed fire activity from adjacent landowners and/or other Forest Service projects may temporarily affect air quality within the project area. The current smoke permit process used by the State of Washington considers the potential impacts of nearby burning when evaluating requests for smoke approval for specific prescribed fire operations. Approval for burning on a given day may be denied if the cumulative effects from all burning within an airshed exceed regulatory requirements. Thus, the cumulative effects from all potential sources of wildland fire smoke from the proposed action and additional cumulative effects will result in adverse, very short-term, moderate impacts on air quality and human health.

## Effects of Forest Plan Amendments on 2012 Planning Rule Substantive Requirements

The substantive requirements that are likely affected by the amendments and are tied to fire, fuels and air quality resources are described below.

Amending Forest Plan S&G 19-8 would allow for prescribed fire treatments to reduce natural fuels on up to 65 acres of FPOG. This amendment would likely have a beneficial effect on opportunities to restore fire-adapted ecosystems (36 CFR 219.8(a)(1)(v)). Currently, this stand of FPOG is at risk from uncharacteristic effects from wildfire because it has departed substantially from its historic vegetation and fuel conditions. Although the majority of the FPOG area is characterized by a low severity, frequent fire regime with an historic mean fire return interval of approximately 16-20 years, this stand has not burned within the last 90 years. This has resulted in conditions that are likely to support high intensity, stand-replacing fire behavior during typical fire season weather conditions. Prescribed fire treatments allowed by this amendment would be implemented following Principles 1-4, which would have a beneficial, short term, moderate effect on potential fire behavior in stands of FPOG. Specifically, the proposed treatments directly benefit FPOG because they would reduce/alter surface and ladder fuels such that this stand would have reductions in crown fire activity and flame lengths, which would help restore the low severity, frequent fire regime associated with this stand. Without this amendment, this stand would continue to be at high risk of experiencing stand-replacing fire behavior during the next wildfire which likely degrade its FPOG status.

## Summary

The issues related to fire, fuels, or air quality raised during public comment periods would be addressed by each alternative as shown in Table 23.

AR 12690

**Table 25. Comparison of how alternatives address key issues related to fuels & air quality**

| Issue | Indicator/ Measure | Treatment | Alternative 1 | | Alternative 2 | |
|---|---|---|---|---|---|---|
| Issue #6: Prescribed burning will adversely affect air quality, public health, and visibility. Address local air-quality concerns and communicate in a timely manner through a communications strategy. Issue #8: Project activities will negatively impact the local economy with […] smoke from prescribed burning […]. | Tons of PM 2.5 and PM 10 emissions by treatment type | | Tons of emissions | | Tons of emissions | |
| | | | PM 2.5 | PM 10 | PM 2.5 | PM 10 |
| | | Hand & machine piles | 0 | 0 | 554 | 329 |
| | | Landing piles | 0 | 0 | 40 | 46 |
| | | Underburn (initial) | 0 | 0 | 3131 | 3694 |
| | | Underburn (maintenance) | 0 | 0 | 1218 | 1436 |
| | | **Totals** | **0** | **0** | **4943** | **5834** |

| | Alternative 1 | Alternative 2 |
|---|---|---|
| Issue #2: […] Road construction and opening roads are not needed for restoration.<br><br>Issue #11: Shaded fuelbreaks outside of WUI are ineffective and do not address landscape departures. | 0 miles roads constructed or opened.<br>0 acres shaded fuelbreak treatments. | 2.8 miles of roads constructed, and 8 miles of unauthorized roads added to NFS roads for safe and efficient access to maintain restorative fuels treatments and provide wildfire response.<br><br>759 acres treated with Matrix Fuelbreak thinning prescription to help create barriers that change fire flow to limit the negative effects associated with wildfires in the WUI and to facilitate fire suppression operations. Consistent with available research that suggests fuelbreaks be designed to form a connected network that start and end at logical locations that are relevant to fire control operations (Agee et al. 2000). |
| Issue #7: Treatments on recently burned areas […] are not needed for fuels reduction. Conversely, treatments in burned areas are necessary to promote recovery and restoration. | 0 acres treated in areas burned by the 2021 Cedar Creek fire.<br>Fuel buildup over time will reach levels supporting undesirable fire effects for dry forest environment. | 100 acres treated with understory (noncommercial) thinning and prescribed fire after area has recovered to maintain desired stand stocking and low fuel loading consistent with the fuel loading typical of this dry forest environment |
| Issue #22: Thinning will create debris and allow for growth of more fine fuels, which will increase fire behavior. | 0 acres treated.<br>Surface fuels and stand structure more likely to support crown fire behavior with high-severity fire effects. | 23,167 acres treated with thinning and/or prescribed fire.<br>Combined surface fuel treatments as proposed by this project would create overall reduction in expected fire behavior and fire severity, especially in comparison to untreated stands, as supported by substantial evidence and modelling. |

Table 24 summarizes the impacts of Alternatives 1 and 2 on fire behavior and air quality resource indicators. Alternative 1 provides for natural succession more effectively than Alternative 2 because it

AR 12691

would not implement any management activities in the project area, but it would result in increased crown fire activity because stand density and fuel loading would not be reduced through thinning and prescribed fire treatments, and shrub and grassland vegetation communities shrink with continued conifer encroachment (Hessburg et al. 2000b). Alternative 2 does not provide for this approach because it would not meet Needs #2, 3, or 4. In contrast, proposed treatments in this alternative would cause beneficial, short to long-term, minor to moderate effects on crown fire activity and potential flame lengths. The sub-watersheds in the project area would likely see a decrease in area with a high likelihood of crown fire activity during peak fire season weather conditions. Additionally, flame lengths within the WUI and along major access roads are almost all expected to be low enough to enable successful fire suppression operations during peak fire season conditions.

Compared to Alternative 1, Alternative 2 would meet Needs # 2, 3, and 4 more effectively because it would reduce the likelihood of crown fire behavior and high flame lengths along major ridges and roads. These changes would promote fire behavior that would be more aligned with historical norms with less likelihood of high-severity fire effects. Alternative 1 best addresses concerns about air quality impacts (Issues #6,8) from prescribed fire emissions associated with this project because it would not create any. However, the tradeoff for not implementing prescribed fire treatments in this alternative would likely be an increase in emissions during wildfires that are likely to continue to occur in the project area, with heavier concentrations of smoke emitted during periods that do not provide for adequate dispersion and ventilation. The likely result of this would be more intensive and sustained air quality impacts. Proposed prescribed fire treatments in Alternative 2 would result in very short-term, adverse, moderate impacts on air quality over the life of the project; particulate matter emissions would likely increase in the short-term due to a substantial increase in the amount of burned area in the project area. While this alternative creates more emissions than Alternative 1, the effects of these emissions would be minimized by adhering to smoke approval requirements and design features described above.

**Table 26. Summary of effects of Alternatives 1 and 2 on fire, fuels and air quality resource indicators**

| Resource Element | Resource Indicator | Measure | Sub-watershed | Alt. 1 (% area) | Alt.2 (% area) | Change (% area) |
|---|---|---|---|---|---|---|
| Develop, maintain, or restore potential fire behavior to conditions within the desired range of variability | The amount of crown fire activity within each sub-watershed as compared to the desired range of variability | Percentage of area, by sub-watershed, likely (>50%) to experience crown fire activity during peak fire season weather conditions | Lower Twisp | 40 | 17 | -23 |
| | | | Alder | 17 | 11 | -6 |
| Reduce potential fire behavior within and adjacent to the WUI and along major access routes and ridges | Conditional flame length class | Percentage of area in the WUI and within 200 feet of major roads and ridges by conditional flame length class | **Flame length class (ft)** | | | |
| | | | 0-4 | 80 | 96 | +16 |
| | | | 4-8 | 7 | 4 | -3 |
| | | | 8-11 | 3 | <1 | -3 |
| | | | >11 | 10 | <1 | -10 |
| Air Quality | Emissions of PM 2.5 and PM 10 | Tons of emissions by | **Treatment** | **Alt 1** | **Alternative 2** | |
| | | | | | Years 1-10 | Years 11-20 |

AR 12692

8-ER-1618

| Resource Element | Resource Indicator | Measure | Sub-watershed | | Alt. 1 (% area) | Alt.2 (% area) | Change (% area) | |
|---|---|---|---|---|---|---|---|---|
| | | | | | PM 2.5 | PM 10 | PM 2.5 | PM 10 |
| | | treatment type | Hand & machine piles | 0 | 277 | 329 | 277 | 329 |
| | | | Landing piles | 0 | 40 | 46 | 0 | 0 |
| | | | Underburn (Initial) | 0 | 3131 | 3694 | - | - |
| | | | Underburn (Maint.) | 0 | - | - | 1218 | 1436 |
| | | | Totals | 0 | 3448 | 4069 | 1495 | 1765 |
| Abbreviations: PM, particulate matter; MAINT, maintenance. | | | | | | | | |

# Transportation

This section is summarized from the Twisp Restoration Project Final Transportation and Travel Analysis Report (Maher 2022). Road maintenance levels (ML) used in this analysis are grouped as closed (ML1) or as open to varying levels of traffic (MLs 2, 2A, 3, 4). The issues raised during public comment periods that are related to transportation resources would be addressed by each alternative as described in Table 27. Direct, indirect, and any cumulative effects of each alternative on transportation resource indicators are shown in Table 28.

## Alternative 1: Direct and Indirect Effects

### Resource Indicator: NFS and Unauthorized Roads

The existing transportation network in the project area is described in Table 28 and shown in Appendix E. Of the 14.5 miles of existing NFS and unauthorized roads in the project area, approximately 82.8 miles (72%) are part of the inventoried network of NFS roads that was developed over the last 80 years to meet forest management and public recreation needs. While past road maintenance funding kept road surfaces up to standards, declining budgets have resulted in a backlog of road maintenance work. As a result, some roads do not meet current safety or design standards. Other roads are not needed as frequently as in the past because of changes in logging system practices or management objectives. A 1.3-mile NFS road in the Alder Creek area crosses private land to access NFS lands without a recorded easement with the landowner. Culverts were installed prior to consideration of 100-year storm flows or fish access; several culverts in the project area are consequently undersized and increase the risk for road failure during these storm flows.

The remaining 31.7 miles of roads in the project area (28%) are not currently in the NFS road inventory and are therefore considered "unauthorized roads". The TAP requires that these roads be evaluated with the existing NFS road network in the project area. Many of these roads were constructed for past FS management access, decommissioned to different standards than currently exist without consideration of hydrologic stability, and then dropped from the NFS road inventory at that time. Other roads were created by forest users and are not needed for current land management access. In one location, 0.2 miles of

AR 12693

unauthorized road accesses private lands adjacent to the project boundary and is not authorized by permit or easement as required by 36 CFR 251.50, FSH 2709.12 and 41.23, and FSM 2733.

Portions of the project area in the Alder, Canyon, Little Bridge, and Poorman Creek drainages have no access as identified in the TAP. Opportunities for vegetation and fuels management in these areas are limited by lack of access to ridgetops, as explained further in the vegetation and fuels resource reports.

Hazard trees along open NFS roads in the project area present an ongoing concern for motorist safety and access as trees die from insects, disease, or wildfire and become unstable. Currently, hazard tree removal on the district is limited to 2 trees/acre per year without further analysis. Removing more trees than this would require additional ESA consultation.

