No. 24-1422

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

NORTH CASCADES CONSERVATION COUNCIL,
*Plaintiff/Appellant*,

v.

UNITED STATES FOREST SERVICE, *et al.*,
*Defendants/Appellees*.

Appeal from the United States District Court
for the Eastern District of Washington
No. 2:22-cv-293-SAB (Hon. Stanley A. Bastian)

**APPELLEES' ANSWERING BRIEF**

TODD KIM
*Assistant Attorney General*
RACHEL HERON
ANDREW M. BERNIE
SHAUN M. PETTIGREW
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
c/o NOAA, Damage Assessment
7600 Sand Point Way, NE
Seattle, WA 98115
(202) 532-5973
shaun.pettigrew@usdoj.gov

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION..................................................2

STATEMENT OF THE ISSUES.........................................................3

PERTINENT STATUTES AND REGULATIONS ..............................4

STATEMENT OF THE CASE.............................................................4

    A.    Legal Background ............................................................4

    B.    Factual background .........................................................6

        1.    Management of the Okanogan-Wenatchee National Forest.......6

        2.    Okanogan-Wenatchee National Forest Restoration Strategy and Twisp Landscape Evaluation ................................7

        3.    Twisp Restoration Project........................................10

            a.    Project Initiation and Scoping ........................10

            b.    Draft EA...........................................................12

            c.    Final EA and DN/FONSI .................................14

    C.    Proceedings below.................................................19

SUMMARY OF ARGUMENT ........................................................20

STANDARD OF REVIEW ...............................................................22

ARGUMENT ......................................................................................24

    A.    The Final EA's analysis of alternatives was reasonable ....................24

        1.    The stated purpose and need did not preordain the Project......24

        2.    The Final EA considered a reasonable range of alternatives....29

    B.    The Final EA took a hard look at the Project's potential direct, indirect, and cumulative effects ..........................................34

i

1. The Forest Service appropriately considered the potential effects of condition-based management ...................................35

2. The Final EA was not required to consider cumulative effects from the potential Midnight Restoration Project ..........45

C. The Forest Service was not required to reopen the comment period on the Draft EA after the Cedar Creek Fire .............................49

D. The FONSI was not arbitrary or capricious .......................................52

1. Public health and safety ...............................................54

2. Highly controversial effects .......................................56

3. Highly uncertain effects ...........................................61

CONCLUSION ...................................................................................63

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| CEQ | Council on Environmental Quality |
| DN | Decision Notice |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FACA | Federal Advisory Committee Act |
| FONSI | Finding of No Significant Impact |
| FWS | Fish and Wildlife Service |
| IDT | Interdisciplinary Team |
| LSR | Late Successional Reserve |
| NMFS | National Marine Fisheries Service |
| NEPA | National Environmental Policy Act |
| NSO | Northern Spotted Owl |
| PLTA | Potential Landscape Treatment Areas |
| WUI | Wildland Urban Interface |

# TABLE OF AUTHORITIES

## Cases

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*,
  67 F.3d 723 (9th Cir. 1995) ..................................................................29

*All. for the Wild Rockies v. Pena*,
  865 F.3d 1211 (9th Cir. 2017) ..............................................................54

*All. for the Wild Rockies v. Petrick*,
  68 F.4th 475 (9th Cir. 2023) ................................................................44

*All. for the Wild Rockies v. Probert*,
  412 F. Supp. 3d 1188 (D. Mont. 2019)..................................................60

*Anderson v. Evans*,
  371 F.3d 475 (9th Cir. 2004) ................................................................53

*Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*,
  751 F.3d 1054 (9th Cir. 2014) ..............................................................52

*Baltimore Gas & Elec. Co. v. NRDC*,
  462 U.S. 87 (1983)..................................................................................4

*Bark v. Northrop*,
  607 F. App'x 652 (9th Cir. 2015)..........................................................53

*Bark v. U.S. Forest Service*,
  958 F.3d 865 (9th Cir. 2020) ................................................................57

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*,
  524 F.3d 938 (9th Cir. 2008) .......................................................... 49, 50

*Blue Mountains Biodiversity Proj. v. Blackwood*,
  161 F.3d 1208 (9th Cir. 1998) ..............................................................52

*Cal. Trout v. FERC*,
  572 F.3d 1003 (9th Cir. 2009) ..............................................................51

*Cascade Forest Conservancy v. U.S. Forest Serv.*,
  577 F. Supp. 3d 1163 (W.D. Wash. 2021) ............................................56

iv

*City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*,
123 F.3d 1142 (9th Cir. 1997) ................................................................24

*City of Tanakee Springs v. Block*,
778 F.2d 1402 (9th Cir. 1985) ..............................................................43

*Ctr. for Biological Diversity v. Nat'l Hwy. Traffic Safety Admin.*,
538 F.3d 1172 (9th Cir. 2008) ..............................................................62

*Decker v. U.S. Forest Serv.*,
780 F. Supp. 2d 1170 (D. Colo. 2011)...................................................56

*Earth Island Inst. v. Muldoon*,
82 F.4th 624 (9th Cir. 2023) ................................................ 57, 60, 61

*Earth Island Inst. v. U.S. Forest Serv.*,
697 F.3d 1010 (9th Cir. 2012) .............................................. 29, 30

*Env't Def. Ctr. v. Bureau of Ocean & Energy Mgmt.*,
36 F.4th 850 (9th Cir. 2022) ..............................................................24

*Env't Prot. Info. Ctr. (EPIC) v. U.S. Forest Serv.*,
451 F.3d 1005 (9th Cir. 2006) ......................... 6, 45, 47, 48, 53, 59, 61

*Friends of Se.'s Future v. Morrison*,
153 F.3d 1059 (9th Cir. 1998) ..............................................................25

*Great Basin Res. Watch v. Bureau of Land Mgmt.*,
844 F.3d 1095 (9th Cir. 2016) ..............................................................35

*Hapner v. Tidwell*,
621 F.3d 1239 (9th Cir. 2010) .............................................. 54, 59

*Humane Society of the United States v. Locke*,
626 F.3d 1040 (9th Cir. 2010) .............................................. 55, 56

*Idaho Cmty. Action Network v. U.S. Dep't of Transp.*,
545 F.3d 1147 (9th Cir. 2008) ..............................................................29

*Idaho Conservation League v. Bonneville Power Admin.*,
667 F. App'x 214 (9th Cir. 2016) ..........................................................29

v

*Japanese Village, LLC v. Fed. Transit Admin.*,
   843 F.3d 445 (9th Cir. 2016) ........................................................ 26, 44

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
   681 F.3d 1006 (9th Cir. 2012) .................................................................22

*Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008) ..................................................... 22, 33

*Lands Council v. Powell*,
   395 F.3d 1019 (9th Cir. 2005) ...............................................................60

*League of Wilderness Defs./Blue Mountains Biodiversity Proj. v. Connaughton*,
   752 F.3d 755 (9th Cir. 2014) ...................................................... 22, 48

*McFarland v. Kempthorne*,
   545 F.3d 1106 (9th Cir. 2008) ................................................................23

*Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ..................................................................................23

*Native Ecosystems Council v. Marten*,
   883 F.3d 783 (9th Cir. 2018) ..................................................................22

*Native Ecosystems Council v. U.S. Forest Serv.*,
   428 F.3d 1233 (9th Cir. 2005) ....................................... 29, 31, 32, 53, 54

*Native Village of Nuiqsut v. Bureau of Land Mgmt.*,
   9 F.4th 1201 (9th Cir. 2021) ....................................................................5

*Neighbors of Cuddy Mountain v. Alexander*,
   303 F.3d 1059 (9th Cir. 2002) ................................................................46

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
   137 F.3d 1372 (9th Cir. 1998) ..................................................... 34, 40

*N. Cascades Conserv. Council v. U.S. Forest Serv.*,
   No. 22-35430, 2023 WL 2642930 (9th Cir. Mar. 27, 2023) ..................33

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
   475 F.3d 1136 (9th Cir. 2007) ................................................................23

*Ocean Advoc. v. U.S. Army Corps of Eng'rs*,
 402 F.3d 846 (9th Cir. 2005) ...............................................52

*River Runners for Wilderness v. Martin*,
 593 F.3d 1064 (9th Cir. 2010) .............................................23

*Robertson v. Methow Valley Citizens Council*,
 490 U.S. 332 (1989)..........................................................4, 5

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
 747 F.3d 581 (9th Cir. 2014) ...............................................25

*San Luis Obispo Mothers for Peace v. NRC*,
 449 F.3d 1016 (9th Cir. 2006) .............................................63

*Southeast Alaska Conservation Council v. U.S. Forest Service*,
 443 F. Supp. 3d 995 (D. Alaska 2020) .................................41

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
 608 F.3d 592 (9th Cir. 2010) ....................................31, 38, 39

*Theodore Roosevelt Conserv. P'ship v. Salazar*,
 616 F.3d 497 (D.C. Cir. 2010)..............................................48

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
 671 F.3d 1113 (9th Cir. 2012) ........................................34, 40

*Westlands Water Dist. v. U.S. Dep't of Interior*,
 376 F.3d 853 (9th Cir. 2004) .......................................5, 24, 33

*Wild Wilderness v. Allen*,
 871 F.3d 719 (9th Cir. 2017) ...............................................52

*WildEarth Guardians v. Conner*,
 920 F.3d 1245 (10th Cir. 2019) ...........................................38

*Yesler Terrace Cmty. Council v. Cisneros*,
 37 F.3d 442 (9th Cir. 1994) .................................................51

## Statutes and Court Rule

5 U.S.C. § 553 ..........................................................................51

5 U.S.C. § 706(2)(A).................................................................23

5 U.S.C. §§ 701-706 ......................................................................22

16 U.S.C. § 1600 ...........................................................................33

16 U.S.C. §§ 528-31 ......................................................................33

28 U.S.C. § 1291 .............................................................................3

28 U.S.C. § 1331 .............................................................................2

42 U.S.C. § 4332 .............................................................................1

42 U.S.C. § 4332(2)(C) (2022) ......................................................5

42 U.S.C. §§ 4321 ...........................................................................2

Fed. R. App. 4(a)(1)(B) ..................................................................3

## Regulations and Administrative Material

36 C.F.R. pt. 212 ..........................................................................33

36 C.F.R. pt. 218 ..........................................................................52

36 C.F.R. § 218.1 .........................................................................52

40 C.F.R. 1508.27(b)(2) ..............................................................53

40 C.F.R. § 1501.4 (1978) ........................................................1, 3

40 C.F.R. § 1501.4(c) ....................................................................5

40 C.F.R. § 1501.4(e)(1) ............................ 6, 7, 8, 9, 10, 13, 14, 16, 17

40 C.F.R. § 1501.7 .................................................................. 45, 1, 3

40 C.F.R. § 1502.14 ................................................................. 32, 1, 4

40 C.F.R. § 1506.13 .......................................................................5

40 C.F.R. § 1508.1(mm) (2024) ............................................... 55, 1

40 C.F.R. § 1508.27 (1978) ........................................................1, 4

40 C.F.R. § 1508.27(b) (2005) ....................................................52

40 C.F.R. § 1508.27(b)(2)........................................................................54

40 C.F.R. § 1508.27(b)(4)........................................................................57

40 C.F.R. § 1508.27(b)(7)........................................................................62

40 C.F.R. § 1508.27(b)(9)........................................................................53

40 C.F.R. § 1508.9 (1978) ....................................................................1, 4

40 C.F.R. § 1508.27(b)(5)........................................................................61

43 Fed. Reg. 55,978 (Nov. 29, 1978) .......................................................5

89 Fed. Reg. 35,442 (May 1, 2024). .........................................................5

## INTRODUCTION

Like other national forests throughout the West, past management and over a century of wildfire suppression on the Okanogan-Wenatchee National Forest (Forest) in north central Washington has resulted in unnatural forest stands that are overstocked and homogeneous in structure and composition. This has led to a less resilient forest that is subject to high intensity wildfires, insect infestations, and disease outbreaks. Over a decade ago, the Forest Service developed a restoration strategy to address these substantial risks by improving the resiliency of the Forest. In furtherance of this strategy, the Forest Service conducted a landscape-level assessment of conditions on areas of the Forest near Twisp, Washington, documenting how current conditions depart from desired historic and future reference conditions. That assessment recommended that the Forest Service develop projects to begin restoring the forest and improving its resiliency by moving it toward desired reference conditions. Toward that end, after more than three years of planning, public participation, environmental analysis, and consultation with tribes and other government agencies, the Forest Service approved the Twisp Restoration Project (Project) in July 2022, which Plaintiff now challenges.

