**No. 24-1422**

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

NORTH CASCADES CONSERVATION COUNCIL,

Plaintiff-Appellant,

v.

UNITED STATES FOREST SERVICE, and KRISTIN BAIL,

Defendants-Appellees.

_____

On Appeal from the United States District Court for the Eastern District of
Washington, Case No. 2:22-cv-00293-SAB, Hon. Stanley A. Bastian

_____

BRIEF *AMICUS CURIAE* OF AMERICAN FOREST RESOURCE COUNCIL IN
SUPPORT OF DEFENDANTS-APPELLEES

_____

Sarah Melton, Ore. Bar #227050
Sara Ghafouri, Ore. Bar #111021
American Forest Resource Council
700 N.E. Multnomah, Suite 320
Portland, Oregon 97232
(503) 222-9505
smelton@amforest.org
sghafouri@amforest.org

Attorneys for *Amicus Curiae*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1(a), *amicus curiae* American Forest Resource Council, an Oregon non-profit corporation, states that it has no parent companies and that no publicly-held corporations own any of its stock.

Dated this 9th day of August, 2024.

Respectfully submitted,

<u>/s/ Sarah Melton</u>
Sarah Melton, Ore. Bar #227050
American Forest Resource Council
700 N.E. Multnomah, Suite 320
Portland, Oregon 97232
(503) 222-9505
smelton@amforest.org

Attorney for *Amicus Curiae*

# **TABLE OF CONTENTS**

I.    IDENTITY AND INTEREST OF *AMICUS CURIAE*....................................1

II.    FACTUAL BACKGROUND ........................................................5

III.   STANDARD OF REVIEW..........................................................11

IV.   ARGUMENT........................................................................13

    A.    Condition-Based Management Complies With NEPA ......................13

    B.    The Forest Service's "Maximum Effects" Analysis Complies with NEPA.........................................................................20

V.    CONCLUSION ........................................................................27

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*All. for the Wild Rockies v. Bradford*,
856 F.3d 1238 (9th Cir. 2017) ...........................................................11

*Burlington Truck Lines v. United States*,
371 U.S. 156 (1962)..........................................................................12

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971), *overruled on other grounds by Califano v.
Sanders*, 430 U.S. 99 (1977)..............................................................12

*Ctr. for Biological Diversity, et al. v. U.S. Forest Serv., et al.*,
No. 9:23-cv-00110-DLC-KLD (D. Mont.).........................................26

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
807 F.3d 1031 (9th Cir. 2015) ...........................................................12

*Idaho Sporting Cong., Inc. v. Rittenhouse*,
305 F.3d 957 (9th Cir. 2002) .............................................................11

*John Muir Project of Earth Island Inst., et al. v. U.S. Forest Serv., et
al.*,
No. 2:24-cv-00909-TLN-JDP (E.D. Cal.) ..........................................26

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) (en banc), *overruled on other
grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7
(2008)..........................................................................................11, 12

*Los Padres ForestWatch v. U.S. Forest Serv.*,
25 F.4th 649 (9th Cir. 2022) ..............................................................13

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989).............................................................................12

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.
Co.*,
463 U.S. 29 (1983) ............................................................................12

*N. Alaska Env't Ctr. v. Kempthorne*,
  457 F.3d 969 (9th Cir. 2006) ...................................................................16

*Or. Nat. Desert Ass'n v. Rose*,
  921 F.3d 1185 (9th Cir. 2019) ............................................................13

*Protect Our Cmtys. Found. v. Jewell*,
  825 F.3d 571 (9th Cir. 2016) ..............................................................18

*Se. Alaska Conservation Council v. U.S. Forest Serv.*,
  443 F.Supp.3d 995 (D. Alaska 2020) ....................................23, 24, 25

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
  608 F.3d 592 (9th Cir. 2010) ...............................................................16

*WildEarth Guardians v. Conner*,
  920 F.3d 1245 (10th Cir. 2019) ...............................................*passim*

**Statutes**

5 U.S.C. § 706 ........................................................................................11

16 U.S.C. § 6591c ..................................................................................10

16 U.S.C. § 6591c(b) .............................................................................10

16 U.S.C. § 6591c(d)(4)(A) ...................................................................10

**Other Authorities**

Fed. R. App. P. 29(a)(4)(E).......................................................................1

## I.  IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

*Amicus Curiae* American Forest Resource Council ("AFRC") is a regional trade association representing over 50 forest product businesses and forest landowners.  AFRC advocates for sustained-yield timber harvests on public timberlands throughout the West to enhance forest health and resistance to fire, insects, and disease.  AFRC and its members advocate before federal and state agencies, legislatures, the public, and the courts.