Alternative 1 would have no impact on current access in the project area because it would not change the existing road system or upsize culverts. All road maintenance costs would continue to be the responsibility of the Forest Service. Limited routine road maintenance would continue to occur as funding became available but would remain lower than needed to maintain all existing roads. The ongoing decline in road maintenance and lack of culvert replacements means that these roads would continue to be maintained to a lesser standard, which is not sustainable over the long term. Deferred maintenance costs would continue to increase to this road system with no foreseeable funding to make the necessary repairs. As road conditions continue to decline, the likelihood of road failure would increase over time, with resulting impacts to other resources through sediment release (refer to Hydrology report). Roads that were decommissioned in the past to different standards, and user-created roads, would continue to exist across the project area, providing access in locations that is not needed or desirable for resource management and increasing the road drainage network as discussed in the Hydrology report. Hazard tree-removal would be limited to the current limitation of two trees per acre until additional ESA consultation occurred at some future time, resulting in ongoing risks to forest road users.

## Alternative 2: Direct, Indirect, and Cumulative Effects

### Resource Indicator: NFS and Unauthorized Roads

Alternative 2 would have a direct, beneficial, major, long-term effect on the amount of NFS and unauthorized roads because it would reduce the number of NFS roads to be maintained, allowing limited funds to be used more effectively and reduce resource impacts while facilitating access (Table 4). No unauthorized roads would remain in the project area because they would be added to the NFS road inventory where they provided desired access, decommissioned, or would become private roads permitted to the landowners whose land they access as authorized by the 1976 Federal Land Policy Management Act, pending application from that landowner. If applications are not received or permit is not provided, this 0.2 miles of unauthorized road would be decommissioned. When considered together, these changes would help meet TAP requirements and Travel Management goals.

Alternative 2 would add 10.9 miles of new permanent roads to the NFS inventory to access existing facilities under special use permits, existing campgrounds, or proposed and future vegetation management and prescribed fire treatment areas. Of this amount, 8 miles (73%) are existing unauthorized roads, most of which are already in use with varying degrees of improvement needed to bring them up to standard. Another 2.8 miles would be new roads that would initially be built to access portions of the project area for proposed overstory thinning and subsequent prescribed fire treatments. Of the total new permanent roads proposed, 8.44 miles (75%) would be closed post-project (ML1), and the remaining 1.8 miles (25%) would be open for administrative access only (ML2A roads).

AR 12694

Compared to the No Action alternative, NFS roads would decrease by 1% (1.2 miles) post-project; this change includes the addition of 10.9 miles of permanent roads as described, countered by decommissioning 10.9 miles of existing NFS roads that would not be needed in the long term, are redundant with other nearby roads, are causing resource damage. An additional 1.1 miles of current NFS roads that lie on private land would be removed from the NFS road inventory because the FS has no legal easement with the landowner. Access for special use permit holders (such as those with facilities at the McClure Mountain Communication Site) and agency personnel would exist on 11.3 miles of roads closed to the public and designated as "Administrative Use Only", or "ML2A". Most of these roads have been gated with restricted access for decades; this project would make this designation consistent with Forest Service Handbook direction.

Of the total 34.5 miles of roads proposed for decommissioning, approximately 10.9 miles (32%) includes of NFS roads and 23.7 miles (68%) of unauthorized roads, including roads that would be decommissioned to trails for nonmotorized recreation use or decommissioned to stock driveways to allow for stock access as part of administering range permits. The NFS road in the Alder Creek area with no easement would be used as a Temporary haul route pending agreement with the landowner. When the agreement expires, the road would be decommissioned where it crosses NFS lands (0.25 miles); where it crosses private lands, it would be dropped from the NFS road inventory, and no further action would be taken.

During overstory thinning activities, up to 109.3 miles of existing NFS (72%), new permanent NFS (3%), temporary roads (4%), and unauthorized roads (21%) would be in use as log hauling routes. Log hauling would likely occur in phases in an estimated three timber sale areas within this project and would likely be offered at 1-year intervals after project implementation began, lasting for 3 to 5 years each. Given this timeframe, it is unlikely that all log hauling roads would be in use as haul routes at the same time. Temporary log hauling roads and unauthorized roads used for haul would be built or improved to the minimum extent necessary for safe operations. All temporary log hauling roads would be fully decommissioned post project, while other roads used for haul would remain or be added as NFS roads, fully decommissioned, or converted to trails or stock driveways. An additional 20 miles of NFS roads outside of the project area in in the Buttermilk Creek, Canyon Creek, Little Bridge Creek, and Thompson Creek drainages would be used for log hauling because these roads provide established access without the need to build temporary or new roads.

The estimated 78.6 miles of NFS roads used as log hauling routes would receive maintenance and/or reconstruction to minimize impacts of heavy traffic, then would be open, closed, or decommissioned post-log-haul as specified in Appendix A. This maintenance or reconstruction would not likely occur otherwise given current and projected road maintenance budgets and would prolong the longevity of these roads while reducing resource impacts like long-term sediment production as discussed in the hydrology report. During summer log hauling operations, approximately 10.4 miles of open NFS roads would be treated with water or lignin sulfonate to minimize dust and associated visibility issues. This treatment would not occur on County roads because Federal funds cannot be used on county lands without appropriate agreements with the county, and these are not in place.

Up to 4.8 miles of temporary roads would be constructed to the minimum extent needed to provide for safe operations and decommissioned after use, generally within 12-18 months of construction. However, in one location in Alder Creek, approximately 0.6 miles of two temporary roads included in the total above would also be used by WA DNR and BLM staff to access their adjacent lands for thinning operations. Depending on the timing of timber harvest by these agencies, these temporary roads may remain for up to 3 years in a closed status, then decommissioned by these agencies after use. District staff are seeking approval from FS Region 6 staff to use approximately 2.5 miles of roads on private and BLM lands for log hauling to facilitate overstory thinning treatments in the Alder Creek vicinity, per FSM

AR 12695

5403.1, 5403.0, 5461.2, and 5461.21. This use would occur pending agreement by landowners and development of appropriate temporary road use agreements.

The unauthorized roads, new permanent roads, and all temporary roads are proposed to access portions of Matrix lands where condition-based overstory thinning treatments may occur as described in Chapter 2. These roads would be constructed by the timber sale purchaser or agent only if the forested stands accessed by these proposed roads met the decision points listed above for the thinning prescription Matrix Harvest Thin and if the market value of the timber provided by the sale in that area supported the expense of building new roads.

Other road-related actions in this alternative that would benefit the NFS road inventory include upsizing three culverts and installing four AOPs. These actions would help stormproof roads, resulting in less sedimentation and decreased risk of road failure over time. Road maintenance associated with log hauling operations proposed in this project also benefit NFS roads by reconditioning roadbeds and creating road drainage. Hazard tree removal along up to 110.8 miles of open NFS roads as proposed in this project would provide for a timelier reduction in risks to motorists in the project area in comparison to Alternative 1 because it would allow for removal of these trees more rapidly than the current restriction of up to 2 trees per acre per year.

## Proposed Road Changes Since Draft EA

As described in Chapter 2 ("Changes between Draft and Final Environmental Assessments"), the following changes occurred since the Draft EA comment period (Table 25):

- The post-project status of most proposed new road construction changed from ML2 to ML1 or ML2A to address concerns about wildlife impacts.

- Review of more detailed LiDAR (light detecting imagery) revealed several additional unauthorized roads scattered throughout the project area. The interdisciplinary team added these roads to the Travel Analysis Process and included them in the transportation proposal in Alternative 2. In Table 25, these roads are identified as "Not Identified" in the column "Draft EA Proposal". One of these roads accesses WA DNR lands and would be under permit to this agency for their use.

- During post-fire revision of the project, the IDT also identified two roads that had been proposed for temporary construction on ridges along the project boundary in Canyon Creek and Little Bridge Creek drainages that would be beneficial for future access to treat locations within and adjacent to the project area. Rather than building these roads, decommissioning them in this project, and rebuilding them for future treatments in and adjacent to the project area, the IDT proposes that these roads be added as NFS roads and closed post-project.

- Two temporary road locations were changed to use sites with more durable rocky soils, reducing the total area of landscape disturbance by 0.27 miles.

AR 12696

**Table 27. Summary of road changes between Draft EA and Final EA**

| Draft EA Proposal | Final EA Proposal | | | | | |
|---|---|---|---|---|---|---|
| | Decommission | Decommission to Stock Driveway | ML1 | ML2 | ML2A | Grand Total |
| Decommission | | 0.7 | 1.1 | | 0.5 | 2.3 |
| ML1 | | | | | 2.9 | 2.9 |
| ML2 | 0.4 | | 0.3 | | 1.3 | 2.0 |
| ML2A | | | 2.6 | 0.3 | | 2.9 |
| Not identified | 2.6 | | 2.8 | | 1.0 | 6.4 |
| Grand Total | 2.9 | 0.7 | 6.8 | 0.3 | 5.7 | 16.4 |

Figure 10 and Table 26 display the roads that were added or have proposed post-project changes since the Draft EA. See Figures 18-21 (Appendix E) for all transportation changes proposed in this alternative.

**Figure 10. Road Changes between Draft and Final EA**



AR 12697

8-ER-1623

**Table 28. Specific road changes between Draft and Final EA**

| Map ID | Current Status | Miles | Draft EA Proposal | Final EA Proposal |
|--------|----------------|-------|-------------------|-------------------|
| 53 | ML2 | 0.5 | ML2 | ML2A |
| 64 | ML2 | 0.3 | ML2 | ML2A |
| 76 | ML2 | 0.3 | ML2 | ML1 |
| 124 | Unauthorized | 0.2 | Not identified | Decommission |
| 154 | Unauthorized | 0.1 | ML2 | ML2A |
| 169 | ML1 | 2.8 | ML1 | ML2A |
| 212 | Proposed Temp Road | 0.2 | Not identified | Decommission |
| 282 A | ML1 | 0.3 | ML2A | ML2 |
| 282 B | ML2 | 2.6 | ML2A | ML1 |
| 393 | Unauthorized | 0.1 | ML1 | ML2A |
| 469 | Proposed Unauthorized to NFS Road | 0.5 | Decommission | ML1 |
| 470 | Unauthorized | 0.1 | ML2 | Decommission |
| 760 | ML3 | 0.7 | Decommission | Decommission to Stock Driveway |
| 791 | Proposed Unauthorized to NFS Road | 0.5 | Decommission | ML2A |
| 793 | Proposed Unauthorized to NFS Road | 0.5 | ML2 | ML2A |
| 814 | Proposed Unauthorized to NFS Road | 0.2 | Decommission | ML1 |
| 832 | Proposed Unauthorized to NFS Road | 0.4 | Decommission | ML1 |
| 1010 | Proposed New Construction | 0.7 | Not identified | ML2A |
| 1020 | Proposed Unauthorized to NFS Road | 0.0 | Not identified | Decommission |
| 1021 | Proposed New Construction | 0.8 | Not identified | ML1 |
| 1022 | Unauthorized | 0.1 | Not identified | Decommission |
| 1023 | ML2 | 0.3 | ML2 | Decommission |
| 1027 | Unauthorized | 0.1 | Not identified | Decommission |
| 1047 | Proposed Unauthorized to NFS Road | 0.3 | Not identified | ML1 |
| 1050 | Proposed New Construction | 0.5 | Not identified | ML1 |
| 1054 | Proposed New Construction | 0.8 | Not identified | ML1 |
| 6009 | Proposed Unauthorized to NFS Road | 0.2 | Not identified | ML1 |
| 6011 | Unauthorized | 0.1 | Not identified | Decommission |
| 6011 | Unauthorized | 0.2 | Not identified | Decommission |
| 6012 | Unauthorized | 0.1 | Not identified | Decommission |

AR 12698

8-ER-1624

| Map ID | Current Status | Miles | Draft EA Proposal | Final EA Proposal |
|--------|----------------|-------|-------------------|-------------------|
| 6016 | Proposed Unauthorized to NFS Road | 0.3 | Not identified | ML1 |
| 6022 | Unauthorized | 1.1 | Not identified | Decommission |
| 6027 | Unauthorized | 0.1 | Not identified | Decommission |
| 6028 | Unauthorized | 0.1 | Not identified | Decommission |
| 6028 | Unauthorized | 0.1 | Not identified | Decommission |
| 6049 | Unauthorized | 0.1 | Not identified | Decommission |
| 6054 | Proposed Unauthorized to NFS Road | 0.3 | Not identified | ML2A |

## Cumulative Effects

Past actions related to the transportation network are considered in Alternative 1 in a description of the existing road network. Of the present and reasonably foreseeable future actions occurring in the project area, road maintenance activities such as blading, brushing, and clearing out culverts will affect NFS roads by maintaining the Transportation System for longevity use and drainage. While this activity will benefit NFS roads to the degree it is funded, it will not add cumulative effects to the resource indicators used in this analysis. Since no other ongoing or reasonably foreseeable future actions affect these indicators, there are no cumulative effects to address in this analysis.