The Project will improve forest resiliency in the Project area by, among other things, authorizing non-commercial understory thinning, commercial overstory vegetation treatments, and prescribed fire to reduce fuels. And it will accomplish

1

this largely through the application of condition-based management by which pre-identified units in the Project area that meet certain decision criteria will be treated according to detailed prescriptions.  In developing the Project, the Forest Service received extensive public comments during scoping and in response to a draft environmental assessment (EA).  It then provided further information to the public following a wildfire in the Project area in 2021 before issuing a final EA (that considered a substantially reduced Project area by omitting areas potentially affected by the wildfire), considering objections to the Final EA, and approving the Project.

Plaintiff brought this action claiming that the Forest Service violated the National Environmental Policy Act (NEPA) by not properly defining the purpose and need for the Project, considering a reasonable range of alternatives, taking a hard look at the potential environmental consequences of the Project, sufficiently engaging the public, and preparing an environmental impact statement (EIS).  The district court properly rejected all these arguments and its entry of summary judgment in favor of Defendant should be affirmed.

## STATEMENT OF JURISDICTION

(a)    The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims arose under federal law, specifically NEPA, 42 U.S.C. §§ 4321 et seq.

(b)    The district court's judgment was final because it disposed of all claims. 1-ER-2-3. This Court has jurisdiction under 28 U.S.C. § 1291.

(c)    The judgment was entered on July 24, 2023. 1-ER-3. Plaintiff timely filed its notice of appeal on September 19, 2023. 3-ER-416; Fed. R. App. 4(a)(1)(B).

## STATEMENT OF THE ISSUES

1.    Whether the Forest Service's statement of purpose and need—which identified five broad needs that a project should address, including protecting and maintaining aquatic resources and improving watershed resiliency, moving the forest toward a more resilient condition, enhancing wildlife habitat, and reducing fire intensity—was consistent with the broad discretion the Forest Service has to define the purpose and need of a project.

2.    Whether the Final EA considered a reasonable range of alternatives by considering a no action alternative and proposed action alternative and explaining why other alternatives were not considered.

3.    Whether the Final EA took a hard look at the potential effects of the Project by assessing the Project's maximum potential effects.

4.    Whether the Forest Service acted within its discretion by declining to consider the potential effects of an inchoate project for which a proposed action had not yet been developed and submitted for public comment through NEPA's scoping

process, which is used to determine the scope of issues to be addressed in the environmental review.

5.    Whether the Forest Service provided the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process for the Project.

6.    Whether the Forest Service reasonably found that an EIS was not required.

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are set forth in the Addendum following this brief or when discussed below.

## STATEMENT OF THE CASE

### A.    Legal Background

NEPA ensures that federal agencies consider significant environmental impacts of a proposed action and inform the public of their analysis. *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983).  NEPA serves the twin aims of informing agency decision-makers of the environmental effects of proposed federal actions and ensuring that relevant information is made available to members of the public.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA itself "does not mandate particular results, but simply prescribes the

4

necessary process." *Id.* at 350.  As a result, a "court must avoid passing judgment on the substance of an agency's decision.  Its focus must be on ensuring that agencies took a 'hard look' at the environmental consequences of their decisions." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004) (citing *Robertson*, 490 U.S. at 350).

NEPA requires the preparation of an EIS for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C) (2022).  For proposed actions that normally do not require an EIS, an agency may prepare an EA to assess "whether to prepare an [EIS]." 40 C.F.R. § 1501.4(c).[1]  An EA is "a concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]."  *Id.* § 1508.9.  If an agency concludes the proposed action has no

---

[1] The Council on Environmental Quality (CEQ) promulgated regulations implementing NEPA in 1978.  43 Fed. Reg. 55,978 (Nov. 29, 1978).  CEQ amended those regulations effective September 14, 2020; *see Native Village of Nuiqsut v. Bureau of Land Mgmt.*, 9 F.4th 1201, 1210 (9th Cir. 2021) (citing 85 Fed. Reg. 43,304 (July 16, 2020)).  Although the Project was approved after September 14, 2020, the 2020 regulations did not apply because the NEPA process began before September 14, 2020, and the Forest Service chose to apply the pre-2020 regulations. *See* 40 C.F.R. § 1506.13 (noting amended regulations applied "to any NEPA process begun after September 14, 2020," or where an agency elected to apply them "to ongoing activities and environmental documents."); AR12843 (noting pre-2020 regulations applied to Project).  CEQ also revised the regulations after the Project was approved to address recent amendments to NEPA and other issues.  *See* 89 Fed. Reg. 35,442 (May 1, 2024).  Unless otherwise noted, citations in this brief are to the pre-2020 regulations.

5

significant effect, "it may issue a FONSI in lieu of preparing an EIS." *Env't Prot. Info. Ctr. (EPIC) v. U.S. Forest Serv.*, 451 F.3d 1005, 1009 (9th Cir. 2006); *see* 40 C.F.R. § 1501.4(e)(1).

### B. Factual background

### 1. Management of the Okanogan-Wenatchee National Forest

The Forest Service manages the part of the Forest encompassing the Project under a 1989 land and resources management plan (Forest Plan) that identifies various forest management goals and objectives, forest-wide standards and guidelines, and management area prescriptions. 2-ER-186-296 (record of decision approving Forest Plan); 3-ER-299-407 (Forest Plan management direction). This includes standards and guidelines for managing mixed conifer old growth stands. 3-ER-331-332; 2-ER-185 (defining mixed conifer old growth). The Forest Service implements the Forest Plan through site-specific projects like the Project. 2-ER-297 ("Specific activities and projects will be planned and implemented to carry out the direction in this Forest Plan.").

The Forest Service adopted the Northwest Forest Plan in 1994 to amend forest plans within the range of the northern-spotted owl (NSO), including the Forest Plan, to include standards and guidelines for the management of habitat for late-successional and old-growth forest related species within the range of the NSO. 4-ER-409-644 (decision approving Northwest Forest Plan). It does this by allocating

6

land to various areas that are to be managed for specified purposes according to detailed standards and guidelines. 4-ER-418. These land-use allocations include late successional reserves (LSR), riparian reserves, and matrix lands. 4-ER-420-424. LSRs are to be managed in such a way as to "serve as habitat for late-successional and old-growth related species including the [NSO]," 4-ER-420, while riparian reserves are intended "to protect the health of the aquatic system and its dependent species." 4-ER-421. Matrix lands are lands outside the reserves and the other land-use allocations "in which most timber harvest and other silvicultural activities will be conducted." *Id.*

**2.     Okanogan-Wenatchee National Forest Restoration Strategy and Twisp Landscape Evaluation**

In November 2012, the Forest Service finalized a document titled "The Okanogan-Wenatchee National Forest Restoration Strategy: adaptive ecosystem management to restore landscape resiliency" (Restoration Strategy). 5-ER-646-764. The Restoration Strategy identified the need for a concerted effort "to restore the sustainability and resiliency of forested ecosystems on the [Forest]," in light of documented increased susceptibility to wildfire, insect outbreaks, and habitat decline. 5-ER-651. The Restoration Strategy also explained that "while the Forest's aging road network provides needed access for recreation and forest management, it also degrades the condition of aquatic ecosystems." *Id.* To improve forest resilience and aquatic ecosystems on the Forest, the Restoration Strategy promoted a "planning

7

approach based on principles of landscape-level restoration ecology," *id.*, in which "ecological outcomes for multiple resources drive the development and implementation of projects," 5-ER-653.

Implementation of this ecosystem management approach involves first preparing a landscape evaluation and then developing projects for restoration treatments based on that evaluation. 5-ER-679. The landscape evaluation looks at various ecological indicators that "are meaningful at the landscape scale," and for which "[r]eference conditions have been established for both the historical range of variability and the future range of variability, representing a likely climate change scenario." *Id.* The landscape evaluation process prioritizes areas "where restoration should occur in order to affect larger landscape change" by identifying potential landscape treatment areas (PLTAs). 5-ER-680; *see also* 5-ER-680-682 (summary of landscape evaluation process); 5-ER-685-701 (details of process). Projects are then to be developed in the PLTAs that will contribute to restoring the sustainability and resiliency of forest ecosystems on the Forest. ER-701-704.

In April 2019, the Forest Service completed the Twisp Landscape Evaluation (Twisp Evaluation), covering six watersheds in the greater Methow Valley in Okanogan County, Washington: Upper Twisp River, Middle Twisp River, Little Bridge Creek, Lower Twisp River, Thompson Creek, and Alder Creek. 5-ER-767; 5-ER-769 (map). The Twisp Evaluation explained that previous management to

8

suppress wildfires, promote grazing, intensively harvest timber, and build roads related to these activities "has caused widespread degradation of forest, rangeland, watershed condition and stream habitat, and has increased the risks of uncharacteristically severe wildfire."[2]  5-ER-767.  This has resulted in an "urgent need" for ecological restoration projects on the Forest as illustrated by eastern Washington experiencing "some of its worst fire seasons on record" the last few years.  *Id.*  To aid in the development of such projects, the Twisp Evaluation examined the ecological conditions of the six watersheds, comparing current conditions with reference conditions (i.e., historic and future ranges of variability) to "identify significant areas of departure."  5-ER-769; *see also* 5-ER-770-773 (detailing terrestrial and aquatic evaluation methods).

Having quantified such areas of departure in the terrestrial and aquatic environment, which reflect "a less resilient environment," the Twisp Evaluation found "several opportunities for restoration."  5-ER-805.  For the terrestrial environment, underburning could "be used to thin out the smaller ladder fuels and reduce the risk of spreading crown fire, whereas thinning can open up space for the growing of larger trees which are more resilient and provide better structure for

---

[2] Plaintiff repeatedly claims that the Project involves the same previous management activities that caused these problems. *See, e.g.*, Opening Brief 20.  As discussed below, that is not correct.

9

wildlife." *Id.* And for the aquatic environment, road-related impacts could "be addressed by implementing road specific restoration methods," such as "decommissioning, relocating all or portions of the road, hydrologically closing roads, and upgrading existing roads." 5-ER-806.