One of AFRC's primary purposes is to advance its members' interests in maintaining a reliable and sustainable supply of timber for their facilities from federal lands managed by the U.S. Forest Service ("Forest Service") and the Bureau of Land Management ("BLM").  SER-5 (Decl. of Tom Partin ("Partin Decl.") ¶ 4).  Many of AFRC's members rely on federally managed timber, including lands managed by the Okanogan-Wenatchee National Forest, because they do not own their own private forestlands and, therefore, purchase timber from national forests to supply their mills.  SER-4 (Partin Decl. ¶ 3).  AFRC and its members actively work with federal agencies and participate in federal agency

---

[1] No party's counsel authored this brief in whole or in part.  No party or party's counsel contributed money that was intended to fund preparing or submitting this brief.  No person—other than *Amicus* and its members—contributed money that was intended to fund preparing or submitting this brief.  *See* Fed. R. App. P. 29(a)(4)(E).  All parties consent to the filing of this *Amicus Curiae* brief.  Ninth Cir. R. 29-2(a).

decision-making involving the protection, allocation, and management of federal timber in Washington state. AFRC actively works to improve federal and state laws, regulations, and policies regarding access to and the management of public forest lands. AFRC has a strong interest in improving forest health, particularly in areas that are at risk of catastrophic wildfire events. SER-12 (Partin Decl. ¶ 20). Therefore, AFRC strongly supports the Forest Service's use of all available forest management methods to reduce wildfire risk and improve forest health.

Plaintiff-Appellant North Cascades Conservation Council challenges the Twisp Restoration Project ("Twisp Project") on the Okanogan-Wenatchee National Forest. The Twisp Project promotes forest health and mitigates the risk of wildfire in the Wildland Urban Interface ("WUI"), while also supporting local communities who rely on a thriving timber industry. AFRC and our members have an interest in maintaining forest health and mitigating wildfire risk and strongly support the Twisp Project. One of AFRC's members, Hampton Lumber, is the purchaser of two contracts that will implement a portion of the Twisp Project—the Lookout Stewardship contract and the Woodpecker DxP Timber Sale.

This appeal centers on the Forest Service's use and analysis of condition-based management in the Twisp Project's Final Environmental Assessment ("EA"), which the Forest Service prepared under the National Environmental Policy Act ("NEPA"). Op. Br. at 2 (Dkt. #6). The Forest Service's use of

condition-based management is consistent with NEPA. Condition-based management provides flexibility to land managers, like the Forest Service, to make landscape-scale decisions based on current, on-the-ground forest conditions. SER-11 (Partin Decl. ¶ 18). The Forest Service's ability to make time sensitive forest management decisions on a flexible basis is crucial to forest management practices, in part because the surveys conducted under NEPA can take a significant amount of time and resources, and site conditions may change prior to project implementation. 2-ER-138 (Decl. of Kris McCall ("McCall Decl.") ¶ 19).

AFRC strongly advocates for the Forest Service's use of condition-based management because it can be used to employ a landscape-scale approach to minimize the risk of catastrophic wildfire events, insect infestations, and disease epidemics. Condition-based management is not a new or novel forest management approach. The Forest Service, as well as other government agencies like the BLM, has a history of using adaptive or condition-based forest management approaches. 2-ER-138 (McCall Decl. ¶ 19); SER-11–12 (Partin Decl. ¶ 19) (identifying six Forest Service projects that rely on condition-based management). Condition-based management has been used in various Forest Service projects, including the North Fork Stillaguamish and Snoquera Landscape Analysis Projects on the Mount Baker-Snoqualmie National Forest; the Upper Wenatchee Pilot Project on the Okanogan-Wenatchee National Forest; the Mud Creek and Gold Butterfly Projects

on the Bitterroot National Forest; the End of the World Project on the Nez Perce-Clearwater National Forest; and the Mid Swan Project on the Flathead National Forest. 2-ER-137–138 (McCall Decl. ¶ 19); SER-11–12 (Partin Decl. ¶ 19).

AFRC's fundamental concern here is that Plaintiff-Appellant seeks to prevent the Forest Service from relying upon condition-based management, which has broad implications beyond the Twisp Project. 1-ER-17. Flexible management approaches, like condition-based management, allow for a more tailored approach to improving overall forest health and decreasing the risk of catastrophic wildfires. Plaintiff-Appellant argues that the Twisp Project's "use of condition-based management, combined with its lack of monitoring strategy, eliminates meaningful analysis of the [Twisp] Project's direct, indirect, or cumulative effects." Op. Br. at 14. AFRC fundamentally disagrees with Plaintiff-Appellant's assertion that condition-based management is inconsistent with NEPA. For that reason, this *amicus curiae* brief will address the following two points: (1) condition-based management is consistent with NEPA because the site-specific criteria outlines when certain treatments will occur; and (2) condition-based management, combined with a "maximum effects" analysis, is consistent with NEPA because it provides the public with a complete understanding of the Twisp Project's environmental effects.