## Summary

Alternative 1 addresses Issue #2 (impacts to public access on NFS lands) by retaining the existing level of public access. In comparison, Alternative 2 would decrease motorized access on existing open NFS roads by a total of 16% through closure (5.5 miles) or decommissioning (15.8 miles). Closed roads used for non-motorized access would decrease by 26% compared to Alternative 1. Alternative 1 does not meet Need #5 because it does not address current or projected road needs, leaving a road system that is less affordable and inefficient compared to Alternative 2. This alternative does not comply with agency direction as specified by the Travel Management Rule (36 CFR 212.5, subparts a & b). Alternative 2 meets Need #5 because it satisfies the Travel Management Rule by using a project-specific Travel Analysis to determine current and future road needs, creating a more sustainable transportation system with fewer impacts to soil, aquatic and wildlife resources that can be more economically maintained. This alternative also complies with the Surface Transportation Assistance Act, National Forest Roads & Trails Act, Highway Safety Act, and the Forest Plan. In doing so, Alternative 2 would create a more sustainable transportation system with fewer impacts to soil, aquatic and wildlife resources that can be more economically maintained.

Table 27 describes how each alternative addresses issues related to transportation resources. Alternative 1 would not impact current public access because all existing roads are retained in the project area. In comparison, Alternative 2 would decrease motorized access on existing open NFS roads (ML 2, 3, and 4) by a net total of 10.1 miles and would eliminate unauthorized roads (31.7 miles) by either adding them to the system, decommissioning to trails or stock driveways, or decommissioning altogether. Note that the degree to which unauthorized roads are used by the public for recreation is difficult to quantify. Impacts to public access are described further in the Recreation report.

AR 12699

**Table 29. Comparison of how alternatives address key issues/concerns related to transportation**

| Issue | Indicator/Measure | Alt 1 | | Alt 2 | |
|---|---|---|---|---|---|
| **Issue/Concern #2**<br><br>Opening closed roads, building temporary or permanent roads, and/or trail building will adversely affect wildlife, and damage soils and sensitive plant habitat. | Miles of road in project area by maintenance level and by unauthorized roads | ML 1 | 31.1 Miles | ML 1 | 28.8 Miles |
| | | ML 2 | 31.5 Miles | ML 2 | 31.2 Miles |
| | | ML 2A | 0 miles | ML 2A | 11.5 Miles |
| | | ML 3 | 20.1 Miles | ML 3 | 10.3 Miles |
| | | ML 4 | 0.1 Miles | ML 4 | 0.1 Miles |
| | | UA | 31.7 Miles | UA | 0 Miles |

Table 28 summarizes the effects of the proposed actions on transportation resources. Alternative 1 does not meet Need #5 because it does not address current or projected road needs, leaving a road system that is less affordable and inefficient compared to Alternative 2. This alternative does not comply with agency direction as specified by the Travel Management Rule (36 CFR 212.5, subparts a & b). In contrast, Alternative 2 meets Need #5 because it satisfies the Travel Management Rule by using a project-specific Travel Analysis to determine current and future road needs. This alternative also complies with the Surface Transportation Assistance Act, National Forest Roads & Trails Act, Highway Safety Act, and the Forest Plan. In doing so, Alternative 2 would create a more sustainable transportation system with fewer impacts to soil, aquatic and wildlife resources that can be more economically maintained.

**Table 30. Summary of effects of Alternatives 1 and 2 on transportation resources.**

| Resource Element | Resource Indicator | | Alternative 1 | Alternative 2 |
|---|---|---|---|---|
| Road System | Miles of NFS roads by ML, and of Unauthorized (UA) Roads | ML1 | 31.1 Miles | 28.8 Miles |
| | | ML2 | 31.5 Miles | 31.2 Miles |
| | | ML2A | 0 miles | 11.5 Miles |
| | | ML3 | 20.1 Miles | 10.3 Miles |
| | | ML4 | 0.1 Miles | 0.1 Miles |
| | | UA | 31.1 Miles | 0 Miles |

# Recreation

This section is summarized from the Twisp Restoration Project Final Recreation Report (Seifried 2022). Resource concerns raised in connection with recreation were addressed through adjusting the proposed action, design features (Appendix B), or responses to comments. The issues raised during public comment periods that are related to recreation resources would be addressed by each alternative as described in Table 29.

## Effects of Forest Plan Amendments on 2012 Planning Rule Substantive Requirements

The substantive requirements that are likely affected by the amendments and are tied to recreation resources are described below.

Amendments to Forest Plan S&Gs 14-6A and 26-6A would allow for reductions in deer winter range in 3256 and 866 acres respectively. These amendments would likely have a beneficial effect on social and

AR 12700

8-ER-1626

economic sustainability (36 CFR 219.8(b)(1)) and sustainable recreation (36 CFR 219.8(b)(2)). Within the project area, MA 14 and MA 26 lie directly adjacent to or near private lands including the communities of Buttermilk and Pine Forest (Firewise USA communities), Sun Mountain Lodge (a renowned resort and major employer in the local area), the greater Twisp River drainage, and the city of Twisp. In addition, the local economy in the Methow Valley is closely tied to recreation opportunities found on NFS lands within and around the project area.

While only a small number of trails are within the project area, many trails of high recreational value are adjacent to or near the project area.  Treatments allowed by these amendments would have a beneficial long-term impact on economic sustainability and sustainable recreation by promoting resilience to expected disturbances from wildfires, insects and disease, and climate change as explained in the vegetation and fuels sections. Increasing resilience to these disturbances would help reduce the likelihood that these disturbances would cause uncharacteristically severe impacts to adjacent private lands and improvements or diminish the recreation value of the project area and adjacent areas, which would in turn have adverse impacts on the economic stability in nearby communities.

## Summary

The issues related to recreation raised during public scoping would be addressed by each alternative as shown in Table 29.

**Table 31. Comparison of how alternatives address key issues related to recreation**

| Issue/Concern | Alt 1 | Alt 2 |
|---|---|---|
| **Issue #8** Project activities will negatively impact the local economy with log hauling, noise and traffic, smoke from prescribed burning, and by limiting recreation access. | No impacts from log hauling, noise, traffic, prescribed burning would occur. Recreation access would not be limited. | The local economy in the Methow Valley relies in part on recreation opportunities found on NFS lands within and around the project area. Project activities such as area or trail closures, increased truck traffic, or smoke from prescribed fires would have a short term, minor, negative effect on recreation in both the immediate project area and surrounding areas and travel routes. A substantial body of scientific evidence shows that treatments such as prescribed fire and thinning combined with prescribed fire contribute to decreased fire severity in the event of subsequent fires (Cansler, 2021). The improved resilience to severe wildfire, post project, would have a long term, moderate, beneficial effect on recreation in the project area and adjacent areas. It would help to protect local communities along with long term recreational access and associated recreation-based economic benefits. |
| **Issue #14** Dozer fireline will damage trails and promote off-road vehicle use. | No dozer fireline is constructed that may damage trails and promote off-road vehicle use. | The protection of recreation infrastructure, including trails, and post project repair is covered under Issue #1.  All hand and dozer line used for prescribed fire include rehabilitation measures to help disguise fire lines and minimize unintended use (Appendix B), including restoring soil, organic layers or vegetative debris; blocking access to firelines from roads or trails, and camouflaging these points.  Further measures to prevent unintentional motorized and non-motorized use are described in Appendix B, Mitigation #1. |

AR 12701

8-ER-1627

| Issue/Concern | Alt 1 | Alt 2 |
|---|---|---|
| **Issue #1:** Project activities will limit public access and opportunities for recreation, firewood gathering, and other uses, and will damage trails. Closing Roads End Campground will restrict recreation opportunities and overburden existing recreation facilities. | No actions would occur through this project, and no changes to public access, opportunities for recreation, firewood gathering, or other uses would occur. No trail damage would occur, and Roads End Campground would not be removed. | Some trails and roads would have short-term closures during project implementation to ensure public safety. The project area contains 1.7% of total district trail miles; the remaining 98.3% of trails outside of the project area would remain accessible to the public for the duration of the project. The overall effect of the trail closures would have a short term, negligible, negative impact to recreation access. Design features would minimize trail damage and require repair to standards.

Motorized access on existing open NFS roads within the project area would decrease by 19% through closure or decommissioning (10.4 miles). Closed roads used for non-motorized recreation would decrease by 7% (2.3 miles). Alternative 2 would add 10.9 miles of unauthorized and newly constructed roads to the NFS inventory to provide access where needed for existing and ongoing public and administrative uses. 31.7 miles of unauthorized roads in the project area that may have had incidental use by the public would be eliminated as they would become NFS roads (25%), stock driveways or non-motorized system trails (5%) or be decommissioned (70%). Nonmotorized recreation access would increase by 3.1 miles through decommissioning roads to trails or stock driveways. Road closures would provide access for non-motorized use wherever feasible. Changes to road access would not adversely impact permit areas used by outfitter-guides in the project area. Opportunities for public use of NFS lands such as hiking, camping, hunting, horseback riding, and mushroom hunting would continue through use of over 80 miles of NFS roads post-project.

Plowing may occur on up to 1.7 miles of groomed snowmobile routes on NFS Rd 4300000 from its junction with NFS Rd 4300475 to the junction with NFS Rd 4300300 (in the vicinity of Blackpine Lake) if necessary for winter timber haul. Alternately, 5.6 miles of NFS Rd 4300300 from its intersection with FSR 4300000 to the Poorman SnoPark may be plowed. Only one of these routes would be plowed during any given winter.

Opportunities for firewood gathering would diminish due to road closures or decommissioning, representing a loss of less than 1% of existing firewood gathering opportunities across the district.