### 3. Twisp Restoration Project

#### a. Project Initiation and Scoping

Consistent with the Restoration Strategy, the Forest established a fourteen-member interdisciplinary team (IDT) in June 2019 to develop a restoration project in a 79,682-acre area of the Methow Valley Ranger District covered by the Twisp Evaluation. 5-ER-836-839. The project would move the landscape toward more resilient desired future conditions by: (1) changing the vegetation composition, structure, and pattern to intersect with the historic and future ranges of variability as defined in the Restoration Strategy and other sources; (2) reducing the potential for high intensity wildfire in the wildland urban interface (WUI); and (3) designing and maintaining forest infrastructure, including roads, to reduce water quality impacts and maintain healthy, functioning watersheds that provide high quality water, air, and fishery habitat. 5-ER-837.

In November 2019, a scoping letter was sent to 362 individuals, groups, and agencies detailing the proposed project developed by the IDT, scheduling a public open house, and inviting comments on the proposal. 5-ER-840-842; 6-ER-872. As

displayed in the below map, the proposed project (area within the purple line) was in a 77,038-acre area "southwest, west and northwest of Twisp, Washington in the Twisp River, Alder Creek, Rader Creek, and Wolf Creek drainages." 5-ER-840.



SER-123.

In developing the proposed action, the IDT had applied the Restoration Strategy to "identify areas where the current conditions have departed from desired conditions." 5-ER-843. This process identified five needs to be addressed based on conditions specific to the project area: (1) protection and maintenance of high-functioning aquatic, riparian, and hydrologic resources for species listed under the Endangered Species Act (ESA) and increased resiliency of watersheds to existing and anticipated disturbances; (2) modification of vegetation structure, composition,

11

and patterns to improve resiliency to disturbances and bring vegetation within historic and future ranges of variability; (3) creation and maintenance of wildlife habitat, including late and old forest structure stands; (4) modification of forest stands in and next to the WUI to reduce fire intensity and enable direct firefighting strategies to protect life and personal property, and reduction of fire intensity in certain areas outside the WUI to aid fire suppression efforts; and (5) provision of an affordable, safe, and efficient transportation system. 5-ER-843-846.

The proposed project would address the first and fifth needs through various actions related to roads and vegetation treatments in and around riparian areas. 5-ER-847. It would address the remaining needs through additional actions, including commercial and noncommercial thinning and prescribed fire treatments. 5-ER-847-848. As explained in the scoping letter, most of the thinning and prescribed fire treatments would use "a condition-based management strategy," which involves developing a suite of proposed treatments based on "pre-identified management requirements and specific resource conditions across a broad area," and applying "the most appropriate treatments to move resources toward the desired conditions" based on pre-implementation field reviews. 5-ER-846.

### b. Draft EA

After receiving and considering responses to the scoping letter from 55 individuals, organizations (including Plaintiff), businesses, and local governments,

12

the Forest Service issued a Draft EA in October 2020. 6-ER-857-1099; 6-ER-872. The Draft EA considered a no-action and proposed action alternative, analyzing the potential environmental effects of each. 6-ER-877-978. The Draft EA also considered several other alternatives but eliminated them from detailed study because they would not meet the needs for the project. 6-ER-877-878.

Although the needs for the project remained the same in the scoping letter and Draft EA, 6-ER-866-870, the Forest Service changed the proposed action in the Draft EA in response to issues raised in the public comments to the scoping letter, 6-ER-879-880. These changes included applying site-specific (as opposed to condition based) thinning and prescribed fire treatments in riparian reserves, LSRs, inventoried roadless area, and areas covered by the Forest Plan's old-growth standard. *Id.* With these changes, the Draft EA's proposed action provided for understory vegetation thinning on up to 30,220 acres and overstory vegetation treatments on at most 21,985 acres. 6-ER-882-883 (Table 4). The overstory vegetation treatments would use condition-based management to thin up to 10,840 acres of matrix lands, with the remainder being site specific treatments. *Id.* The overstory thinning in matrix lands would allow removal of trees up to thirty inches in diameter. 6-ER-991-992. Fuel reduction through piling, pile burning, and underburning would occur on at most 59,093 acres, requiring the construction of 204.5 miles of fire line. 6-ER-883.

13

The Forest Service conducted a two-month comment period on the Draft EA. 6-ER-1100-1101; 6-ER-1109. During that time, it also hosted a virtual open house and facilitated a self-guided tour of the project area (in light of then-applicable COVID-19 restrictions). 6-ER-1105-1108. The Forest Service ultimately received 1,029 comments on the Draft EA. 8-ER-1541.

### c. Final EA and DN/FONSI

Shortly before completion of the Final EA, "the Cedar Creek Fire burned into the northern portion of the project area in August 2021, causing mild to severe fire effects in the Wolf, Rader, and Little Bridge Creek drainages." 8-ER-1532. Fire suppression activities also involved fire line construction and fuel break thinning "in portions of the Little Bridge Creek and middle/upper Twisp River drainages." *Id.*

In response to the Cedar Creek Fire and comments received on the Draft EA, the Forest Service revised the proposed action to omit areas potentially affected by the Fire, explaining those revisions in a public meeting in January 2022. 7-ER-1343; 7-ER-1326-1341; 7-ER-1348. A representative of Plaintiff attended that meeting and later expressed to the Forest Service that the "brevity and clarity" of the information presented "was impressive." 7-ER-1342. The Forest Service provided a public link to the meeting and materials used, summarized the major changes to the proposed action, and provided an update on the status of the Final EA. 7-ER-1343.

14

The Forest Service released the Final EA in April 2022, highlighting the key differences between the proposed action in the Draft EA and Final EA. 8-ER-1532-1535. The Final EA considered eleven alternatives that it explained were eliminated from detailed study because they would not meet the needs of the proposed action. 8-ER-1542-1547; 8-ER-1479. The revised proposed action reduced the project area to 24,140 acres from 77,037 acres. 8-ER-1531; 6-ER-862. This resulted in "dropping proposed thinning and prescribed fire actions and most transportation-related changes in the Wolf, Rader, and Little Bridge Creeks and upper and middle Twisp River sub-watersheds." 8-ER-1532. The below map identifies the original project area (tan shaded), the Cedar Creek Fire footprint (orange hashes), and the revised project area (within the purple line):



8-ER-1534.

The Final EA's proposed action provided for non-commercial understory vegetation thinning on up to 13,812 acres and commercial overstory vegetation treatments on up to 8,151 acres. 8-ER-1550 (Table 6). No overstory treatments would occur in LSRs, with condition-based thinning on up to 7,275 acres of matrix lands and site-specific treatments for the remainder on matrix lands and in riparian reserves. *Id.* The diameter cap on overstory thinning on matrix lands was reduced

16

from thirty inches ("large" trees) to twenty-one inches ("medium" trees).[3]  8-ER-1641; 8-ER-1638 (defining "medium" and "large" trees).  Fuel reduction through piling, pile burning, and underburning would occur on at most 23,167 acres, with 102.6 miles of associated fire line construction.  8-ER-1550.  The proposed action would address transportation management by removing hazard and danger trees, replacing culverts, and constructing, maintaining, and closing roads.  8-ER-1557-58.  And although there would still be some aquatic habitat enhancement measures, 8-ER-1551, most of that work became a separate project called the Twisp Aquatic Restoration Project, implementation of which was expected to begin soon after April 2022.  8-ER-1533.

The Forest Service released a draft Decision Notice and Finding of No Significant Impact (DN/FONSI) concurrently with the Final EA.  7-ER-1350-1378.  Under Forest Service regulations, this triggered a 45-day period during which individuals and organizations who previously commented on the scoping letter or Draft EA could object to the Final EA or draft DN/FONSI.  7-ER-1349 (citing 36 C.F.R. pt. 218).  The scope of those objections could include "new information that arose after the opportunities for comment."  *Id.*

---

[3] An exception to this diameter cap related to the presence of dwarf mistletoe allows thinning of trees less than twenty-five inches in diameter under specified conditions.  8-ER-1641.

The Forest Service received several objections, including objections from Plaintiff.  *See* 8-ER-1380-1471.  The Acting Deputy Regional Forester discussed those objections with the objectors (including Plaintiff) on July 12, 2022, 8-ER-1472-1474, and provided written responses to the objectors two weeks later, 8-ER-1476-1519.  These responses explained, among other things, that the Forest Service "provided the public with adequate opportunities to respond to the project during the scoping period, 30-day comment period, public meetings, and objection period;" the "reductions in the project area did not significantly change the project's proposed activities to warrant the need for an additional comment period;" the effects of a potential project in the area removed from the proposed action in the Final EA were not reasonably foreseeable because the Forest Service was still determining "if and what type of treatment may be needed as a result of the fire;" the Final EA considered a reasonable range of alternatives; an EIS was not required; the changes between the Draft EA and Final EA were adequately disclosed; and the reduction in acreage will "meet the needs associated with reducing wildfire risk."  8-ER-1476-1481.

In the meantime, the Forest Service also consulted with the National Marine Fisheries Service (NMFS) and U.S. Fish and Wildlife Service (FWS) as required by the ESA.  NMFS concurred with the Forest Service's determination that the proposed action may affect but would not likely adversely affect two ESA-listed aquatic species, finding that the potential effects on those species were insignificant.

7-ER-1379. Similarly, FWS concurred with the Forest Service's determination that the proposed action may affect but would not likely adversely affect five aquatic and terrestrial species, including the NSO. 8-ER-1475.[4]

The Forest Supervisor adopted the proposed action in the Final EA as the Twisp Restoration Project in a final DN/FONSI dated July 20, 2022. 9-ER-1565-1692. In doing so, the FONSI examined the context and intensity of the Project, concluding that an EIS was not required because it would not "have a significant effect on the quality of the human environment." 9-ER-1669.

## C.    Proceedings below

Plaintiff brought this action challenging the Project in November 2022, asserting one claim under NEPA and another under the Federal Advisory Committee Act (FACA). 2-ER-21-31. Plaintiff waived the FACA claim in its motion for summary judgment. 2-ER-32 n.1. Defendants' cross-moved for summary judgment. On January 17, 2024, the district court granted Defendants' cross-motion, denied Plaintiff's motion, and entered judgment for Defendants. 1-ER-2-19.

In doing so, the district court found that the Project was "the result of careful decision-making on the part of the Forest Service that included more than three years of planning, public participation, environmental analysis and consultation with tribes

---

[4] Plaintiff challenges neither of these conclusions and did not assert an ESA claim below.

19

and other government agencies," and that "the Forest Service met all the requirements of NEPA in approving the [Project]." 1-ER-18. In particular, the district court held that: (1) the Forest Service did not narrowly define the purpose and need for the proposed action so as to preordain the Project, 1-ER-10-11; (2) the EA properly considered no action and action alternatives while sufficiently explaining why other alternatives were not considered in detail, 1-ER-11-13; (3) the EA took a hard look at the potential cumulative impacts of the Project and was not required to consider the potential effects of a project that had not yet proceeded to scoping, 1-ER-13; (4) "the Forest Service provided the public with adequate opportunity to meaningfully participate in the process during the development of the Project," 1-ER-13-14; and (5) the "FONSI was not arbitrary or capricious" because it and "supporting documentation fully explain the basis for the Forest Service's conclusion that the Project would not have a significant effect on the quality of the human environment," 1-ER-14-17.