## II.    FACTUAL BACKGROUND

The Twisp Project is located in the Methow Valley Ranger District on the Okanogan-Wenatchee National Forest.  9-ER-1658.  The 24,140-acre project area "has experienced fire exclusion and timber harvest over the past century that has caused substantial changes to forest vegetation, including conifer encroachment, increased tree density and shade-tolerant species, decreased forest health, and greater vulnerability to disturbances including wildfires, insect and disease outbreaks, and projected climate change impacts."  *Id.*  These changed conditions have resulted in wildlife habitat deterioration, loss of habitat for old-growth dependent species, and increased wildfire risk to lands adjacent to areas that the Okanogan County Community Wildfire Protection Plan has identified as a WUI. *Id.*

In June 2019, an interdisciplinary team ("IDT") led the Twisp Project's initial development.  5-ER-836.  The IDT evaluated the conditions of the Twisp Project area based on parameters set forth in the 2012 Forest Restoration Strategy for the Okanogan-Wenatchee National Forest ("Restoration Strategy").  5-ER-770. The Restoration Strategy "outline[d] a set of procedures to assess a landscape for departures from the natural range of variability."  *Id.*  Relying on the methods of evaluation set forth in the Restoration Strategy, the Forest Service identified five "needs" that would return the Twisp Project area to its desired conditions:

5

(1) "[p]rotect and maintain aquatic, riparian, and hydrologic resources and restore areas impacted by past management";

(2) "[m]odify vegetation structure, composition, and patterns to develop, maintain, or restore healthy stand structures in the project area that respond to disturbances such as wildfire and climate change in a resilient manner and are consistent with historic and future ranges of variability";

(3) "[p]rotect, develop, and/or enhance late and old forest stands for wildlife species dependent on them and reduce the risk of large-scale habitat loss to fires by increasing resilience of habitats to wildfire";

(4) "[m]odify the structure, composition, and patterns of forest stands within and adjacent to the WUI to reduce and/or maintain fire intensity and the risk of crown fire initiation and enable the use of more direct firefighting strategies to protect life and personal property"; and

(5) "[p]rovide a transportation system that is affordable, safe, and efficient for administration, public use, and protection of [National Forest System] lands while also providing access for forest management."

8-ER-1537–39.

The Forest Service developed the Twisp Project with significant input from other government agencies, the public, and community collaborative groups. 8-ER-1540–42. On November 5, 2019, the Forest Service sent consultation letters to the Confederated Tribes of the Colville Reservation, the Yakama Nation, and Okanogan County Commissioners. 8-ER-1540. The Confederated Tribes of the Colville Reservation and the Yakama Nation both provided feedback. *Id.* In fact, the Yakama Nation voiced their support for the Twisp Project due to its beneficial impacts on fish habitat. *Id.* Furthermore, BLM, the Washington State Department of Fish and Wildlife, and the Washington State Department of Natural Resources have consulted and engaged in discussions with the Forest Service since late 2019. 8-ER-1540–41. During the planning process, the Forest Service gave a

presentation to the public and the North Central Washington Forest Health Collaborative ("NCWFHC"). 7-ER-1326; 8-ER-1390. NCWFHC is a community collaborative group comprised of diverse members, ranging from environmental organizations to timber industry representatives that work to promote forest management activities. SER-6 (Partin Decl. ¶ 7). NCWFHC submitted comments during the planning process, acknowledging that "the magnitude and scale of treatments authorized for the Twisp Restoration Project reflected an understanding of the needs present on the landscape, balanced with site-specific conditions" and "was overall supportive of the Forest Service's commitment to treating the landscape as a whole." SER-6–7 (Partin Decl. ¶ 8).

The Forest Service published a Schedule of Proposed actions and, on November 12, 2019, sent scoping letters to 368 individuals, agencies, and groups, receiving 55 comment letters. 8-ER-1542. After issuing the Draft EA, the Forest Service again encouraged public participation (by sending notices to 448 individuals, agencies, and groups) and provided a two-month comment period from October 2, 2020 to December 18, 2020, ultimately receiving 1,029 comments. *Id.* Overall, the Forest Service provided robust public engagement throughout the planning process.

In August 2021, prior to the completion of the Final EA, the Cedar Creek Fire burned the northern part of the proposed Twisp Project area. 8-ER-1533. In

7

response to the Cedar Creek Fire and public comments, the Forest Service made the following relevant changes in the Final EA: (1) reducing the total area of the Twisp Project by 69% by dropping thinning and prescribed fire plans for a total of 24,140 acres; (2) reducing the Twisp Project's duration from 30 years to 20 years in response to concerns raised during the public comment period; and (3) reducing the maximum diameter limits to 21 inches diameter at breast height ("DBH") for overstory thinning with exceptions for trees up to 25 inches DBH in areas infected with dwarf mistletoe within 30 feet of a healthy tree that is 18 inches DBH. 8-ER-1533–34.