Removing Roads End Campground and a campsite at Poplar Flats Campground would eliminate 5 campsites in the Twisp River Drainage. This loss would be addressed by constructing 5 replacement campsites at South Creek, Mystery Creek, and Poplar Flats Campgrounds. An additional estimated 15 dispersed campsites are scattered throughout the project area for public use. The Gilbert Trailhead would remain open. |

## Scenic Resources

This section is summarized from the Twisp Restoration Project Final Scenic Resources Report (Jackson 2022). Resource concerns related to scenic resources were addressed through design features (Appendix

AR 12702

B) or responses to comments. The issues raised during public comment periods that are related to scenic resources would be addressed by each alternative as described in Table 30.

## Summary

The issue related to scenic resources raised during public comment periods would be addressed by each alternative as shown in Table 30.

**Table 32 Comparison of how alternatives address key issues related to scenic resources**

| Issue/Concern | Alt 1 | Alt 2 |
|---|---|---|
| Issue #18: Thinning, fireline, and prescribed burning will degrade visual character of project area | Alternative 1 would not actively alter scenic resources but would maintain denser forest conditions as described in the Vegetation and Fuels reports. These conditions are more susceptible to high-severity wildfires that are more likely to substantially alter scenery in scenic travel corridors, recreation use areas, and viewsheds. | Treatments would comply with Forest Plan VQOs specific to identified scenic travel corridors, recreation use areas, landscape visibility and scenic sensitivity levels in each viewshed. These VQOs provide the degree of acceptable alteration of the characteristic landscape and are also a measure of the degree to which a landscape is visually perceived to be complete. The project will be designed to meet Retention, Partial Retention, and Modification-Maximum Modification VQO's assigned by the Forest Plan as seen from the viewsheds described above. Several design features described in Appendix B help ensure that thinning, prescribed burning, and fireline in this project would meet VQO standards. |

# Invasive Plants

This section is summarized from the Twisp Restoration Project Final Invasive Plant report (McFetridge and Baraibar 2022). The issues raised during public comment periods that are related to invasive plants would be addressed by each alternative as described in Table 31.

## Summary

Several invasive plants occur in the project area, summarized in the Invasive Plant report. Six Established Invaders occur throughout the project area:  Cirsium vulgare (bull thistle), Verbascum thapsus (common mullein), Poa bulbosa (bulbous bluegrass), Taraxacum officinale (dandelion), Bromus tectorum (cheatgrass), Rumex crispus (Curly dock), and to a lesser extent, Cirsium arvense (Canada thistle). The lower priority established invaders are fairly widespread within disturbed areas in the project area and are so extensive Forest wide that they are not generally inventoried or treated. Diffuse knapweed is the only Established Invader that has been inventoried in this project, however not all populations have been mapped and the total gross acres are an estimate. Knapweed is generally only found along roads but also has invaded some of the open off-road grasslands areas. It is not continuous; it occurs as scattered individuals and in some small dense patches but very low in the dense conifer understory due to its shade intolerance. These patches may be found within some of the restoration treatment units. Diffuse knapweed is a state-listed Class B noxious weed but not designated as B in Okanogan County.  Common mullein and bull thistle are highly invasive within the soil disturbance created by the harvest activities but are much less persistent than New Invaders and diminish over time – about 5 years. The other Established Invaders listed above have not been observed to be problematic following similar forest restoration projects. Cheatgrass is present in patches throughout the shrub steppe habitat within the project area and there are specific project design criteria to limit its spread potential.

AR 12703

8-ER-1629

Resource concerns related to invasive plants, including the need to prevent further spread in new invaders, are addressed through design features and mitigations (Appendix B) that include ongoing invasive plant treatments authorized by the 2005 PNW Invasive Plant ROD and the 2017 OWNF Invasive Plant ROD that amended the Forest Plan. These RODs cover the entire 4.1 million acres of the Oka-Wen NF and authorizes the treatment of all 16,281 infested acres across the Okanogan-Wenatchee National Forest, along with treatment of invasive plants that are not currently mapped, as long as the area treated does not exceed 16,281 acres in any one year.

**Table 33. Comparison of how alternatives address key issues related to invasive plants**

| Issue/Concern | Alt 1 | Alt 2 |
|---|---|---|
| Issue #14: Dozer fireline will […] introduce weeds […].<br><br>Issue #20: Proposed treatments will spread invasive plants. | No treatments or associated actions such as dozer fireline would occur. Invasive plant treatments authorized by the 2005 PNW Invasive Plant ROD and the 2017 OWNF Invasive Plant ROD will occur as needed across the project area. | Project design features include several effective actions that would help minimize or eliminate the spread of invasive plants prior to and during project implementation. Project mitigations would treat areas impacted by proposed actions to promote recovery of native plant species and reduce the likelihood of invasive plant spread. Funding continues to be available for invasive plant treatments and these treatments continue to be effective. By improving understory forage production as a secondary effect of thinning and prescribed fire treatments, cattle distribution in the project area would likely expand, increasing access to invasive plant populations; however, the large project area would lend to equal dispersal of cattle away from the existing populations. |

# Range Management

This section summarizes the Twisp Restoration Project Final Range Management report (McFetridge 2022). Resource concerns related to range management were addressed in this project through design features (Appendix B) that would effectively address the risk of grazing impacts increasing due to actions proposed by this project, protect range developments, and provide for ongoing access to key routes used to move cattle. Roads needed for range permittee use were identified during the Travel Analysis Process for this project and designated in this alternative as needed wherever possible to provide ongoing access for continued allotment management. The issues raised during public comment periods that are related to range management resources would be addressed by each alternative as described in Table 32.

## Summary

The project area contains portions of the Little Bridge and Lookout Mountain grazing allotments. Eliminating cattle grazing is outside of the scope of this project because this activity and its impacts are effectively managed through allotment management plans as shown by the results of required yearly monitoring. Data from this monitoring show that grazing complies with requirements specified by regulatory agencies. The allotment management plans applicable to this project area include effective actions used to minimize or eliminate grazing impacts such as pasture rest and rotation, fencing (as was completed along Little Bridge Creek to exclude cattle), and other best management practices.

AR 12704

8-ER-1630

**Table 34. Comparison of how alternatives address key issues related to range**

| Issue/Concern | Alt 1 | Alt 2 |
|---|---|---|
| **Issue #16:** The project will increase impacts from cattle grazing by allowing more access to sensitive areas such as wetlands and RRs. The project should consider eliminating grazing to achieve restoration goals. | Understory forage production would continue to decline as stand density increased over time, consequently limiting livestock use patterns and distribution. Livestock use within the project area would be more concentrated in sensitive vegetation areas as the understory forage production became more limited, and allowable grazing use standards may be exceeded more readily. | Thinning and prescribed fire treatments in Alternative 2 would initially cause a brief decline in understory forage for approximately one year, then help promote understory forage production to varying degrees on up to 18,963 acres that would be further maintained for up to 20 years where maintenance underburning occurred. Increased amounts of understory forage production would improve livestock distribution throughout the grazing allotments, and increased forage availability in upland areas would help reduce grazing impacts in riparian areas. |

# Economics

This section is summarized from the Twisp Restoration Project Final Economics Report (McClelland 2022). The issues raised during public comment periods that are related to economics would be addressed by each alternative as described in Table 34. Direct, indirect, and any cumulative effects of each alternative on transportation resource indicators are shown in Table 35.

## Alternative 1: Direct and Indirect Effects

### Resource indicator: Net value of timber sale

Since there are no current commercial vegetation management contract offerings underway in the project area, there are no funds generated from the sale of timber available to fund other restoration activities in the project area. Funding for restoration activities may be available through appropriated funding, grants, agreements with other agencies or partners, or retained receipts generated from other integrated resource timber contracts (IRTC; stewardship contracts) on the Okanogan – Wenatchee National Forest.

Alternative 1 would have no economic impact and no net value because no actions would be undertaken that would result in harvesting or selling forest products, and no restoration treatments would occur, including non-commercial stand improvement thinning, prescribed burning, culvert replacement, or any other restorative treatment.

### Resource indicator: Number of Full-time Equivalent (FTE) jobs created

Without any vegetation management contracts underway in this alternative, no FTE job opportunities would be created or maintained.

## Alternative 2: Direct, Indirect, and Cumulative Effects

### Resource indicator: Net value of timber sale

Alternative 2 would have a beneficial, short-term, minor net value because it would implement commercial thinning treatments on 8,151 acres, producing an estimated 49,611 Thousand Board Feet (MBF), or 99,222 Hundred Cubic Feet (CCF) of harvestable commercial timber. See Appendix A for

AR 12705

detailed descriptions of overstory thinning treatments. Table 33 describes the economic viability of implementing Alternative 2 by comparing the estimated log price to the costs of conducting the sale. Implementing this alternative would result in benefits as described and would outweigh the timber sale costs, which means the project would be viable and a good value for further investment. When breaking this planning area into smaller projects for implementation, costs would need to be assessed carefully in each sale area and any low volume or high-cost units must be given a hard look. Any individual units that have lower-than-estimated volumes or higher-than-estimated costs would have to be balanced by units with lower costs and higher volumes to make the timber sale economically viable.

**Table 35. Commercial harvest costs and current log value**

| Commercial harvest Appraisal Item | Included within the Commercial Harvest Appraisal | Costs | Benefits |
|---|---|---|---|
| Total Adjusted Log Price including competition factor | | | $23,192,726 |
| Logging Costs (@ $91.25/CCF) | Yes | $9,054,007 | |
| Hauling Cost (@ $106.38/CCF) | Yes | $10,555,236 | |
| Brush Disposal FS (@ $2.5/CCF) | Yes | $248,055 | Fuel loading in the project is reduced |
| Road Construction/Reconstruction | Yes | $311,109 | Roads used for logging are left in better condition for administrative and public use |
| Road Maintenance (@ $6/CCF) | Yes | $595,332 | Roads used for logging are left in better condition of administrative and public use |
| Temporary Road development and decommissioning – 4.8 miles of new road and 23.3 miles of existing unauthorized roads) | Yes | $235,800 | Soil compaction and sedimentation impacts caused by unauthorized roads would be reduced through decommissioning of unauthorized roads used for logging. |
| Sub-Total | | $20,912,174 | |
| Net Value from the Appraisal | | | $2,280,552 |

Indirect economic benefits would result from proposed commercial harvest include protection of non-market resource values (i.e., soils, water, habitat, and scenic values) that are difficult to quantify but nonetheless important for ecosystem health. Moving the area to a condition where fire can play a more natural role in the ecosystem would help ensure that these resource values are protected and managed in a sustainable manner. Indirect economic benefits would also occur through protection of existing market value resources (forest resources, private property, recreation opportunities, income from tourism); biomass removal and firewood collection opportunities; potential reduction of future fire suppression costs; and opportunities to be cost-efficient by implementing vegetation management treatments at a landscape scale.

Funding available for this project may come from various sources, including future appropriations, partnerships with Tribes and other organizations, collaborative groups, agreements with other agencies, and other interested parties. Current costs for non-timber projects are detailed in the Economics report.

AR 12706

These projects would be prioritized for implementation using general guidelines such as treatments that reduce fire risk in areas closest to the WUI and main access routes; treatments that could be implemented with little or no cost or generate funds that could pay for other treatments; and treatments with a strategic location that would have a greater effect on modifying fire behavior at the landscape scale.