## SUMMARY OF ARGUMENT

The Forest Service fully complied with NEPA when it authorized the Project. Plaintiff's scattershot objections are unavailing, as the district court correctly recognized.

1.     The Forest Service identified a broad purpose and need for a proposed action to improve the resiliency of the Forest by moving the area toward reference

20

conditions. That broad purpose and need did not preordain this specific Project, and it falls well within the Forest Service's broad discretion.

2. The EA reasonably considered a no action alternative and a proposed action alternative while explaining why additional proposed alternatives were not considered in detail. Plaintiff argues that the EA should have considered an alternative planning process, but the alternative as described by Plaintiff is either duplicative of the proposed action (which requires monitoring, contrary to Plaintiff's assertions), impractical, or not the type of alternative that NEPA requires an agency to consider. Plaintiff also contends that the EA should have considered what it calls a "natural succession" alternative. But such an alternative is either duplicative of the no-action alternative or—under Plaintiff's formulation, as prohibiting nearly all Forest Service actions throughout the landscape, including separately authorized actions—exceeds the scope of the Project and is inconsistent with the Forest Service's multiple-use mandate.

3. The Final EA took a hard look at the potential effects of the Project by identifying when and where commercial treatments, non-commercial thinning, and fuels reduction activities are authorized to occur and by assessing the maximum potential effect of implementing all those actions. This detailed information and analysis facilitated the type of informed decision-making and public participation NEPA requires.

4.     Plaintiff ignores that Ninth Circuit precedent makes clear that the Final EA was not required to consider cumulative effects from a potential project that had not yet been proposed or subject to scoping because the potential effects of such a project were not reasonably foreseeable.  *See League of Wilderness Defs./Blue Mountains Biodiversity Proj. v. Connaughton*, 752 F.3d 755, 762 (9th Cir. 2014) ("Although projects need not be finalized before they are reasonably foreseeable, they must be more than merely contemplated." (citations omitted)).

5.     The Forest Service provided extensive opportunities for public input before and after the Cedar Creek Fire.  These opportunities provided the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process.

6.     An EIS was not required.  The Forest Service's analysis of potential effects was thorough, and its finding of no significant impact was reasonable.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment de novo. *Native Ecosystems Council v. Marten*, 883 F.3d 783, 789 (9th Cir. 2018). Agency decisions under NEPA are reviewed under the judicial review provisions of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706.  *See Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc); *Karuk Tribe of Cal. v. U.S.*

22

*Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc).  Under the APA, agency

decisions may be set aside if they are "arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  In accordance with

that standard, an agency's decision will be overturned

> only if the agency relied on factors which Congress has not intended it
> to consider, entirely failed to consider an important aspect of the
> problem, offered an explanation for its decision that runs counter to the
> evidence before the agency, or is so implausible that it could not be
> ascribed to a difference in view or the product of agency expertise.

*McFarland v. Kempthorne,* 545 F.3d 1106, 1110 (9th Cir. 2008) (citation omitted).

The standard of review for an agency's factual and policy determinations is "highly

deferential, presuming the agency action to be valid and affirming the agency action

if a reasonable basis exists for its decision."  *Nw. Ecosys. All. v. U.S. Fish & Wildlife*

*Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (citation omitted).  The APA "does not

allow the court to overturn an agency decision because it disagrees with the decision

or with the agency's conclusions about environmental impacts."  *River Runners for*

*Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (per curiam).  The agency

need only articulate a "rational connection between the facts found and the choice

made."  *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

29, 43 (1983).

## ARGUMENT

## The Forest Service Complied with NEPA

### A.    The Final EA's analysis of alternatives was reasonable.

The Final EA considered an adequate range of alternatives under NEPA by considering an action and no-action alternative and explaining that several other proposed alternatives would not meet the appropriately broad purpose and need for the Project or were otherwise not practicable. Plaintiff's contrary arguments fail.

### 1.    The stated purpose and need did not preordain the Project.

Plaintiff first argues that the Forest Service's consideration of alternatives was based on an impermissibly narrow statement of purpose and need.  Plaintiff is wrong. "The stated goal of a project necessarily dictates the range of 'reasonable' alternatives and an agency cannot define its objectives in unreasonably narrow terms." *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997).  But agencies have "considerable discretion to define the purpose and need of a project." *Westlands Water Dist.*, 376 F.3d at 866 (citation omitted). And a statement of purpose and need is unreasonably narrow only if it preordains the outcome. *Env't Def. Ctr. v. Bureau of Ocean & Energy Mgmt.*, 36 F.4th 850, 876 (9th Cir. 2022).

Plaintiff falls far short of meeting that demanding standard.  From scoping through the Final EA, the Forest Service identified five needs that a project would

24

address. These included protecting and maintaining aquatic resources and improving watershed resiliency, remedying past forest management by moving the forest toward a more resilient condition consistent with historic and future ranges of variability, enhancing wildlife habitat, reducing fire intensity while creating conditions to safely manage wildfire in the WUI, and managing the transportation system in an affordable, safe, and efficient manner. 8-ER-1536-1539; SER-16. Those needs are reasonable on their face, and Plaintiff itself notes that two of them "are admirable in the abstract." Brief 21.

More fundamentally, none of these five needs, collectively or individually, preordained a specific project. *See, e.g.*, *Friends of Se.'s Future v. Morrison*, 153 F.3d 1059, 1067 (9th Cir. 1998) (upholding purpose and need statement for vegetation management and timber production project). Indeed, as the district court correctly noted, the Project "authorizes a variety of strategies to meet the stated needs," with only one of those strategies (commercial overstory treatments) involving "the kind of commercial timber harvest that Plaintiff suggests the statement of needs preordained." 1-ER-11. Plaintiff nevertheless maintains that the painstaking three-year process the Forest Service engaged in to approve the Project was "just a formality." Brief 19. Not only does Plaintiff's contention find no factual support, but it also ignores that an "agency's decision is entitled to a presumption of regularity." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601

(9th Cir. 2014) (quotation omitted). Plaintiff points to nothing to overcome that presumption.

Instead, perhaps realizing its arguments in the district court lack legal support, Plaintiff now changes tack on appeal to challenge the factual basis for the Forest Service's identification of the needs for a proposed action in the first instance. *See* Brief 20-21. Plaintiff forfeited this argument by not raising it in the district court. *See Japanese Village, LLC v. Fed. Transit Admin.*, 843 F.3d 445, 454-55 (9th Cir. 2016) (court will not consider arguments raised for first time on appeal absent "exceptional circumstances"); 1-ER-11 (district court order noting "Plaintiff argues the [Project] relied on an unreasonabl[y] narrow purpose and need statement, but it did not identify which of the five state[d] goals were too narrow or unnecessary."); 2-ER-43-44; 2-ER-145-149. In addition, this new argument has nothing to do with whether the Forest Service's purpose and need statement was unduly *narrow* (which is the relevant inquiry under NEPA).

Even putting aside these defects, the record fully supports the Forest Service's determination that current conditions diverge from historic reference conditions and that moving the landscape toward reference conditions that "have been established for both the historical range of variability and the future range of variability, representing a climate change scenario," 5-ER-679, will result in a forest that is more

26

resilient to high intensity wildfire, insect infestations, and disease outbreaks.[5]  *See supra* Stmt. of the Case § B.2 (detailing Restoration Strategy and Twisp Evaluation).

Plaintiff also asserts that the purpose and need statement somehow violated NEPA because it reflects the "circular logic" of "blam[ing] the Forest's current condition on the exact same management activities that will be carried out under the Project."  Brief 20.  That is wrong.  Far from authorizing the "exact same management activities" that resulted in the current conditions that are susceptible to high-severity wildfire, insect infestations, and disease outbreaks, the need for a project was based on principles of landscape-level restoration ecology that would employ a variety of targeted restoration activities.  *See supra* Stmt. of the Case § B.2.  Past management activities that degraded habitat were not based on these same restoration ecology principles.  Instead, as explained in the Restoration Strategy, management based on ecological principles "emphasizes a restoration paradigm where ecological outcomes for multiple resources drive the development and implementation of projects," rather than "timber production targets" that overlook the needs of other resources.  5-ER-653.

Finally, Plaintiff argues "the Forest Service crafted the Project based on

---

[5] Plaintiff's challenge to the Forest Service's use of historic reference conditions ignores that the reference conditions also include the predicted future range of variability that accounts for the changing climate.  *See* Brief 21.

private input from the Project's direct economic beneficiaries instead of engaging in decision-making informed by public participation." Brief 20. This misrepresents the purpose and need statement as well as the agency's decision-making process.

As to the purpose and need statement, the needs identified by the Forest Service relate to the agency's management of the Forest to improve its resiliency; its objective was not to meet the needs of any private entity and Plaintiff provides no basis for its contrary assertion. To the extent private companies may benefit from the commercial timber harvest that the Forest Service determined is necessary to improve forest health, that is far different from narrowly drafting a statement of needs to meet a private proponent's needs without considering the needs of the agency.

As to the facts, Plaintiff's argument misrepresents the development of the project. The Project was developed through a robust, open process that engaged the broader public through scoping, public meetings, comment periods, and site visits. *See supra* Stmt. of the Case § 3. As part of that process, the Forest Service also "engaged with members of the North Central Washington Forest Health Collaborative during project development," SER-17, which comprises a diverse coalition of members with interests in forest management, ranging from environmental organizations to local governments to timber industry representatives, SER-6. None of this engagement was improper, nor did it result in

28

a statement of needs designed to serve private interests.

## 2. The Final EA considered a reasonable range of alternatives.

The range of alternatives an agency must consider is "dictated by the nature and scope of the proposed action." *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 729 (9th Cir. 1995) (citations omitted). "Alternatives that do not advance the purpose of [a project] will not be considered reasonable or appropriate." *Native Ecosys. Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1247 (9th Cir. 2005).

Importantly, "an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS." *Id.* at 1246. This is because "whereas with an EIS, an agency is required to '[r]igorously explore and objectively evaluate all reasonable alternatives,' with an EA, an agency only is required to include a brief discussion of reasonable alternatives." *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008) (citation omitted). An EA must consider a "no action" alternative and a "preferred alternative." *See Native Ecosys. Council*, 428 F.3d at 1245-46. But beyond that, there is no "numerical floor on alternatives to be considered," *id.* at 1246, and consideration of only these two alternatives is "generally sufficient," *Idaho Conserv. League v. Bonneville Power Admin.*, 667 F. App'x 214, 215 (9th Cir. 2016); *see also Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1021-22 (9th Cir. 2012). Indeed, "it makes little sense to fault an agency

for failing to consider more environmentally sound alternatives to a project which it has properly determined, through its decision not to file an impact statement, will have no significant environmental effects anyway." *Earth Island Inst.*, 697 F.3d at 1023 (citation omitted).

The Final EA considered in detail a no-action alternative and a proposed action alternative. AR12615-33. It also identified several alternatives that "were considered but dismissed from detailed consideration" for various reasons. 8-ER-1542-1547. This consideration of alternatives and explanations for why other alternatives were not considered satisfied NEPA. Plaintiff nevertheless claims that the Final EA's explanations for not considering two of the proposed alternatives in detail were arbitrary or capricious. Brief 22-26. They were not.