Table 6 in the Final EA provides details regarding the proposed action activities, including the maximum acreage of site-specific and condition-based noncommercial understory vegetation thinning, condition-based commercial overstory vegetation treatments, site-specific overstory vegetation treatments, and fuel reduction treatments. 8-ER-1551. The Forest Service identified 7,275 acres of condition-based commercial thinning in the overstory, all of which will occur on matrix lands. *Id.* This is a reduction from what was proposed in the Draft EA for condition-based management in the overstory. 6-ER-991–92 (proposing condition-based management to thin 10,840 acres of matrix lands). The Final EA provides maps that display which areas are designated for stand improvement thinning, matrix thinning, and matrix shaded fuel break thinning. 8-ER-1652. The Forest

8

Service also provided three detailed maps that break down the Twisp Project area into individual vegetation polygon numbered units. 8-ER-1653–55. Each vegetation polygon numbered unit is labeled and shaded a different color to indicate whether it will be subject to stand improvement thinning, matrix thinning, or matrix shaded fuel break thinning. *Id.*

Appendix B of the Final EA outlines the various project design features. 6-ER-1020–1057.[2] Appendix B lays out the project design features based on certain categories, including air quality, aquatic-hydrology, fuels, scenic resources, soils, transportation, vegetation, and wildlife. 6-ER-1021–1050. Moreover, Appendix A provides specific criteria for both understory thinning and overstory thinning prescriptions. 8-ER-1640–42. The thinning prescriptions are explained in further detail in Appendix A, which provides size and stand density requirements and targets for both dry and moist forest matrix areas. 8-ER-1642–43.

In the Final Decision Notice, the Forest Service selected Alternative 2 and relied on a "maximum effects" analysis for the commercial overstory thinning activity, which in turn relies on condition-based management using the criteria discussed above. 9-ER-1659. The Forest Service selected Alternative 2 because

---

[2] The Final EA's Appendix B is not provided in the Excerpts of Record or Supplemental Excerpts of Record, but this Court may take judicial notice of the Final EA's Appendix B, which is available at https://www.fs.usda.gov/project/?project=56554 (last visited Aug. 6, 2024).

condition-based management allows for flexibility in the Twisp Project area, an area that is subject to rapid environmental change and varied site conditions. 8-ER-1549; 2-ER-138 (McCall Decl. ¶ 19). A "maximum effects" analysis assumes that all conditions for thinning will be met and that all areas would be treated, even though the IDT estimates that not all these conditions for thinning will actually be present. 8-ER-1549–50.

After the Forest Service issued a Decision Notice and conducted the necessary surveys, AFRC member Hampton Lumber was awarded the Lookout Stewardship contract[3] and the Woodpecker DxP Timber Sale,[4] which will implement a portion of the Twisp Project. 2-ER-133 (McCall Decl. ¶ 10). The volume from the Lookout Stewardship contract and Woodpecker DxP Timber Sale will provide employment for workers at Hampton Lumber's Darrington mill in

---

[3] A "stewardship" contract is pursuant to 16 U.S.C. § 6591c, whereby contractors remove material that is both commercially valuable and not valuable. *See* 2-ER-133 (McCall Decl. ¶ 10). The value of the timber is then offset against payments otherwise due for forest restoration work. 16 U.S.C. § 6591c(d)(4)(A). Congress enacted authority for these contracts in order to "achieve land management goals for the national forests and the public lands that meet local and rural community needs." 16 U.S.C. § 6591c(b). Stewardship contracts allow the Forest Service to improve the vitality of a forest ecosystem and are an incredibly useful tool for the Forest Service. These contracts promote restoration of forest ecosystems while simultaneously bringing economic benefits to local communities dependent on the forest products industry.

[4] U.S. Forest Serv., *Report of Timber Sale Convertible and Nonconvertible Products (Ref. FSM 2490)*, available at https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd1152868.pdf (last visited July 23, 2024).

Snohomish County, Washington, Hampton Lumber's Randle mill in eastern Lewis County, Washington, and Hampton Lumber's various subcontractors. 2-ER-130 (McCall Decl. ¶ 5). Family-wage jobs, like the ones Hampton Lumber provides, are an essential element of the economy in rural Snohomish and Lewis Counties. *Id.* Two other timber sales associated with the Twisp Project, Coal Train Timber Sale and Rotor Wash Timber Sale, have not yet been advertised. 2-ER-134 (McCall Decl. ¶ 12). The Twisp Project's implementation would bring significant benefits to the forest ecosystem and rural communities that depend on a steady supply of federal timber.

## III.   STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo*. *All. for the Wild Rockies v. Bradford*, 856 F.3d 1238, 1242 (9th Cir. 2017). A challenge to an agency's land management decision is reviewed under the Administrative Procedure Act ("APA"), and a court "must set aside agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 964 (9th Cir. 2002) (citing 5 U.S.C. § 706); *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc), *overruled on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008). An agency action may only be reversed as arbitrary and capricious "if the agency relied on factors Congress did not intend

it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council*, 537 F.3d at 987 (internal quotation marks omitted).

The arbitrary or capricious standard is a highly deferential standard of review. *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (noting that "the ultimate standard of review is a narrow one"). In fact, an agency's decision is "entitled to a presumption of regularity," and courts may not "substitute its judgment for that of the agency." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). "This traditional deference to the agency is at its highest where a court is reviewing an agency action that required a high level of technical expertise." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1043 (9th Cir. 2015).

An agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). "An agency's determination is arbitrary and capricious where it merely

provides 'generic statements' to support its conclusion in lieu of evidence that it has actually applied its substantive expertise." *Los Padres ForestWatch v. U.S. Forest Serv.*, 25 F.4th 649, 657 (9th Cir. 2022) (quoting *Or. Nat. Desert Ass'n v. Rose*, 921 F.3d 1185, 1191 (9th Cir. 2019)).

## IV.    ARGUMENT

Plaintiff-Appellant makes two arguments regarding condition-based management in support of its NEPA claim.  First, Plaintiff-Appellant claims that condition-based management violates NEPA because it does not provide site-specific detail as to which trees will be removed within the Twisp Project area. Op. Br. at 28.  Second, Plaintiff-Appellant claims that the Forest Service's "maximum effects" analysis for the condition-based management activity (portions of the commercial overstory thinning) is insufficient because it does not provide the public with a meaningful understanding of the Twisp Project's environmental impacts.  *Id*.  As explained below, condition-based management and the Forest Service's "maximum effects" analysis is consistent with NEPA.

### A.    Condition-Based Management Complies With NEPA.

Plaintiff-Appellant attacks the Forest Service's use of condition-based management arguing that it does not provide site-specific information necessary under NEPA.  Plaintiff-Appellant claims that "there is no reason why a non-specific, uninformative approach that tells the public only what might possibly

occur would satisfy NEPA under an EA." Op. Br. at 30. But as explained below, the Forest Service provided ample information regarding the location, timing, and type of prescriptions authorized under the Twisp Project.

The Forest Service's use of condition-based management is an important approach to implementing multi-year, landscape-scale projects. The Forest Service's reliance on condition-based management for the Twisp Project is based upon site-specific criteria that dictates the conditions needed for treatment to occur. This ensures that the appropriate treatment activities occur in the necessary locations to achieve the Project's purposes and needs. Moreover, the Project's site-specific project design features include important sideboards, such as diameter limits for overstory thinning prescriptions, which "was reduced to 21" dbh with an exception to remove trees 21.1-25" dbh if they have a dwarf mistletoe rating of $\geq 2$ and are within 30 feet of a healthy tree $\geq 18$" dbh." 8-ER-1534. The Forest Service also outlined another limited exception for creating openings in the forest canopy, which would "generally [be] ½ to 1 acre in size" and "may increase to 2 acres if insect and disease issues are present as described in the Dry Forest and Moist Forest Matrix Thin prescriptions." 8-ER-1639–40. These "[o]penings would be determined on a unit-basis using the [individual trees, clumps, and openings] implementation guidelines and Eastern Washington Reference Stand Conditions." 8-ER-1640.

14

Beyond the various project design features, the Forest Service provided maps that indicate which areas are suitable for condition-based treatment. 8-ER-1653–55. The maps provide unit-by-unit locations of the treatment areas. *Id*. Of the 21,149 acres available for treatment, only 7,275 acres are suitable for commercial overstory thinning using condition-based management. 8-ER-1555. The Forest Service identified an estimated timeline of when commercial treatments would occur, noting that commercial thinning would likely occur in three phases "with each phase typically implemented over a three to five-year period, or over the next 3-7 years." 8-ER-1554.

Despite this robust information, Plaintiff-Appellant attacks the Forest Service's use of condition-based management, claiming that the Twisp Project's amount, location, and timing of commercial thinning activities cannot be predicted: "condition-based management is the epitome of uncertainty, because not even the Forest Service can explain at this time which trees will be cut under the [Twisp] Project or when cutting will occur in any given area during the [Twisp] Project's twenty-year time frame."[5] Op. Br. at 38. Plaintiff-Appellant fundamentally misunderstands condition-based management and the level of site-specificity required under NEPA.

---

[5] Plaintiff-Appellant incorrectly characterizes the Project as having a "twenty-year time frame" when, in fact, the commercial component is much shorter. 8-ER-1554.

This Court has already concluded that government agencies do not necessarily need "to do a parcel-by-parcel examination of potential environmental effects." *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 977 (9th Cir. 2006). In *Kempthorne*, the BLM allocated an area for individual natural gas and oil leases. *Id.* at 974. The BLM could not know which parcels would be leased, leading this Court to conclude that a parcel-by-parcel examination was impractical as "[s]uch effects are currently unidentifiable, because the parcels likely to be affected are not yet known." *Id.* at 977. Similarly, in *Te-Moak Tribe of West Shoshone of Nevada v. United States Department of Interior*, 608 F.3d 592, 600 (9th Cir. 2010), this Court rejected the plaintiffs' failure to take a hard look claim, holding that the BLM did not violate NEPA "by approving the Amendment without knowing the precise locations of drill sites, access roads, and other project activities." *Id*. at 601. This Court reasoned that the BLM had sufficiently analyzed impacts "in all parts of the project area and impose[d] effective avoidance and mitigation measures to account for unknown impacts." *Id.* at 600.