## Resource indicator: Number of FTE jobs created or maintained

The impact of timber harvest on direct job creation/maintenance depends on the size of the logs, local infrastructure and fluctuations in log markets. Estimated number of jobs directly created/maintained per Million Board Feet (MMBF) harvested is about 13.2 FTE jobs with an additional 55.3 indirect FTE jobs (Lippke and Mason -2005). This project could support up to 665 FTE jobs of direct employment and up to 2,743 FTE jobs of indirect employment through the life of this project.

## Cumulative Effects

No present or reasonably foreseeable future actions that affect economic value overlap the Twisp Restoration project area in time and space; therefore, there are no cumulative effects related to the financial aspects of the project. The project lies within the Central Washington Initiative as one of ten priority landscape selected as part of the Forest Service's 10-year wildfire strategy. The project is also within the newly funded North Central Washington Collaborative Forest Landscape Restoration Project. Both initiatives will increase the funding and opportunities to complete service work over the next few years to help support restoration projects

## Summary

Table 34 describes how each alternative addresses the issue raised during public comment periods that is related to economics.

Table 36. Comparison of how alternatives address key issues related to economics

| Issue/Concern | Indicator/Measure | Alt 1 | Alt 2 |
|---|---|---|---|
| Issue #8: Provide economic & sociological benefits | Net value of commercial harvest appraisal<br><br>Select indirect economic benefits | No commercial harvest would occur, resulting in no net value of timber sale. No jobs would be created or maintained, and no new sources of commercial or personal use firewood would be created. Biomass material for biochar opportunities would not be available. | Commercial harvest would create 49,507 MBF of timber harvested and generate $2,280,552 for use on restoration treatments associated with the project. Up to 665 direct FTE jobs and 2,743 indirect FTE jobs would be created or maintained. New, additional sources of both commercial and personal use firewood, as well as biomass material for biochar would become available. |

Table 35 describes the resource indicators and measures for Economics.

AR 12707

8-ER-1633

**Table 37. Summary of effects of Alternatives 1 and 2 on economic resource indicators.**

| Resource Element | Resource Indicator | Measure | Alternative 1 | Alternative 2 |
|---|---|---|---|---|
| Economic viability of timber sale | Net value of the timber sale appraisal | Dollar | $0<br>No timber harvest would occur, resulting in no net value through sale of materials. No commercial harvest-related funding would be available for implementing other restoration treatments. | $2,280,552<br>Timber harvest would occur on up to 8,151 acres, resulting in positive cash flow that could help fund restoration treatments. |
| Economic viability of timber sale | Number of FTE jobs created or maintained | Number of jobs | 0 FTE jobs<br>No jobs would be created or maintained. | Up to 655 direct FTE jobs and up to 2,743 indirect FTE jobs would be created or maintained during the life of this project |

# Other Required Disclosures

## American Indian Treaty Rights

No American Indian Treaty Rights would be adversely affected by the Twisp Restoration Project (Sweeney 2022). Government to government consultation letters were sent to the Confederated Tribes of the Colville Indian Reservation (CTCR) and the Yakama Nation (YN) on November 5, 2019. New consultation letters were sent to both Tribal entities on April 8, 2022, to address changes to the project after it was revised due to the 2021 Cedar Wildfire. The letters described the Twisp Watershed Restoration Project and identified its Area of Potential Effect (APE), defined as the geographic area or areas which an undertaking may directly or indirectly cause alterations in the character or use of historic properties. The APE is three dimensional and includes auditory, visual and ground disturbing activities.

On December 11, 2019, the Yakama Nation's Natural Resources Program responded and provided additional alternatives for aquatic habitat improvements in the watershed, especially those affecting high value tribal resources such as anadromous fish populations.

On December 18, 2019, the Colville Tribes History and Archaeology Program responded, concurring with the APE as well as with the methods described to identify potential cultural resources within the APE. They highlighted that the project area falls within the traditional territory of the Methow Tribe, a constituent member of the CTCR. In addition, they shared that the project area contains traditional cultural properties (TCPs), areas with important traditional cultural values, including one possessing tribal resource opportunities. The CTCR Tribal Historic Preservation Officer (THPO) requested that these TCPs be considered during the archaeological surveys and in the determination of project effects.

Overall, project design criteria and mitigations will serve to avoid impacts to known historic properties and cultural resources. Literature and archival research will be completed to obtain additional information on the nature of potential TCPs in the project area.

## Climate Change, Greenhouse Gases and Carbon Sequestration

This proposed action would affect up to 23,167 acres of forest by thinning trees, reducing surface fuels through prescribed fire, and/or thinning treatments in combination with prescribed fire. Treatments would

AR 12708

8-ER-1634

**Table 14. Comparison of how alternatives address key issues related to aquatics**

| Issue/Concern | Alt 1 | Alt 2 |
|---|---|---|
| **Issue #1:** Closing Roads End Campground will restrict recreation opportunities. | No campground removal occurs; fish habitat viability maintained in its current state with adverse impacts to bull trout. | Campground removed with long-term, minor beneficial effects to Bull Trout due to the removal of a stressor and improved habitat quality. |
| **Issue #5:** Thinning and firewood collection in Riparian Reserves will adversely affect aquatic habitat and species | No thinning or prescribed fire treatments in RRs. Fish habitat viability maintained in current state. | Mixed effect on fish habitat viability through 72 acres of commercial overstory thinning and 460 acres of non-commercial thinning in RRs that would cause negligible short-term, adverse effects from treatments due to riparian vegetation disturbances with negligible, long-term beneficial effects from improved RR stand conditions. |

Table 13 summarizes the effects of each alternative on aquatic resources.

**Table 15. Summary of effects of Alternatives 1 and 2 on aquatic resources.**

| Resource Element | Resource Indicator | Measure | Alternative 1 Direct/Indirect Effects | Alternative 2 | | |
|---|---|---|---|---|---|---|
| | | | | Direct/Indirect Effects | Cumulative Effects | Total |
| Fish Habitat Access | Fish Distribution | Miles of stream accessible to fish | 0 miles | 5.1 miles | 2 miles | 7.1 miles |
| Habitat for ESA, R6 Sensitive, MIS fish species | Fish Habitat Viability | Degrade, maintain, or improve | Maintain as "Functioning at risk" | Improve towards "Properly Functioning" | | |

## Effects to ESA Fish Species

The proposed removal of Roads End Campground and campsite relocation has an ESA determination of Likely to Adversely Affect for a short term for upper Columbia River spring chinook, Columbia River bull trout, and upper Columbia River steelhead species and their designated critical habitat. All other activities proposed in Alternative 2 have an ESA determination of May Affect, Not Likely to Adversely Affect for these species and their designated habitat.

AR 12651

# Appendix A: Proposed Treatments Descriptions

Detailed descriptions of proposed actions are separated by the main treatment types (vegetation thinning, prescribed fire, wildlife habitat enhancement, aquatic habitat enhancement, and transportation and trail management.

## Vegetation Treatments

Prescriptions were prepared by Eireann Pederson, Silviculturist, and Carissa Camenson, Forester (Methow Valley Ranger District) and focus on modifying or maintaining structure stages to achieve a diverse array across the project area. Figure 11 provides a visual depiction of each forest structure class, while Table 37 describes each class and how it is used by wildlife focal species.

**Figure 11. Forest structure classes (O'Hara et al. 1996, Hessburg et al. 2000)**


A. Stand Initiation (SI): Growing space is reoccupied following a stand replacing disturbance.


E. Young Forest Multi-Strata (YFMS): Two or more cohorts are present through establishment after periodic disturbances. Large and/or old early seral trees are often at reduced density from fire or logging.


B. Stem Exclusion Open Canopy (SEOC): Below-ground competition limits establishment of new individuals.


F. Old Forest Multi-Strata (OFMS): Two or more cohorts and strata are present including large, old trees.


C. Stem Exclusion Closed Canopy (SECC): New individuals are excluded through light or below-ground competition.


G. Old Forest Single-Strata (OFSS): Single-stratum stands of large, old trees. Relatively few young trees are present in the understory.


D. Understory Reinitiation (UR): Initiation of a new cohort as the older cohort occupies less than full growing space.

AR 12718

**Table 39. Structural class descriptions and key functions for focal wildlife species (USDA 2012).**

| Structural class | Description | Key functions for focal wildlife species |
|---|---|---|
| Stand initiation (SI) | Single canopy stratum (may be broken or continuous); one cohort, seedlings or saplings; grasses, forbs, shrubs may be present with early seral trees. | Black-backed woodpecker – source habitat if created by fire and not salvage harvested. |
| Stem exclusion open canopy (SEOC) | One broken canopy stratum; one cohort; trees excluding new stems through competition; poles, small or medium trees; understory shrubs, grasses, forbs may be present. | White-headed woodpecker – habitat may be provided depending on cover of large trees and cover of understory. |
| Stem exclusion closed canopy (SECC) | Continuous closed canopy; one or more canopy strata; one cohort; lower strata, if present, are same age as upper strata; poles, small or medium trees; understory shrubs, grasses, forbs may be present. | Northern spotted owl – dispersal habitat |
| Understory Re-initiation (UR) | Broken overstory canopy; >2 canopy strata; two cohorts; overstory is poles, small, or medium trees; understory is seedlings, saplings, or poles. | Northern spotted owl – high-quality habitat depending on the canopy closure and size of overstory trees.<br><br>Northern goshawk – source habitat depending on the canopy closure and size of overstory trees. |
| Young-forest multistory (YFMS) | Broken overstory canopy; >2 canopy strata; >2 cohorts; large trees are absent in the overstory; stands are characterized by diverse horizontal and vertical distributions of trees and tree sizes; seedlings, saplings, poles, and medium trees are present. | Northern spotted owl – high-quality habitat depending on the canopy closure and size of overstory trees.<br><br>Northern goshawk – high-quality habitat depending on the canopy closure and size of overstory trees.<br><br>White-headed woodpecker – habitat may be provided depending on cover of large trees and cover of understory. |
| Old-forest multistory (OFMS) | Broken overstory canopy; >2 canopy strata; >2 cohorts; large trees dominant in the overstory; stands characterized by diverse horizontal and vertical distributions of trees and tree sizes; all tree sizes may be present. | Northern spotted owl – high -quality habitat<br><br>Northern goshawk – source habitat |

AR 12719

| Structural class | Description | Key functions for focal wildlife species |
|---|---|---|
| Old-forest single story (OFSS) | Broken or continuous canopy of large, old trees; one stratum, may be single but usually multi-cohort; large trees dominate the overstory; understory absent or seedlings or saplings; grasses, forbs, or shrubs may be present in the understory. | White-headed woodpecker – source habitat |

Table 38 lists the current structure classes and Table 39 lists the current forest types within the project area and the acres associated with each. Currently, young forest multistory (YFMS) covers approximately 45% of the project treatment area compared to historic and future ranges of variability that range from 1.3% - 32%   Refer to Table F3 in the Twisp Landscape Evaluation to identify the landscape metric breakdowns for the Lower Twisp watershed included in the landscape evaluation.   Other classes such as old forest multistory (OFMS) or single story (OFSS) are lacking across the project area as described in the Vegetation report and summarized above.