First, Plaintiff contends the Final EA should have considered in detail a "phased approach," by which an initial project was approved and implemented over the course of three to five years followed by four more planning processes to approve successive projects. Brief 22-23 (citing 6-ER-1103-1104). As Plaintiff describes it, the "main substantive departure from the selected alternative is actual monitoring." Brief 22. But Plaintiff ignores that the selected Project requires extensive monitoring. SER-18-20; *see also* 8-ER-1558 ("During contract development and project implementation, agency staff would regularly evaluate treatments to assure that design features are addressed as specified."). Because there is no meaningful

30

difference between the alternative proposed by Plaintiff and the Project on this point, the Final EA reasonably did not consider such an alternative in detail. *See* 8-ER-1546 (explaining "monitoring will help inform treatments as they occur"); *Native Ecosys. Council*, 428 F.3d at 1248-49 ("NEPA does not require federal agencies to consider alternatives that are substantially similar to other alternatives."); *cf. Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 602 (9th Cir. 2010) (finding analysis of effects of "first phase of project versus all three phases are substantially similar").

Further, even if there were a meaningful difference, the Final EA reasonably explained that such a phased approach would "roughly tripl[e] the time spent on analysis and implementation" and delay "planning efforts for other restoration projects on the district." 8-ER-1546. Plaintiff claims this reflects "defective arithmetic," Brief 23, but the Final EA correctly explained that dividing a project as proposed would require three separate planning processes, "roughly tripling the time spent on analysis and implementation . . . ." 8-ER-1546.

And more to the point, what Plaintiff really seeks is consideration of an alternative planning process, rather than a substantively different action. 6-ER-1104 ("[Plaintiff] is proposing separate but sequential restoration planning processes."). But such an alternative is not the type of "alternative[] to the proposed action" to which NEPA's alternatives requirement applies because the potential effects of a

different process cannot be presented in "comparative form based on the information and analysis presented in the sections on the affected environment (§ 1502.15) and the environmental consequences (§ 1502.16)." 40 C.F.R. § 1502.14. Plaintiff cites no legal support for the proposition that NEPA requires consideration of alternative planning processes, and the Final EA's rejection of such an alternative was not arbitrary or capricious.

Second, Plaintiff asserts the Final EA should have considered in detail what it calls a "natural succession" alternative. Brief 23-25. The Final EA explained that this would be duplicative of the no-action alternative, "which would provide for natural succession by taking no active management." 8-ER-1544. This explanation satisfied NEPA. *See Native Ecosys. Council*, 428 F.3d at 1248-49.

Plaintiff claims that rather than an alternative that considered taking no action, it wanted the Final EA to consider an alternative that would "aim to eliminate human intervention," including "standard resource protection and recurrent maintenance" measures, other than vague, unidentified "affirmative agency acts [that] would be necessary to satisfy the Forest Service's obligations under the ESA." Brief 23-24. But the parameters of such an alternative are so ill-defined as to preclude its consideration. In any event, any such alternative would clearly fail to meet the purpose and need of the proposed action. *See* 8-ER-1536-1538 (noting need to, among other things, modify vegetation to increase resiliency, create and maintain

wildlife habitat, and modify forest stands in and next to the WUI).

Further, Plaintiff's proposed alternative ignores that the Forest Service must manage the Forest for multiple uses under the National Forest Management Act, 16 U.S.C. § 1600 et seq., and the Multiple-Use Sustained Yield Act, 16 U.S.C. §§ 528-31, as well as comply with numerous other statutes and regulations, including the Travel Management Rule, 36 C.F.R. pt. 212. An alternative that would prevent the Forest Service from implementing management responsibilities under these laws would not be reasonable. *See McNair*, 537 F.3d at 990 ("Congress has consistently acknowledged that the Forest Service must balance competing demands in managing National Forest System lands. Indeed, since Congress' early regulation of the national forests, it has never been the case that the national forests were to be set aside for non-use." (citation and quotation omitted)).

As the Court previously explained in response to similar arguments from this Plaintiff, "[t]he alternatives that Appellants argue the Forest Service should have considered in greater depth would 'extend beyond those reasonably related to the purposes of the project.'" *N. Cascades Conserv. Council v. U.S. Forest Serv.*, No. 22-35430, 2023 WL 2642930, at *3 (9th Cir. Mar. 27, 2023) (quoting *Westlands Water Dist.*, 376 F.3d at 868). The same is true here.

33

**B.      The Final EA took a hard look at the Project's potential
         direct, indirect, and cumulative effects**.

An EA satisfies NEPA's hard-look mandate if it contains a "reasonably thorough discussion of the significant aspects of probable environmental consequences." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1376 (9th Cir. 1998). "The purpose of an EA under NEPA is not to amass and disclose all possible details regarding a proposal, but to create a 'concise public document' that serves to briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1128 (9th Cir. 2012) (citation omitted). "An EA must provide the public with sufficient environmental information, considered in the totality of the circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." *Id.* (citation omitted).

The Final EA meets these standards. Plaintiff maintains that it does not because the Project's condition-based management "is inherently violative of NEPA" and because the Final EA did not consider potential effects of the Midnight Restoration Project, a project that had not yet been proposed or subject to scoping when the Final EA was issued. Brief 28, 30. As explained below, both arguments fail. The Final EA contains a detailed review of the applicable condition-based management and its potential effects that facilitated the type of informed decision-

34

making and public participation NEPA requires.  And the Final EA was not required to consider a potential project that had not yet been proposed or subject to scoping because the potential effects of such a project were not reasonably foreseeable.

### 1. The Forest Service appropriately considered the potential effects of condition-based management.

Using known existing information, limited field verification, and modeling to determine stand structures, forest types, and insect and disease vulnerabilities throughout 21,149 acres of the Project area, the Forest Service relied on its expertise to identify those areas that would benefit from non-commercial understory thinning, commercial overstory treatments, and fuels reduction activities.  *See* 8-ER-1548-1553; 8-ER-1520-1521.  This approach to understanding and disclosing conditions throughout the Project area complies with NEPA.  *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016) (noting agency can rely on "data from a similar area, computer modeling, or some other reasonable method.").

The Forest Service also acknowledged that some uncertainty existed as to the actual on-the-ground conditions and wanted to ensure "that the right activity occurs on the right location to move the landscape towards the desired condition."  8-ER-1548.  To do this, the Final EA disclosed detailed decision criteria that will be applied during Project implementation to ensure the actual conditions on the ground meet the expected conditions disclosed in the Final EA.  8-ER-1548-1549.  If they do not, then the treatment will not be applied.  If they do, then the approved treatment

will be applied. And where the decision criteria are met, the Final EA detailed the specific prescriptions that apply, provided maps identifying where those prescriptions apply, and estimated the timing of implementation. 8-ER-1548-1556, 8-ER-1635-1649, 8-ER-1650-1655.

For example, the Final EA disclosed that condition-based management for commercial overstory thinning would apply to at most 7,275 acres of the 21,149-acre Project area. 8-ER-1548; 8-ER-1550; 8-ER-1554. It then mapped the specific unit-by-unit location of those 7,275 acres (orange):



8-ER-1653; *see also* 8-ER-1652 (map of upper third); 8-ER-1654 (map of lower third).

But as the Final EA candidly acknowledged, despite relying on the best available information to estimate conditions in these units, some of the units may

deviate from those estimates such that they would not benefit from overstory thinning. 8-ER-1548. Thinning will occur only if the units meet four specific decision criteria detailed in the Final EA related to slope, tree density, structural stage of the stand, and timber volume. 8-ER-1554.

If a unit does not meet all four decision criteria, it will not receive overstory thinning. If a unit does meet all the criteria, it will be thinned according to the prescriptions set forth in the Final EA. For units in dry forest, trees up to 21 inches in diameter would be thinned from below (i.e., first removing trees in the understory, then the midstory, and then the overstory, which leaves predominantly larger diameter trees in achieving the desired stand density) until there were 20 to 30 trees per acre greater than 10 inches in diameter. 8-ER-1638; 8-ER-1641. This would result in a minimum of 70 to 105 trees per acre in these units with various size classes, creating "a mosaic of forest structures including old forest multi or single storied stands." 8-ER-1641. Slightly modified prescriptions would apply to units in moist forest. 8-ER-1640-1641. Application of these prescriptions would "develop, maintain, or restore healthy stand structures in the project area that respond to disturbances such as wildfire and climate change in a resilient manner and are consistent with historic and future ranges of variability." 8-ER-1537 (need two); 8-ER-1643 (noting objective of overstory thinning to meet need two).

37

Although these prescriptions will not apply where the decision criteria are not met, in assessing the potential effects of the Project on various resources, the Final EA considered the *maximum potential effects* of the Project by assuming *all* 7,275 acres would be treated. 8-ER-1548-1549; *see also* 8-ER-1522 ("Although actual acres treated would vary across the landscape, the effects of implementing every acre of proposed treatments will be analyzed to clearly show the maximum effect of the proposed treatment."). For example, the Final EA assessed the Project's potential effects on NSO habitat, finding that if all vegetation and fuel reduction treatments were implemented, they would remove "877 acres of low-quality" nesting, roosting, or foraging habitat from the Project area, along with 5,141 acres of dispersal habitat. 8-ER-1588. Calculation and disclosure of these types of maximum potential effects provided the reasonably thorough discussion of the significant aspects of the probable environmental consequences of the Project that NEPA requires. *See WildEarth Guardians v. Conner*, 920 F.3d 1245, 1258 (10th Cir. 2019) (upholding EA analyzing "maximum possible effect on lynx habitat" where specific timing and location of vegetation treatments not known); *see also Te-Moak Tribe of W. Shoshone of Nev.*, 608 F.3d at 600 ("BLM may approve an exploration project without knowing the exact locations of drill sites and other project activities" if it "analyze[s] the impact of drilling activities in all parts of the

38

project area and impose[s] effective avoidance and mitigation measures to account for unknown impacts.").

And implementation of the overstory thinning would not occur at some indeterminate time over the course of twenty years.[6] Rather, the Final EA explained that commercial harvest associated with the overstory thinning "would likely occur in three phases with each phase typically implemented over a three to five-year period." 8-ER-1553. The Final EA then disclosed that "[i]mplementation of Phase 1 (Lookout) would likely begin within the first year of project implementation with Phase 2 (Newby) and Phase 3 (Woodpecker) likely starting at one-year intervals after the initial phase," *id.*, as reflected in the below map:

---

[6] The Project's "twenty-year lifespan" mentioned by Plaintiff, Brief 28, comes not from any of the thinning activities but instead from one component of the prescribed fire treatments called "maintenance underburning," which is authorized to "occur when the mean historic fire return interval has passed (approximately 16-20 years for most of the project area) after the initial underburn treatment to help maintain desired fuel levels and stand structure." 8-ER-1555.



8-ER-1554.

Notwithstanding this carefully tailored set of activities keyed to objective measures of on-the-ground conditions, Plaintiff makes the sweeping claim that "[c]ondition-based management is inherently violative of NEPA because it fails to inform the public what will in fact occur as the Project is implemented over its twenty-year lifespan." Brief 28. But NEPA requires only that an EA provide a "reasonably thorough discussion of the significant aspects of *probable* environmental consequences," *Neighbors of Cuddy Mountain*, 137 F.3d at 1376 (emphasis added), such that the totality of the circumstances "permit members of the public to weigh in with their views and thus inform the agency decision-making process," *Tri-Valley CAREs*, 671 F.3d at 1128. The Final EA easily cleared this threshold.