Plaintiff-Appellant is essentially asking this Court to force the Forest Service to provide a parcel-by-parcel analysis of the Twisp Project. But such an ask is impractical and contrary to this Court's caselaw. *See also infra* IV.B. Over the 15-year timeframe, on-the-ground conditions within the Twisp Project area can

change significantly. For example, wildfires can drastically change the conditions within a project area. *See, e.g.*, SER-9–10 (Partin Decl. ¶ 15) (explaining the fire history in the project area). During initial development of the Twisp Project, the Cedar Creek wildfire burned the northern portion of the project area and changed the on-the-ground conditions. 8-ER-1533. The Twisp Project's total acreage was reduced by 69% in response to the Cedar Creek wildfire. *Id.* Condition-based management, however, accounts for those changed conditions based on closer-in-time surveys and guidance from the Forest Service to ensure that the project design features set forth in the Final EA are followed. As work progresses, monitoring information will be provided to the public because on-the-ground conditions will be continuously evaluated. The Forest Service is "working with its partners in developing a broad monitoring strategy for implementation of the Twisp Restoration Project." 8-ER-1506. While "this strategy is still in development," it "is expected to create a monitoring partnership with collaborators and regular reporting of monitoring results." *Id.*; 2-ER-135–36 (McCall Decl. ¶ 15) (noting that NCWFHC's "Monitoring Work Group will be contracting out and/or performing the Twisp Project area monitoring").

Plaintiff-Appellant completely overlooks the fact that condition-based management allows for flexibility in responding to rapidly changing site-specific conditions. Although this Court has not addressed condition-based management

expressly, this Court has upheld an agency's use of adaptive management plans. In *Protect Our Communities Foundation v. Jewell*, 825 F.3d 571 (9th Cir. 2016), the BLM granted right-of-way permits for the construction of a wind energy project. In that case, the project's Environmental Impact Statement ("EIS") incorporated multiple mitigation measures reducing the environmental impact on wildlife. *Id.* at 577. This Court determined that "the EIS's inclusion of an adaptive-management plan, among other mitigation measures, provides flexibility in responding to environmental impacts through a regime of continued monitoring and inspection." *Id.* at 582. This Court also accepted that an adaptive-management plan can have numerous benefits because such a plan can "help to refine and improve the implementation of those measures as the Project progresses." *Id.*

The *Jewell* decision recognized that environmental conditions may continue to evolve and that an agency's ability to respond to these changes in a flexible manner is crucial. Similarly, condition-based management provides "flexibility in responding to environmental impacts" and changed forest health conditions. *Id.* The Twisp Project area is comprised of an environment that is dynamic, not static. On-the-ground conditions can rapidly change from wildfire events, insect infestations, and disease epidemics: "If adjustments to treatment units are needed, these adjustments are made within the constraints of the prior identified and analyzed range of possible forest management activities and project design

features." 2-ER-138 (McCall Decl. ¶ 19). Condition-based management accounts

for changing forest conditions and allows the Forest Service to implement a

flexible forest management strategy while remaining consistent with NEPA's

requirements.

For example, during the implementation of the Twisp Project, "[d]istrict

staff would assess the stands identified on maps in Appendix E to determine the

locations of thinning units." 8-ER-1639. Under condition-based management,

contractors (like Hampton Lumber) do not have the freedom to harvest any stands

they deem fit because that would result in a breach of the stewardship contract

agreement. 2-ER-135–36 (McCall Decl. ¶ 15) (expecting that the oversight and

administration to include "regular inspection reports by the agency to ensure the

thinning work achieves the desired trees per acre prescription"). Rather, the Forest

Service's contracting officer would conduct on-site oversight to ensure compliance

with the requirements of the Final EA and Decision Notice, including Appendix

B's project design features. The Forest Service relies on "a suite of tools to

address these fluctuating conditions, with site-specific data collection and/or field

reviews conducted before implementation to verify that these conditions on site

match those predicted and to apply decision criteria for the condition-based

treatment." 8-ER-1549. "Condition-based management does not exclude any

important analyses or authorize operators to act without supervision or

authorization." 2-ER-138 (McCall Decl. ¶ 19).

Finally, under a condition-based management approach, the Forest Service performs environmental surveys and analyses prior to any harvest activities or commercial thinning. 8-ER-1484. This agency practice ensures that treated areas fit within the criteria outlined in the Final EA. Contrary to Plaintiff-Appellant's position, condition-based management provides flexibility in responding to on-the-ground conditions, not flexibility to harvest as many trees as possible. The Forest Service is well-aware that within a project area like Twisp, conditions may rapidly change on a site-to-site basis. Thus, this adaptive approach to forest management is beneficial because the Forest Service's management is tailored to the specific needs of each stand, which leads to a healthier forest ecosystem that closely replicates the project area's historical range of variability. 2-ER-138 (McCall Decl. ¶ 19).

In sum, the Forest Service's use of condition-based management is not a novel approach and should be upheld by this Court. The Forest Service provided adequate information about the timing, location, and prescription type in a manner consistent with NEPA and this Court's caselaw.