**Table 40. Structure stages within the Twisp Restoration Project area.**

| Structure Class | Acres | % of Project area |
|---|---|---|
| Stand Initiation (SI) | 570 | 2% |
| Young Forest Multi Story (YFMS) | 10,525 | 45% |
| Stem Exclusion Closed Canopy (SECC) | 1,241 | 5% |
| Stem Exclusion Open Canopy (SEOC) | 2,924 | 13% |
| Understory Re-initiation (UR) | 1,730 | 7% |
| Old Forest Multi Story (OFMS) | 240 | 1% |
| Old Forest Single Story (OFSS) | <2 | <1% |

**Table 41. Forest types within the Twisp Restoration project area.**

| Forest Type | Acres | % of Project area |
|---|---|---|
| Dry Forest | 9,683 | 42% |
| Moist Forest | 7,820 | 34% |
| Cold Forest | 500 | 2% |
| Other (dry shrub, cool shrub, agriculture) | 5,132 | 22% |

## Thinning Prescriptions

Proposed vegetation treatments are shown in Figures 13-16, Appendix E. Alternative 2 includes three tools for treating vegetation in this project:

- Understory thinning removes trees too small to be of commercial value to reduce live ladder fuels, removes competition with larger diameter trees, and reduces stocking levels in plantations.

AR 12720

8-ER-1638

- Overstory thinning prescriptions reduce stocking levels and crown density, remove diseased trees, and create openings in which seral species may become established.

- Prescribed fire reduces surface fuels, scorches lower branches and increases live crown heights, and reduces young conifer stocking levels.

This section describes the thinning prescriptions proposed in this alternative to meet Needs #1-4; refer to "Prescribed Fire Treatments" below for details on this treatment. District staff would assess the stands identified on maps in Appendix E to determine the locations of thinning units. By reducing stocking levels and crown density, thinning treatments are designed to promote stand health, reduce the risk of insect and disease outbreaks, and reduce elevated risks of stand-replacing wildfire events. Understory treatments would remove trees less than 10" dbh, while overstory treatments would remove commercial-size material (trees greater than 7" dbh). Overstory treatments would modify stand structures to move departed conditions such as the abundance of young forest multi-story into desired stand structures described in the Vegetation specialist report. Overstory treatments would focus on treating stands with issues related to forest health and reduced resiliency to wildfire created by overstocking, undesirable species composition, and disease and insect occurrence. Since the most effective treatments at restoring forest health and resilience to wildfire are those that treat both the overstory and understory components while shifting species to larger fire-tolerant trees (USDA 2012), this project includes overlapping combinations of overstory and understory treatments. All prescriptions would be applied only to pre-identified, site-specific locations except for Stand Improvement Thin, and Dry Forest and Moist Forest Matrix Thinning as described below.

Common Prescription Elements

The following information applies to all thinning prescriptions as described.

- In this project, "small" trees are defined as ≤ 15.9" dbh, "medium" trees are 16"- 24.9" dbh, and "large" trees are ≥ 25" dbh. These definitions are based on the tree size classes identified in the Ecosystem Management Decision Support (EMDS)landscape analysis completed for this project (Downing 2018).

- Overstory treatments would thin trees from below (i.e., remove trees starting from the understory, then the midstory and lastly the overstory leaving predominately larger diameter trees to achieve desired stand density) and would be designed to promote a mosaic of individual trees, clumps, and openings (ICO):

  o Clumps range in size from small (2-4 trees), medium (5-9 trees), or large (10+ trees). Clumping parameters would be chosen on a unit level basis and would be based on reference conditions identified using the Eastern Washington Cascades Reference Stand Summary Tables & Figures and the ICO implementation guidelines (Churchill et al. 2014, Churchill et al. 2016). These two reference documents provide guidance on clump sizes and clump density across an area that is based on historical conditions, including two reference plots located on the Methow Valley Ranger District. Clumps would be incorporated into the prescription written for each unit prior to implementation. On average, small, medium, and large clumps would cover 50-60% of the unit. The remaining area within each unit would consist of individual trees and openings, creating variable densities across the unit.

  o Openings generally ½ to 1 acre in size have no trees present; may increase to 2 acres if insect and disease issues are present as described in Dry Forest and Moist Forest Matrix

AR 12721

8-ER-1639

Thin prescriptions. Openings would be determined on a unit-basis using the ICO implementation guidelines and Eastern Washington Reference Stand Conditions (Churchill et al. 2014, Churchill et al. 2016).

- Old trees will be retained and identified using guidance from the Identifying Old Trees and Forests in Eastern Washington (Van Pelt 2008).

- All treatments within designated FPOG would maintain the minimum 15 TPA greater than 18" dbh, 2 snags per acre greater than 12" dbh, 3 down logs per acre greater than 12" dbh, multi-storied canopy except in the Douglas-fir/pinegrass (PSME/CARU) plant association, and 50% crown closure. A minimum 20% crown closure exception may be applied in stands dominated by ponderosa pine or dry site Douglas-fir.

- Overstory and understory preferred leave tree species (listed in preference order) include ponderosa pine (PIPO), western larch (LAOC), Douglas-fir (PSME), and lodgepole pine (PICO).

- No western red cedar, whitebark pine, or western white pine would be removed.

- All overstory thinning treatments include reducing conifer competition around aspen by thinning all conifers less than 20" dbh within 50 feet of 5 or more aspen clones taller than 15 feet.

- Trees larger than the maximum diameters for each prescription would not be removed unless needed for immediate safety purposes.

- Residual stand densities for all overstory and understory thinning treatments would vary post treatment depending on the forest types within the project area, defined by general temperature/precipitation classifications and dominant species:  Warm/dry PIPO, Warm/dry PSME, and Cool/moist PSME. Units with more than one forest type would have varying stand densities post-treatment.

## Understory Thinning Prescription: Stand Improvement (SI) Thin

The objective of this prescription is to reduce the density of understory trees < 10" dbh to help restore forest health, create the desired stand structure, and reduce ladder fuels, to minimize the likelihood of crown fire initiation, thereby building resilience to wildfire. Areas treated with this prescription may include plantations, areas of natural regeneration, and multistory stands with a substantial "ladder fuel" component. This prescription would be applied in treatment areas outside of overstory thinning units. These treatments would begin after project implementation starts and continue over 15-20 years, generally prioritizing locations within the Wildland Urban Interface (WUI). This treatment would be applied to site-specific locations within FPOG stands, and RRs. On BLM and Matrix lands outside of these areas, this prescription would be applied using the following condition-based criteria.

Decision Criteria for Stand-Improvement Thin Prescription in Matrix:

- Slope is less than 80% and within one mile of an NFS road.

- Forested stand has naturally regenerated or was planted following disturbance (i.e., wildfire, insect outbreak, or past thinning).

- Current stocking level of trees < 10" dbh exceeds 150 trees per acre.

AR 12722

8-ER-1640

Where these decision criteria are met, the following prescription may be applied to meet objectives for understory treatments:

- Thin trees < 10" dbh from below to 50-75 TPA depending on forest type, removing the smallest trees first to achieve desired understory stand structure and reduce the ladder fuel component.

- Trees of any size may be pruned to a height of 4-6 feet from the forest floor to raise canopy base height to decrease ladder fuels, while helping to retain desired stand densities.

## Overstory Thinning Prescriptions

Several overstory thinning prescriptions are proposed in this project to meet specific goals. Except for Dry Forest Matrix Thin and Moist Forest Matrix Thin, these prescriptions would be applied to site-specific (pre-identified) locations in the project area rather than through condition-based decision criteria. These treatments would be accomplished using timing and methods as described below.

### Dry and Moist Forest Overstory Thinning Prescriptions within Matrix

The objective of these treatments are to meet project Need #2 by helping move stand structure, patterns, and species toward the desired conditions between HRV/FRV by creating a mosaic of forest stand structure appropriate for dry and moist forests across Matrix lands.  A goal within this objective will be to create a mosaic of forested conditions with individual trees, clumps of trees, and openings (ICO) by isolating large old trees as individuals, creating clumps of various-sized trees and creating openings. Openings would be identified on a unit basis prior to implementation, utilizing natural clearings where appropriate to create a mosaic pattern of ICO.  Openings would generally range from 1/2 to 1 acre but may increase up to 2 acres where heavy infestations of insect or disease are present, including (but not limited to) dwarf mistletoe infections with an average DMR ≥ 2, root rot, bark beetles, and defoliators. Areas considered for 2-acre openings must have identified insect or disease issues in more than 50% of the trees.

This prescription may also be applied to help maintain stand structure in areas previously harvested in the 2000 Twisp Pine Restoration Project; in these stands, the prescription would focus on insect and disease removal along with maintaining or improving stocking control.  These areas were harvested in 2000-2004 and since then the understory has developed contributing to increased risks to the overstory.  As stated, trees within the larger size classes would not be targeted for removal unless necessary to protect a large healthier tree. Elsewhere on Matrix lands, this prescription would be applied to no more than 8,151 acres within the "Condition-based management areas" identified in Figure 6 of the EA. These acres would be evaluated using the decision criteria below.

Decision Criteria for Dry or Moist Forest Matrix Thin:

- Current stocking level exceeds 50 trees per acre greater than 7" dbh in a Warm/dry PIPO or Warm/dry PSME forest type.

- Current stocking level exceeds 70 trees per acre greater than 7" dbh in a Cool/moist PSME forest type.

- One of the following stand structures exists: young forest multi story (YFMS), stem exclusion closed canopy (SECC), understory re-initiation (UR), or stem exclusion open canopy (SEOC). Stand structures are defined above.

AR 12723

8-ER-1641

- Ground-based harvest operations may occur on slopes less than 45% and within one mile of an NFS road.

- Cable tethered or helicopter harvest operations may occur on slopes greater than 45% but less than 80% and within one mile of an NFS road.

- Units thinned with ground-based harvest systems would generally need to provide at least four thousand board feet (MBF) per acre from trees from 7-25" dbh to be commercially viable; 6 MBF per acre for cable/tethered logging systems; and 8-10 MBF for harvest operations using helicopters.

- Areas that do not meet these decision criteria would be considered for understory thinning (SI Thin) using the decision criteria described previously.

The following prescriptions may be applied to meet overstory objectives where the decision criteria listed above are met:

### Dry Forest Matrix Thin

- Thin trees up to 21" dbh from below to 20-30 TPA in size classes >10" dbh. Trees 21-24.9" dbh may be removed only if they have a dwarf mistletoe rating (DMR) ≥ 2 (Hoffman 2004) and are within 40 feet of a healthy uninfected preferred leave tree species with a minimum of 18" dbh. Trees within the larger size class (>21" dbh) that do have dwarf mistletoe may be retained to meet minimum stocking levels or as identified by a wildlife biologist for habitat value, in which these areas will be buffered by removing susceptible species from within 30 feet of the mistletoe pocket.

- Understory thinning to remove trees <10" dbh may also be applied with a targeted residual density of 50-75 TPA within this size class.

- Post-treatment density targets after combined overstory and understory thinning in this prescription would maintain a minimum of 70-105 TPA in various size classes to create a mosaic of forest structures including old forest multi or single storied stands.

- Trees of any size may be pruned to a height of 4-6 feet from the forest floor to raise canopy base height to decrease ladder fuels, while helping to retain desired stand density.

### Moist Forest Matrix Thin

- Thin trees up to 21" dbh from below to 30-40 TPA in size classes >10" dbh. Trees 21-24.9" dbh may be removed only if they have a dwarf mistletoe rating (DMR) ≥ 2 (Hoffman 2004) and are within 40 feet of a healthy uninfected preferred leave tree species with a minimum of 18" dbh. Trees within the larger size class (>21" dbh) that do have dwarf mistletoe may be retained to meet minimum stocking levels or as identified by a wildlife biologist for habitat value, in which these areas will be buffered by removing susceptible species from within 30 feet of the mistletoe pocket.