Plaintiff's reliance on *Southeast Alaska Conservation Council v. U.S. Forest Service*, 443 F. Supp. 3d 995 (D. Alaska 2020), to support a different result is misplaced. Brief 28, 30. Although the district court in that case—which is of course not binding on this Court—found that an EIS for a project that applied "condition-based analysis" violated NEPA, the facts supporting that finding were materially different than those presented here. *Se. Ak. Conserv. Council*, 443 F. Supp. 3d at 1003. The condition-based approach in that case applied to 1.8 million acres, potentially authorizing 46 different types of activities, including various approaches to timber harvest such as "clear-cut methods." *Id.* at 1000-02. The project identified 125,529 acres for potential timber harvest, nearly two-thirds of which would be in old-growth forest. *Id.* at 1001. But the acreage available for timber harvest varied from alternative to alternative without identifying the location of the actual harvest units. *Id.* at 1008. And the court noted the EIS did not specify the "methods" of harvest that would apply and did "not include a determination—or even an estimate—of when and where the harvest activities or road construction authorized by each alternative will actually occur." *Id.* at 1002, 1009. All these facts combined led the court to conclude that the EIS did not foster public participation and informed decision-making. *Id.* at 1010.

By contrast, the Project area is around *one percent* of the project area at issue in *Southeast Alaska Conservation Council*. And within that much smaller Project

41

area, the Final EA identifies the specific methods of understory thinning, overstory treatments, and fuels reduction that will be employed and where those methods may be employed. For example, the below map identifies where within the Project area understory thinning can occur (gray) in relation to the overstory matrix thinning (orange), matrix shaded fuelbreak thinning (tan), regeneration harvest (yellow), and riparian reserve thinning (turquoise).



8-ER-1651. The Final EA also breaks this map down into three other maps that provide the same information on specific units in the Project area. 8-ER-1652-1654. These various areas correspond to the detailed prescriptions set forth in the Final EA. 8-ER-1639-1640 (understory), 8-ER-1640-1642 (matrix thin), 8-ER-1642 (matrix shaded fuelbreak thin), 8-ER-1642-1643 (regeneration), 8-ER-1643

(riparian reserve).[7]  And the Final EA explains the methods and timing for the understory and overstory thinning.  8-ER-1643-1646; 8-ER-1553-1554 (Figure 7).[8]

That some of these areas may not ultimately be thinned or otherwise treated where on-the-ground conditions differ from those estimated by the Forest Service in no way undermines the usefulness and adequacy of this information in promoting public participation and informed decision-making.  Anyone reviewing this information will know exactly where proposed activities may occur, when they may occur, which prescriptions apply, and which harvest methods may be employed. NEPA requires nothing more and the district court correctly held "that the use of condition-based management is not arbitrary or capricious as a matter of law and as applied in this case."  1-ER-17.

For the first time, Plaintiff now claims on appeal that the Final EA's consideration of the maximum potential effects was flawed because it did not account for the potential for an increase in the diameter cap in the overstory thinning prescriptions from 21 inches to 25 inches where dwarf mistletoe is present, or for an

---

[7] The same detail applies to the fuel reduction treatments.  *See* 8-ER-1655 (map); 8-ER-1646-1649 (treatment specifics).

[8] These detailed disclosures also distinguish *City of Tanakee Springs v. Block*, 778 F.2d 1402 (9th Cir. 1985), which Plaintiff mentions in passing, Brief 28, because that case concerned the complete lack of information in an EIS about potential timber harvest on 750,000 acres of land.  *Id.* at 1407-08.  As the court noted, "[i]t is impossible to determine where and when harvesting will occur on the 750,000 acres of land."  *Id.* at 1408.  The Final EA contains no similar deficiency.

increase in the size of openings (areas without trees) from one acre to up to two acres "where heavy infestations of insect or disease are present." Brief 28 (citing 8-ER-1534, 1641). Plaintiff forfeited this argument twice, first by not raising it during the administrative process and second by not making it in the district court. *See All. for the Wild Rockies v. Petrick*, 68 F.4th 475, (9th Cir. 2023) ("[A]bsent exceptional circumstances, failure to raise arguments before an agency, such as in comments during a public-comment process, usually waives a litigant's right to make those arguments in court."); *Japanese Village, LLC*, 843 F.3d at 454-55 (argument generally waived if not raised below); *see also* AR07222-28 (scoping comments); AR10548-55 (comments on Draft EA); AR12162-78 (objections).

But, even if the issue were properly before the Court, Plaintiff's argument would fail because the modeling used for the maximum effects analysis incorporated the potential increase in diameter size up to 25 inches. SER-39 (Vegetation Silviculture Report noting modeling used maximum diameter of 25 inches). And Plaintiff's claim that the insect and disease "exceptions could, for example, hypothetically double the Project's overstory thinning acreage," is mistaken. Brief 29 (citing 8-ER-1641). Nothing at the cited page supports that proposition, and Plaintiff is wrong if it means to argue that the potential for an increase in the size of openings noted at 8-ER-1640 could have such a result. That increase applies only to openings, not to other treated acres that will "create a mosaic of forested

conditions" by "isolating large old trees as individuals [and] creating clumps of various-sized trees . . . ." 8-ER-1640. In other words, most of the treated acres will not be treated to create openings, and where openings are desired, natural clearings would be used "where appropriate" to create them. *Id.* And in those areas in which openings are desired, openings up to two acres will occur only in the limited areas "where heavy infestations of insect or disease are present," with "insect or disease issues in more than 50% of the trees." *Id.* As such, even if properly before the Court, Plaintiff's misunderstanding of the modeling used for the maximum effects analysis and the scope of the authorized activities does not support a NEPA violation.

> ## 2. The Final EA was not required to consider cumulative effects from the potential Midnight Restoration Project.

Plaintiff next argues that the Final EA violated NEPA by not considering the cumulative impacts of a potential project that had not yet been proposed and subject to NEPA's public scoping process, which is "an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action." 40 C.F.R. § 1501.7; *see* Brief 30-32. Plaintiff is mistaken. In considering a project's cumulative impacts, an agency must consider other "reasonably foreseeable" projects. *EPIC*, 451 F.3d at 1014 (citation omitted). But NEPA does not "require the government to do the impractical," *id.*, and an agency's determination of the scope of its analysis of the effects of reasonably

foreseeable actions is subject to deference, *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1071 (9th Cir. 2002).

In August 2021, the Cedar Creek Fire burned through part of the area included in the Draft EA's proposed action. 8-ER-1532. In response, the Forest Service removed areas potentially affected by the Fire from the proposed action in the Final EA. *Id.* As explained in the Final EA, among other effects, the Fire likely "increased levels of fuel created by snags collapsing, which can negatively impact late successional habitat and delay habitat recovery by elevating the fuel loading over time and increasing the possibilities for short return intervals of more severe, stand-replacing wildfires." 8-ER-1537. The Final EA disclosed that those areas removed from the Project area were "under assessment to determine the degree to which baseline vegetation and terrestrial habitat conditions were affected" by the Fire and "to assess whether previously identified or new needs for treatment exist." 8-ER-1532. The Final EA further noted that areas "severely impacted by the Cedar Creek fire may benefit from fire restoration treatments. If these needs are identified, they would be addressed by initiating new projects and analyses." 8-ER-1532-1533. Thus, although a potential project called the Midnight Restoration Project covering these areas was under internal Forest Service consideration, any such project was in its initial planning stages and had not yet been subject to public scoping at the time the Final EA for the Twisp Project was issued. This shows that the inchoate

46

Midnight Restoration Project was not reasonably foreseeable, and the Final EA had no duty to speculate about any potential cumulative effects of the potential project.

*EPIC* is directly on point, holding in a similar situation that it was not arbitrary or capricious for the Forest Service to omit a project in its initial planning stages from the cumulative effects analysis. 451 F.3d at 1014-15. In that case, the Forest Service had initially proposed a large timber harvest project that was later abandoned. *Id.* at 1014. The Forest Service then approved a timber sale that had been part of that larger project. *Id.* While conducting an EA for that project, the Forest Service had proposed another project that had also been part of the abandoned larger project. *Id.* Despite the common origin of the projects, the court held that it was not arbitrary or capricious for the Forest Service to entirely omit the proposed project from the cumulative effects analysis in the EA because at the time the EA was issued, the "project had just been proposed" and its parameters were unknown. *Id.* at 1014-15.

The same analysis applies here. At the time the Twisp Project Final EA was issued, the Midnight Restoration Project was in its initial planning stages, no decision had been made as to whether such a project would move forward, and no scoping setting forth a proposed action had occurred. Thus, it was not arbitrary or capricious for the Final EA to omit the nascent Midnight Restoration Project from

its cumulative effects analysis.[9]  *See Connaughton*, 752 F.3d at 762 ("Although projects need not be finalized before they are reasonably foreseeable, they must be more than merely contemplated." (citations omitted)); *Theodore Roosevelt Conserv. P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010) (finding not arbitrary or capricious to omit projects from a cumulative effects analysis "for which nothing had been completed except notices of intent" (i.e., scoping)).

Plaintiff cites a March 2022 email from the District Ranger for the proposition that the Midnight Restoration Project was reasonably foreseeable.  Brief 31 (citing 7-ER-1344).  But that email merely confirms the inchoate nature of the potential project by explaining that no decision had been made as to whether treatments in the removed areas would be proposed as a separate project.  7-ER-1344 (noting "more analysis was needed to determine if there is still a need for treatments in that area that was left behind").  And, more to the point, it nowhere indicates that, even if

---

[9] Contrast this with the Final EA's treatment of the Twisp Aquatic Restoration Project, which the Final EA did consider.  As the Final EA documented, the Forest Service determined that the Cedar Creek fire "did not change the need for [aquatic habitat enhancement] treatments or baseline conditions used to analyze effects."  8-ER-1533.  These treatments were then separately approved through another project called the Twisp Aquatic Restoration Project, with project approval and implementation having been expected to occur in late April 2022.  *Id.*  Because the proposed treatments from this project were known and nearing approval, the Forest Service considered those "treatments and all related actions as reasonably foreseeable future actions that will be addressed under cumulative effects as needed in specialists' reports."  *Id.*

48

some sort of project was likely, the same treatments proposed in the Draft EA would be carried forward in any proposal. To the contrary, the email notes that although "early indications are that there is still a need for treatments post-fire," and it was "likely that Midnight will be developed as a project," any "proposed action" would be updated "to reflect the changes from the fire and suppression efforts," with the NEPA process starting "from the beginning." *Id.* But those treatments had not yet been developed, much less proposed and subjected to scoping under NEPA, and the Final EA did not need to speculate as to the effects of the potential project.

### C. The Forest Service was not required to reopen the comment period on the Draft EA after the Cedar Creek Fire.

When preparing an EA, an agency need only "provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 953 (9th Cir. 2008).[10] The Forest Service more than met this standard. The Forest Service engaged the public during the scoping period by identifying the proposed project, hosting an open house, and requesting comments. *See supra* Stmt. of the Case § B.3.a. The Forest Service then

---

[10] This standard can be met without even preparing and soliciting comments on a draft EA. *See id.* at 952 ("We hold today that the circulation of a draft EA is not required in every case.").