### B. The Forest Service's "Maximum Effects" Analysis Complies with NEPA.

Plaintiff-Appellant argues that the Final EA's reliance on a "'maximum effects' analysis cannot satisfy NEPA's requirement for informed agency decision-

making."  Op. Br. at 27-28.

At least one Circuit Court has squarely addressed the issue of whether a "maximum effects" analysis complies with NEPA.  *See WildEarth Guardians v. Conner*, 920 F.3d 1245 (10th Cir. 2019).  In *WildEarth Guardians*, the Forest Service issued an EA that called for a multitude of harvesting prescriptions and treatments to combat wildfire risk in an area affected by insect outbreaks.  *Id.* at 1254.  The Forest Service's EA identified an area suitable for treatment to reduce insect infestation but did not determine the exact locations that would be treated over the 10- to-15-year project timeframe.  *Id.* at 1255.  The project area also contained 9,480 acres of mapped lynx habitat, *id.* at 1254, and the Forest Service crafted a "worst-case scenario" approach to analyze possible impacts on lynx populations.  *Id.* at 1255.  Under the "worst-case scenario approach," the Forest Service concluded that six percent of lynx habitat would be temporarily unhabitable.[6]  *Id.*  The Tenth Circuit upheld the Forest Service's EA and use of a "worst-case scenario" approach, determining that the environmental effects of whatever locations that are ultimately chosen for treatment were appropriately analyzed.  *Id.* at 1258.  The Tenth Circuit concluded that the "nature of the Project,

---

[6] Plaintiff-Appellant states "the EA assumed the entirety of the lynx habitat would be destroyed."  Op. Br. at 29 (citing *WildEarth Guardians*, 920 F.3d at 1255).  The EA actually determined that six percent of lynx habitat would be temporarily unhabitable for a ten-year period.  *WildEarth Guardians*, 920 F.3d at 1255.

which requires responding to conditions on the ground as they develop over the course of 10 to 15 years," makes such identifying the precise locations for treatment "impracticable" and, therefore, the Forest Service's reliance on the "worst-case scenario" approach was appropriate.  *Id*. at 1261.

Plaintiff-Appellant expresses concerns that the "maximum effects" analysis does not provide for adequate public participation over the Project's lifespan and urges this Court not to follow the Tenth Circuit's reasoning on a "maximum effects" analysis.  Op. Br. at 27-29.  Specifically, Plaintiff-Appellant argues that *WildEarth Guardians* is distinguishable because the Twisp Project's Final EA does not rely on a "worst-case scenario" analysis that analyzes the real maximum effects on project activities.  Op. Br. at 29.  But that argument is based on a distinction without a difference.  A "worst-case scenario" analysis assumes that *all conditions* will be met in *all locations*, such that the maximum amount of treatment (for all project activities) will occur.  Like a "worst-case scenario" analysis, a "maximum effects" analysis assumes that *all conditions* for each treatment activity will be met, and treatments will occur to the furthest extent possible.

Plaintiff-Appellant next takes issue with the Twisp Project's "exceptions," specifically the exceptions that allows for a larger diameter cap in areas with dwarf mistletoe and up to 2-acre openings in areas with insect and disease infestations. Op. Br. at 28-30.  Plaintiff-Appellant claims that these exceptions "are highly

problematic for the Forest Service's ability to either identify or analyze the [Twisp] Project's real impact[s]." *Id*. at 29. Plaintiff-Appellant fundamentally mischaracterizes the environmental effects the Forest Service evaluated under a "maximum effects" analysis. The Final EA specifically states that "[u]sing existing vegetation/fuels data, the IDT used these conditions and criteria to estimate the maximum amount of thinning and prescribed fire treatments that would be implemented using condition-based management; all analyses for this project assumed that this maximum amount would be implemented." 8-ER-1549–50. Despite Plaintiff-Appellant's claims to the contrary, this description of criteria clearly demonstrates that the Forest Service accounted for all thinning and harvesting activities, including the exception for additional removal of trees that have been infected by dwarf mistletoe. 8-ER-1560 (noting that "[a]nalyses completed for this project are based on the maximum level of treatment that could occur"). The Forest Service's maximum effects approach is overly conservative, as "the IDT expects that some of these areas would not be treated because they do not meet the decision criteria." 8-ER-1549.

Given that the Tenth Circuit's decision in *WildEarth Guardians* is identical to the circumstances in this case, Plaintiff-Appellant heavily relies on one district court decision—which is obviously not binding on this Court—that rejected the Forest Service's use of the "maximum effects" analysis. *See Se. Alaska*

23

*Conservation Council v. U.S. Forest Serv.*, 443 F.Supp.3d 995, 1013 (D. Alaska 2020). At issue in that case was the Forest Service's Prince of Wales Landscape Level Analysis Project on the Tongass National Forest, which covered 1.8 million acres and included a 15-year implementation period. *Id.* at 1000. The project's EIS relied on a "condition-based analysis approach" that would determine the exact locations of timber sales, based on site specific criteria, at a later date. *Id.* at 1002-03. The project's EIS also relied on a "maximum effects" analysis to determine the project's environmental impacts. *Id.* at 1002.