- Understory thinning treatments to remove trees <10" dbh may also be applied with a targeted residual density of 50-75 TPA within this size class.

AR 12724

- Post-treatment density targets after combined overstory and understory thinning in this prescription would maintain a minimum of 80-115 TPA in various size classes to create a mosaic of forest structures including old forest multi or single storied stands.

- Trees of any size may be pruned to raise canopy base height to decrease ladder fuels, while helping to retain desired stand density.

The following prescriptions in Matrix are site-specific and would not use decision criteria for condition-based management.

### Matrix Shaded Fuelbreak Thin

The goal of this site-specific prescription is to reduce vegetation and fuel loading at strategic areas along roads and ridgelines in Matrix lands outside of RRs, to change the horizontal continuity of the fuels to reduce fire intensity at strategic points to allow for firefighters to engage safely in direct suppression. Surface fuel management can limit fireline intensity (Byram, 1959) and lower potential fire severity (Ryan and Noste, 1985). Doing so would help provide a suppression anchor for firefighters during wildfires and project-related prescribed fire treatments and would help reduce fire-related hazards during public egress and firefighter ingress. This prescription would be applied to specified ridges and along forest system roads with a varying width of up to 200 feet depending on fuel type, access, and topography.

The following prescription may be applied to meet the goals of this treatment:

- Thin trees up to 21" dbh from below to 20-30 TPA in size classes > 10" dbh. Trees 21-24.9" dbh may be removed only if they have a dwarf mistletoe rating (DMR) ≥ 4 (Hoffman 2004). The ICO approach would not be incorporated in this prescription because it leaves clumps of trees that help move fire from the surface to the canopy. Instead, a general spacing of 20 feet by 20 feet or greater would be applied between leave trees to provide adequate spacing that is more likely to keep fire on the ground rather than moving from the surface into the crown through a continuous canopy and clumps of trees.

- Understory thinning may occur to remove trees <10" dbh to reduce the risks created by ladder fuels and to meet desired stocking levels. Decreasing the ladder fuel component raises the canopy base height and reduces the risks of fire flow from the surface into the crown.

- •Trees of any size may be pruned to a height of 4-6 feet from the forest floor to raise canopy base height to decrease ladder fuels, while helping to retain desired stand density.

- Snags would be removed unless designated for retention by the Wildlife Biologist.

### Regeneration Harvest (Shelterwood with Reserves, Seed Tree with Reserves)
- Thin trees using "Shelterwood with Reserves" or "Seed Tree with Reserves" methods to remove up to 90% of the existing stand infected with insect and disease.

This prescription would be applied to regenerate 46 acres in one location within Matrix lands where more than 50% of the trees are affected by insect and disease, with the goal of removing infected trees to promote the establishment of a healthy new cohort while retaining an overstory that is less susceptible to insects and diseases. Clear-cutting would not be used to regenerate these stands. Instead, two methods may be used depending on the amount of overstory that could remain uninfected. The "Seed tree with reserves" method would produce a two-aged stand in which some or all seed trees are retained as reserve

AR 12725

trees after regeneration has become established to attain goals other than regeneration. Reserve trees may also include those trees that are not expected to provide seed for desirable regeneration. The "Shelterwood with reserves" method would create a two-aged stand in which some or all shelter trees are retained to attain goals other than regeneration. In both methods, the reserve trees generally comprise at least 10% of full stocking after harvest. All areas identified for this treatment would be planted after harvest and fuels treatments with the desired species, based upon the preferred leave tree species listed above. Desired stocking five years post-harvest would range from 100-150 TPA. To meet this objective, 150-200 TPA may be planted initially depending on natural regeneration potential. Tree species and planting densities would consider climate change adaptations as identified in the Climate Change Vulnerability and Adaptation in the North Cascades Region-Washington such as planting the preferred climate adapted species of ponderosa pine and lower density planting targets with the intent of best survival for the projected warmer and drier climates.

### Riparian Reserve Prescription

This prescription focuses on improving riparian reserve habitat by controlling stocking densities to promote large and old trees, maintaining and improving understory shrub species, maintaining multiple layers, and providing shade and nutrients into the riparian system. In doing so, this treatment would meet Aquatic Conservation Strategy Objective #8 by maintaining and restoring species composition and structural diversity of plant communities in riparian areas. Riparian Reserve areas identified for treatment are mostly located on the outer edges of the true riparian zone and are generally upland riparian areas. Some of these areas are located along road systems that intersect the Riparian Reserve boundaries at closer distances then the prescribed no treatment buffers of 100 feet along perennial streams and 75 feet along intermittent streams.

### Riparian Reserve Thin

- Thin trees up to 21" dbh from below to 40-50 TPA within the 10"-21" dbh size classes. Trees 21-24.9" dbh may be removed only if they have a dwarf mistletoe rating (DMR) $\geq$ 2 and are within 40 feet of a large healthy uninfected preferred leave tree species with a minimum of 18" dbh.

- Maintain a minimum 40% canopy cover.

- Maintain or create snags > 10" dbh with a goal of 2 snags per acre.

- Understory treatments to remove trees <10" dbh may also be applied to create a targeted residual density of 50-75 TPA within this size class.

- Stand density targets post treatment would retain at a minimum 90-125 TPA in various size classes within the outer reaches of these riparian areas.

- Trees of any size may be pruned to raise canopy base height to decrease ladder fuels, while helping to retain some TPA.

## Thinning Methods and Timing

Understory thinning using the Stand Improvement Thin prescription would occur during the spring through fall months and may begin immediately after a decision is signed, unit layout is complete, and funding becomes available. Work may continue for an estimated 20 years across the project area and would generally be completed by hand, although a masticator attached to low-pressure ground equipment

AR 12726

8-ER-1644

may be used where feasible on slopes up to 45%. These treatments would be implemented by agency personnel, partners, or contractors.

The overstory thinning prescriptions would be completed in an estimated three phases of commercial harvest activity in locations as shown in Figure 7. The first phase of commercial thinning may begin immediately after a decision is signed, unit layout is complete, and a sale contract is awarded. Subsequent phases would likely begin at one-year intervals, with commercial thinning in each location lasting 3-5 years per phase, for an estimated total of 5-7 years to complete. Commercial harvest may occur any time of year in the project area except as described below:

- Overstory thinning in Riparian Reserves may only occur in the winter months to protect soil resources unless the purchaser can provide a plan of operations that provides for the same level of soil protection as winter operations (see Design Feature S1, Appendix B). If FS staff approve such operating plans, harvest in designated Riparian Reserves may occur outside of winter months.

- One exception to winter-only operations in RRs would allow summer skidding of trees from upland units through some RRs to riparian roads (see details under "skidding upland trees" below). Where commercial thinning in RRs would occur in these areas, purchasers must provide a harvest method that meets the equivalent of winter harvest as described above.

- In portions of the project area in the vicinity of Little Bridge Creek, Coal Creek, and Lookout Mountain designated as Forest Plan Management Area 26, logging and post-sale operations would be prohibited December through March to protect deer winter habitat. Logging and post-sale operations would be limited in these areas during June to protect fawning habitat as determined necessary by the district wildlife biologist.

Table 40 displays the proposed acres for each harvesting method.

**Table 42. Proposed harvest method acres.**

| Harvest Method | Acres |
|---|---|
| Tractor | 5,248 |
| Tether/Cable (skyline)/Helicopter | 2,407 |
| Helicopter | 496 |
| **Total** | **8,151** |

Commercial harvest would generally be completed by purchasers or their agents using ground-based logging equipment on slopes below 35% but may be used on slopes up to 45%. This logging system uses a feller-buncher to cut trees and a skidder to bring them to the landing. Skidders are usually rubber-tired with a grapple but may have tracks in place of wheels or cable chokers in place of a grapple. Trees are skidded to the landings with limbs and tops attached, known as whole tree yarding. Ground-based logging may also include the use of a cut-to-length harvester and a forwarder. With this option, felled trees are limbed, topped, and cut to log length in the harvest unit. The limbs are placed in the trails used by harvester/forwarder equipment to reduce ground pressure and soil compaction. The logs are then taken to a landing using a forwarder. Either of these ground-based systems may be used during commercial harvest proposed in this project on slopes up to 45% if their use complies with design features to minimize soil compaction described in Appendix B. Ground-based commercial treatments must be operationally feasible and would generally require a road and suitable landing at the bottom of the unit. Stands must have a minimum of 4 thousand board feet (MBF) per acre for this system to be economically

viable. However, some stands with volume as low as 1,000 board feet per acre may also be considered for ground-based treatment to address forest health issues. Figure 12 shows where different logging systems may be used based on existing road access and slope.

**Figure 12. Proposed harvest methods based on slope and access.**



Skyline or cable logging would be used to implement overstory thinning prescriptions on the approximately 25% of these acres that lie on slopes above 35% with roads located at the top of these units. This system uses hand fallers with chainsaws to cut the trees, limb and top the trees in place, and buck them into log length. Chokers attached to a carriage, pulled by hauling cables, runs along a skyline cable providing vertical lift to the logs. The logs are pulled up the slope by a yarder with at least one end of the log suspended. Stands must have a minimum of 6 MBF per acre for this system to be economically viable.

Tethered logging uses winch-assisted cut-to-length harvesters, feller bunchers, skidders, and forwarders specifically designed to operate on slopes that normally require skyline logging. The winch and cable attached to the equipment help control the equipment as it goes down the slope and assists it as it goes up slope. The winch system either mounts to the working equipment or it is mounted to another piece of equipment, like a dozer, that also acts as the anchor. When mounted to the working equipment, the winch line is anchored to an anchor point, such as a stump or the base of a standing tree, somewhere on the slope. The mechanical influence of the winch is used for enhanced traction and mobility on steep slopes

AR 12728

8-ER-1646

(often called "traction assist") or for safety on steep slopes (preventing machine sliding and overturning). To meet operational and economic constraints, these stands would generally need to be able to provide 6,000 board feet per acre of conifers greater than 7" dbh.

Helicopter logging may be used on steep slopes when there is no road access to the timber stand being harvested. This system uses hand fallers with chainsaws to cut the trees and limb, buck, and top the trees in place. Chokers attached to the helicopters are set and the logs are flown to a landing. This logging system requires removing 8-10 MBF per acre minimum to justify the cost. While this project includes helicopter-only harvest on approximately 496 acres, it is unlikely that these would be implemented given current haul distances to a processing facility and market conditions for forest products. However, if there are changes in demand for forest products, new processing facilities open closer to the project area, or funds become available to subsidize the cost of harvest, these acres may be implemented. Acres of proposed commercial harvest shown as skyline could also be harvested by helicopter if, for example, a proposed temporary road could not be built.

## Fuel Reduction Treatments

Fuel reduction treatments described in this section include mastication, firewood or biomass removal, and prescribed fire activities.

### Mastication

On 6,101 acres where Stand Improvement Thinning is proposed on slopes < 45%, equipment may be used to masticate (grind, chip, or break apart) fuels such as brush, small trees, and slash into small pieces. Masticating fuels would reduce ladder fuels and creating a gap between surface fuels and crown fuels. Mastication may be used as a stand-alone treatment or an alternative treatment prior to prescribed burning. A masticator head is mounted on an excavator-type tractor which moves through the forest to grind or chip trees and brush, leaving the chips behind. Treated areas are generally not at risk of beetle infestation due to the small size of woody debris.