49

released an extensive Draft EA, detailing the proposed project and the specific prescriptions that would apply to the proposed understory thinning, overstory treatments, and fuel reduction work, and assessing the potential environmental effects of those actions. *See id.* § B.3.b; 6-ER-880-891; 6-ER-987-1001. The Forest Service received over 1,000 comments on the Draft EA. 8-ER-1541.

After the Cedar Creek Fire burned through a portion of the Project area, the Forest Service presented information "the brevity and clarity" of which "was impressive," at a public meeting before issuing the Final EA. *See supra* Stmt. of the Case § B.3.c. Aside from reducing the size of the proposed action in the Draft EA to the Final EA, the proposed activities and analysis of effects in the reduced area in the Final EA remained similar to those proposed in the Draft EA. *See* 8-ER-1532-1535 (explaining changes between Draft EA and Final EA). Thus, comments on the Draft EA regarding the types and effects of the authorized activities remained the same (e.g., effects of condition based management to implement overstory thinning). And after issuing the Final EA, the Forest Service received and considered objections to the Final EA and draft DN/FONSI, including objections "based on new information that arose after the opportunities for comment." 7-ER-1349. Plaintiff participated in this objection process and has identified no issues it could not raise during that process. *See* 8-ER-1380-1471. Only after consideration of these comments and objections did the Forest Service approve the Project. This

substantial public participation satisfied NEPA.  *See Cal. Trout v. FERC*, 572 F.3d 1003, 1017 (9th Cir. 2009) ("[T]he level of participation required by NEPA's implementing regulations is not substantial.").  The district court therefore correctly rejected Plaintiff's claim that the Forest Service violated NEPA by not reopening the public comment period on the Draft EA after the Cedar Creek Fire.  1-ER-13-14.

Rather than address these flaws in its NEPA claim, Plaintiff argues on appeal that the Forest Service was required "to reopen the *APA* public comment period." *See* Brief 34 (emphasis added).  In doing so, Plaintiff shifts the asserted source of its claim away from NEPA and onto the APA.  Although Plaintiff forfeited any claim based on the APA's notice and comment requirement by not asserting it in the district court, any such claim would fail for a basic reason: that requirement and the cases Plaintiff cites address rulemaking under 5 U.S.C. § 553, but the Project was not a rulemaking.  *See Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994) (explaining general prospective nature of a "rule" and that an "adjudication" under the APA "is virtually any agency action that is not a rulemaking.").  As such, § 553 does not apply to the Project and cannot be the source of any claim under the APA that the opportunities for public participation on the Project were somehow unlawful.[11]  The Forest Service satisfied NEPA by providing

---

[11] Forest Service regulations provide for notice, comment, and objection procedures for "projects and activities implementing land and resource management plans," like

the public with sufficient environmental information to foster public participation and informed decision-making, and Plaintiff's attempt to recast this claim on appeal fails.

**D.   The FONSI was not arbitrary or capricious.**

Under NEPA, "an agency may prepare an EA to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS." *Blue Mountains Biodiversity Proj. v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998).   "Whether an action 'significantly' affects the environment requires analyzing both 'context' and 'intensity.'" *Wild Wilderness v. Allen*, 871 F.3d 719, 727 (9th Cir. 2017) (citing 40 C.F.R. § 1508.27 (2017)). "Context refers to the setting in which the proposed action takes place," *Ocean Advoc. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005) (citing 40 C.F.R. § 1508.27(a) (2005)).   "Intensity means 'the severity of the impact.'" *Id.* (quoting 40 C.F.R. § 1508.27(b) (2005)).   "[T]he regulations identify ten factors that agencies should consider in evaluating intensity." *In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1068 (9th Cir. 2014)  (citing  40  C.F.R.  § 1508.27(b)(1)-(10)  (2014)).    An  agency  can "reasonably rel[y] on its own expert reports and technical expertise in concluding

---

the Project.  36 C.F.R. § 218.1; *see generally* 36 C.F.R. pt. 218.  The Forest Service fully complied with these regulations, and Plaintiff brought no claim alleging otherwise.

that the impact of the project would be insignificant." *Bark v. Northrop*, 607 F. App'x 652, 655 (9th Cir. 2015). A FONSI "may be overturned only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Anderson v. Evans*, 371 F.3d 475, 486 (9th Cir. 2004).

The Forest Service considered the context and intensity of the Project as assessed in the Final EA and additional "documentation in the project record," and concluded that preparation of an EIS was not needed because the Project would not "have a significant effect on the quality of the human environment." 9-ER-1669. The FONSI and supporting documents fully explain the basis for this conclusion, 9-ER-1669-1682, providing the "convincing statement of reasons" that NEPA requires, *Native Ecosys. Council*, 428 F.3d at 1239 (citation omitted). Plaintiff focuses on three intensity factors to argue otherwise. Brief 36 (citing 40 C.F.R. 1508.27(b)(2), (4), (5)).[12] None of Plaintiff's arguments has merit, much less provides a basis for second-guessing the agency's reasoned finding that an EIS was not warranted.

---

[12] Without citing the applicable intensity factor, Plaintiff also suggests an EIS was required because the "Project area is home to several ESA-listed species." Brief 42. But this argument ignores that it is not the presence of ESA-listed species that determines a project's significance; it is the *degree of any effect* of a project on the species as a whole. *See EPIC*, 451 F.3d at 1010, 1012; *see* 40 C.F.R. § 1508.27(b)(9). The record shows that there would be no significant effects on ESA-listed species, 9-ER-1677-1681, and Plaintiff does not argue otherwise.

### 1. Public health and safety

First, relying on 40 C.F.R. § 1508.27(b)(2), which provides for consideration of the "degree to which the proposed action affects public health or safety," Plaintiff maintains that any project "designed in large part to protect the public from high-intensity wildfire" requires preparation of an EIS. Brief 37. This is clearly wrong, as the Ninth Circuit has routinely upheld FONSI's for forest restoration projects like the Project that are intended to improve forest resiliency and reduce the risk of catastrophic wildfire. *See, e.g.*, *Native Ecosys. Council*, 428 F.3d at 1236 (upholding FONSI for thinning and prescribed burning project "designed to reduce the potential for a large-scale, high intensity, stand-replacing fire in the [project] vicinity."); *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1215, 1217-20 (9th Cir. 2017) (upholding FONSI for "forest restoration project" with "commercial timber harvest treatments, road maintenance, stream restoration, and culvert replacements."); *Hapner v. Tidwell*, 621 F.3d 1239, 1244 (9th Cir. 2010) (upholding EA for forest restoration project the primary purpose of which was to reduce "the risk of wildfires to local residents").

Plaintiff asks the Court to ignore these cases because "there is no indication the plaintiffs" argued that beneficial effects required preparation of an EIS. Brief 38. Stated differently, under Plaintiff's view, had the issue been raised in those cases, an EIS would have been required because every forest restoration project

54

intended to reduce wildfire intensity and severity (i.e., promote public health and safety) requires an EIS.

Plaintiff's argument runs headlong into CEQ's 2024 amended NEPA regulations. Although this Court had not previously addressed "whether NEPA requires an agency to prepare an EIS when an action has a significant *beneficial* impact but no significant *adverse* impact on the environment," *Humane Society of the United States v. Locke*, 626 F.3d 1040, 1056 (9th Cir. 2010), CEQ's 2024 amended NEPA regulations resolved the issue by explaining that "significant effects" refers only to "*adverse* effects." 40 C.F.R. § 1508.1(mm) (2024) (emphasis added). Because these regulations make clear that there is no degree of beneficial effect that is, by itself, grounds for requiring the agency to prepare an EIS, Plaintiff's argument fails. But even if the Court disregards the 2024 amended regulation, which postdates the action under review, and assumes that beneficial effects can be "significant" under NEPA, Plaintiff's argument ignores that projects having beneficial impacts do not always have sufficiently serious effects on the human environment to require an EIS under NEPA.

For example, *Locke* held that the beneficial impacts to salmonids from removing sea lions "does not demonstrate a significant beneficial impact on the human environment" under NEPA despite the agency finding that sea lions were "having a significant negative impact on listed salmonid populations" under the

Marine Mammal Protection Act. 626 F.3d at 1056; *see also Cascade Forest Conservancy v. U.S. Forest Serv.*, 577 F. Supp. 3d 1163, 1187 (W.D. Wash. 2021), *aff'd*, No. 22-35087, 2022 WL 10964667 (9th Cir. Oct. 19, 2022) ("Neither federal regulations, nor case law support Plaintiffs' claim that an EIS must be prepared for all projects intended to benefit public health and safety."); *Decker v. U.S. Forest Serv.*, 780 F. Supp. 2d 1170, 1178-79 (D. Colo. 2011) (upholding FONSI for project designed to reduce hazardous fuels, enable fire suppression, and protect public safety by harvesting beetle-infested trees because "an agency's determination that a project will generate some beneficial effects does not necessarily mean the project will have a 'significant' impact so as to require a full EIS under NEPA."). Likewise, here, although the Project will reduce wildfire intensity and provide protections within the WUI, the Forest Service reasonably determined that its potential effects on the human environment do not rise to the level requiring an EIS. Plaintiff cannot and has not shown that an EIS is required simply because a project is intended to protect the public by reducing wildfire intensity and improving the ability of firefighters to respond to wildfire. Indeed, any such holding would severely hamstring the Forest Service's ability to proactively develop and implement projects that are intended to protect the public from the ever-increasing intensity and severity of wildfire.

### 2. Highly controversial effects

An agency must also consider whether the "degree to which the effects on the

quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4). Mere opposition to an agency action does not make it highly controversial. *Earth Island Inst. v. Muldoon*, 82 F.4th 624, 637 (9th Cir. 2023) (citations omitted). Instead, "[a] project is highly controversial if there is a substantial dispute about its size, nature, or effect." *Id.* (citations omitted).

Plaintiff maintains that the effectiveness of thinning to reduce wildfire intensity is always highly controversial because *Bark v. U.S. Forest Service*, 958 F.3d 865 (9th Cir. 2020), "calls into question the efficacy of fuel reduction [as] a fire-prevention strategy at a basic level." Brief 41. *Bark* does no such thing. Instead, the court in *Bark* faulted the Forest Service for not explaining why the variable density thinning at issue in that case, which would thin "selected trees of all sizes" throughout the project area, was not highly controversial in light of what the court described as "considerable scientific evidence" and "[s]ubstantial expert opinion" in the record disputing the efficacy of such an approach to reduce wildfire intensity. *Id.* at 870.

Here, Plaintiff points to no similar evidence to question the Forest Service's reasoned conclusion that the Project's combination of understory thinning, overstory treatments, and fuels reduction activities will improve the resiliency of the forest, reduce the intensity of wildfires in the area, and facilitate firefighters' ability to effectively respond to wildfire. Indeed, to support the supposed highly

controversial effects of the Project, Plaintiff cites only to its own comments. Brief 39 (citing 6-ER-1115). Those comments, however, reference no scientific studies or expert opinions, and instead include general statements as to the Project's efficacy based on the commenter's "three years experience and training in fire behavior and as a wildland firefighter on a helitack crew from 1980 to 1982." 6-ER-1115. These statements fall far short of the considerable scientific evidence or substantial expert opinion *Bark* requires.