The district court's decision is distinguishable for two reasons. First, unlike the Twisp Project, the Prince of Wales Landscape Level Analysis Project's EIS did not identify the types of harvest prescriptions, any estimates of the amount of treatment, or estimates of the timing for implementation. *Id.* at 1002, 1009. Second, and more importantly, the district court declined to follow the Tenth Circuit's *WildEarth Guardians* decision because even though "the Forest Service applied an analytical framework similar to the one it used in *WildEarth Guardians v. Conner*, the difference between an EA and an EIS renders that case inapplicable." *Id.* at 1012. The difference between an EA and an EIS is important as "[a]n EA is meant to determine whether a proposed action will have a significant impact on the environment, such that an EIS is necessary." *Id.* at 1012-1013. The function of an EIS is much different as it "must compare the

24

environmental impacts of different alternatives, not just determine whether environmental impacts will occur." *Id.* at 1013. Given that the Twisp Project relies on an EA instead of an EIS, the *Southeast Alaska Conservation Council* decision is clearly distinguishable. *Id.* at 1009.

Like in *WildEarth Guardians*, the Forest Service's "maximum effects" analysis in the Twisp Project's Final EA creates a workable framework of known and expected environmental conditions and is based on site-specific data that is analyzed and disclosed throughout the NEPA process. Moreover, monitoring throughout implementation of the Twisp Project will ensure that the environmental effects of management activities do not exceed what was anticipated under the maximum effects analysis. The Forest Service will provide substantial post-implementation analysis and monitoring of the Twisp Project. 8-ER-1506. These monitoring activities incorporate the 2016 Okanogan-Wenatchee National Forest Transitional Monitoring Plan which "covers eight categories of required monitoring for 34 management plan components." 6-ER-1020. This broad monitoring strategy will "create a monitoring partnership with collaborators" and will include "regular reporting of monitoring results." 8-ER-1506. The Forest Service will directly monitor the environmental effects of the Twisp Project as it is implemented. Therefore, it is hard to see how Plaintiff-Appellant can claim that the Twisp Project is "hampered by [a] surprising lack of a developed monitoring

strategy." Op. Br. at 12.

It is important to note that the Forest Service has used a maximum effects analysis in other forest health projects, some of which are currently under litigation, including the South Plateau Area Landscape Treatment Project on the Custer-Gallatin National Forest and the Central/West Slope Project on the Plumas National Forest. *See Ctr. for Biological Diversity, et al. v. U.S. Forest Serv., et al.*, No. 9:23-cv-00110-DLC-KLD (D. Mont.); *John Muir Project of Earth Island Inst., et al. v. U.S. Forest Serv., et al.*, No. 2:24-cv-00909-TLN-JDP (E.D. Cal.). Therefore, this Court's decision will have broad ramifications on the Forest Service's ability to implement landscape-scale forest management projects, particularly projects that seek to address wildfire risk and insect and disease infestations.

Accordingly, the same "maximum effects" analysis used in *WildEarth Guardians* applies to the Twisp Project and should be upheld by this Court. The Forest Service adequately identified areas suitable for treatment and analyzed the effects based on the maximum treatment amount authorized, in compliance with NEPA. Therefore, this Court should uphold the much-needed Twisp Project.

## V.   CONCLUSION

For the aforementioned reasons, this Court should affirm the district court's

decision and allow implementation of the Twisp Project to move forward.

Respectfully submitted this 9th day of August, 2024.

/s/ Sarah Melton
Sarah Melton, Ore. Bar #227050
Sara Ghafouri, Ore. Bar #111021
American Forest Resource Council
700 N.E. Multnomah, Suite 320
Portland, Oregon 97232
(503) 222-9505
smleton@amforest.org
sghafouri@amforest.org

Attorneys for *Amicus Curiae*

## **STATEMENT OF RELATED CASES**

Counsel is aware of no related cases within the meaning of Circuit Rule 28-2.6.

DATED this 9th day of August, 2024.

/s/ Sarah Melton
Attorney for *Amicus Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  <u>24-1422</u>

I am the attorney or self-represented party.

**This brief contains 5,885 words,** including **0** words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ x ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties.
    [  ] a party or parties are filing a single brief in response to multiple briefs.
    [  ] a party or parties are filing a single brief in response to a longer joint brief.
[  ] complies with the length limit designated by court order dated _____.
[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  <u>/s/ Sarah Melton</u>            **Date** August 9, 2024

*(use "*s/[typed name]*" to sign electronically-filed documents)*

## **CERTIFICATE OF SERVICE**

I hereby certify that for Case No. 24-1422, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF on August 9, 2024.  I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED this 9th day of August, 2024.


/s/ Sarah Melton
Attorney for *Amicus Curiae*