### Firewood/Biomass Removal

Debris from thinning treatments would be available for public firewood utilization where this activity is consistent with the current district firewood removal policy. Biomass removal may occur where debris is near an open NFS road; if not removed, it would be piled by hand and then burned as described above. Biomass removal would likely occur in the spring through fall months. If removed for biomass, work would be accomplished by contractors using low-pressure equipment to bring materials to existing roads where it would be loaded with equipment such as an excavator for removal and processing off NFS lands. Biomass removal may also involve removal of landing piles through similar means. Debris may be partly or wholly processed into biochar onsite; these activities include consolidating debris using a tub grinder or baler, then processing them with equipment such as an air curtain burner at a nearby landing or removing the materials for off-site processing. Air curtain burners produce lower smoke emissions compared to pile burning or underburning (Zahn, 2005).

### Prescribed Burning

Proposed prescribe fire treatments are shown in Figure 22, Appendix E. This project includes two general types of prescribed fire treatments: piling and pile-burning, and underburning. Piling treatments generally focus on the surface debris created by thinning treatments. This debris would be piled by hand or machine when it is extensive enough to create undesirable fire intensity that threatens the desired stand retention

AR 12729

objectives or creates control problems near the boundaries of burn units. In underburn treatments, fire is applied across a broad area to achieve widespread fuel consumption and fire effects. The goal of these treatments is to reduce natural accumulations of debris in unthinned areas, minimize debris created by thinning, reduce tree stocking in the lowest diameter classes, scorch the lower branches of trees to increase canopy base height, and invigorate or encourage grasses, forbs, and shrubs species that are dependent on fire to thrive on the landscape. In most areas, up to three prescribed fire treatments may occur in either site-specific locations within FPOG and RRs or using condition-based criteria on Matrix lands.  Where condition-based thinning prescriptions were applied (i.e., SI Thin and Matrix Thin outside of FPOG and RRs), pile-burning treatments below would occur to the extent that these thinning treatments occurred using the decision criteria below.

Prescribed burning treatments would begin approximately three years after project implementation began, allowing time for thinning treatments to occur and debris to cure, and extend over the next ~~30~~ 20 years as described below. The initial prescribed fire treatment in any location would likely involve piling debris by hand or machine and burning piles 1-2 years after thinning to allow curing). Piling and pile burning would occur as needed where thinning created debris in amounts that would create undesirable fire intensity during underburning that would impact desired retention of overstory trees or create control problems adjacent to burn unit boundaries. An initial underburn would follow pile burning within approximately 1-3 years in most locations or may be the initial prescribed fire treatment to reduce debris and/or to prepare for replanting where this activity is proposed in regeneration harvest units. Finally, maintenance underburning may occur after the initial underburn treatment when the mean historic fire return interval has passed (approximately 16-20 years for most of the project area) to help maintain desired fuel levels and stand structure.

Prescribed fire treatments proposed in this project would occur on NFS and BLM lands. Pile burning would occur in March – June and September – December, while underburning would occur March – June and September – November. During any given burn season, timing of treatments would be subject to burn plan objectives, environmental conditions needed to meet objectives, availability of staff, funding, and smoke approval. Prescribed fire treatments would use site-specific burn plans that consider the fuel loading and stand structure after thinning treatments were completed. Burn plan objectives would be consistent with design features in Appendix B, with staff review to assure that desired resource objectives are met. Burn operations would follow the current Washington State Smoke Implementation Plan administered by WA DNR to prevent or limit air quality impacts, as described in the Fuels/Air Quality report.

In the FPOG stand and RRs, prescribed fire treatments would be applied at site-specific locations. Within Matrix outside of these land management designations, prescribed burning would be applied using the decision criteria below.

Decision Criteria for prescribed fire treatments in Matrix:

The decision to implement prescribed fire in Matrix lands would be based on the condition of characteristics that influence the frequency, intensity, and severity of wildland fires. Specific prescribed fire prescriptions, including timing and location, would focus on restoring historic fire regimes and creating or maintaining conditions that allow direct attack by firefighters working with hand tools during weather conditions that are common during the peak of the fire season. Typical conditions that would trigger a prescribed fire treatment are as follows:

- *Pile Burning:* Within overstory thinning units, machine piling would be used when surface fuel loading following thinning exceeds 10 tons per acre or residual slash exceeds 12 inches in depth. Machine piling or slash dispersal may occur when residual slash exceeds 6 inches in depth within

10 feet of leave trees or 50 feet of prescribed fire control lines where residual slash. This will be followed by pile burning after approximately one year of curing. This activity is subject to other requirements as described in Appendix B (Design Features).

In Stand Improvement thinning units, hand piling would be used to pile all residual slash, including a portion of the existing dead and down woody debris where needed to prevent woody debris from connecting adjoining piles. This will be followed by pile burning after approximately one year of curing. This activity is subject to other requirements as described in Appendix B (Design Features).

- ***Underburning:*** Following pile burning or where no pile burning is expected, the initial underburn may occur when the time since last fire exceeds the historic mean fire return interval (MFRI, approximately 16 to 20 years for most of project area). Most of the project area already exceeds the historic MFRI; in these locations, the initial underburn may occur within 1-3 years after pile burning or immediately after project implementation begins where no pile burning is expected. Maintenance burning may be implemented when the time since last fire exceeds the historic mean fire return interval.

## Hand pile and burn

Hand-piling and pile burning would follow Stand Improvement Thin treatments on FS and BLM lands to consolidate and reduce small-diameter debris created by these treatments if the resulting fuel loading would likely create undesirable fire behavior during subsequent prescribed underburning treatments. This treatment may also be used in lieu of machine piling in overstory thinning units where infeasible to use machinery. Hand-piling woody debris generally occurs as trees are thinned and would only occur where debris is small enough to be piled safely and efficiently by hand crews into piles that are typically less than 8 feet wide by 8 feet tall. Piles would be burned usually with a drip torch, fusee, or propane torch generally 8 months to 1 year after piling when the debris has cured enough to allow for complete consumption, and generally occurs in fall months. Given the time-lag between thinning, piling, and curing, pile burning may begin three years after project implementation began and would continue in various locations in the project area for up to 20 years post-decision.

## Machine pile and burn

Within overstory thinning units on FS and BLM lands outside of Riparian Reserves, an excavator or similar piece of equipment may create piles on slopes up to 45% to concentrate natural or activity fuel loadings where slash and soil conditions are sufficient to prevent adverse impacts of tracked equipment. Excavator machine piles would generally be 8 feet by 8 feet. Piles would be burned usually with a drip torch, fusee, or propane torch generally 8 months to 1 year after piling when the debris has cured enough to allow for complete consumption, and generally occurs in fall months. Given the time-lag between thinning, piling, and curing, pile burning may begin two years after project implementation began and would continue in various locations in the project area for up to 15-20 years post-decision.

Up to 412 landing sites would be designated as needed at overstory thinning units, using existing landings wherever possible. Piles at landings would average approximately ½ acre each. Most landings would be created by condition-based thinning with the Matrix Thin prescription and would only occur to the extent that this prescription is implemented. Trees removed from units would be brought to landings where equipment strips them of branches and tops prior to transport. This debris would be collected by machinery such as excavators into a large pile ranging from less than ¼ acre to up to 1 acre. Where accessible by an open road, this debris would be available for biomass removal or firewood collection while curing (generally up to one year). After adequate time to cure (generally one year), these piles

AR 12731

would be burned by hand usually with drip torches, propane torches, or fusees. Landing piles may be created as soon as commercial harvest activity begins and may continue to be created for up to 10-15 years depending on the pace of commercial thinning operations. Landings would be rehabilitated after burning using methods described in the Table 44 in Appendix B.

## Underburning

Underburning treatments use primarily surface fire at generally low intensity levels to reduce existing and activity-created debris to desired levels. Treatments would occur on BLM and NFS lands and may also occur on up to 550 acres of private lands pending landowner approval and completion of required agreements. Where underburning is prescribed to prepare a site for replanting (i.e. in Regeneration Harvest prescription), a more intense fire behavior is desired that creates natural seedlings and planting sites by exposing mineral soil. This treatment generally occurs in March – June and September – November. Underburning would be accomplished by FS staff or partners and would be accomplished by hand ignition (methods include drip torches, propane torches, and fusees), aerial ignition (methods include a sphere dispenser machine or helitorch) or a combination of both. Underburning would occur across the project area in site-specific locations within FPOG and RRs. Outside of these areas in Matrix lands, this treatment would be applied using the decision criteria below.

Underburn unit boundaries would follow existing roads, trails, and natural fuelbreaks such as rock outcroppings as burn boundaries wherever feasible and safe. Where these features do not exist or are inadequate, hand or machine fireline would be constructed to provide a safe anchor point to contain burn operations to the desired area. Hand fireline would be constructed using chainsaws and hand tools to create a vegetation-free barrier down to mineral soil depth, approximately 12" to 18" wide. Machine fireline would be constructed using chainsaws and mechanized equipment such as a dozer to produce a barrier up to 5-7' feet wide, dug to mineral soil depth. Burn units would be as large as feasible to reduce exposure to firefighters, take advantage of longer periods with good ventilation conditions, and be cost-effective. The amount of fireline proposed in this project would be reduced to the extent that this is possible. In some instances, however, larger units may need to be broken into smaller sections with additional fireline to allow burning during shorter windows of good ventilation, which would result in constructing more fireline up to the maximum amount described in Chapter 2. Fireline would be rehabilitated after use using methods described in Table 44 in Appendix B.

# Hydrology/Aquatic Habitat Treatments

In addition to the thinning and prescribed fire treatments described above that would benefit aquatic habitat, the following treatments are included in Alternative 2.

## Culvert Replacement and AOP Installation

Culverts replacement and AOP installation may begin as soon as a decision is signed for this project and would be completed by FS staff or partners in the spring through fall months, depending on the site-specific instream work window. This work would continue for up to 20 years till completed. Equipment such as an excavator would be used to remove existing culverts and install larger culverts or AOPs. that would be designed to withstand 100-year storm events and associated debris per WDFW/Region 6 Forest Service MOU (WDFW & USDA 2012) and ARBO II (USDC-NMFS 2013 & USDI – FWS 2013) Design Criteria for instream work). AOPs would be designed to provide full access for all aquatic and riparian dependent species at all life stages. Areas disturbed by work would be rehabilitated as described in the Table 44, Appendix B.

AR 12732

# Appendix E: Proposed Action Maps

The following maps display the actions proposed in Alternative 2. All maps are formatted to print at 8 ½" by 11". Larger maps (24" x 36") of proposed vegetation treatments and transportation maps are available on the project website in the Final EA folder under the Analysis tab.

AR 12816

**Figure 13. Overview of Alternative 2 proposed vegetation treatments**



AR 12817

**Figure 14.  Detail of Alternative 2 proposed vegetation treatments (Map 1 of 3)**



AR 12818

**Figure 15. Detail of Alternative 2 proposed vegetation treatments (Map 2 of 3)**



AR 12819

**Figure 16.  Detail of Alternative 2 proposed vegetation treatments (Map 3 of 3)**



AR 12820

**Figure 17. Alternative 2 prescribed fire treatments and associated fireline**



AR 12821