Moreover, even if Plaintiff had provided any such evidence or opinion, the Forest Service fully supported the Project's efficacy through reliance on the relevant scientific literature and well-established modeling of fire behavior. As the Forest Service explained:

> a large amount of research has assessed the effectiveness of fuel treatments on changing fire behavior and fire severity, both empirically (Pollet and Omi 2002; Prichard et al. 2020) and using simulation modelling (Johnson et al. 2011). Current evidence suggests that a combination of mechanical thinning, followed by prescribed fire will restore important forest vegetation characteristics, increase resilience to wildfires, and decrease fire hazard (Skinner 2005; Schwilk et al. 2009; Kalies and Kent 2016; Prichard et al. 2020).

SER-83. And as the Forest Service further explained in response to comments:

> Although there is evidence that overstory thinning without treatment of the surface fuels could increase fire hazard through changes in microclimate (surface wind speed and fuel moisture) and increases in surface fuel loading from slash (Weatherspoon 1996; Stone et al. 2008; Whitehead et al. 2008), a combined surface fuel treatment as proposed by this project should result in an overall reduction in expected fire behavior and fire severity (Agee and Skinner 2005). Both empirical

evidence and fire behavior modelling suggest that the differences in dead fuel moisture and wind speed between untreated and thinned stands are either non-existent or so minor that their effects on potential fire behavior may be inconsequential (Faiella and Bailey 2007; Bigelow and North 2012). These findings are corroborated by substantial evidence indicating that a combination of mechanical thinning, followed by prescribed fire is the most effective means of decreasing fire behavior and fire severity (Schwilk at al. 2009; Prichard et al. 2020) and observations of fire behavior dramatically decreasing when moving from closed canopy conditions into fuels treatments with open, thinned canopies (Graham et al. 2009; Hudak et al. 2011; Kennedy and Johnson 2014; Johnson and Kennedy 2019).

SER-85-86; *see generally* SER-76-122 (fire and fuels report assessing effects on fuels in relation to fire behavior, discussing intensity factors, and citing relevant scientific literature); SER-21-75 (silviculture report assessing effects on forest).

Plaintiff cites no evidence, much less substantial scientific evidence, that questions the Forest Service's approach or suggests the effects of the Project are highly controversial. As such, *Hapner* is controlling. There, the court found that the effects of thinning and other actions to reduce likely fire intensity were supported by studies and modeling and were not highly controversial. 621 F.3d at 1244-45. The same is true here. *See also EPIC*, 451 F.3d at 1016-17 (upholding EA explaining "that all project logging will be accompanied by fuels treatment [and] citing studies that have, in the agency's view, shown thinning combined with prescribed fire/fuels treatment has yielded the best results in preventing catastrophic wildfire.").

Plaintiff seeks to avoid this conclusion by claiming that "exceptions to

NEPA's administrative exhaustion requirements" excuse it from being unable to point to substantial scientific evidence or expert opinion in the record questioning the efficacy of the Project in reducing wildfire severity. Brief 39. This argument is misplaced for two reasons. First, the Forest Service does not argue that Plaintiff forfeited this issue by not raising it during the administrative process. Plaintiff generally raised the issue but has not identified anything in the record supporting its claim that the Project's effects are highly controversial.[13] And, even if Plaintiff could, as discussed above, the Forest Service fully explained the science and modeling supporting the Project's efficacy.

Second, *Bark* does not mechanically apply to establish highly controversial effects for all projects that employ thinning to reduce fire intensity, as Plaintiff claims. Brief 40. *Muldoon* makes that clear. There, the court explained that the literature submitted by the plaintiff "as evidence of scientific disagreement" did "not criticize thinning of the sort contemplated by the Project." 82 F.4th at 638. To the

---

[13] Plaintiff effectively asks the Court to take judicial notice of unidentified comments and studies in the administrative record in *Bark*. But Plaintiff never sought to supplement the administrative record with those materials in the district court, and Plaintiff makes no attempt to satisfy any of the narrow exceptions to the general rule that limits judicial review to the administrative record before the agency. *See Lands Council v. Powell*, 395 F.3d 1019, 1029-30 (9th Cir. 2005) (noting rule and exceptions); *All. for Wild Rockies v. Probert*, 412 F. Supp. 3d 1188, 1198 (D. Mont. 2019) ("Fundamentally, a party cannot circumvent the rules governing record supplementation by asking for judicial notice rather than supplementation." (quotation omitted)). Any attempt to do so now is improper.

contrary, one of the cited papers supported the project, "concluding that although the efficacy of thinning alone as a fuel reduction treatment is questionable and site dependent, there exists widespread agreement that *combined* effects of thinning plus prescribed burning consistently reduces the potential for severe wildfire across a broad range of forest types and conditions." *Id.* at 638. As noted above, the Forest Service provided the same explanation here.

The court then expressly rejected the argument that *Bark* "compels us to conclude that thinning of the sort at issue here is highly controversial." *Id.* at 639. In doing so, the court emphasized that the project imposed diameter caps on the trees to be thinned and provided for post-thinning prescribed burns. *Id.* at 640. The Project does the same, (8-ER-1641, 8-ER-1550), and Plaintiff's claim that *Bark* mandates an EIS anytime a project employs thinning to reduce wildfire severity is wrong.

### 3. Highly uncertain effects

Third, Plaintiff incorporates its hard-look arguments regarding condition-based management to argue that the Project's potential effects are "highly uncertain" under 40 C.F.R. § 1508.27(b)(5). Brief 38. But these "regulations do not anticipate the need for an EIS anytime there is *some* uncertainty, but only if the effects of the project are 'highly' uncertain." *EPIC*, 451 F.3d at 1011. As the FONSI explains, the Project does not present any highly uncertain effects because it authorizes

activities that "are typical of those successfully implemented in the past on National Forest System lands, including the Okanogan-Wenatchee National Forest." AR12846. Plaintiff's claim to the contrary continues to misunderstand the Project. As detailed in section B.1 above, the potential effects are not highly uncertain. The Final EA details the types of authorized treatments, the specific prescriptions that apply to those treatments, and an estimated timeline for their implementation. It then assesses the maximum potential effect of implementation of the authorized treatments. Nothing about this is highly uncertain, and this factor does not support preparation of an EIS.[14]

In short, the FONSI considered the Project's context and intensity and reasonably determined that no EIS was required. This finding was fully supported by the record and was not arbitrary or capricious. It should be upheld. And even if Plaintiff could show that the FONSI was arbitrary or capricious (which it cannot), the proper remedy would be to remand for the agency to consider whether a revised EA or an EIS was appropriate, not to require preparation of an EIS.[15]

---

[14] Citing 40 C.F.R. § 1508.27(b)(7), Plaintiff also argues in passing that "[t]hese uncertainties are magnified by the Final EA's failure to discuss Midnight." Brief 39. As discussed above, however, the Final EA was not required to speculate as to the potential effects of that inchoate project.

[15] *See Ctr. for Biological Diversity v. Nat'l Hwy. Traffic Safety Admin.*, 538 F.3d 1172, 1179 (9th Cir. 2008) (noting where "there is uncertainty over whether the proposed project may have a significant impact, including uncertainty caused by an incomplete administrative record or an inadequate [environmental assessment]," a

## CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.

Respectfully submitted,

/s/ *Shaun M. Pettigrew*

TODD KIM
*Assistant Attorney General*
RACHEL HERON
ANDREW M. BERNIE
SHAUN M. PETTIGREW
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
c/o NOAA, Damage Assessment
7600 Sand Point Way, NE
Seattle, WA 98115
(202) 532-5973
shaun.pettigrew@usdoj.gov

Dated: August 2, 2024
DJ# 90-1-4-16942

---

court "should ordinarily remand for the agency to either prepare a revised [assessment] or reconsider whether an EIS is required."); *San Luis Obispo Mothers for Peace v. NRC*, 449 F.3d 1016, 1035 (9th Cir. 2006) (explaining that ordering the agency to prepare an EIS fails to recognize that it still has "a wide variety of actions it may take on remand.").

63

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Appellees state that they are not aware of any related cases.

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)**        23-55801.

I am the attorney or self-represented party.

**This brief contains 13,898 words,** excluding the items exempted by Fed. R.

App. P. 32(f). The brief's type size and typeface comply with Fed. R. App.

P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ]   complies with the word limit of Cir. R. 32-1.

[ ]   is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ]   is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5),
Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ]   is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.


[]   complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select
only one)*:

[ ]   it is a joint brief submitted by separately represented parties;

[] a party or parties are filing a single brief in response to multiple briefs; or

[ ]   a party or parties are filing a single brief in response to a longer joint brief.

[ ]   complies with the length limit designated by court order dated _____.

[]   is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature**   s/ *Shaun M. Pettigrew*

**Date**        August 2, 2024

# ADDENDUM

National Environmental Policy Act

    42 U.S.C. § 4332.................................................................................1a

NEPA Regulations

    40 C.F.R. § 1501.4 (1978) .............................................................3a
    40 C.F.R. § 1501.7 (1978) .............................................................3a
    40 C.F.R. § 1502.14 (1978) ...........................................................4a
    40 C.F.R. § 1508.9 (1978) .............................................................4a
    40 C.F.R. § 1508.27 (1978) ...........................................................4a
    40 C.F.R. § 1508.1(mm) (2024) ....................................................6a

# NATIONAL ENVIRONMENTAL POLICY ACT

**42 U.S.C. § 4332 (2022). Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts**

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, and shall accompany the proposal through the existing agency review processes;

(D) Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

(i) the State agency or official has statewide jurisdiction and has the responsibility for such action,

(ii) the responsible Federal official furnishes guidance and participates in such preparation,

(iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

(iv) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(F) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(G) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(H) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(I) assist the Council on Environmental Quality established by subchapter II of this chapter.

2a

# NEPA REGULATIONS

## 40 C.F.R. § 1501.4 (1978). Whether to prepare an environmental impact statement.

In determining whether to prepare an environmental impact statement the Federal agency shall:

(a) Determine under its procedures supplementing these regulations (described in § 1507.3) whether the proposal is one which:

(1) Normally requires an environmental impact statement, or

(2) Normally does not require either an environmental impact statement or an environmental assessment (categorical exclusion).

(b) If the proposed action is not covered by paragraph (a) of this section, prepare an environmental assessment (§ 1508.9). The agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments required by § 1508.9(a)(1).

(c) Based on the environmental assessment make its determination whether to prepare an environmental impact statement.

(d) Commence the scoping process (§ 1501.7), if the agency will prepare an environmental impact statement.

(e) Prepare a finding of no significant impact (§ 1508.13), if the agency determines on the basis of the environmental assessment not to prepare a statement.

. . . .

## 40 C.F.R. § 1501.7 (1978). Scoping.

There shall be an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action. This process shall be termed scoping. . . .

**40 C.F.R. § 1502.14 (1978). Alternatives including the proposed action.**

This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (§ 1502.15) and the Environmental Consequences (§ 1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. . . .

**40 C.F.R. § 1508.9 (1978). Environmental assessment.**

*Environmental assessment:*

(a) Means a concise public document for which a Federal agency is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

**40 C.F.R. § 1508.27 (1978). Significantly.**

*Significantly* as used in NEPA requires considerations of both context and intensity:

(a) ***Context.*** This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) *Intensity.* This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

**40 U.S.C. § 1508.1 (2024). Definitions.**

The following definitions apply to the regulations in this subchapter. Federal agencies shall use these terms uniformly throughout the Federal Government.

. . . .

(mm) ***Significant effects*** means adverse effects that an agency has identified as significant based on the criteria in § 1501.3(d) of this subchapter.

. . . .